**Nos. 25-1212, 25-1213**

———————

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

———————

NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION,

*Plaintiff-Appellant / Cross-Appellee*,

JERRY LEEMAN,

*Plaintiff*,

v.

HOWARD LUTNICK, in his official capacity as Secretary of Commerce;
NATIONAL MARINE FISHERIES SERVICE; EMILY MENASHES, in her official
capacity as Acting Assistant Administrator for Fisheries at NMFS; SAMUEL D.
RAUCH, III, in his official capacity as Deputy Assistant Administrator for
Regulatory Programs at NMFS,

*Defendants-Appellees / Cross-Appellants*.

———————

On Appeal from the U.S. District Court for the District of Maine
No. 23-cv-339
Hon. John A. Woodcock, Jr., District Judge

———————

**JOINT APPENDIX**

———————

Donald F. McGahn, II
John M. Gore
John Henry Thompson
Louis J. Capozzi, III
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
jmgore@jonesday.com
*Counsel for New England
Fishermen's Stewardship
Association*

# TABLE OF CONTENTS

**ITEM**                                                                                                    **PAGE**

District of Maine Docket Sheet ........................................................................001

Defendants' Notice of Appeal ..........................................................................013

Plaintiff's Notice of Appeal ..............................................................................016

First Amended Petition for Review and Complaint ........................................018

Declaration of David Osier ..............................................................................076

Declaration of Devyn Campbell .......................................................................081

Pentony Memorandum Approving Proposed Rule .........................................088

Janet Coit Initial Approval Email ....................................................................098

Framework Adjustment 65 Proposed Rule ......................................................100

NEFSA Comment on Proposed Rule ................................................................112

Pentony Approval Memorandum After Notice and Comment ..........................121

Janet Coit Second Approval Email ...................................................................132

Framework Adjustment 65 Final Rule...............................................................134

NOAA Organizational Handbook Transmittal No. 61 ....................................152

Pentony Career SES Paperwork .......................................................................163

Transcript of 10/29/2024 District Court Hearing ..........................................170

APPEAL,CLOSED,PAPERDOC,STANDARD

# U.S. District Court
## District of Maine (Portland)
## CIVIL DOCKET FOR CASE #: 2:23−cv−00339−JAW

NEW ENGLAND FISHERMEN'S STEWARDSHIP
ASSOCIATION v. RAIMONDO et al
Assigned to: JUDGE JOHN A. WOODCOCK, JR
Referred to: MAGISTRATE JUDGE KAREN FRINK WOLF
Cause: 28:1331 Fed. Question

Date Filed: 09/08/2023
Date Terminated: 12/31/2024
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NEW ENGLAND FISHERMEN'S
STEWARDSHIP ASSOCIATION**

represented by **JOHN HENRY THOMPSON**
JONES DAY
51 LOUISIANA AVENUE, N.W.
WASHINGTON, DC 20001
803−546−8772
Email: jhthompson@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**LOUIS JOSEPH CAPOZZI , III**
JONES DAY − WASHINGTON
51 LOUISIANA AVENUE NW
WASHINGTON, DC 20001
717−802−2077
Email: lcapozzi@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MEGAN SOWARDS NEWTON**
JONES DAY
51 LOUISIANA AVENUE, N.W.
WASHINGTON, DC 20001
202−879−3986
Email: msowardsnewton@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXIS ZHANG**
2 I STREET SE
1301
WASHINGTON, DC 20003
614−495−6282
Email: alexiszhang@jonesday.com
*TERMINATED: 06/21/2024*
*PRO HAC VICE*

**BRETT SHUMATE**
JONES DAY − WASHINGTON
51 LOUISIANA AVENUE NW
WASHINGTON, DC 20001
202−879−3835
Email: brett.a.shumate@usdoj.gov
*TERMINATED: 01/17/2025*
*PRO HAC VICE*

**JAMES BURNHAM**
KING STREET LEGAL PLLC
800 CONNECTICUT AVE., NW
SUITE 300
WASHINGTON, DC 20006
602−501−5469
Email: james@kingstlegal.com
*TERMINATED: 01/17/2025*
*PRO HAC VICE*

**Plaintiff**

**JERRY LEEMAN**
*TERMINATED: 09/22/2023*

represented by **JOHN HENRY THOMPSON**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**LOUIS JOSEPH CAPOZZI , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MEGAN SOWARDS NEWTON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXIS ZHANG**
(See above for address)
*TERMINATED: 06/21/2024*
*PRO HAC VICE*

**BRETT SHUMATE**
(See above for address)
*TERMINATED: 01/17/2025*
*PRO HAC VICE*

**JAMES BURNHAM**
(See above for address)
*TERMINATED: 01/17/2025*
*PRO HAC VICE*

V.

**Defendant**

**GINA RAIMONDO**
*In her official capacity as Secretary of Commerce*

represented by **FREDERICK H. TURNER**
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION
PO BOX 7611
WASHINGTON, DC 20044
202−305−0641
Email: frederick.turner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOHN G. OSBORN**
U.S. ATTORNEY'S OFFICE
DISTRICT OF MAINE
100 MIDDLE STREET PLAZA
PORTLAND, ME 04101
207−780−3257
Email: john.osborn2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL MARINE FISHERIES
SERVICE**

represented by **FREDERICK H. TURNER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOHN G. OSBORN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JANET COIT**
*In her official capacity as Assistant Administrator for Fisheries at NMFS*

represented by **FREDERICK H. TURNER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOHN G. OSBORN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SAMUEL D RAUCH , III**
*In his official capacity as Deputy Assistant Administrator for Regulatory Programs at NMFS*

represented by **FREDERICK H. TURNER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOHN G. OSBORN**
(See above for address)
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 09/08/2023 | 1 | COMPLAINT against All Defendants **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION, JERRY LEEMAN. (Service of Process Deadline 12/7/2023) Fee due by 9/11/2023.(jad) (Entered: 09/11/2023) |
| 09/08/2023 | 2 | CIVIL COVER SHEET. (jad) (Entered: 09/11/2023) |
| 09/11/2023 | 3 | Summons Issued as to All Defendants. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** (Attachments: # 1 NMFS summons, # 2 Raimondo summons, # 3 Coit summons)(jad) (Entered: 09/11/2023) |
| 09/12/2023 | | Reset Deadlines : Filing Fee due by 9/15/2023. (jad) (Entered: 09/12/2023) |
| 09/13/2023 | | Filing Fee Received from JERRY LEEMAN: Amount Paid: 402.00. Receipt Number: AMEDC−2851982. Method of Payment: credit card. Purpose of Payment: Filing Fee. Date Paid: 09/11/2023 (jad) (Entered: 09/13/2023) |
| 09/14/2023 | 4 | **FILED IN ERROR** Summons Issued as to All Plaintiffs. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** (Attachments: # 1 Summons Bellavance, # 2 Summons Brawn, # 3 Summons Tracy, # 4 Summons Patterson, # 5 Summons Salerno, # 6 Summons Hansen, # 7 Summons Reid, # 8 Summons Garland, # 9 Summons Odell, # 10 Summons Pappalardo, # 11 Summons Alexander, # 12 Summons Griffin, # 13 Summons Pentony, # 14 Summons Pierdinock, # 15 Summons Ware, # 16 Summons McElwee, # 17 Summons NEFMC, # 18 Summons Aarrestad, # 19 Summons Whalen, # 20 Summons Olszewski)(jad) Modified on 9/14/2023 to add filed in error as summons improperly issued as to non−named parties (jad). (Entered: 09/14/2023) |

| 09/14/2023 | 5 | NOTICE of Docket Entry Modification regarding 4 Summons Issued: Docket entry modified by the Clerk's Office to indicate filed in error as summons improperly issued as to non−named parties. (jad) (Entered: 09/14/2023) |
|---|---|---|
| 09/14/2023 | 6 | Summons Issued as to JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III.<br><br>**Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**<br><br>**Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**<br><br>(Attachments: # 1 AG summons, # 2 US Attorney summons)(jad) (Entered: 09/14/2023) |
| 09/19/2023 | 7 | CERTIFICATION for Admission Pro Hac Vice of Brett A. Shumate filed by MEGAN SOWARDS NEWTON on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2855416.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Exhibit Attachment−Admissions)(NEWTON, MEGAN) (Entered: 09/19/2023) |
| 09/19/2023 | 8 | CERTIFICATION for Admission Pro Hac Vice of James Burnham filed by MEGAN SOWARDS NEWTON on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2855418.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (NEWTON, MEGAN) (Entered: 09/19/2023) |
| 09/19/2023 | 9 | CERTIFICATION for Admission Pro Hac Vice of Louis J. Capozzi filed by MEGAN SOWARDS NEWTON on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2855420.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (NEWTON, MEGAN) (Entered: 09/19/2023) |
| 09/19/2023 | 10 | CERTIFICATION for Admission Pro Hac Vice of John Henry Thompson filed by MEGAN SOWARDS NEWTON on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2855422.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (NEWTON, MEGAN) (Entered: 09/19/2023) |
| 09/19/2023 | 11 | CERTIFICATION for Admission Pro Hac Vice of Alexis Zhang filed by MEGAN SOWARDS NEWTON on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2855424.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this |

| | | |
|---|---|---|
| | | District via PACER at www.pacer.uscourts.gov (NEWTON, MEGAN) (Entered: 09/19/2023) |
| 09/20/2023 | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney JAMES BURNHAM, JOHN HENRY THOMPSON must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 10/4/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jad) (Entered: 09/20/2023) |
| 09/20/2023 | 12 | MOTION Expedite Proceedings by JERRY LEEMAN, NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION Responses due by 10/11/2023. (NEWTON, MEGAN) (Entered: 09/20/2023) |
| 09/22/2023 | 13 | First AMENDED COMPLAINT against JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III, filed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. (Service of Process Deadline 12/21/2023)(NEWTON, MEGAN) (Entered: 09/22/2023) |
| 09/26/2023 | 14 | Summons Issued as to JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** (Attachments: # 1 Summons US AG Garland, # 2 Summons US Atty McElwee, # 3 Summons NMFS, # 4 Summons Raimondo, # 5 Summons Rauch)(jad) (Entered: 09/26/2023) |
| 09/27/2023 | 15 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. JANET COIT served on 9/14/2023. (ZHANG, ALEXIS) (Entered: 09/27/2023) |
| 09/27/2023 | 16 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. NATIONAL MARINE FISHERIES SERVICE served on 9/14/2023. (ZHANG, ALEXIS) (Entered: 09/27/2023) |
| 09/27/2023 | 17 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. GINA RAIMONDO served on 9/14/2023. (ZHANG, ALEXIS) (Entered: 09/27/2023) |
| 09/27/2023 | 18 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. SAMUEL D RAUCH, III served on 9/14/2023. (ZHANG, ALEXIS) (Entered: 09/27/2023) |
| 09/27/2023 | 19 | AFFIDAVIT of Service by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. MERRICK B GARLAND served on 9/20/2023. (ZHANG, ALEXIS) (Entered: 09/27/2023) |

| | | |
|---|---|---|
| 09/27/2023 | 20 | AFFIDAVIT of Service by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. DARCIE N MCELWEE served on 9/18/2023. (ZHANG, ALEXIS) (Entered: 09/27/2023) |
| 09/27/2023 | | **FILED IN ERROR** Set Answer Deadline for JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH III per executed summons No. 15, 16, 17, 18: Answer due by 10/5/2023. (jad) Modified on 9/28/2023 to indicate filed in error (jad). (Entered: 09/27/2023) |
| 09/27/2023 | | **FILED IN ERROR** Set Answer Deadline for MERRICK GARLAND per executed summons No. 19: Answer due by 10/11/2023. (jad) Modified on 9/28/2023 to indicate filed in error (jad). (Entered: 09/27/2023) |
| 09/27/2023 | | **FILED IN ERROR** Set Answer Deadline for DARCIE MCELWEE per executed summons No. 20: Answer due by 10/10/2023. (jad) Modified on 9/28/2023 to indicate filed in error (jad). (Entered: 09/27/2023) |
| 09/28/2023 | 21 | NOTICE of Docket Entry Modification regarding Set Answer Deadlines: Modified by the Clerk's office to reflect that they were filed in error as they contain incorrect answer deadline calculations. Additionally, the parties Darcie McElwee and Merrick Garland have been removed from the docket. (jad) (Entered: 09/28/2023) |
| 09/28/2023 | | Set Answer Deadline for JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH III per executed summons No. 15, 16, 17, 18: Answer due by 11/17/2023. (jad) (Entered: 09/28/2023) |
| 10/05/2023 | 22 | NOTICE of Appearance by FREDERICK H. TURNER on behalf of All Defendants (TURNER, FREDERICK) (Entered: 10/05/2023) |
| 10/06/2023 | 23 | CORPORATE DISCLOSURE STATEMENT by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. (NEWTON, MEGAN) (Entered: 10/06/2023) |
| 10/10/2023 | 24 | RESPONSE to Motion re 12 MOTION Expedite Proceedings filed by JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III. Reply due by 10/24/2023. (TURNER, FREDERICK) (Entered: 10/10/2023) |
| 10/10/2023 | 25 | NOTICE of Appearance by JOHN G. OSBORN on behalf of All Defendants (OSBORN, JOHN) (Entered: 10/10/2023) |
| 10/16/2023 | 26 | JOINT MOTION for Approval of Local Rule 56(h) Schedule by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION (NEWTON, MEGAN) (Entered: 10/16/2023) |
| 10/17/2023 | 27 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. JANET COIT served on 10/2/2023. (ZHANG, ALEXIS) (Entered: 10/17/2023) |
| 10/17/2023 | 28 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. NATIONAL MARINE FISHERIES SERVICE served on 10/2/2023. (ZHANG, ALEXIS) (Entered: 10/17/2023) |
| 10/17/2023 | 29 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. GINA RAIMONDO served on 10/2/2023. (ZHANG, ALEXIS) (Entered: 10/17/2023) |
| 10/17/2023 | 30 | |

|  |  | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. SAMUEL D RAUCH, III served on 10/2/2023. (ZHANG, ALEXIS) (Entered: 10/17/2023) |
|---|---|---|
| 10/17/2023 | 31 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. MERRICK B GARLAND served on 9/27/2023. (ZHANG, ALEXIS) (Entered: 10/17/2023) |
| 10/17/2023 | 32 | SUMMONS Returned Executed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. DARCIE N MCELWEE served on 9/29/2023. (ZHANG, ALEXIS) (Entered: 10/17/2023) |
| 10/17/2023 |  | Set Answer Deadline for JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH III per executed summons 27−30: Answer due by 12/1/2023. (jad) (Entered: 10/17/2023) |
| 10/17/2023 | 33 | ORDER re 26 JOINT MOTION for Approval of Local Rule 56(h) Schedule filed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION: The Court received and reviewed the parties' Joint Motion for Approval of Local Rule 56(h) Schedule (ECF No. 26). The Court is amenable to the schedule proposed and to exceeding the page limits under District of Maine Local Rule 7(d) as suggested. However, before issuing an order, the Court seeks clarification from counsel as to the contemplated procedural status of the motion, the law the Court should apply to disputed facts, and the factual underpinnings of the contemplated motion. Although the parties refer to Rule 56, there is no mention of the submission of statements of material fact required under Local Rule 56(b), (c) and (d). By contrast, the parties mention filing an administrative record. The parties seem to have in mind a hybrid motion, using an administrative record in lieu of evidence and the summary judgment mechanism to brief the law, but it is not clear. The Court is curious what procedural mechanism the parties contemplate. One alternative under First Circuit law is for the parties to submit the case to judgment on a stipulated record. In so doing, the parties empower the Court to decide any significant issues of material fact that [the judge] discovers.... OneBeacon Am. Ins. Co. v. Johnnys Selected Seeds, Inc., No. 1:12−cv−00375−JAW, 2014 U.S. Dist. LEXIS 53098, at *2−3 (D. Me. Apr. 17, 2014); Boston Five Cents Sav. Bank v. Secy of Dept of Hous. & Urban Dev., 768 F.2d 5, 11−12 (1st Cir. 1985). The Court ORDERS the parties to supplement their Joint Motion for Approval of Local Rule 56(h) Schedule within seven days to clarify how they contemplate proceeding. SO ORDERED. By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: 10/17/2023) |
| 10/17/2023 |  | Set Deadlines per Order No. 33: Supplement to Joint Motion for Approval of Local Rule 56(h) schedule due by 10/24/2023. (jad) (Entered: 10/17/2023) |
| 10/23/2023 | 34 | Supplement to 26 Joint Motion for Approval of Local Rule 56(h) Schedule by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION (NEWTON, MEGAN) Modified on 10/23/2023 to link to the motion (jad). (Entered: 10/23/2023) |
| 10/23/2023 | 35 | ORDER granting 26 Motion for Approval of Local Rule 56(h) Schedule By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: 10/23/2023) |
| 10/23/2023 |  | Reset Answer Deadline per Order No. 35: Answer due by 11/2/2023. (jad) Modified on 10/25/2023 to remove reference to administrative record (jad). (Entered: 10/23/2023) |
| 10/23/2023 |  |  |

| | | |
|---|---|---|
| | | Set Deadlines per Order No. 35: Motions for Summary Judgment due by 11/8/2023. Defendants combined cross−motion for summary judgment and opposition to Plaintiff's motion due December 1, 2023. Plaintiff's combined opposition to due December 19, 2023. Defendants reply in support of cross−motion due January 10, 2024. (jad) (Entered: 10/23/2023) |
| 10/24/2023 | 36 | ORDER granting 12 Motion to Expedite Proceedings By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: 10/24/2023) |
| 10/25/2023 | | Set Deadlines Per Order No. 35: Administrative Record due by 11/2/2023. (jad) (Entered: 10/25/2023) |
| 11/02/2023 | 37 | NOTICE/CORRESPONDENCE Re: Lodging of Administrative Record by All Defendants (Attachments: # 1 Exhibit Administrative Record Certification, # 2 Exhibit Administrative Record Index)(TURNER, FREDERICK) (Entered: 11/02/2023) |
| 11/02/2023 | 38 | ANSWER to 13 Amended Complaint by JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III.(TURNER, FREDERICK) (Entered: 11/02/2023) |
| 11/03/2023 | | Set Deadlines as to NATIONAL MARINE FISHERIES SERVICE: Per Local Rule 7.1 Notice of Interested Parties or Corporate Disclosure Statement due by 11/9/2023. (clp) (Entered: 11/03/2023) |
| 11/08/2023 | 39 | MOTION for Summary Judgment by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION Responses due by 11/29/2023. (Attachments: # 1 Affidavit Declaration of David Osier, # 2 Affidavit Declaration of Devyn Campbell)(NEWTON, MEGAN) (Entered: 11/08/2023) |
| 11/09/2023 | 40 | NOTICE of Interested Parties by JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III (OSBORN, JOHN) (Entered: 11/09/2023) |
| 12/01/2023 | 41 | Cross MOTION for Summary Judgment *and Response to Plaintiff's Motion for Summary Judgment* by JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III Responses due by 12/22/2023. (TURNER, FREDERICK) (Entered: 12/01/2023) |
| 12/01/2023 | 42 | RESPONSE to Motion re 39 MOTION for Summary Judgment filed by JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III. No PDF Document is attached to this docket entry. The Response to Motion #39 for Summary Judgment is incorporated within Cross Motion #41 for Summary Judgment. To view PDF document, see ECF No. 41. Reply due by 12/19/2023. (jad) (Entered: 12/08/2023) |
| 12/08/2023 | | Reset Deadlines as to 41 Cross MOTION for Summary Judgment *and Response to Plaintiff's Motion for Summary Judgment* per Order No. 35: Responses due by 12/19/2023. (jad) (Entered: 12/08/2023) |
| 12/19/2023 | 43 | RESPONSE to Motion re 41 Cross MOTION for Summary Judgment filed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. Reply due by 1/2/2024. (NEWTON, MEGAN) Modified on 12/28/2023 to remove reference to the reply as it is captured at ECF 44 (jad). (Entered: 12/19/2023) |
| 12/19/2023 | 44 | REPLY to Response to Motion re 39 MOTION for Summary Judgment filed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. The Reply to the |

| | | |
|---|---|---|
| | | Response to Motion #39 for Summary Judgment is incorporated within the Response to Cross Motion #41 for Summary Judgment. To view PDF document, see ECF No. 43. (jad) (Entered: 12/19/2023) |
| 12/20/2023 | | Reset Deadlines as to 41 Cross MOTION for Summary Judgment *and Response to Plaintiff's Motion for Summary Judgment* per Order No. 35: Reply due by 1/10/2024. (jad) Modified on 12/20/2023 to indicate correct order no. (jad). (Entered: 12/20/2023) |
| 01/10/2024 | 45 | REPLY to Response to Motion re 41 Cross MOTION for Summary Judgment *and Response to Plaintiff's Motion for Summary Judgment* filed by JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III. (TURNER, FREDERICK) (Entered: 01/10/2024) |
| 01/10/2024 | 46 | ** FILED IN ERROR** RESPONSE to Motion re 39 MOTION for Summary Judgment filed by JANET COIT, NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO, SAMUEL D RAUCH, III. No PDF attached, see ECF 45 for document. Reply due by 1/24/2024. (jad) Modified on 1/11/2024 to indicate filed in error by clerk's office (jad). (Entered: 01/11/2024) |
| 01/11/2024 | 47 | NOTICE of Docket Entry Modification regarding 46 Response to Motion, This entry was made in error by the Clerk's office and has been marked as filed in error. (jad) (Entered: 01/11/2024) |
| 02/13/2024 | 48 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION (Attachments: # 1 Exhibit Opinion and Order in Arnesen v. Raimondo)(NEWTON, MEGAN) (Entered: 02/13/2024) |
| 03/01/2024 | 49 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Defendants (Attachments: # 1 Exhibit Opinion in Lofstad v. Raimondo, # 2 Exhibit Order in Lofstad v. Raimondo)(TURNER, FREDERICK) (Entered: 03/01/2024) |
| 06/17/2024 | 50 | NOTICE/CORRESPONDENCE Re: Recent Development by All Defendants (TURNER, FREDERICK) (Entered: 06/17/2024) |
| 06/20/2024 | 51 | MOTION by Attorney Alexis Zhang to Withdraw as Attorney by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION Responses due by 7/11/2024. (ZHANG, ALEXIS) (Entered: 06/20/2024) |
| 06/21/2024 | 52 | ORDER granting 51 Motion for Withdrawal of Attorney Zhang as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 06/21/2024) |
| 10/02/2024 | 53 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Defendants (Attachments: # 1 Exhibit Opinion in Lofstad v. Raimondo)(TURNER, FREDERICK) (Entered: 10/02/2024) |
| 10/08/2024 | 54 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION (NEWTON, MEGAN) (Entered: 10/08/2024) |
| 10/09/2024 | 55 | NOTICE of Hearing on Motion 39 MOTION for Summary Judgment : Oral Argument set for 10/29/2024 10:00 AM in Portland Courtroom 1 before JUDGE JOHN A. WOODCOCK JR. (CCS) (Entered: 10/09/2024) |
| 10/09/2024 | 56 | MOTION for Order *Excusing Attendance of Local Counsel under Local Rule 83.1(c)(1)* by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION |

| | | |
|---|---|---|
| | | Responses due by 10/30/2024. (NEWTON, MEGAN) (Entered: 10/09/2024) |
| 10/10/2024 | 57 | ORDER granting 56 Motion to Excuse Attendance of Local Counsel under Local Rule 83.1(c)(1) By JUDGE JOHN A. WOODCOCK, JR. (mlm) (Entered: 10/10/2024) |
| 10/29/2024 | 58 | Minute Entry for proceedings held before JUDGE JOHN A. WOODCOCK, JR: Oral Argument held re 39 MOTION for Summary Judgment filed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. (Court Reporter: Lori Dunbar) (jam) (Entered: 10/29/2024) |
| 12/30/2024 | 59 | ORDER ON MOTIONS FOR SUMMARY JUDGMENT granting in part and denying in part 39 Motion for Summary Judgment; granting in part and denying in part 41 Motion for Summary Judgment By JUDGE JOHN A. WOODCOCK, JR. (CCS) (Entered: 12/30/2024) |
| 12/31/2024 | 60 | JUDGMENT By Rodrigue, DEPUTY CLERK. (jwr) (Entered: 12/31/2024) |
| 01/17/2025 | 61 | MOTION by Attorney Brett Shumate to Withdraw as Attorney by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION Responses due by 2/7/2025. (NEWTON, MEGAN) (Entered: 01/17/2025) |
| 01/17/2025 | 62 | MOTION by Attorney James Burnham to Withdraw as Attorney by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION Responses due by 2/7/2025. (NEWTON, MEGAN) (Entered: 01/17/2025) |
| 01/17/2025 | 63 | ORDER granting 61 Motion for Withdrawal of Attorney Shumate as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 01/17/2025) |
| 01/17/2025 | 64 | ORDER granting 62 Motion for Withdrawal of Attorney Burnham as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 01/17/2025) |
| 02/28/2025 | 65 | NOTICE OF APPEAL by GINA RAIMONDO, NATIONAL MARINE FISHERIES SERVICE, JANET COIT, SAMUEL D RAUCH, III . <br><br> **NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov. <br><br> **NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (Attachments: # 1 Dec. 30, 2024 Order, # 2 Dec. 31, 2024 Judgment)(TURNER, FREDERICK) (Entered: 02/28/2025) |
| 02/28/2025 | 66 | NOTICE OF APPEAL by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION . ( Filing fee $ 605 receipt number AMEDC−3076640.) <br><br> **NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov. <br><br> **NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review |

| | | |
|---|---|---|
| | | the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (NEWTON, MEGAN) (Entered: 02/28/2025) |
| 03/03/2025 | | COPIES of Notice of Appeal Sent to Counsel Re: 65 Notice of Appeal, filed by GINA RAIMONDO, NATIONAL MARINE FISHERIES SERVICE, JANET COIT, SAMUEL D RAUCH, III. (jlm) (Entered: 03/03/2025) |
| 03/03/2025 | | COPIES of Notice of Appeal Sent to Counsel Re: 66 Notice of Appeal,,, filed by NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION. (jlm) (Entered: 03/03/2025) |
| 03/03/2025 | 67 | APPEAL COVER SHEET Re: 65 Notice of Appeal. (jlm) (Entered: 03/03/2025) |
| 03/03/2025 | 68 | CLERK'S CERTIFICATE Re: 65 Notice of Appeal, Documents sent to the U.S. Court of Appeals. (jlm) (Entered: 03/03/2025) |
| 03/03/2025 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 65 Notice of Appeal. (jlm) (Entered: 03/03/2025) |
| 03/03/2025 | 69 | APPEAL COVER SHEET Re: 66 Notice of Appeal. (jlm) (Entered: 03/03/2025) |
| 03/03/2025 | 70 | CLERK'S CERTIFICATE Re: 66 Notice of Appeal, Documents sent to the U.S. Court of Appeals. (jlm) (Entered: 03/03/2025) |
| 03/03/2025 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 66 Notice of Appeal. (jlm) (Entered: 03/03/2025) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 2:23-cv-00339-JAW ) |
| HOWARD LUTNICK, U.S. Secretary of Commerce, et al.,[1] | ) ) ) |
| Defendants. | ) ) |

# DEFENDANTS' NOTICE OF APPEAL

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Howard Lutnick, in his official capacity as Secretary of Commerce, is automatically substituted for Gina Raimondo. Likewise, Emily Menashes, in her official capacity as Acting Assistant Administrator for Fisheries, is automatically substituted for Janet Coit.

Pursuant to Federal Rules of Appellate Procedure 3 and 4 and 28 U.S.C. § 1291, notice is hereby given that Howard Lutnick, Secretary of the United States Department of Commerce; National Marine Fisheries Service (NMFS); Emily Menashes, NMFS Acting Assistant Administrator; and Samuel D. Rauch III, NMFS Deputy Assistant Administrator for Regulatory Programs, Defendants in the above-named case, appeal to the United States Court of Appeals for the First Circuit from the Court's December 30, 2024 Order and December 31, 2024 Judgment. Copies of these two documents are attached.

Dated: February 28, 2025

Respectfully submitted,

LISA L. RUSSELL
Deputy Assistant Attorney General
S. JAY GOVINDAN
Section Chief
MEREDITH L. FLAX
Deputy Section Chief

OF COUNSEL:

MITCH MACDONALD
U.S. Department of Commerce
National Oceanic and Atmospheric
    Administration
Office of General Counsel

*/s/ Frederick H. Turner*
FREDERICK H. TURNER
Senior Trial Attorney
Wildlife and Marine Resources Section
Environment and Natural Resources Division
United States Department of Justice
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0641
Fax: (202) 305-0275
Email: frederick.turner@usdoj.gov

CRAIG M. WOLFF
ACTING UNITED STATES ATTORNEY

JOHN G. OSBORN
Assistant U.S. Attorney
100 Middle Street
East Tower, 6th Floor
Portland, ME 04101
(207) 780-3257
John.Osborn2@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing using the

CM/ECF system.

*/s/ Frederick H. Turner*
FREDERICK H. TURNER

*Attorney for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
PORTLAND DIVISION**

NEW ENGLAND FISHERMEN'S STEWARDSHIP
ASSOCIATION,

    *Plaintiff,*

  *v.*

HOWARD LUTNICK, U.S. Secretary of Commerce, *et al.*

    *Defendants.*

No. 23-cv-00339-JAW

**NOTICE OF APPEAL**

  Pursuant to Federal Rules of Appellate Procedure 3(a)(1) and 4(a)(1)(B), Plaintiff New England Fishermen's Stewardship Association hereby appeals to the United States Court of Appeals for the First Circuit from the final judgment entered on December 31, 2024. *See* ECF 59 (Dec. 30, 2024) (opinion and order); ECF 60 (Dec. 31, 2024) (final judgment).

Dated:  February 28, 2025    Respectfully submitted,

            /s/ *Megan S. Newton*
            Megan S. Newton, ME Bar No. 004461
            JONES DAY
            51 Louisiana Avenue N.W.
            Washington, DC 20001
            (202) 879-3986
            msowardsnewton@jonesday.com

            *Counsel for Plaintiff New England Fishermen's
Stewardship Association*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 28, 2025, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all attorneys of record.

*<u>/s/ Megan S. Newton</u>*
Megan S. Newton

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE
### PORTLAND DIVISION

NEW ENGLAND FISHERMEN'S STEWARDSHIP
ASSOCIATION (NEFSA)

*Plaintiff,*


    *v.*


GINA RAIMONDO, U.S. Secretary of
Commerce
1401 Constitution Ave. NW
Washington, DC 20230

NATIONAL MARINE FISHERIES SERVICE
(NMFS)
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910

JANET COIT, NMFS Assistant Administrator
1315 East-West Highway,  14th Floor
Silver Spring, MD 20910

SAMUEL D. RAUCH III, NMFS Deputy
Assistant Administrator for Regulatory
Programs
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910

    *Defendants.*

Civil Action No. 23-cv-00339-JAW


**AMENDED PETITION FOR
REVIEW AND COMPLAINT**

**INJUNCTIVE RELIEF SOUGHT**

## INTRODUCTION

1.     The United States is blessed with abundant natural resources, including teeming marine fisheries.  The Framers recognized that our fisheries are vital to the Nation, THE FEDERALIST NO. 4 (John Jay), and the Government has an obligation to ensure these vital resources are harvested responsibly.  How to balance the competing interests in fishing—production versus conservation, commercial versus sport, fishing versus other uses of marine resources—is a complex question that turns on fundamental values and broad policy priorities.

2.     Despite the national importance of offshore fishing regulation, Congress has removed the issue from democratic control.  Rather than make these decisions itself or vest them in executive agencies accountable to the elected President, Congress has assigned control of the nation's fisheries to novel federal councils that violate the Constitution's structural protections in multiple respects.  This unconstitutional regime puts local fishermen like the members of the New England Fishermen's Stewardship Association ("NEFSA") at the mercy of unaccountable bureaucrats who answer only to themselves.  The Constitution's fundamental promise of representative government forbids that result.

3.     In 1976, Congress passed the Magnuson-Stevens Fishery Conservation and Management Act (Act).  The Act was Congress's first comprehensive attempt to regulate fishing in federal territorial waters.  At the time, Congress was concerned that

1

foreign fleets were entering federal waters and pilfering a precious American resource. Congress also feared that new technologies could trigger unsustainable overfishing— threatening ecosystems and the Nation's long-term food security. These were noble aims, and ones that nobody understands better than NEFSA's members, for whom the long-term health of America's marine fisheries is a matter of deeply personal concern.

4.    In its zeal to regulate, however, Congress converted federal waters into Constitution-free zones, violating the Constitution in multiple respects—violations that are increasingly drawing judicial scrutiny. For example, the Fifth Circuit recently held that the National Marine Fishery Service (NMFS), which administers the Act, violates the Fourth Amendment rights of fishermen when it subjects their boats to round-the-clock GPS surveillance. *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023). And fishermen are currently in the Supreme Court challenging NMFS's power under the Act to force government observers onto fishing boats while making fishermen fund that federal surveillance. *Loper Bright Enters. v. Raimondo*, No. 22-451, 2023 WL 3158352 (S. Ct. May 1, 2023). A well-intentioned attempt at rule by enlightened experts has devolved into a bureaucratic morass captured by narrow interests.

5.    That dynamic is clear in this case, which confronts the unconstitutional core of the Act's regulatory apparatus. At the heart of the Act are eight Regional Fishery Management Councils: federal entities charged by Congress with "exercis[ing] sound

2

judgment in the stewardship of fishery resources" within multi-state zones. 16 U.S.C. § 1801(b)(5). This suit involves the New England Fishery Management Council, upon which Congress has bestowed broad policymaking "authority over the fisheries in the Atlantic Ocean seaward of" Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. *Id.* § 1852(a)(1)(A).

6.    Congress "designated" the Councils as the "primary policy makers" for federal fisheries, "vest[ing] [them] with the authority to develop management plans" that "dictate the fundamental objectives and methods of managing a given fishery." William R. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163, 177–78 (1980). This is clear from the Act's text, which enshrines the Councils as the first and last word on marine fishing policy. The Act provides that each Council "shall have authority" over, and "develop annual catch limits for," its fisheries. 16 U.S.C. § 1852(a)(1)(A), (h)(6). And each Council "shall" craft all "measures … necessary and appropriate for the conservation and management" of those fisheries. *Id.* § 1853(a)(1)(A). Once a Council exercises that power, the Secretary of Commerce "may repeal or revoke" its policies only if three-quarters of the Council approves of the Secretary's policy choice. *Id.* § 1854(h).

7.    Given this broad authority to set, monitor, adjust, and preserve federal policies—authority that trumps even the Commerce Secretary's power in certain

3

respects—one would expect some degree of federal democratic control over the Councils. But Congress provided just the opposite, immunizing Council Members from meaningful control by the President, his Commerce Secretary, and through them the American people. It conferred the power to appoint Council Members on *state* rather than *federal* officials and it granted Members nearly impenetrable tenure protections. Congress thus ensured that fishermen like NEFSA's members are regulated by officials insulated from democratic control and vulnerable to capture by narrow private interests. More fundamentally, Congress broke the Constitution's promise of separated powers and executive accountability to the President. This is clear in multiple respects.

8.     To start, the Act makes no effort to hew to the Appointments Clause. *No federal official* is empowered to select and approve the vast majority of voting Council Members. Five hold their federal office simply by virtue of holding particular state offices. *Id.* § 1852(b)(1). Thus, a large bloc of each Council is composed of *state* officials who wield *federal* authority without having been approved by the President, the Secretary of Commerce, or anyone else with constitutionally sound appointment power.

9.     Another group of Council Members is likewise chosen by state officials, albeit in a more complicated fashion. Governors of the states within each Council's region assemble lists of three or more potential Council Members whom they deem "qualified" under statutory criteria. *Id.* § 1852(b)(2)(A), (C). Those lists are submitted

4

to the Secretary, who may either approve an appointment or "notify" the governor that he must provide "an additional explanation" of a nominee's "qualifications." *Id.* § 1852(b)(2)(C). The Secretary is forbidden from going outside the governors' lists of approved nominees to make her own selection.

10. Then there are Council Members' removal protections. Most incredibly, under no circumstances may anyone in the Executive Branch dismiss a Member who holds his seat by virtue of his role in a state government. *Id.* § 1852(b)(1)(A). The Members from the governor-curated lists, for their part, can be removed only "for cause," with "cause" defined as solely breaking specific conflict-of-interest rules. *Id.* § 1852(b)(6). For *anything else*, the Secretary is limited to asking the Council to remove one of its own by a two-thirds supermajority vote. *Id.*

11. These appointment methods and removal restrictions are patently unconstitutional. Council Members are "officers of the United States" subject to the Appointment Clause. But they are not selected according to its rules. Moreover, due to their near-ironclad removal protections, the Councils exercise policymaking authority beyond presidential control. That insulation flouts the Constitution's vesting of executive power in the President and frustrates his obligation to faithfully execute the Nation's laws.

12. The Act's operation demonstrates the shortsightedness of subordinating constitutional structure to novel innovation. Councils have been captured by special

5

interests, from foreign-funded seafood titans to well-connected recreational fishermen. The immediate casualties are working-class commercial fishermen, who face a campaign of exclusionary restrictions. Without the deep pockets or personal connections necessary to penetrate and persuade an insulated Council, these small businessmen face economic extinction.

13.    The public also suffers under this regime. The Councils have failed to foster sustainability and undermined our domestic fishing fleet. In particular, the Councils have implemented so-called "catch share" programs that divvy up fishing rights in a discriminatory manner and then allow them to be bought and sold. This policy has consolidated the commercial fishing industry, squeezing out local fishermen and forcing them to lease rights from mega corporations.

14.    If this weren't enough, the Council's work is implemented by an agency official at NMFS who *himself* wields federal executive power in violation of the Constitution. That position, the Deputy Assistant Administrator for Regulatory Programs, is currently filled by Defendant Samuel Rauch. A career civil servant, Mr. Rauch is not subject to the at-will removal the Constitution requires for such senior executive officials.

15.    As a result of the illegitimate exercise of federal authority by the Council and NMFS, NEFSA members and others like them face the prospect of their industry's demise. New England groundfishing is governed by the Northeast Multispecies Fishery

6

Management Plan (FMP). As the name suggests, "[t]he Fishery is composed of thirteen bottom-dwelling fish species, inhabiting waters from Maine to the mid-Atlantic, which are divided for management purposes into twenty individual 'stocks.'" *Lovgren v. Locke*, 701 F.3d 5, 14 (1st Cir. 2012). Catch limits are imposed on a stock basis; for instance, the Council sets different limits and allocations for Georges Bank cod stock than for cod harvested from the Gulf of Maine. Since 2010, the Council has subjected the fishery to a catch share program.

16.     The Council's latest policy initiative is Framework Adjustment 65, which (among other things) sets annual catch limits for several groundfish species, including haddock (pictured below), cod, white hake, and yellowtail flounder. Most notably, it slashes the overall commercial catch limit for haddock by about 80%. The Council also chose to cut the white hake commercial catch limit by around 13% and install a 10-year Gulf of Maine cod rebuilding plan that will further restrict access to the cod fishery.



Haddock (*Melanogrammus aeglefinus*)

17.     For NEFSA members and others like them—who sacrifice earnings to enable corporations to lease catch shares—Framework Adjustment 65 is disastrous. The crushing weight of lease fees and other expenses makes fishing volume crucial—

7

but the Council has responded by decimating the haddock harvest. Moreover, the Council's restrictions will cause NEFSA members to spend much of their time at sea *avoiding* areas where tightly regulated fish might be present—a difficult task when it comes to groundfish, and especially deep-water fish like white hake. And the cod rebuilding plan ensures that fishery will not take up the slack any time soon. In sum, for local fishermen, Framework Adjustment 65 threatens a generations-long history of groundfishing in the North Atlantic.

18. This Court should vacate, enjoin, and declare unlawful Framework Adjustment 65, the Framework Adjustment Final Rule, and accompanying regulations.

## PARTIES

19. Plaintiff New England Fishermen's Stewardship Association ("NEFSA") is an alliance of commercial fishermen dedicated to educating the public about seafood resource management and protecting the future of local commercial fishing in New England. It aims to promote regional economic strength, ecosystem sustainability, and American food security.

20. NEFSA's members include fishermen adversely affected by the catch-limit reductions, cod rebuilding plan, and other regulations contained in Framework Adjustment 65. Among them is David Osier, a commercial fisherman and business owner from South Bristol, Maine, with over 49 years of experience. David's business consists of four fishing vessels—three groundfish trawlers and one seiner–trawler. In

8

past seasons, David's boats have harvested around 400,000 pounds of haddock; under the new regime, they are restricted to around 80,000 pounds combined. Framework Adjustment 65's lower white hake catch limit and more onerous cod plan will likewise injure David's business.

21.    Defendant Gina Raimondo is the Secretary of Commerce and the official charged by law with administering the Act. She is sued only in her official capacity.

22.    Defendant National Marine Fisheries Service (NMFS) is an agency within the Department of Commerce. The Secretary of Commerce has delegated to the National Oceanic and Atmospheric Administration (NOAA) the authority to administer the relevant portions of the Act; NOAA sub-delegated that authority to NMFS. *See infra* ¶¶ 60-62.

23.    Defendant Janet Coit is the Assistant Administrator for Fisheries at NMFS. She has been delegated the power to administer various portions of the Act by the Under Secretary for Oceans and Atmosphere. *See infra* ¶ 61. She is sued only in her official capacity.

24.    Defendant Samuel Rauch is the Deputy Assistant Administrator for Regulatory Programs at NMFS. The Assistant Administrator for Fisheries has delegated the authority to sign materials for publication in the Federal Register and the Code of Federal Regulations to this official. Mr. Rauch executed the Framework Adjustment 65 Final Rule, finalizing the Framework Adjustment and accompanying

9

regulations as legal and binding. 16 U.S.C. § 1854(a)(1)(A), (b)(1). He also signed and issued the Final Rule in his own name. He is sued only in his official capacity.

<u>JURISDICTION AND VENUE</u>

25. This is an action arising under the United States Constitution and the Magnuson-Stevens Fishery Management Act, 16 U.S.C. § 1801, *et seq.* The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

26. The Act authorizes judicial review of NMFS rules and district-court jurisdiction over cases arising under the Act. 16 U.S.C. §§ 1855(f), 1861.

27. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as by Federal Rule of Civil Procedure 57.

28. Equitable relief is authorized under this Court's equitable powers, *see, e.g.,* *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and the Administrative Procedure Act as incorporated by the Act, 16 U.S.C. § 1855(f)(1); 5 U.S.C. §§ 703, 706.

29. Venue is proper in this District under 28 U.S.C. § 1391(e).

30. There is an actual controversy between the parties concerning the lawfulness of Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations. NEFSA members will suffer concrete, irreparable injuries traceable to Defendants and redressable by this Court. *See infra* ¶¶ 125-35.

<u>FACTUAL ALLEGATIONS</u>

*Federal Fisheries Management*

10

31.     "Groundfishing, the catching of fish that swim in close proximity to the bottom, was the first colonial industry in America."  S. Murawski, *A Brief History of the Groundfishing Industry of New England*, NOAA Fisheries 1 (2022).  The first European fishermen—the Portuguese—dropped lines off the banks of Newfoundland in 1501, soon followed by the French and Spanish.  W. Lear, *History of Fisheries in the Northwest Atlantic: The 500-Year Perspective*, 23 J. Northw. Atl. Fish. Sci. 41, 44 (1998).  And by the early 1700s, hundreds of vessels were sailing from New England ports to Nova Scotia, Georges Bank, and the Grand Banks in search of cod and other groundfish.  *Id.* at 52.

32.     "By the time of the American Revolution, the New England cod fisheries involved more than 500 boats and 5,000 cod fishermen."  *Id.*  And the Treaty of Paris, which ended hostilities and recognized American independence, addressed the recurring issue of fishing rights.  Its terms gave New England ships the right to fish across the region.  *Id.* at 60.  As a result, "[c]oastal towns in New England sent every able bodied man and boy" to sea in search of groundfish.  *Id.*  "Between 1790 and 1810 about 1,230 New England fishing vessels sailed each year, half of them to the Grand Banks," and by 1835, the Georges Bank cod fishery was "a permanent industry."  *Id.*

33.     As this history attests, "[t]he fishing industry of New England has, for over 400 years, been identified both economically and culturally with groundfishing."  Murawski, *supra*, at 1.  And debates about how to regulate groundfishing are as old as the industry itself.  "[T]he first apparent regulation of the New England fishing industry

11

was enacted in 1652," and banned "the taking of cod, haddock, hake, and pollock during spawning times." D. Allen, *Searching for Tradition: A Brief History of the New England Groundfish Fishery*, Commercial Fisheries News 36 (2014).

34.     For much of its history, the United States claimed only a narrow strip of exclusive territorial waters. *See* Congressional Research Service, R43565, *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* 31 (May 22, 2014) ("CRS Report"). Nearly all regulation of commercial fishing fell to state authorities, who still manage nearshore waters. *See United Cook Inlet Drift Ass'n v. NMFS*, 837 F.3d 1055, 1058 (9th Cir. 2016). But after the United States asserted jurisdiction up to 200 miles offshore, substantial waters lay beyond state regulation and open to exploitation.

35.     Congress grew concerned that foreign fleets were overfishing American stocks and, in 1976, passed the Fishery Conservation and Management Act—a comprehensive attempt to regulate fishery resources in federal waters. The statute has been reauthorized and amended multiple times.

36.     The Act establishes federal jurisdiction over all marine fishery resources located within 200 miles of any United States coastline and beyond state territorial waters. *See* 16 U.S.C. § 1811(a). To regulate this zone, the Act created "an entirely new[] regional management system." CRS Report at 314. And to operate it, the Act created eight Regional Fishery Management Councils. *See* 16 U.S.C. § 1852. Those "councils, composed of federal, state, and public representatives, are not modeled after

12

any other authority; rather, they were shaped by the demands of compromise and necessity." Rogalski, *supra*, at 164–65. "[P]olitical pressures played an important role in placing the states in a dominant representative position on the councils," in part because the industry "would have been hostile towards a purely federal regime." *Id.* at 174.

37.     Among the Act's enacted purposes is to "promote domestic commercial and recreational fishing under sound conservation and management principles" by "provid[ing] for the preparation and implementation … of fishery management plans." 16 U.S.C. § 1801(b)(3)–(4). Congress "establish[ed] Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans." *Id.* § 1801(b)(5). These Councils must consider the interests of "States, the fishing industry, consumer and environmental organizations, and other interested persons," and "take into account the social and economic needs of the States." *Id.*

38.     The Councils dominate the Act's regulatory regime, and Congress outlined their structure and functions in detail. Each regional Council "shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority." *Id.* § 1852(a)(2). Not every fishery falls within a Council's ambit: The Secretary of Commerce has "authority over any highly migratory species fishery," because such species move among jurisdictions. *Id.* § 1852(a)(3).

13

39.     "[T]he New England Fishery Management Council … regulates fishery resources within the federal waters off New England's coast." *Lovgren*, 701 F.3d at 12. The Council "shall have authority over the fisheries in the Atlantic Ocean seaward of" Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut.  16 U.S.C. § 1852(a)(1)(A).

40.     The Council has "18 voting members." *Id.*  They include "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State … so long as the official continues to hold such position, or [his] designee." *Id.* § 1852(b)(1)(A).  In other words, each state government has a permanent representative on the federal Council.  And while the Act reserves seats for the *head* of each state fishery agency, those officials can designate *others* to fill their seats.  *Id.*

41.     No federal official plays any role in selecting these Members or their designees.  Nor can any federal official remove them, because their *federal* Council membership flows directly from their *state* position: they hold Council seats "so long as" they hold state office.

42.     Each Council also includes "[t]he regional director of the [NMFS] for the geographic area concerned, or his designee." *Id.* § 1852(b)(1)(B).  For the New England Council, that is Mike Pentony.  Mr. Pentony is part of the Senior Executive Service (SES) and holds a career-appointed position.  *See* House Committee on Oversight and Reform, 116th Cong., 2d Sess., *United States Government Policy and Supporting Positions* 27

14

(Comm. Print 2020) ("*Plum Book*").  He can be removed from office only for cause under civil-service statutes.  5 U.S.C. §§ 3592, 7541–43.

43.     The remaining 12 voting Members are chosen by the Secretary from "a list of individuals submitted by the Governor of each … constituent State."  16 U.S.C. § 1852(b)(2)(C).  When compiling these lists, a governor "determine[s] that each such individual is qualified" for the role under a statutory rubric.  *Id.*  Each list "shall include the names and pertinent biographical data of not less than three individuals."  *Id.*  The Secretary's job is to "review each list" and "ascertain if the individuals … are qualified" under the Act's terms.  *Id.*  If the Secretary finds them unqualified, she cannot make her own selection.  Instead, she must "notify" the governor, who then "submit[s] a revised list or resubmit[s] the original list with an additional explanation of the qualifications of the individual."  *Id.*

44.     These 12 Members can be removed by the Secretary only "for cause," and in only one situation: where "the member is found by the Secretary, after notice and an opportunity for a hearing … to have committed an act prohibited by" the Act's conflict-of-interest provision.  *Id.* § 1852(b)(6)(B).  For *anything else*, only the Council, by a two-thirds vote, can initiate removal.  *Id.* § 1852(b)(6)(A).

45.     Each Council conducts its statutory duties by majority vote, and a bare majority of voting Members present constitutes a quorum.  *Id.* § 1852(e)(1).

15

46.     A Council's core responsibility is the development of fishery management plans (FMPs) and amendments to FMPs.  Each Council must, "for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary" an FMP and "amendments to each such plan that are necessary from time to time." *Id.* § 1852(h)(1).  Specifically, each Council must "develop annual catch limits for … its managed fisheries." *Id.* § 1852(h)(6).

47.     Each Council may also develop any regulations it "deems necessary or appropriate for … implementing a [FMP] or plan amendment" and submit them to the Secretary before or after such FMP or amendment takes effect.  *Id.* § 1853(c).

48.     The Act empowers Councils to "develop … multi-year research priorities" for "areas of research that are necessary for management purposes," *id.* § 1852(h)(7), and to generally "conduct any other activities … which are necessary and appropriate to [their] functions," *id.* § 1852(h)(9).

49.     Each Council may "appoint[] and assign duties to" various administrative employees, "determine its organization, and prescribe its practices and procedures." *Id.* § 1852(f)(1), (6).  And each Council "shall establish, maintain, and appoint … a scientific and statistical committee to assist it in the … development and amendment of any [FMP]." *Id.* § 1852(g)(1)(A).  Indeed, each Council is empowered to "establish such advisory panels as are necessary or appropriate to assist it in carrying out its functions." *Id.* § 1852(g)(2).

16

50.   In contrast with its sweeping grant of policymaking authority to the Councils, the Act gives the Commerce Department only a limited role.  The Secretary's role in the development of FMPs and amendments is purely advisory:  She "establish[es] advisory guidelines (which shall not have the force and effect of law) … to *assist in the development* of [FMPs]" by the Councils.  *Id.* § 1851(b) (emphasis added).

51.   Once a Council develops a FMP or amendment, the Secretary "review[s]" its work "to determine whether it is consistent with" the Act and "other applicable law."  *Id.* § 1854(a)(1)(A).  The Secretary simultaneously publishes the FMP or amendment in the Federal Register and initiates a comment period.  *Id.* § 1854(a)(1)(B).

52.   At the end of that period, the Secretary must "approve, disapprove, or partially approve" the FMP or amendment.  *Id.* § 1854(a)(3).  But a "disapprov[al]" or "partial[] approv[al]" does not end a Council's involvement.  The Secretary's authority following disapproval is limited to offering "recommendations … that could be taken by the Council to conform [its] plan or amendment to the requirements of applicable law."  *Id.* § 1854(a)(3)(C).  The Council "may" then "submit a revised plan or amendment."  *Id.* § 1854(a)(4).

53.   If for any reason the Secretary fails to "notify [the] Council" of her decision "within 30 days of the end of the comment period," the Council's "plan or amendment *shall take effect* as if approved."  *Id.* § 1854(a)(3) (emphasis added).

17

54.     A similar process governs a Council's proposed implementing regulations. When a Council "deems" such regulations necessary, *id.* § 1853(c), the Secretary reviews them over 15 days to determine their legality and consistency with the Council's FMP or amendment, *id.* § 1854(b)(1).  If the Secretary finds the rules illegal or inconsistent with the Council's work, she may "recommend[] … revisions." *Id.* § 1854(b)(1)(B).  The Council "may" then "revise the proposed regulations." *Id.* § 1854(b)(2).

55.     Following notice and comment, the Secretary "shall promulgate final regulations" and must "consult with the Council before making any revisions to the proposed regulations." *Id.* § 1854(b)(3).  The Secretary cannot bypass this consultation requirement—even as she has no authority to summon a Council to consult with her. *See Oceana, Inc. v. Ross*, No. 17-CV-05146, 2020 WL 5239197, at *5 (C.D. Cal. Jan. 8, 2020) (ordering NMFS to consult with a Council); *see also* Dkt. No. 124 at 8–9, *Oceana, Inc.*, No. 17-CV-05146 (C.D. Cal. Nov. 18, 2019) (NMFS "has repeatedly attempted to consult with" the Council but "lacks the authority to *compel* the independent … Council to place this item on its agenda").

56.     Once a FMP or amendment takes effect, the Council *must* approve its repeal or revocation:  "The Secretary may repeal or revoke a [FMP] for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members."  16 U.S.C. § 1854(h).

18

57.     The Secretary has authority to promulgate her own FMP or amendment in only very narrow circumstances—(1) where a Council "fails to develop" a FMP or amendment "after a reasonable period of time," (2) where a Council "fails to submit a revised or further revised plan or amendment," or (3) where the fishery is not within any Council's jurisdiction. *Id.* § 1854(c)(1). But even then, the Secretary must "submit [her] plan or amendment to the appropriate Council for consideration and comment," which she must then "tak[e] into account." *Id.* § 1854(c)(4)(A), (5). The same is true of Secretary-generated regulations. *Id.* § 1854(c)(6).

58.     A Council can force the Secretary to take immediate action. If it "finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a [FMP] exists for such fishery," "the Secretary *shall promulgate* emergency regulations … if the Council, by unanimous vote … requests the taking of such action." *Id.* § 1855(c)(2)(A) (emphasis added).

59.     Even when the Secretary is authorized to adopt fishing regulations, the Council can permanently block the Secretary from adopting a "limited access system" that "limits participation in a fishery to those satisfying certain eligibility criteria." *Id.* §§ 1802(27), 1854(c)(3). The Council can also permanently block the Secretary from adopting a "limited access privilege program," whereby fishermen gain "a Federal permit . . . to harvest a quantity of fish . . . of the total allowable catch of the fishery." *Id.* §§ 1854(c)(3), § 1802(26).

19

60.    Making matters worse, while the Act refers to "the Secretary," the reality is that the Secretary plays no role in this process.  She has instead delegated her authority under the Act to the Under Secretary for Oceans and Atmosphere (the head of NOAA).



61.    The Under Secretary has, in turn, redelegated that authority to the Assistant Administrator for Fisheries—currently Defendant Janet Coit—who heads NMFS.  *See* NOAA, *NOAA Organizational Handbook: Transmittal No. 61*, U.S. Department of Commerce, at 2–4 (Feb. 24, 2015) ("NOAA Handbook"); *see also* NOAA, *Transmittal 61 Clearance Memo*, U.S. Department of Commerce (Jan. 26, 2015).

62.    The Assistant Administrator for Fisheries has, in turn, redelegated the authority to sign material generated under the Act for publication in the Federal Register and Code of Federal Regulations to the Deputy Assistant Administrator for Regulatory

20

Programs. *See* NOAA Handbook at 5. That role has been filled by Defendant Samuel Rauch for nearly twenty years.

63.     Mr. Rauch is a member of the SES appointed to a career position. *See Plum Book* at 26. As an SES career appointee, Mr. Rauch may be removed only for cause. *See* 5 U.S.C. §§ 3592, 7541–43.

64.     In an interview posted to a NMFS website, Mr. Rauch described his role in detail. *See* Ruth Sando, *Rauch, Sam ~ Oral History Interview*, Voices from the Fisheries (June 30, 2016) ("Rauch Interview"). Mr. Rauch "work[s] with the [C]ouncils … to put out fisheries regulations" and "sign[s] all of those" regulations, *id.* at 5, as his job is "to manage the regulations," *id.* at 9. Asked whether fishery regulations "all kind of bubbl[e] up to" him, Mr. Rauch answered: "Yes. Somebody has to[.]" *Id.* at 5.

65.     Although Mr. Rauch acknowledged that he exercises these duties under the Act, he reiterated that the Councils "really drive the system" of "who, when, and where people get to fish," and described them as "mini legislative bod[ies]." *Id.* at 15. Mr. Rauch explained that although he "ultimately issue[s] the regulations," he "do[es] that" only "because it resolves what [the Council] do[es] as legal." *Id.* In other words, he is "the auditor[]" of a Council-controlled "system." *Id.*

### Consequences for Local Commercial Fishermen

66.     The unaccountable Councils have overseen massive—and damaging— changes to American commercial fishing. An industry once characterized by small,

21

family-run businesses has been transformed by relentless consolidation. The voices of big business, environmental groups, and the recreational sector have drowned out those of local fishermen like NEFSA's members. Captains and crew with the generational knowledge needed to responsibly steward our marine resources have been reduced to hired hands for distant corporations. As a result, the domestic fishing fleet faces an uncertain future—a looming threat to American food security. But because the Act insulates the Councils from democratic accountability, local fishermen like NEFSA's members cannot effect political change. Under the current regime, not even the elected President of the United States has the authority to steer federal fishery policy in a different direction.

67. The Councils' approach is perhaps best illustrated by the implementation of so-called "catch share" programs. Under this system, as implemented in New England, the Council first determines how much of a given species can be harvested—the "Total Allowable Catch," or TAC. It then allocates the TAC among "sectors"—"self-selecting groups" of Multispecies permit holders who agree to follow certain regulations. *Lovgren*, 701 F.3d at 15.

68. In 2010, the New England Council "assigned every … permit holder" a share of the catch limit for each of the fishery's stocks "based on [the] permit holder's historic landings from 1996 to 2006." *Id.* at 19. A sector's combined individual shares

22

determine its annual catch entitlement—"the maximum amount of each fish stock that a sector's members could collectively catch." *Id.*

69.   Under catch shares, initial allocations are based on past harvest levels—necessarily privileging large players and freezing out younger fishermen.  To make matters worse, the right to fish under sector permits can be transferred and leased—allowing deep-pocketed corporations to seize an ever-growing share of the fishery's profits.  And those corporations pass the cost of leasing permit rights along to the captains and crew who venture into the North Atlantic to harvest groundfish.

70.   In New England and nationwide, catch share regulation has triggered dramatic industry consolidation.  Indeed, that was the goal:  By concentrating rights in a few hands, the Council sought to end "overcapitalization" by squeezing out smaller, less profitable players.  The leading beneficiary of consolidation in New England is Blue Harvest Fisheries, the subject of a 2022 exposé.  W. Sennott, *How Foreign Private Equity Hooked New England's Fishing Industry*, ProPublica (July 6, 2022).  Since catch shares arrived courtesy of the Council, Blue Harvest and other newcomers have dominated Atlantic fisheries from haddock to flounder.  After leasing as much of the fishing quota as the law allows, these firms pass along lease fees to the captains and crew who operate their vessels.  After deducting lease charges and other expenses, fishermen take home pennies on the dollar.  "You can no longer work your way up from the deck, become a captain and buy your own boat and permit," one fisherman explained.  *Id.*  "You'll never

23

make enough. They made it unattainable to do anything but work for them." *Id.* Blue Harvest is owned by Bregal Partners, part of a wealthy Dutch family's financial empire.

71.     Researchers have long known that catch shares have these effects. "No matter what you do," one academic has observed, "there is a dynamic that is going to unfold in predictable ways, toward the concentration of wealth and away from public participation." Susanne Rust, *System turns US fishing rights into commodity, squeezes small fishermen*, Reveal (Mar. 12, 2013).

72.     A 2016 study supported by another regional Council revealed numerous problems driven by catch shares. *See* D. Griffith et al., *Private Fish, Public Resource: Socioeconomic Impacts of the Grouper-Tilefish Individual Fishery Quota (IFQ) Program on Gulf of Mexico Communities* (Sept. 2016). The authors reported that fleet consolidation poses particular threats to "diverse, multispecies, and multi-gear fisheries." *Id.* at 4. Fishermen told researchers that high barriers to entry and cuts to take-home pay have led to "an aging population of fishermen and a dearth of younger fishers." *Id.* at 6. The study concluded that regulators "need to rethink the wisdom of putting every species under [a catch-share] program." *Id.* at 7.

73.     For years, NEFSA members have watched the influence of large shareholders and environmentalists play out in Council meetings and decisions. As they can attest, the Council is uninterested in the concerns of local commercial fishermen. In fact, the NMFS Deputy Assistant Administrator—Defendant Rauch—has spoken

24

*favorably* of the Councils' capture. For instance, Mr. Rauch explained that the Councils' approach is driven by "the environmental community": "We've got the regulatory structure that we do now because the environmentalists are pushing us." Rauch Interview at 19. Unsurprisingly, activist groups have pivoted away from lawsuits and toward a strategy of influencing the Councils. As Mr. Rauch explained, "the environmental community—they still use litigation, but they are also *making an enormous investment in the [C]ouncil process*, and that has moved the [C]ouncil[s] in their direction." *Id.* (emphasis added).

74. If any doubt remained about the regulators' perspective, Mr. Rauch has dispelled it: If the Councils and NMFS "fail" to properly calibrate their regulatory efforts, he shrugged, "it's just less money for fishermen." *Id.* at 20. To NMFS and the Councils, those "consequences of failure" just aren't "significant." *Id.* But for NEFSA's membership, and others like them, "less money for fishermen" is not only "significant"—it could cripple their businesses and doom a centuries-old way of life in New England.

### *Framework Adjustment 65*

75. The New England Council recently developed Framework Adjustment 65, a policy under the Northeast Multispecies FMP that revises catch limits for groundfish species and installs a 10-year Gulf of Maine cod rebuilding plan. On April 18, 2023, the Council announced that it had finalized Framework Adjustment 65.

NMFS published Framework Adjustment 65 in the Federal Register for comment on May 31, 2023. NMFS issued the Framework Adjustment 65 Final Rule and implementing regulations on August 18, 2023.[1] Defendant Rauch signed both the proposed and final rules.

76. Framework Adjustment 65 makes numerous changes to groundfishing regulation under the Northeast Multispecies FMP. Most notably, it slashes haddock catch limits: For Georges Bank haddock, the commercial annual catch limit falls from 81,383 metric tons to 11,901—an 85% reduction. For haddock in the Gulf of Maine, the cut is over 78%—from 11,526 metric tons to just 2,515. Framework Adjustment 65 also lowers the white hake commercial catch limit by around 13%. And it initiates a "more cautious" 10-year rebuilding plan for Gulf of Maine cod, which will tightly restrict access to the cod fishery. NEFMC, *Framework 65 – Final Submission – April 2023* at 27.

77. Even before Framework Adjustment 65, NEFSA members and other local New England groundfishermen operated on razor-thin margins. After expenses and paying lease fees under the Council's catch share program, NEFSA members are

---

[1] The haddock catch limit in the final rule was somewhat more relaxed than that in the Council's original plan. At its April 2023 meeting, the Council acknowledged that its scientists had previously underestimated the haddock population in the Gulf of Maine. Consequently, it voted for NMFS to take an "emergency" action to modestly increase the Gulf of Maine haddock catch limit. NMFS complied with the Council's demand in the Final Rule, noting the revised catch limit still "represent[ed] a substantial reduction" from the prior year.

26

often left with pennies on the dollar. The Framework Adjustment's dramatic cuts to the haddock harvest will erase much of what remains. And these restrictive quotas in a multispecies fishery characterized by bottom-dwellers will cause NEFSA members to spend much of their precious time and resources *avoiding* fish populations.

78.     Every day Framework Adjustment 65 is in effect, NEFSA members will lose the opportunity to harvest haddock and other groundfish species and bring that harvest to market. And they will waste a growing share of resources avoiding fish populations that the Council has tightly regulated and for which he cannot afford to purchase permitting rights. These injuries are irreparable and indefinite. They are imposed by a Council that NEFSA can attest is out of touch, unresponsive to commercial fishermen, and beholden to special interests. And it is overseen by an equally unaccountable career bureaucrat at NMFS.

<u>**CONSTITUTIONAL VIOLATIONS**</u>

*Council Members Serve in Violation of the Appointments Clause*

79.     The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. The Clause also allows Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

27

80. Principal officers must be nominated by the President and confirmed by the Senate. The same rule presumptively applies for inferior officers, but Congress may authorize the President alone, the courts, or the "Heads of Departments" to appoint such officers. The Appointments Clause does not dictate the manner of appointment for "lesser functionaries" beyond these categories. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979–80 (2021).

81. The Council's voting Members wield vast authority on behalf of the United States, subject only to limited supervision by NMFS. Yet none of them are appointed by the President or anyone accountable to him. Whether viewed as principal or inferior officers, all Members serve in violation of the Appointments Clause.

### Council Members are Officers of the United States.

82. Any official assigned "continuing and permanent" duties, *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018), and who "exercis[es] significant authority pursuant to the laws of the United States[,] is an 'Officer of the United States,'" *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

83. Council Members—the "primary policy makers" for federal fisheries—are quintessential officers. *See* Rogalski, *supra*, at 178. They bear no resemblance to the "broad swath of 'lesser functionaries' in the [federal] workforce." *Lucia*, 138 S. Ct. at 2051. Thus, Council Members must be appointed "in the manner prescribed by" the Appointments Clause. *Buckley*, 424 U.S. at 126.

28

84.    *First*, Council Members "occupy a 'continuing' position established by law." *Lucia*, 138 S. Ct. at 2051 (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)). Congress established Council seats by statute and spelled out Members' duties in detail. *See* 16 U.S.C. § 1852.  Twelve of the Council's 18 Members serve statutorily-defined three-year terms, which can be extended for a further six years. *Id.* § 1852(b)(3).  The Members from state bureaucracies hold their positions indefinitely. *See supra* ¶ 40.  No Members serve for merely "occasional or temporary" periods. *Germaine*, 99 U.S. at 511–12.

85.    *Second*, Council Members exercise significant policymaking authority over federal fisheries, affecting every aspect of the commercial and recreational fishing industries.  Congress vested Councils with sweeping and ongoing "authority over the fisheries in" their regions, 16 U.S.C. § 1852(a)(1)(A), and empowered them to "exercise sound judgment in the stewardship of fishery resources," *id.* § 1801(b)(5).

86.    To fulfill this mandate, each Council has the power to adopt and amend FMPs for all federal fisheries within its jurisdiction.  *Id.* §§ 1852(h)(6), 1853(a)(1)(A). Relying on data from advisory committees that report only to it, a Council determines how much of a particular species can be harvested, how to divide the catch, and the manner in which fish can be caught.  The Act leaves these decisions to a Council's policy judgment.  The Secretary contributes only nonbinding guidance. *Id.* § 1851(b).

87.     Here, Council Members made several important decisions that affect the livelihoods of NEFSA members.  It chose to drastically reduce commercial catch limits for haddock, to cut the quota for white hake, and to install a more cautious decade-long rebuilding plan for the Gulf of Maine cod fishery.  These policy judgments—made solely by the Council—make it unfeasible for commercial fishermen to harvest haddock and other groundfish species, preventing fresh seafood from reaching stores and restaurants.

88.     After a Council makes a policy decision, the Act requires it to submit its proposed edict to the Secretary of Commerce.  But that formal approval does not—and cannot—divest the Council from its control over federal policy.

89.     NMFS can block the Council's edicts only if it identifies a *legal* defect in its proposal.  16 U.S.C. § 1854(a)(3)(A).  The agency cannot block a proposal based on a *policy* disagreement.  And if NMFS does happen to identify a legal defect, its only option is to remand the plan to the Council with "recommendations" on how to fix the legal problem—recommendations that the Council is not obliged to even *consider*, much less adopt.  *Id.* § 1854(a)(3)(C), (a)(4).

90.     If for any reason NMFS fails to act on a Council submission within 30 days, the FMP or amendment "shall take effect as if approved."  *Id.* § 1854(a)(3); *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 431 (D.D.C. 2014).

30

JA.048

91.     The Council's power is even greater, though, if the President or Secretary ever wishes to repeal or modify an existing FMP or amendment.  The Secretary may repeal or modify federal fishing policy "only if the Council approves" that repeal or modification "by a three-quarters majority."   16 U.S.C. § 1854(h).   Thus, once Framework Adjustment 65 takes effect, *only* the Council may lift it.  Indeed, a bloc of unaccountably-appointed-and-insulated officials can preserve Framework Adjustment 65 *forever*.

92.     An official cannot serve as an "officer[] for purposes of some of [his] duties" but as a "mere employee[] with respect to other responsibilities."  *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991).   Thus, if Council Members wield officer-level authority in the exercise of *any* of their duties, they must be appointed under the terms of the Appointment Clause.

93.     In sum, each Council is "a mini legislative body" that decides "who, when, and where people get to fish."  Rauch Interview at 15, 19.  That is "significant authority" that can only be exercised by "Officers of the United States."  *Buckley*, 424 U.S. at 126.

## Council Members are principal officers.

94.     Council Members are principal officers who must be appointed by the President and confirmed by the Senate.  The Appointments Clause refers to certain "inferior" officers "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."

31

*Edmond v. United States*, 520 U.S. 651, 663, 664–65 (1997). Any officer who does *not* fit that description is a "principal" officer. *See Arthrex*, 141 S. Ct. at 1980. The key inquiry is "how much power an officer exercises free from control by a superior." *Id.* at 1982. Three factors guide that inquiry: *First*, does any principal officer exercise "administrative oversight" over the officer in question? *Id.* at 1980. *Second*, may a principal officer remove the officer without cause? *Id.* *Third*, can a principal officer "review the [officer's] decisions"? *Id.*

95. These factors all demonstrate that Council Members are principal officers. *First*, Council Members are subject only to minimal NMFS oversight. No principal officer controls the Council's policy priorities, research agenda, procedural rules, or staffing decisions. *See* 16 U.S.C. § 1852(e)–(i); *Arthrex*, 141 S. Ct. at 1980; *Edmond*, 520 U.S. at 664–65.

96. The Act shields the Council's core responsibility—developing FMPs and amendments—from administrative or policy oversight. The Secretary's input consists of mere "advisory guidelines." 16 U.S.C. § 1851(b). Once the Council completes a FMP or amendment, NMFS merely checks it for legality. Indeed, a Council Member— the Regional Administrator—is involved in this process. *See* NOAA Handbook at 7. And as Mr. Rauch explained, although he "ultimately issue[s] the regulations," he "do[es] that" only "because it resolves what [the Council] do[es] as legal." Rauch Interview at 15. None of this circumscribed review involves a principal officer.

32

97. *Second*, Council Members enjoy extraordinarily strong protection from removal. The Supreme Court has recognized that the "power to remove officers … is a powerful tool for control." *Edmond*, 520 U.S. at 664. But not even the President can freely remove Council Members. Much of the Council is immune from removal by any federal official, and the remaining Members enjoy some of the most robust tenure protections in federal law. *See infra*, at ¶¶ 112-13.

98. *Third*, given the Council's dominant role in developing FMPs and amendments, it issues "final decision[s]." *Arthrex*, 141 S. Ct. at 1981. Although NMFS may block a plan or amendment if it identifies a *legal* defect, the Council has the final word when it comes to fishery *policy*. "Since the founding, principal officers have directed the decisions of inferior officers on matters of law *as well as policy*." *Id.* at 1983 (emphasis added). The Act also provides that the Council's policies "shall take effect" if NMFS fails to act. 16 U.S.C. § 1854(a)(3). And the finality of the Council's decisionmaking is most stark whenever the President wishes to revoke or change the existing limits—a step that just five Council Members can thwart.

99. In sum, Council Members hold primary responsibility for federal fisheries policy and answer to no principal officer in the course of their duties. Councils operate independently, free of administrative oversight. They cannot be removed at will, if they are removable at all. And their policy judgments cannot be overturned by any federal official that answers to the President—or even by the President himself.

33

**Even as inferior officers, 17 Council Members were appointed in violation of the Appointments Clause.**

100.    Because no Member was nominated by the President and confirmed by the Senate, each serves unlawfully as a principal officer.

101.    Even if Members are *inferior* officers, though, 17 of them were still unlawfully appointed.  Congress may "vest the Appointment" of "inferior Officers" in three (and only three) places—"in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  Neither the President nor any court is involved in the selection of Council Members.  That leaves "Heads of Departments"—Cabinet-level officers and certain independent agencies.  *Freytag*, 501 U.S. at 886; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511–12 (2010).  But Heads of Departments do not appoint 17 of 18 Council Members either.

102.    To start, five Members hold their seats simply because they hold positions in state governments within the Council's region.  *See supra* ¶¶ 40-41.  These Members were thus "appointed" by state officials.  The Appointments Clause does not allow Congress to outsource the power to fill federal offices to state officials.  The Clause "ensure[s] that those who wield[]" the appointment power are "accountable to political force and the will of the people."  *Freytag*, 501 U.S. at 884.  But state officials are accountable, if at all, only to state electorates.  Allowing those officials to choose federal officers with authority over multiple states is a clear Appointments Clause violation.

34

103. The Government has argued elsewhere that all but one of the Council's Members are not Officers of the United States because they are not federal employees. *See Arnesen v. Raimondo*, 1:23-cv-00145, Dkt. No. 66 at 20-23 (S.D. Miss. Aug. 29, 2023). The Supreme Court has recognized that officials can be Officers of the United States even if they are not federal employees. *See, e.g.*, *Free Enterprise Fund*, 561 U.S. at 484-85 (addressing privately employed federal officers). But if the Government were correct that most of the Council's Members are not federal officers, *then* the Act is "unconstitutional because it delegates government power to a [non-federal] entity without sufficient agency supervision." *Nat. Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022). "A cardinal constitutional principle is that federal power can be wielded only by the federal government." *Id.* But under the Government's theory, most of the Council's Members impermissibly wield federal power *without* serving as federal officials. Because "the Constitution vests federal power only in the three branches of the federal government," *id.* at 872, this arrangement is unconstitutional under the Government's own account.

104. Meanwhile, 12 Members were improperly appointed because they were nominated by governors. For inferior officers, the Constitution permits Congress to "vest" the "Appointment" power in the Secretary of Commerce. U.S. Const. art. II, § 2, cl. 2. But the Act violates that instruction by giving the Secretary only a limited, subordinate role in selecting these Members. *See supra* ¶ 43.

35

105.    These Members are deemed "qualified" not by the Secretary's (or the President's) judgment, but through a set of statutory criteria evaluated by State governors wholly outside the Executive Branch. *See* 16 U.S.C. § 1852(b)(2)(A), (C). The Secretary may disagree with a governor's conclusion that a candidate is "qualified," but that does not empower the Secretary to exercise independent judgment. *Id.* § 1852(b)(2)(C). Instead, she can only "notify" the governor of her view. *Id.* That governor may then resubmit the candidate "with an additional explanation of [his] qualifications," or nominate someone else. *Id.* The Act does not limit the amount of back-and-forth or empower any federal official to bypass state stonewalling.

106.    Under this scheme, the Secretary is never permitted to choose whom she (or the President) would like to appoint; she must always pick from a closed set dictated by a state official.

107.    This scheme unconstitutionally "limit[s] selection and … trench[es] upon executive choice." *Myers v. United States*, 272 U.S. 52, 128 (1926). The President must be able to exclude those with "different views of policy," those "from a competing political party," and those he thinks "not intelligent or wise." *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (cleaned up). The Act flouts that principle by delegating Member selection to state officials accountable only to state voters. This "diffusion of the appointment power" to separate sovereigns assaults "the Constitution's structural integrity." *Freytag*, 501 U.S. at 878.

36

### Council Members are Unconstitutionally Insulated from Removal

108. "[T]he 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1, & § 3). Although the President can delegate to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Id.* at 2197. A President powerless to fire such officials "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514.

109. Thus, the default rule is that the President must be able to remove Executive Branch officials at will. *Seila Law*, 140 S. Ct. at 2191–92. There are only two exceptions. The first covers "multimember bod[ies] of experts, balanced along partisan lines, that performed legislative and judicial functions" and do not "exercise any executive power." *Id.* at 2199. The second covers certain "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 2199–2200.

110. Even within those categories, Congress does not have free rein to insulate subordinate executive officials. The Constitution permits only certain forms of modest tenure protection. *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 619 (1935) (President may remove FTC commissioners for "inefficiency, neglect of duty, or malfeasance in office"); *but see Free Enter. Fund.*, 561 U.S. at 495–96 (two layers of such for-cause removal protection are unconstitutional). Some protections are simply

37

"inappropriate for officers wielding the executive power of the United States." *Free Enter. Fund*, 561 U.S. at 503.

111. The Act unconstitutionally insulates every Council Member from removal. *First*, regardless of the *Seila Law* exceptions, 17 of the Council's 18 Members enjoy removal protections stronger than any removal protection the Supreme Court has ever approved in any context. These restrictions impose far greater restrictions on presidential control and democratic accountability than the two-layer for-cause regime the Court invalidated in *Free Enterprise Fund*, and exponentially greater burdens than those the Court blessed in *Humphreys Executor*.

112. The President is powerless to remove five of the Council's Members— those seats appointed and filled by state bureaucrats—who hold Council seats "so long as" they occupy state offices. *See supra* ¶ 40. Indeed, the only officials empowered to remove these Members are employed by separate sovereigns. It is hard to imagine a more "inappropriate" form of tenure protection "for officers wielding the executive power of the United States," *Free Enter. Fund*, 561 U.S. at 503, than absolute protection at the grace of a separate sovereign.

113. The 12 governor-nominated Members also enjoy unconstitutional protections. The President—through the Secretary—may remove these Members only "for cause." 16 U.S.C. § 1852(b)(6). And the Act provides just *one* scenario that could supply the requisite "cause"—when a formal hearing reveals the Member violated 16

38

U.S.C. § 1857(1)(O), a conflict-of-interest provision.  *Id.* § 1852(b)(6)(B).  The President cannot unilaterally remove a Member for anything else.  If the President wishes to remove a Member outside that extraordinary narrow circumstance, he must persuade the Member's colleagues on the Council to "first recommend[] removal" by a two-thirds vote.  *Id.* § 1852(b)(6)(A).  This scheme clearly "impede[s] the President's ability to perform his constitutional duty."  *Seila Law*, 140 S. Ct. at 2199 (internal quotation marks omitted).

114.    *Second*, the Council and its Members do not fit either *Seila Law* exception and thus *any* removal restriction violates the Constitution.  To start, the Council is not the sort of "multimember body of experts, balanced along partisan lines," that *Humphrey's Executor* found "not to exercise any executive power."  *Id.*  Such independent agencies lack "the authority to promulgate binding rules" and serve as "mere legislative or judicial aid[es]."  *Id.* at 2200.  The Council is a "body of experts" but bears none of the exception's other hallmarks:  It lacks partisan balance; it is not a "legislative agency," *Humphrey's*, 295 U.S. at 628; and it exercises executive functions by, among other things, developing rules.

115.    Nor do Council Members fit the second *Seila Law* exception for inferior officers akin to the independent counsel in *Morrison v. Olson*, 487 U.S. 654 (1988).  Members are *principal* officers.  *See supra* ¶¶ 94-99.  And even if they were inferior officers, they bear no resemblance to a prosecutor with no "policymaking or

39

administrative authority," *Seila Law*, 140 S. Ct. at 2200, who was "appointed … to accomplish a single task," *Morrison*, 487 U.S. at 672.

116.    Thus, Council Members lie beyond both *Seila Law* exceptions.  Their tenure protections are thus unconstitutional.  This includes Regional Director Pentony, who serves on the Council in his capacity as a career SES official in NMFS.  Although his tenure protections are more familiar, they likewise transgress Article II by improperly insulating an official who exercises substantial executive authority.

117.    The Constitution's Executive Vesting and Take Care Clauses protect democracy by ensuring that only those accountable to the President—and thus, the American people—wield executive power.  The Act violates that principle.

### The Deputy Assistant Administrator is Likewise Unconstitutionally Insulated from Removal

118.    Article II of the Constitution mandates that the President possess the power to freely remove any officer who exercises "the executive power."

119.    Neither the President nor any of his deputies may freely remove Mr. Rauch from office.  As a member of the SES appointed to a career position, Mr. Rauch may be removed only for cause.  5 U.S.C. §§ 3592, 7541–43.  This removal protection is "a *de facto* form of life tenure."  *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 391 (5th Cir. 2023) (Ho, J., concurring).

120.    Mr. Rauch is an "Officer of the United States."  *First*, he holds a continuing office created by federal regulations, which can establish officer positions.

40

*See United States v. Mouat*, 124 U.S. 303, 307–08 (1888). Mr. Rauch has held this position for years, and the civil-service laws protect his continued tenure. *Second*, he "exercis[es] significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126. Mr. Rauch issues legally binding regulations on behalf of the Federal Government. In this case, he signed Framework Adjustment 65 and published it in the Federal Register in his own name. The power to issue final rules is one of the most consequential actions an agency can take—one that can be exercised only by "Officers of the United States." *See id.* at 140–41. More broadly, Mr. Rauch "oversees" all NMFS "regulatory actions and programs"—for instance, he "[c]oordinat[es]" the agency's "National Environmental Policy Act programs." NOAA Fisheries, *Samuel D. Rauch III, Deputy Assistant Administrator for Regulatory Programs*, https://www.fisheries.noaa.gov/contact/samuel-d-rauch-iii (last visited June 5, 2023). As the "auditor[]" of the federal fisheries "system," Mr. Rauch is an officer of the United States. Rauch Interview at 15.

121. As noted above at paragraph 111, *Seila Law* recognized "two exceptions" to the rule that the President must be able to freely remove Executive Branch officials from office. 140 S. Ct. at 2191–92. The Court identified exceptions "for multimember expert agencies that do not wield substantial executive power" and "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 2199–2200 (internal quotation marks omitted).

41

122. Mr. Rauch is not part of an expert board, nor is he analogous to the independent counsel in *Morrison*. Most relevant here, Mr. Rauch issues binding regulations that embody the Council's policy judgments and his own agency's legal review. That alone ranks Mr. Rauch above mere employees in the constitutional hierarchy. Mr. Rauch's rulemaking authority and oversight of all NMFS "regulatory actions and programs," *see supra*, at ¶¶ 64-65, entail substantial exercises of discretionary executive power.

123. Mr. Rauch's protection from at-will removal "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Free Enter. Fund*, 561 U.S. at 498. His exercise of federal authority is "incompatible with the Constitution's separation of powers." *Id.*

124. Mr. Rauch has, indeed, bragged about his substantial-and-unaccountable executive authority. Specifically, he has told the story of his "most proud" accomplishment—implementing a rule regulating ship speeds—over the objections of the elected Vice President of the United States. Rauch Interview at 30–31. He described the White House as an "evil empire" against which he "fought" and "won." *Id.* at 31. And he recounted "find[ing] every friend we … have in the government" to assist his effort to resist the very President whose executive power Mr. Rauch wields. *Id.* It is difficult to imagine a starker violation of Article II.

42

### STANDING

125.    NEFSA has Article III standing to challenge Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations. An association like NEFSA has standing to sue on behalf of its members when "(1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992).  NEFSA was formed in part to protect the interests of local commercial fishermen who face onerous regulations like Framework Adjustment 65, and NEFSA's challenges and requested relief do not necessitate individual NEFSA members' participation. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975).

126.    An individual member has standing if he (1) suffers a concrete "injury in fact" that was (2) "likely caused by the defendant" and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  A court must "assume, for purposes of the standing analysis," that a plaintiff is "correct on the merits of [his] claim[s]." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *accord Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

127.    NEFSA members will suffer concrete, irreparable injuries as a result of Framework Adjustment 65.  The Council's policies will cost NEFSA members revenue,

43

profits, and business opportunities derived from groundfishing. In particular, revenue derived from the haddock fishery will decline under the Framework Adjustment's roughly 80% reduction to the overall species catch limit. For example, NEFSA member David Osier's seafood business will be devastated by the Adjustment's reductions of the haddock and white hake catch limits. Moreover, as a result of these shifts, NEFSA members will expend more resources *avoiding* fish species that they cannot afford to catch under the Council's restrictions. Finally, NEFSA members' ability to harvest cod will be impeded by the Framework Adjustment's decade-long cod rebuilding plan.

128. Moreover, being subjected to regulations developed, approved, and issued by unconstitutionally appointed and insulated officers is an independently cognizable "here-and-now" injury. *Seila Law*, 140 S. Ct. at 2196; *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 903 (2023) ("The harm [plaintiffs] allege is being subjected to unconstitutional agency authority …. That harm may sound a bit abstract; but this Court has made clear that it is a here-and-now injury." (quotation marks omitted)).

129. These injuries are "fairly traceable" to Defendants. *Collins*, 141 S. Ct. at 1779. NMFS issued the Final Rule adopting the illegitimate Council's policymaking as law. And an unconstitutional statute that undergirds a regulatory process may be challenged in a suit attacking the *product* of that process. *See FEC v. Cruz*, 142 S. Ct. 1638, 1649–50 (2022).

44

130. NMFS issued the Final Rule under provisions of the Act authorizing it to adopt and implement *the Council*'s FMP amendment. *See* 16 U.S.C. § 1854(a)–(b). But the Council did not lawfully develop such an amendment; instead, officials *devoid* of constitutional authority *purported* to do so. There was no valid FMP amendment to promulgate. The Act's constitutional defects thus short-circuited the regulatory process and deprived NMFS of authority to promulgate the Final Rule. NMFS did so anyway, thus subjecting NEFSA members to concrete injuries.

131. Moreover, as the product of an illegitimate Council, Framework Adjustment 65 was unlawful, and NMFS should have exercised its statutory authority to reject it. *See* 16 U.S.C. § 1854(a)(1)(A). Because it did not, NEFSA members will suffer irreparable harm.

132. These injuries are also traceable to Defendant Rauch, who executed the Final Rule subjecting NEFSA members to the Council's groundfishing policy. In addition, Mr. Rauch's tenure protections divest him of lawful authority to issue the Final Rule or accompanying regulations.

133. The Supreme Court recently clarified that, "for purposes of [Article III] traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to *allegedly unlawful conduct* of the *defendant*, not to the *provision of law* that is challenged." *Collins*, 141 S. Ct. at 1779 (internal quotation marks omitted; emphasis added). Here, all Defendants

45

engaged in "conduct" that NEFSA "alleges" is "unlawful." *Id.* That same conduct will result in concrete injuries. Article III requires nothing more.

134. NEFSA's standing does not require proof that a properly appointed or removable Council Member or agency official would have acted differently. *Seila Law*, 140 S. Ct. at 2196. First, because NEFSA members will be "harmed by … action that was taken by" illegally appointed and insulated officials, they have "establish[ed] standing." *Collins*, 141 S. Ct. at 1788 n.24. Moreover, like the challengers in *Axon* and *Cochran*, NEFSA "protest[s] the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process." *Axon Enter.*, 143 S. Ct. at 904.

135. This Court can redress these injuries. When a party "challenging the legality of government action … is himself an object of the action[,] there is ordinarily little question" that a "judgment preventing" that action will redress his harm. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). That is true of NEFSA's members here. If the Court vacates or enjoins the challenged actions, NEFSA members will be able to harvest more haddock, cod, white hake, and other groundfish species. And if the Court grants such relief, NEFSA members will no longer be "subjected to unconstitutional agency authority," remedying that ongoing injury. *Axon*, 143 S. Ct. at 903.

46

## CLAIMS FOR RELIEF

## Count I:  Council Members Serve in Violation of the Appointments Clause

136.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

137.    The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  The Clause allows Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*

138.    NEFSA has two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action.  *See supra* ¶ 28; *Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial review).  The second cause of action arises under the Act's provisions authorizing judicial review of Framework Adjustment 65, which incorporate the relevant sections of the APA.  *See* 16 U.S.C. § 1855(f).

139.    All 18 Council Members are "Officers of the United States" because they wield substantial authority on behalf of the Federal Government.

47

140.   All 18 Members are principal officers because they are not adequately supervised by or accountable to principal officers.  Therefore, all 18 must be nominated by the President and confirmed by the Senate.  None were.

141.   Even if Members are inferior officers, 17 of 18 were unconstitutionally appointed.  Congress may vest the appointment of inferior officers in the President, the courts, or the "Heads of Departments."   Seventeen Members were appointed by someone else.   Five hold office by virtue of their appointments within State governments; twelve were selected by State Governors and approved by the Assistant Administrator for Fisheries.  The Council cannot lawfully act if any of its Members were unlawfully appointed.  *See Nguyen v. United States*, 539 U.S. 69, 82 (2003) (vacating a conviction affirmed by a circuit panel that unlawfully included an Article IV judge despite two Article III judges voting to affirm); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1725 (2018); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016).  One unconstitutional official is one too many.  *Free Enter. Fund*, 561 U.S. at 511–12 & n.12.  Alternatively, Plaintiff is entitled to relief if the Court concludes that 9 or more of the Members were improperly appointed, because that would deprive the Council of a quorum for its vote on Framework Adjustment 65.  *See supra* ¶ 45.

142.   The Council's Members were appointed in violation of the Appointments Clause and thus never received lawful federal authority.   As a result, Framework Adjustment 65 is unlawful and void.   Because the Council's structure "was

48

unconstitutional at the time [the rule] issued," vacatur of Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations is warranted. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012); *see also Lucia*, 138 S. Ct. at 2055.

143.   The Framework Adjustment 65 Final Rule and accompanying regulations—formulated by an unconstitutionally appointed Council—are "contrary to constitutional right, power, privilege, or immunity" and must be vacated.  5 U.S.C. § 706(2)(B).

144.   Given the Council's lack of authority, NMFS was obligated to reject Framework Adjustment 65 under 16 U.S.C. § 1854(a)(1)(A).  Because it did not, the Framework Adjustment 65 Final Rule and all accompanying regulations are also "not in accordance with law," are "in excess of statutory … authority," and must be vacated. 5 U.S.C. § 706(A), (C).

145.   Injunctive relief is warranted.  Plaintiff has no adequate remedy at law. And "subjection to an unconstitutionally constituted decision-maker" is "in itself a constitutional injury sufficient to warrant injunctive relief." *See United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982); *see also Axon Enter.*, 143 S. Ct. at 899, 903–04.  The Court should enjoin the enforcement of Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations.

49

146.   Declaratory relief is also "appropriate" to "declare [Plaintiff's] rights." 28 U.S.C. § 2201(a).   The Court should declare that Council Members are unlawfully appointed and that Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations are therefore void.

## Count II:  Council Members are Unconstitutionally Insulated from Removal

147.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

148.   Article II of the Constitution provides that "[t]he executive power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1, & § 3.   Although the President can delegate tasks to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 140 S. Ct. at 2197.   In order to hold officials accountable, the President must normally have "the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their functions, obey." *Id.* (cleaned up).

149.   NEFSA has two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action.   *See Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial

50

review).  The second cause of action arises under the Act's provisions authorizing judicial review of Framework Adjustment 65, which incorporate the relevant sections of the APA.  *See* 16 U.S.C. § 1855(f).

150.  The President cannot hold Council Members accountable because he cannot freely remove any of them.  He cannot remove the five Members who hold federal office by virtue of their State offices under any circumstances.  The 12 governor-nominated Members can be removed only if a supermajority of the Council consents or if they violate certain financial conflict-of-interest provisions.  And Council Member Pentony may only be removed for cause.  These restrictions unlawfully interfere with the President's supervision of the Executive Branch.

151.  The Council's removal protections cannot be severed from the Act's provisions granting the Council policymaking authority over federal fisheries.  Because the Council exercised that authority here, Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations were issued without lawful authority and must accordingly be vacated.  *See Axon Enter.*, 143 S. Ct. at 902 ("Only the … ability to sever the relevant statute's for-cause removal provision enable[s]" an agency "to keep running.").

152.  "[T]he 'traditional' rule is that 'the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.'"  *Seila Law*, 140 S. Ct. at 2209 (quoting *Alaska Airlines, Inc. v. Brock*, 480

51

U.S. 678, 685 (1987)).  Given the unambiguous intent of Congress to enshrine *state*-controlled Councils as its primary policymakers, Congress would never have passed the Act if its Councils were directly accountable only to federal officials.  Congress ensured that 17 of the Council's 18 Members would be accountable to state officials.  Indeed, "political pressures played an important role in placing the states in a dominant … position," in part because the industry would have rejected "a purely federal regime." Rogalski, *supra*, at 174.  "Thus, the composition of each council shows a strong state representation among those voting … and a strong federal representation among those advising though not voting."  *Id.* at 173.  No court can undo that choice.

153.    Declaratory relief is also "appropriate" to "declare [Plaintiff's] rights."  28 U.S.C. § 2201(a).    The Court should declare that Council Members are unconstitutionally insulated from removal; and declare that Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations are therefore the unlawful products of an unconstitutionally constituted Council.

### Count III:  Alternatively, the Act Violates the Nondelegation Doctrine by Granting Federal Regulatory Power to Officials Outside the Federal Government.

154.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

155.    Plaintiff maintains that all Council Members who exercise federal power over New England's fisheries are *federal* officials.  But if the Court concludes that the

52

bulk of the Council Members are not federal officers and are thus not subject to the Appointments Clause and the Constitution's removal restrictions—as the Government will surely contend—*then* the Act violates the private nondelegation doctrine. "[T]he Constitution vests federal power only in the three branches of the federal government." *Nat. Horsemen's Benevolent and Protective Ass'n*, 53 F.4th at 872. If the Council's members are *not* federal officials—contrary to Plaintiff's view, but, again, as the Government has argued before—then those non-federal-officials wield federal power in violation of the "cardinal constitutional principle . . . that federal power can be wielded only by the federal government." *Id.*

156. As the product of unlawfully empowered officers, Framework Adjustment 65 would be "contrary to constitutional right, power, privilege, or immunity" and must be vacated. 5 U.S.C. § 706(2)(B).

157. Given the Council's lack of authority, NMFS was obligated to reject Framework Adjustment 65 under 16 U.S.C. § 1854(a)(1)(A). Because it did not, the Framework Adjustment 65 Final Rule and all accompanying regulations are also "not in accordance with law," are "in excess of statutory … authority," and must be vacated. 5 U.S.C. § 706(A), (C).

## Count IV: The Deputy Assistant Administrator is Unconstitutionally Insulated from Removal

158. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

53

159.    Article II of the Constitution provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1, & § 3.  Although the President can delegate tasks to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 140 S. Ct. at 2197.

160.    NEFSA has two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action.  *See Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial review).  The second cause of action arises under the Act's provisions authorizing judicial review of Framework Adjustment 65, which incorporate the relevant sections of the APA.  *See* 16 U.S.C. § 1855(f).

161.    The President cannot hold the Deputy Assistant Administrator accountable because he cannot freely remove him.  As a career-appointed SES civil servant, the Deputy Assistant Administrator may be fired only for cause, under a scheme that effectively bestows "life tenure." *Feds for Med. Freedom*, 63 F.4th at 391 (Ho, J., concurring).  That is unconstitutional:  The Deputy Assistant Administrator exercises the core executive function of unilaterally issuing final binding regulations and thus fits into neither *Seila Law* exception.

54

162. This Court cannot re-write the SES regime to render the Deputy Assistant Administrator terminable at will. The whole point of a Senior Executive Service with career appointees is to create an insulated class of civil servants. Congress would not have enacted a self-defeating scheme that permitted such employees to be fired at will. *See Seila Law*, 140 S. Ct. at 2209. Because the Court cannot revise the web of statutes and regulations that resulted in Mr. Rauch's unconstitutional service, this Court should declare that his issuance of the Final Rule and accompanying regulations was unlawful, vacate those actions, and grant injunctive relief. *See Axon Enter.*, 143 S. Ct. at 902.

163. Declaratory relief is "appropriate" to "declare [Plaintiff's] rights." 28 U.S.C. § 2201. The Court should declare that the Deputy Assistant Administrator is unconstitutionally insulated from removal; and declare that the Framework Adjustment 65 Final Rule and all accompanying regulations are the unlawful products of an unconstitutionally insulated official.

## PRAYER FOR RELIEF

**Now, therefore,** Plaintiff requests a judgment in their favor against Defendants as follows:

A. Declaring that the voting Members of the New England Fishery Management Council were appointed in violation of the Appointments Clause.

55

B.    Alternatively, declaring that Act violates the Constitution's private nondelegation doctrine by delegating federal power to officials outside the federal government.

C.    Declaring that the voting Members of the New England Fishery Management Council are unconstitutionally insulated from removal.

D.    Declaring Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations unlawful, unenforceable, and void as the products of unconstitutionally appointed Council Members.

E.    Declaring Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations unlawful, unenforceable, and void as the products of Council Members with unconstitutional removal protections.

F.    Declaring that the Deputy Assistant Administrator for Regulatory Programs at NMFS is unconstitutionally insulated from removal.

G.    Declaring the Framework Adjustment 65 Final Rule and accompanying regulations unlawful, unenforceable, and void as the products of a Deputy Assistant Administrator for Regulatory Programs with unconstitutional removal protections.

H.    Vacating Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations as "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(A)–(C); 16 U.S.C. § 1855(f)(1).

56

I.     Permanently enjoining Defendants from enforcing Framework Adjustment 65, the Framework Adjustment 65 Final Rule, or accompanying regulations against NEFSA's members.

J.     Awarding reasonable attorneys' fees and costs, plus interest accruing thereon, under 28 U.S.C. § 2412; and

K.     Granting such other and further relief as the Court may deem appropriate.

Dated:  September 22, 2023        Respectfully submitted,

*/s/ Megan S. Newton*
Megan S. Newton, ME Bar No. 004461
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3986
msowardsnewton@jonesday.com

*Counsel for Plaintiff*

57

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

NEW ENGLAND FISHERMEN'S STEWARDSHIP
ASSOCIATION

*Plaintiff,*

*v.*

GINA RAIMONDO, U.S. Secretary of
Commerce, *et al.*

*Defendants.*

No. 23-cv-00339-JAW

I, David Osier, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      My name is David Osier.  I am over 18 years of age, of sound mind, and otherwise competent to make this declaration.  This declaration is based on my personal knowledge.

2.      I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.

3.      I am a member of the New England Fishermen's Stewardship Association ("NEFSA"), a membership association and a plaintiff in this suit.  I submit this declaration in support of NEFSA's standing to bring this suit.

4.      NEFSA is dedicated to representing the interests of local commercial fishermen, educating the public about seafood resource management, and protecting

the future of fishing in New England.  It strives to promote regional economic strength, ecosystem sustainability, and American food security.

5.     NEFSA's membership includes fishermen adversely affected by the catch-limit reductions and cod rebuilding plan contained in Framework Adjustment 65.  I am one of those members.

6.     I have been a commercial fisherman for 43 years.  Throughout, I have operated a fishing business (Osier's Seafood) out of South Bristol, Maine.  South Bristol is a small town, and a large proportion of its residents—including fishermen, suppliers, vendors, and their families—will be harmed by the groundfishing catch limits and other regulations in Framework Adjustment 65.

7.     I operate four fishing vessels, including three groundfish trawlers and one combo seiner/trawler.  My trawlers are docked in Portland, Maine.

8.     I have fished under the Northeast Multispecies groundfishing plan for 40 years.  I make three commercial fishing trips per month, on average.  My groundfish trawlers typically target haddock, cod, pollack, flounder, redfish, grey sole, monkfish, halibut, lobsters, whiting, and white hake.  I typically sell my catch at the Cape Ann Seafood Auction in Gloucester, Massachusetts or at the Portland Fish Exchange in Portland, Maine.

9.     Framework Adjustment 65 represents the latest regulatory assault on local commercial fishermen in New England.  It will irreparably harm my business, the livelihoods of my captains and crew, and the communities we serve.

2

10.     Most important, Framework Adjustment 65 slashes haddock catch limits. For Georges Bank haddock, the commercial ACL will plummet from 75,382 metric tons to 10,829—an 85% reduction.  For haddock in the Gulf of Maine, the cut is over 78%—from 7,056 metric tons to just 1,537.  For fishermen like myself who fish for haddock under leased allocations, this dramatically reduced catch limit represents a major hit to our profitability.

11.     Framework Adjustment 65 is harmful in other ways, too.  For one thing, it imposes a more restrictive 10-year rebuilding plan for cod.  In addition to restricting our access to the cod fishery, these regulations will cause my vessels spend significant time and resources navigating away from areas where cod might be present—even if other fish we would like to harvest are likely to be there.

12.     Moreover, the Framework Adjustment lowers the commercial catch limit for white hake.  Hake is a deep-water fish, and it is nearly impossible to know whether white hake are present in an area.  By lowering the catch limit, Framework Adjustment 65 will cause my vessels to navigate away from suspected hake areas, sacrificing possible harvests of other species.

13.     Prior to the Framework Adjustment 65 catch limits developed by the Council and approved by the National Marine Fisheries Service (NMFS), I routinely harvested 400,000 lbs. of haddock and 300,000 lbs. of hake in a fishing season.  Under the new regulations, I will be able to harvest (at most) around 80,000 lbs. of haddock and 140,000 lbs. of hake.

3

14.    Framework Adjustment 65 and its implementing regulations will impose financial hardship on my fishing business.  Based on more than 40 years of experience, I estimate that these groundfishing catch limits will reduce my revenue by around 50 percent.  Even that estimate, however, assumes that my business will be able to sustain a normal schedule of fishing trips.  In reality, captains and crew are less likely to sign on for much lower pay per trip—the necessary consequence of Framework Adjustment 65.

15.    Because of the Council's policy decisions contained in Framework Adjustment 65, I will lose (and am currently losing) earnings and profits.

16.    Because of NMFS's issuance of the Framework Adjustment 65 Final Rule and implementing regulations that embody the Council's policy decisions, I will lose (and am currently losing) earnings and profits.

17.    Framework Adjustment 65, the Final Rule, and accompanying regulations are causing me irreparable harm.  Every day Framework Adjustment 65's terms are in effect, I lose the opportunity to harvest haddock and other groundfish and bring that harvest to market.  That financial injury cannot be recouped from the Government or made up for in future fishing years.  It is irreversible and indefinite.

18.    A preliminary injunction barring Defendants from implementing Framework Adjustment 65 or the Framework Adjustment 65 Final Rule would redress my injuries and those of other NEFSA members.

4

19. An order vacating the Framework Adjustment 65 Final Rule would redress my injuries and those of other NEFSA members.

20. An injunction barring the Council, NMFS, and the Secretary from enforcing the terms of Framework Adjustment 65 would redress my injuries and those of other NEFSA members.

21. A declaration that Framework Adjustment 65 is the illegitimate product of an unconstitutionally appointed and tenure-protected Council, as well as an unconstitutionally appointed and tenure-protected Deputy Assistant Administrator, would also redress my injuries and those of other NEFSA members.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:        September 5, 2023              _/s/ David Osier_____

                                             David Osier

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

New England Fishermen's Stewardship Association

    *Plaintiff,*

*v.*

Gina Raimondo, U.S. Secretary of Commerce, *et al.*

    *Defendants.*

No. 23-cv-00339-JAW

I, Devyn Campbell, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  My name is Devyn Campbell. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge.

2.  I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.

3.  I am a member of the New England Fishermen's Stewardship Association ("NEFSA"), a membership association and the plaintiff in this suit. I also serve on NEFSA's board of directors. I submit this declaration in support of NEFSA's standing to bring this suit.

4.  NEFSA is dedicated to representing the interests of local commercial fishermen, educating the public about seafood resource management, and protecting

the future of fishing in New England.  It strives to promote regional economic strength, ecosystem sustainability, and American food security.

5.     NEFSA's membership includes fishermen adversely affected by the catch-limit reductions, cod rebuilding plan, and other regulations contained in Framework Adjustment 65.  I am one of those members.

6.     I have been fishing commercially for nine years.  I have been active in the New England Multispecies fishery—also known as groundfishing—for the past five years.  I am the owner-operator of a fishing business based in Boothbay Harbor, Maine.

7.     A large proportion of Boothbay Harbor's residents—including fishermen, seafood dealers, suppliers, and others—are being harmed by the groundfishing catch limits and other regulations in Framework Adjustment 65.

8.     For the past three years I have captained the *F/V Susan And Jessica*, a 40-foot wooden trawler.  To my knowledge, my vessel is the smallest full-time groundfish trawler based in Maine.  I typically make at least one commercial trip per week.

9.     Throughout my groundfishing career, my primary species target has been haddock, which are abundant in areas close to my base of operations.  I also target white hake.  I land my groundfish harvests in Portland, Maine and sell at the Portland Fish Exchange.

10.    Framework Adjustment 65 represents the latest regulatory assault on local commercial fishermen in New England.  It is harming my business, others like it, and the communities we serve.

2

11.     Framework Adjustment 65 makes numerous changes to federal groundfishing regulations.  Most notably, it slashes haddock catch limits:  For Georges Bank haddock, it cuts the acceptable biological catch (ABC) by 85%, from over 79,000 metric tons to just 11,901.  For Gulf of Maine haddock, the cut is about 83%, from around 11,000 metric tons to just 1,936.  For businesses like mine that rely on haddock, these dramatically reduced catch limits represent a major hit to our profitability.  They will also force me to spend time and resources attempting to avoid haddock.

12.     The National Marine Fisheries Service (NMFS) issued the Framework Adjustment 65 Final Rule on August 18, 2023.  The haddock catch limit in the Final Rule was somewhat more relaxed than that in the Council's original plan.  At its April 2023 meeting, the Council acknowledged that its scientists had previously underestimated the haddock population in the Gulf of Maine.  Consequently, it voted for NMFS to take an "emergency" action to modestly decrease the magnitude of its cuts to the Gulf of Maine haddock catch limit.  NMFS complied in the Final Rule, noting that the revised catch limit still "represent[ed] a substantial reduction"—about 78%—from the prior year.  The Final Rule's haddock catch limits remain harmful to my business.

13.     Framework Adjustment 65 is harmful in other ways, too.  For one thing, it lowers the commercial catch limit for white hake by about 13%.  Hake is a plentiful deep-water fish, and it is nearly impossible to know whether hake are present in an area.

3

By lowering the catch limit, Framework Adjustment 65 will force me to navigate away from suspected hake areas, sacrificing possible harvests of other species.

14. The Framework Adjustment Final Rule has imposed, and will impose, significant financial hardship on my business. Prior to its new rules, my business relied on robust harvests of haddock and white hake. In the 2022 fishing season, I landed approximately 20,000 lbs. of haddock and approximately 10,000 lbs. of hake. Under the new regulations, my permit was issued 1,438 lbs. of haddock for the 2023 fishing year. I received an additional approximately 480 lbs. of haddock under the NMFS emergency regulation included in the Final Rule. To harvest additional haddock, I must lease haddock quota at very high rates.

15. As a result of the new regulations, I have been forced to make riskier trips farther out to sea to target other species, including plaice and greysole. Unfortunately, these species fetch significantly lower prices at auction, further undermining my profitability.

16. The Framework Adjustment 65 Final Rule has already led to decreased groundfish landings and commercial trips in my area. Because of its dramatic cuts to the haddock catch limit, buyers are beginning to look elsewhere to fulfill demand for the species. Thus, the price of haddock will fall despite the Rule's restrictions on supply.

17. At this point in previous fishing years, I had accumulated significantly more revenue and savings, which pay for the upgrades and maintenance necessary to keep my vessel seaworthy and make other business investments.

4

18.     Because of the Council's policy decisions contained in Framework Adjustment 65, I will lose (and am currently losing) earnings and profits.

19.     Because of NMFS's issuance of the Framework Adjustment 65 Final Rule that embodies the Council's policy decisions, I will lose (and am currently losing) earnings and profits.

20.     The Framework Adjustment 65 Final Rule is causing my business irreparable harm. Every day Framework Adjustment 65's terms are in effect, I lose the opportunity to harvest haddock and other groundfish and bring that harvest to market. That financial injury cannot be recouped from the Government or made up for in future fishing years. It is irreversible and indefinite.

21.     An order vacating the Framework Adjustment 65 Final Rule would redress my injuries and those of other NEFSA members.

22.     An injunction barring Defendants from enforcing the terms of Framework Adjustment 65 would redress my injuries and those of other NEFSA members.

23.     A declaration that Framework Adjustment 65 is the illegitimate product of an unconstitutionally appointed and tenure-protected Council, as well as an unconstitutionally appointed and tenure-protected Deputy Assistant Administrator, would also redress my injuries and those of other NEFSA members.

5

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      November 7, 2023            */s/ Devyn Campbell*

                                            Devyn Campbell



**New England Fishery Management Council**

50 WATER STREET | NEWBURYPORT, MASSACHUSETTS 01950 | PHONE 978 465 0492 | FAX 978 465 3116
Eric Reid, *Chair* | Thomas A. Nies, *Executive Director*

April 18, 2023

Mr. Michael Pentony
Regional Administrator
Greater Atlantic Regional Fisheries Office
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, MA 01930

Dear Mike:

Today, my staff electronically sent the final submission of Framework Adjustment 65 to the
Northeast Multispecies (Groundfish) Fishery Management Plan, including the Environmental
Assessment and appendices, to your staff in the Sustainable Fisheries Division.

After reviewing the letter and comments dated April 5, 2023, on the preliminary submission
sent on February 22, 2023, we updated the framework document to incorporate all the changes
requested.

In particular, we addressed the concerns raised with the Council's proposal for the Georges
Bank cod acceptable biological catches (ABCs) for fishing years 2023 and 2024 including the
rationale and impacts analysis. I feel we have adequately addressed the issues raised in the letter
and strongly urge you to approve the Council's proposal.

Please contact me if you have questions.

Sincerely,

Thomas A. Nies
Executive Director

000000000005386



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930

May 11, 2023

MEMORANDUM FOR:     Janet Coit
                    Assistant Administrator for Fisheries

FROM:               Michael Pentony
                    Regional Administrator

SUBJECT:            Clearance of a Proposed Rule to Implement Framework
                    Adjustment 65 to the Northeast Multispecies Fishery Management
                    Plan, RIN 0648-BL95--DECISION MEMORANDUM

I request that you make determinations about the proposed rule and transmit it to the NOAA
General Counsel and the Department of Commerce General Counsel for clearance to publish in
the **Federal Register**.  Framework Adjustment 65 to the Northeast Multispecies Fishery
Management Plan (FMP) would revise the rebuilding plan for Gulf of Maine (GOM) cod, set
catch limits for 16 of the 20 multispecies (groundfish) stocks, and make a temporary
modification to the accountability measures (AM) for Georges Bank (GB) cod.  This action is
necessary to respond to updated scientific information and to achieve the goals and objectives of
the FMP.  We intend to propose all Framework 65 measures as recommended by the New
England Fishery Management Council.  We intend to implement Framework 65 as soon as
possible after the start of the 2023 fishing year on May 1, 2023.

BACKGROUND

Rebuilding Program

Originally developed under Amendment 13 (2004), the GOM cod rebuilding plan was previously
revised in Framework 51 (2014), due to inadequate progress.  In 2021, we informed the Council
that the stock had again made inadequate rebuilding progress, setting a deadline of August 13,
2023, to revise the plan.  Framework 65 would revise the rebuilding plan for GOM cod, and
would set the rebuilding fishing mortality rate ($F_{rebuild}$) at 60 percent of F at maximum sustainable
yield ($F_{MSY}$) and the time to rebuild ($T_{Target}$) at 10 years, rebuilding by 2033 with a 70-percent
probability of achieving the target biomass ($B_{MSY}$).  Based on the 2021 stock assessment, the
stock is currently at 5 percent of $B_{MSY}$.  The acceptable biological catch (ABC) previously set for
fishing years 2023 and 2024 (by Framework 63) would remain in place.

Catch Limits
Framework 65 would set overfishing limits (OFLs) and ABCs for:

JA.088



- GB haddock, GOM haddock, Southern New England/Mid-Atlantic (SNE/MA) yellowtail flounder, Cape Cod (CC)/GOM yellowtail flounder, American plaice, witch flounder, GB winter flounder, GOM winter flounder, SNE/MA winter flounder, pollock, ocean pout, Atlantic halibut, and Atlantic wolffish for fishing years 2023-2025, based on the 2022 stock assessments;
- GB cod and GB yellowtail flounder for fishing years 2023-2024; and
- White hake for fishing year 2023, based on the 2022 stock assessment.

Compared to 2022, Framework 65 would increase the ABC for eight stocks and decrease the ABC for eight stocks. Changes range from an increase of 180 percent for GB winter flounder to a reduction of 85 percent for GB haddock (see Table 1, attached). Framework 65 maintains the fishing year 2023 total ABCs set by Frameworks 61 (2021) and 63 (2022) for the remaining four stocks, but would make minor adjustments to the subcomponent quotas for all but redfish, based on updated information.

In Framework 63, the Council opted to set the GB cod ABC for only one year (fishing year 2022), based on the catch advice from the 2021 assessment, which used the iSmooth (previously called the PlanBsmooth) approach. For Framework 65, the Council recommended an ABC for GB cod of 904 mt for 2023 and 2024 with a proportional increase of the recreational catch target from 75 mt to 113 mt. The Council's Scientific and Statistical Committee (SSC) met in August 2022 to discuss alternatives for the GB cod ABC for fishing years 2023 and 2024, and a majority of the SSC recommended an ABC of 904 mt, which is 150 mt above the 2022 ABC. A minority of the SSC recommended the status quo ABC of 754 mt. The Council included an updated analysis in its Framework 65 submission, applying the iSmooth approach using fall 2021 and spring 2022 surveys and catch data through 2021. This updated analysis resulted in an amount that is 74 mt higher than the 904-mt ABC recommended by the Council. The Council did not revise its recommendation with the higher amount. Instead, it has demonstrated that the 904-mt ABC recommendation would contribute to stock rebuilding while having a low probability of overfishing. The sector component of the fishery will have a high (90-percent) target coverage level of monitoring in fishing year 2023, which is anticipated to help ensure the accuracy of commercial catch data.

The Council adopted new catch limits for two U.S./Canada stocks (eastern GB cod and GB yellowtail flounder) based on the Transboundary Resources Assessment Committee's stock assessments conducted in 2022. These catch limits are consistent with the recommendations of the joint U.S./Canada Transboundary Management Guidance Committee (TMGC) that recommends shared quotas each year. For eastern GB haddock, no consensus was reached on the total shared catch limit, and the Council recommended setting a catch limit of 1,520 mt for the U.S. and using 2,320 mt as an estimate of possible Canadian catch. Framework 65 would set these catch limits for 2023 and 2024, with the expectation that the 2024 specifications would be replaced by updated TMGC recommendations as part of next year's annual process.

Framework 65 would also remove the management uncertainty buffers for sectors for GOM haddock and white hake, if the at-sea monitoring (ASM) target coverage level is set at 90 percent or greater for the 2023 fishing year only. While Amendment 23 recently approved the removal of the management uncertainty buffer for sectors for all allocated stocks if the ASM target

00000000006063

coverage level is 100 percent, we expect the ASM target to be set at 90 percent, based on available funds for the program and the most recent draft plan for spending the $10.7 million appropriation for human and electronic ASM in fishing year 2023. The provision is based on an expectation that a 90-percent coverage target is sufficient to reduce observer bias. The higher coverage target should result in higher achieved coverage, and we do not anticipate a significant difference in the achieved coverage from a 90-percent target versus a 100-percent target.

Temporary Modification to GB Cod Accountability Measures
When setting specifications, a portion of the ABC is set aside for the catch in state waters (including both commercial and recreational vessels) and catch in federal waters by other, non-specified fisheries (including non-groundfish commercial and recreational groundfish vessels). For allocated groundfish stocks, there are no AMs for the state and other sub-components; an overage to the annual catch limit (ACL) results in AMs for the allocated components of the groundfish fishery. If the overall ACL for a stock is exceeded, the amount of the overage attributed to catch from vessels fishing in state waters or other, non-specified fisheries is distributed between the allocated components of the groundfish fishery. Each component's share of the overage is added to that component's catch to determine the resulting overage amount, to determine whether the AM for that component is triggered. For the commercial fishery (sectors and common pool), the AM due to an overage is a reduction of allocation equal to the overage amount (i.e., payback) in a subsequent fishing year.

Framework 65 would temporarily modify the AMs for GB cod when an ACL overage in fishing years 2022-2024 is (in part or entirely) due to vessels fishing in state waters or other, non-specified fisheries. If, in the year following the overage (Year 2), the ACL is not achieved or exceeded by any amount, the ACL underage would be proportionally applied to each component's share of the overage from Year 1. While the preliminary payback AM would be implemented at the beginning of Year 3, any reduction to the overage (due to the underage in Year 2) would be made through an in-season adjustment as soon as possible in Year 3.

Additional Measures Not Part of Framework 65
In this rule, we will propose to reinstate regulatory text that was inadvertently removed by the final rule implementing Amendment 23 to the Northeast Multispecies FMP. On September 8, 2022, a final rule (87 FR 54902) implemented a national minimum insurance standard that applies to all regional monitoring programs and updated the regulations at 50 CFR 648.11(h)(3)(vii) to reference the new standards, but that text was overwritten by regulations implementing Amendment 23 (87 FR 75852; December 9, 2022).

We will also propose to remove regulatory text that is specific to previous fishing years. Specifically, we would remove a sentence in 50 CFR 648.90(a)(4)(iii)(H)(*2*) that is specific to the allocation of certain stocks for fishing years 2010 and 2011, and remove the paragraphs at 648.90(a)(5)(iv)(B)-(D) that are specific to temporary (up through fishing year 2020) modifications to the triggers for the Atlantic sea scallop fishery's AMs for certain flatfish stocks.

We will propose to correct sections of the regulations that refer to the northern and southern windowpane flounder as GOM/GB and SNE/MA windowpane flounder, respectively, which is inconsistent with other sections of the regulations. We will propose to remove text that describes

3
JA.090

the Fippenies Ledge Area that was moved to a different section of the regulations, but not deleted from 648.87(c)(2)(i)(A). Lastly, we will propose to correct several citations to paragraphs that were redesignated in a previous action, but the citations were not updated.

Although not part of Framework 65, these changes would be made under our administrative authority at section 305(d) of the Magnuson-Stevens Act and we have included the correction in this rule for efficiency.

CONTROVERSIALITY

We expect that Framework 65 could be controversial. The Conservation Law Foundation (CLF) filed a lawsuit challenging the GB Cod ACL and OFL and the GOM cod ACL established in Framework 59 based, in part, on the use of an unknown OFL. It is possible that CLF could file another challenge to these OFLs and ACLs in Framework 65 based on the Council's and its Scientific and Statistical Committee's recommendation of an unknown OFL for GB cod. We are currently working with the Science Center and the Council to address the use of an unknown OFL in a future action, given the lack of analytical models for this stock (and several others) and the inability to quantify estimates of status determination criteria. The Framework 65 development process included consideration of the ACL issues raised by CLF in the Framework 59 challenge, which may prevent CLF from raising similar issues in a new lawsuit, although this is uncertain. The new catch limits are based on updated stock assessments; however, some members of industry continue to raise concerns that our surveys and stock assessments do not match what they see on the water, and there is concern about the declining GOM and GB haddock quotas, as well as the white hake quota; the GOM haddock and white hake quotas are expected to be constraining.

Subsequent to submitting Framework 65 to us for review and rulemaking, the New England Council, at its April meeting, made a new request for NMFS to implement an emergency rule under section 305(c) of the Magnuson-Stevens Act to increase the ABC for GOM haddock based on concerns regarding the economic impacts of the low quota proposed in this action. We are considering this separately from Framework 65, and will provide more information on this issue once we are able to analyze the information relevant to the Council's request.

RECOMMENDATIONS

Pursuant to sections 304(b)(1)(A) and 305(d) of the Magnuson-Stevens Fishery Conservation and Management Act, I have determined that this proposed rule is consistent with the Northeast Multispecies FMP, other provisions of the Magnuson-Stevens Act, and other applicable law, subject to further consideration after public comment.

000000000006065

I recommend that you sign the attached clearance memoranda to the NOAA General Counsel and the Chief Counsel for Regulation, Department of Commerce.

1.  I concur  RAUCH.SAMUEL.DEAN.1365 Digitally signed by
                850948                    RAUCH.SAMUEL.DEAN.1365850948
                                          Date: 2023.05.17 15:07:49 -04'00'          .
                                                                        Date

2.  I do not concur _____ .
                                                                        Date

Attachments

5

JA.092

Attachment

**Table 1**: Comparison of Fishing Years 2022 and 2023 Overfishing limits (OFL) and Acceptable Biological Catches (ABC) for Northeast Multispecies Stocks

| Stock | 2022 | | ABC Change 2022 to 2023 | 2023 | |
|---|---|---|---|---|---|
| | OFL | U.S. ABC | | OFL | U.S. ABC |
| **GB Cod** | UNK | 343 | 51% | UNK | 519 |
| GOM Cod | 724 | 551 | 0% | 853 | 551 |
| **GB Haddock** | 114,925 | 81,383 | -85% | 18,482 | 11,901 |
| **GOM Haddock** | 14,834 | 11,526 | -83% | 2,515 | 1,936 |
| **GB Yellowtail Flounder** | UNK | 122 | -13% | UNK | 106 |
| **SNE/MA Yellowtail Flounder** | 184 | 22 | 82% | 55 | 40 |
| **CC/GOM Yellowtail Flounder** | 1116 | 823 | 35% | 1,436 | 1,115 |
| **American Plaice** | 3,687 | 2,825 | 102% | 7,316 | 5,699 |
| **Witch Flounder** | UNK | 1483 | -15% | UNK | 1,256 |
| **GB Winter Flounder** | 974 | 608 | 180% | 2,361 | 1,702 |
| **GOM Winter Flounder** | 662 | 497 | 62% | 1,072 | 804 |
| **SNE/MA Winter Flounder** | 1,438 | 456 | 38% | 1,186 | 627 |
| Redfish* | 13,354 | 10,062 | -1% | 13,229 | 9,967 |
| **White Hake** | 3,022 | 2,116 | -13% | 2,650 | 1,845 |
| **Pollock** | 21,744 | 16,812 | -11% | 19,617 | 15,016 |
| Northern Windowpane | UNK | 160 | 0% | UNK | 160 |
| Southern Windowpane | 513 | 384 | 0% | 513 | 384 |
| **Ocean Pout** | 125 | 87 | 0% | 125 | 87 |
| **Atlantic Halibut** | UNK | 101 | -15% | UNK | 86 |
| **Atlantic Wolffish** | 122 | 92 | 1% | 124 | 93 |

UNK: Unknown.
**Bold:** New ABC set by Framework 65.
* Indicates stock with a changing ABC in fishing year 2022, as set by Framework 61.

00000000006067

DETERMINATIONS

MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT

Pursuant to sections 304(b)(1)(A) and 305(d) of the Magnuson-Stevens Fishery Conservation
and Management Act, I have determined that this proposed rule is consistent with the Northeast
Multispecies FMP, other provisions of the Magnuson-Stevens Act, and other applicable law,
subject to further consideration after public comment. NMFS is issuing this rule pursuant to
304(b)(1)(A) of the Magnuson-Stevens Act, which provides specific authority for implementing
this action. Section 304(b)(1)(A) authorizes NMFS to initiate an evaluation of proposed
regulations to determine whether they are consistent with the fishery management plan, plan
amendment, the Magnuson-Stevens Act and other applicable law and, if that determination is
affirmative, publish the regulations in the *Federal Register* for public comment.

Additionally, this rule contains several regulatory corrections being issued pursuant to MSA
section 305(d) that are necessary to carry out the Northeast Multispecies FMP. The corrections
are necessary to carry out the Northeast Multispecies FMP because they either reinstate
inadvertently removed text, remove regulatory text specific to previous fishing years, correct text
that refers to certain groundfish stocks by inconsistent names, remove a section of regulatory text
defining an area that was made redundant by a previous action, or correct several citations to
paragraphs that were redesignated in a previous action, but the citations were not appropriately
updated. All of these changes will help improve the public's understanding of the Northeast
Multispecies FMP regulations. Though this correction is being included in this proposed rule to
implement Framework 65, it is not part of Framework 65 as approved by the Council. Making
this correction pursuant to 305(d) authority allows for the correction to be implemented more
quickly than otherwise possible. Though the correction is consistent with the FMP, the Council
did receive the opportunity to review the changes to the regulatory text and comment if
necessary. The Council did not comment on the proposed corrections.

NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

An environmental assessment (EA) has been prepared that describes the impact on the human
environment that would result from implementation of this action. Based on the EA and review
of the NEPA criteria for significant effects (40 CFR Part 1508.27) and NMFS criteria for
significance (section 7(C) of NOAA's Policies and Procedures for Compliance with NEPA and
Related Authorities (Companion Manual for NAO 216-6A)), no significant effect on the quality
of the human environment is anticipated from this action.

COASTAL ZONE MANAGEMENT ACT (CZMA)

NOAA's National Marine Fisheries Service (NMFS) made a general consistency determination
that the Northeast Multispecies FMP, including Framework 65, is consistent to the maximum
extent practicable with the enforceable policies of the approved coastal management programs of
Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey,
Pennsylvania, Delaware, Maryland, Virginia, and North Carolina. This general consistency
determination applies to the current FMP, and all subsequent routine Federal actions carried out

in accordance with the FMP such as framework adjustments and specifications. This determination was submitted on October 21, 2009, for review by the responsible state agencies under section 307 of the CZMA. North Carolina, Rhode Island, Virginia, Connecticut, New Hampshire, New Jersey, Delaware, and Pennsylvania have concurred with the general consistency determination. Consistency was inferred for those states that did not respond.

REGULATORY FLEXIBILITY ACT (RFA)

An initial regulatory flexibility analysis (IRFA) was prepared, as required by section 603 of the RFA, as part of the regulatory impact review. The IRFA describes the impact this proposed rule, if adopted, would have on small entities. Each of the statutory requirements of section 603(b) and (c) has been addressed and is summarized in the Classification section of the attached proposed rule.

PAPERWORK REDUCTION ACT (PRA)

This proposed rule does not contain collection-of-information requirements subject to review and approval by the Office of Management and Budget under the PRA.

ENDANGERED SPECIES ACT (ESA)

Pursuant to section 7 of the ESA, NOAA's National Marine Fisheries Service (NMFS) issued a Biological Opinion on May 27, 2021, that considered the effects of the NMFS' authorization of ten FMPs, NMFS' North Atlantic Right Whale Conservation Framework, and the New England Fishery Management Council's Omnibus Essential Fish Habitat Amendment 2, on ESA-listed species and designated critical habitat. The ten FMPs considered in the Opinion include the: (1) American Lobster; (2) Atlantic Bluefish; (3) Atlantic Deep-Sea Red Crab; (4) Mackerel, Squid, Butterfish; (5) Monkfish; (6) Northeast Multispecies; (7) Northeast Skate Complex; (8) Spiny Dogfish; (9) Summer Flounder, Scup, Black Sea Bass; and (10) Jonah Crab FMPs. The American Lobster and Jonah Crab FMPs are permitted and operated through implementing regulations compatible with the interstate fishery management plans issued under the authority of the Atlantic Coastal Fisheries Cooperative Management Act, the other eight FMPs are issued under the authority of the Magnuson-Stevens Act.

The 2021 Opinion determined that the proposed action may adversely affect, but is not likely to jeopardize, the continued existence of North Atlantic right, fin, sei, or sperm whales; the Northwest Atlantic Ocean distinct population segment (DPS) of loggerhead, leatherback, Kemp's ridley, or North Atlantic DPS of green sea turtles; any of the five DPSs of Atlantic sturgeon; Gulf of Maine DPS Atlantic salmon; or giant manta rays. The Opinion also concluded that the proposed action is not likely to adversely affect designated critical habitat for North Atlantic right whales, the Northwest Atlantic Ocean DPS of loggerhead sea turtles, U.S. DPS of smalltooth sawfish, Johnson's seagrass, or elkhorn and staghorn corals. An Incidental Take Statement (ITS) was issued in the Opinion. The ITS includes reasonable and prudent measures and their implementing terms and conditions, which NMFS determined are necessary or appropriate to minimize impacts of the incidental take in the fisheries assessed in this Opinion.

00000000006069

The ACLs for constraining stocks remain low or are proposed to be reduced further, and therefore an increase in effort is not expected. Therefore, the proposed action is not expected to result in: (1) More gear (i.e., gillnet or bottom trawl) in the water; (2) an increase in the duration of time that gear is in the water; or (3) changes in the overlap between protected species and the fishery, relative to current operating conditions. Based on this, and the fact that the groundfish fishery must comply with the take reduction plans, I have determined that fishing activities pursuant to this rule will not affect ESA-listed species or critical habitat in any manner not considered in the 2021 Opinion on this fishery. Therefore, this rule is not expected to result in impacts to ESA-listed species or critical habitat that go above and beyond those considered in the 2021 Opinion completed by NMFS.

MARINE MAMMAL PROTECTION ACT (MMPA)

I have preliminarily determined that fishing activities conducted under this rule will have no adverse impact on marine mammals. The Framework 65 EA indicates that, although the measures proposed in Framework 65 are likely to affect marine mammal species inhabiting the multispecies management unit, the measures would not alter the effectiveness of existing MMPA measures, such as take reduction plans, to protect those species based on overall measures that have been implemented in the FMP and reductions in fishing effort that have resulted.

NATIONAL MARINE SANCTUARIES ACT (NMSA)

I have preliminarily determined that this action will not destroy, cause the loss of, or injure any sanctuary resource subject to consultation with the Secretary under the NMSA. This action proposes to set specifications and make minor changes to management measures. The proposed measures do not allow new access to any National Marine Sanctuary, nor authorize any new behaviors. Overall, the combination of past, present, and future actions is expected to control and positively manage fishing effort and hence minimize potential negative impacts to sanctuary resources.

EXECUTIVE ORDER 12866

Pursuant to the procedures established to implement section 6 of Executive Order 12866, the Office of Management and Budget has determined that this proposed rule is not significant.

EXECUTIVE ORDER 13132

This proposed rule does not contain policies with federalism implications under Executive Order 13132.

ESSENTIAL FISH HABITAT (EFH)

The area affected by the proposed action in the Northeast multispecies fishery has been identified as EFH for species managed under the following FMPs: Northeast Multispecies; Atlantic Sea Scallop; Monkfish; Atlantic Herring; Summer Flounder, Scup, and Black Sea Bass; Squid, Atlantic Mackerel, and Butterfish; Spiny Dogfish; Tilefish; Deep-Sea Red Crab; Atlantic

000000000006070

Surfclam and Ocean Quahog; Atlantic Bluefish; Northeast Skates; Atlantic Billfish; and Atlantic Tunas, Swordfish, and Sharks.  Analysis described in the Framework 65 EA demonstrates that the overall habitat impacts of all of the measures combined in this proposed action are unlikely to have more than minimal adverse impacts on EFH and are expected to have neutral impacts relative to the baseline habitat protections established under Omnibus Essential Fish Habitat Amendment 2 (OHA2).  As such, additional measures to mitigate or minimize adverse effects of the multispecies fishery on EFH beyond those established under OHA2 are not necessary. Because the potential adverse impact on EFH is not substantial, NMFS conducted an abbreviated EFH consultation pursuant to 50 CFR 600.920(h) and prepared an EFH Assessment that incorporates all of the information required in 50 CFR 600.920(e)(3).

INFORMATION QUALITY ACT

Pursuant to section 515 of Public Law 106-554, this information product has undergone a pre-dissemination review by the Sustainable Fisheries Division, Greater Atlantic Regional Fisheries Office, completed on April 28, 2023.  The signed Pre-dissemination Review and Documentation Form is on file in that Office, and a copy of the form is included with this package.

00000000006071

**From:** Janet Coit - NOAA Federal
**Subject:** Re: FOR REVIEW: Proposed Rule, Adjustment 65 to Northeast FMP (BL95)
**To:** Maureen Trnka - NOAA Federal
**Cc:** Brianne Szczepanek - NOAA Federal; Sean McNally - NOAA Federal
**Sent:** May 17, 2023 1:53 PM (UTC-04:00)

Thanks Maureen. I approve this moving forward. But let's circle back and add this to my agenda with Sam when we have new data or our response to the petition.

On Wed, May 17, 2023 at 1:31 PM Maureen Trnka - NOAA Federal <maureen.trnka@noaa.gov> wrote:

Janet,

For review
Proposed Rule to Implement Framework Adjustment 65 to the Northeast Multispecies FMP.

Timing
Please review by Tues, May 23

Background
Originally developed under Amendment 13 (2004), the GOM cod rebuilding plan was previously revised in Framework 51 (2014), due to inadequate progress. In 2021, we informed the Council that the stock had again made inadequate rebuilding progress, setting a deadline of August 13, 2023, to revise the plan. Framework 65 would revise the rebuilding plan for GOM cod, and would set the rebuilding fishing mortality rate (Frebuild) at 60 percent of F at maximum sustainable yield (FMSY) and the time to rebuild (TTarget) at 10 years, rebuilding by 2033 with a 70-percent probability of achieving the target biomass (BMSY). Based on the 2021 stock assessment, the stock is currently at 5 percent of BMSY. The acceptable biological catch (ABC) previously set for fishing years 2023 and 2024 (by Framework 63) would remain in place.

Controversiality
We expect that Framework 65 could be controversial. The Conservation Law Foundation (CLF) filed a lawsuit challenging the GB Cod ACL and OFL and the GOM cod ACL established in Framework 59 based, in part, on the use of an unknown OFL. It is possible that CLF could file another challenge to these OFLs and ACLs in Framework 65 based on the Council's and its Scientific and Statistical Committee's recommendation of an unknown OFL for GB cod. We are currently working with the Science Center and the Council to address the use of an unknown OFL in a future action, given the lack of analytical models for this stock (and several others) and the inability to quantify estimates of status determination criteria. The Framework 65 development process included consideration of the ACL issues raised by CLF in the Framework 59 challenge, which may prevent CLF from raising similar issues in a new lawsuit, although this is uncertain. The new catch limits are based on updated stock assessments; however, some members of industry continue to raise concerns that our surveys and stock assessments do not match what they see on the water, and there is concern about the declining GOM and GB haddock quotas, as well as the white hake quota; the GOM haddock and white hake quotas are expected to be constraining. Subsequent to submitting Framework 65 to us for review and rulemaking, the New England Council, at its April meeting, made a new request for NMFS to implement an emergency rule under section 305(c) of the Magnuson-Stevens Act to increase the ABC for GOM haddock based on concerns regarding the economic impacts of the low quota proposed in this action. We are considering this separately from Framework 65, and will provide more information on this issue once we are able to analyze the information relevant to the Council's request.

**Maureen Trnka, PhD**

JA.098

000000000006072

Advisor for Regulatory Programs
Office of the Assistant Administrator
NOAA Fisheries
U.S. Department of Commerce
Work Cell: 301-641-4387
**www.fisheries.noaa.gov/**

--

Janet Coit

Assistant Administrator, NOAA Fisheries

U.S. Department of Commerce

Office: (301) 427-8000

www.fisheries.noaa.gov

JA.099

000000000006073

**34810**     Federal Register / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Proposed Rules

**Martha Williams,**
*Director, U.S. Fish and Wildlife Service.*
[FR Doc. 2023–11471 Filed 5–30–23; 8:45 am]
**BILLING CODE 4333–15–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 648

[Docket No. 230524–0138]

RIN 0648–BL95

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Northeast Multispecies Fishery; Framework Adjustment 65**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Proposed rule; request for comments.

**SUMMARY:** This action proposes to approve and implement Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan. This rule proposes to revise the rebuilding plan for Gulf of Maine cod, set catch limits for 16 of the 20 multispecies (groundfish) stocks, and make a temporary modification to the accountability measures for Georges Bank cod. This action also corrects erroneous regulations and removes outdated regulations. This action is necessary to respond to updated scientific information and to achieve the goals and objectives of the fishery management plan. The proposed measures are intended to help prevent overfishing, rebuild overfished stocks, achieve optimum yield, and ensure that management measures are based on the best scientific information available.

**DATES:** Comments must be received by 5 p.m. EST on June 15, 2023.

**ADDRESSES:** You may submit comments, identified by NOAA–NMFS–2023–0021, by the following method:
• *Electronic Submission:* Submit all electronic public comments via the Federal e-Rulemaking Portal. Go to *www.regulations.gov* and enter NOAA–NMFS–2023–0021 in the Search box. Click on the "Comment" icon, complete the required fields, and enter or attach your comments.

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.*, name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. You may submit anonymous comments by entering "N/A" in the required fields if you wish to remain anonymous.

Copies of Framework Adjustment 65, including the draft Environmental Assessment, the Regulatory Impact Review, and the Regulatory Flexibility Act Analysis prepared by the New England Fishery Management Council in support of this action, are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org/management-plans/northeast-multispecies* or *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Liz Sullivan, Fishery Policy Analyst, phone: 978–282–8493; email: *Liz.Sullivan@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Summary of Proposed Measures

This action would implement the management measures in Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan (FMP). The New England Fishery Management Council reviewed the proposed regulations and deemed them consistent with, and necessary to implement, Framework 65 in a May 4, 2023, letter from Council Chairman Eric Reid to Regional Administrator Michael Pentony. Under the Magnuson-Stevens Act, on behalf of the Secretary of Commerce, the Greater Atlantic Regional Fisheries Office's Regional Administrator approves, disapproves, or partially approves measures that the Council proposes, based on consistency with the Act and other applicable law. NMFS reviews proposed regulations for consistency with the fishery management plan, plan amendment, the Magnuson-Stevens Act and other applicable law. The Regional Administrator is seeking comments on these proposed regulations and intends to promulgate the final regulations after careful consideration of any submitted comments. Through Framework 65, the Council proposes to:
• Revise the rebuilding plan for Gulf of Maine (GOM) cod;

• Set shared U.S./Canada quotas for Georges Bank (GB) yellowtail flounder and eastern GB cod and haddock for fishing years 2023 and 2024;
• Set specifications, including catch limits for 16 groundfish stocks: GB haddock, GOM haddock, Southern New England/Mid-Atlantic (SNE/MA) yellowtail flounder, Cape Cod (CC)/GOM yellowtail flounder, American plaice, witch flounder, GB winter flounder, GOM winter flounder, SNE/MA winter flounder, pollock, ocean pout, Atlantic halibut, and Atlantic wolffish for fishing years 2023–2025, GB cod and GB yellowtail flounder for fishing years 2023–2024; and white hake for fishing year 2023;
• Remove the management uncertainty buffer for sectors for GOM haddock and white hake, if the at-sea monitoring (ASM) target coverage level is set at 90 percent or greater for the 2023 fishing year only; and
• Make a temporary modification to the accountability measures (AM) for GB cod.

This action also proposes regulatory corrections that are not part of Framework 65, but that may be considered and implemented under section 305(d) authority in the Magnuson-Stevens Act to make changes necessary to carry out the FMP. NMFS is proposing these corrections in conjunction with the Framework 65 proposed measures for expediency purposes. These proposed corrections are described in Regulatory Corrections under Secretarial Authority.

## Rebuilding Plan for Gulf of Maine Cod

Framework 65 would revise the rebuilding plan for GOM cod. The current rebuilding plan for GOM cod, as implemented by Framework 51 to the FMP (79 FR 22421, April 22, 2014), has a target date of 2024. On August 13, 2021, the Regional Administrator notified the Council that the stock was not making adequate rebuilding progress. The deadline to implement a rebuilding plan is August 13, 2023.

The Magnuson-Stevens Act requires that overfished stocks be rebuilt as quickly as possible, not to exceed 10 years when biologically possible, accounting for the status and biology of the stocks, the needs of fishing communities, and the interaction of the overfished stock within the marine ecosystem. Rebuilding plans must have at least a 50-percent probability of success. Selection of a rebuilding plan with a higher probability of success is one way of addressing uncertainty, but this does not affect the standard used in the future to determine whether a stock is rebuilt. The minimum rebuilding time

000000000006074

($T_{min}$) is the amount of time a stock is expected to take to rebuild to the biomass (B) associated with maximum sustainable yield (MSY) in the absence of any fishing mortality (F). The actual timeline set with a rebuilding plan ($T_{target}$) may be greater than $T_{min}$, but cannot exceed the maximum rebuilding time ($T_{max}$). $T_{max}$ is 10 years if $T_{min}$ is less than 10 years. In situations where $T_{min}$ exceeds 10 years, $T_{max}$ establishes a maximum time for rebuilding that is linked to the biology of the stock.

The GOM cod rebuilding program proposed in this action would rebuild the stock within 10 years, or by 2033, which is the maximum time period allowed by the Magnuson-Stevens Act. Projections suggest the stock could rebuild in 7 years at an F of zero. Fishing mortality of zero for GOM cod is currently technologically and economically impracticable given available gear, fishing methods, fishery management capability, and the multispecies nature of the commercial and recreational fishery. In addition to these factors, other biological and economic factors were identified and considered by the Council in setting $T_{target} = T_{max}$. First, recent recruitment estimates for this stock have been below average, and recruitment may be lower than assumed in the rebuilding projections, making the $T_{min}$ projections (7 years at F = 0) likely to be overly optimistic. There is uncertainty around the stock's natural mortality, and under one of the two approved models (M-ramp, M=0.4), the stock cannot rebuild in the rebuilding projections. Long-term projections for many groundfish stocks have tended to be overly optimistic, such that future levels of biomass are overestimated and fishing mortality is underestimated. Additionally, recent commercial utilization of the GOM cod annual catch limit (ACL) is high, indicating that the stock is an important component of the fishing industry; a longer rebuilding period considers the needs of the fishing communities as much as practicable. The proposed rebuilding plan for GOM cod would set $F_{rebuild}$ at 60 percent of $F_{MSY}$ with a 70-percent probability of achieving $B_{MSY}$ under the M=0.2 model.

As part of the revised rebuilding plan for GOM cod, we propose to remove regulations at 50 CFR 648.90(a)(2)(iv), which include a review process for the rebuilding plans for GOM cod and American plaice. The revised rebuilding plan for GOM cod does not contain this Council review process, but is still subject to Secretarial review for determining adequate rebuilding progress. As of 2019, American plaice is rebuilt and no longer in a rebuilding plan, making this regulation unnecessary.

**Fishing Years 2023 and 2024 Shared U.S./Canada Quotas**

*Management of Transboundary Georges Bank Stocks*

Eastern GB cod, eastern GB haddock, and GB yellowtail flounder are jointly managed with Canada under the United States/Canada Resource Sharing Understanding. The Transboundary Management Guidance Committee (TMGC) is a government-industry committee made up of representatives from the United States and Canada. For historical information about the TMGC see: *http://www.bio.gc.ca/info/intercol/tmgc-cogst/index-en.php*. Each year, the TMGC recommends a shared quota for each stock based on the most recent stock information and the TMGC's harvest strategy. The TMGC's harvest strategy for setting catch levels is to maintain a low to neutral risk (less than 50 percent) of exceeding the fishing mortality limit for each stock. The harvest strategy also specifies that when stock conditions are poor, fishing mortality should be further reduced to promote stock rebuilding. The shared quotas are allocated between the United States and Canada based on a formula that considers historical catch (10-percent weighting) and the current resource distribution (90-percent weighting).

For GB yellowtail flounder, the Council's Scientific and Statistical Committee (SSC) also recommends an acceptable biological catch (ABC) for the stock. The ABC is typically used to inform the U.S. TMGC's discussions with Canada for the annual shared quota. Although the stock is jointly managed with Canada, and the TMGC recommends annual shared quotas, the Council may not set catch limits that would exceed the SSC's recommendation. The SSC does not recommend ABCs for eastern GB cod and haddock because they are management units of the total GB cod and haddock stocks. The SSC recommends overall ABCs for the total GB cod and haddock stocks. The shared U.S./Canada quota for eastern GB cod and haddock is included in these overall ABCs, and must be consistent with the SSC's recommendation for the total GB stocks.

*2023 and 2024 U.S./Canada Quotas*

The Transboundary Resources Assessment Committee assessed the three transboundary stocks in July 2022, and detailed summaries of these assessments can be found at: *https://www.nefsc.noaa.gov/assessments/trac/*. The TMGC met in September 2022 to recommend shared quotas for 2023 based on the updated assessments, and made recommendations for eastern GB cod and GB yellowtail flounder. The Council adopted the TMGC's recommendations in Framework 65. The TMGC was unable to reach consensus on the most appropriate combined Canada/U.S. quota for eastern GB haddock. Instead, the Council selected a U.S. quota based on the shared quota supported by the U.S. delegation and the established method of determining the allocation for each country (42 percent of 3,619 mt), and supported using 2,320 mt as an estimate of possible Canadian catch.

Framework 65 proposes to set the same shared quotas for a second year (*i.e.*, for fishing year 2024) as placeholders, with the expectation that those quotas will be reviewed annually and new recommendations will be received from the TMGC. The proposed 2023 and 2024 shared U.S./Canada quotas, and each country's allocation, are listed in Table 1.

TABLE 1—PROPOSED 2023 AND 2024 FISHING YEARS U.S./CANADA QUOTAS (MT, LIVE WEIGHT) AND PERCENT OF QUOTA ALLOCATED TO EACH COUNTRY

| Quota | Eastern GB cod | Eastern GB haddock | GB Yellowtail flounder |
|---|---|---|---|
| Total Shared Quota | 520 | *No agreement* | 200. |
| U.S. Quota | 135 (26 percent) | 1,520 | 106 (53 percent). |
| Canadian Quota | 385 (74 percent) | *2,320 (estimate)* | 94 (47 percent). |

JA.101

The proposed 2023 U.S. quotas for the three shared stocks represent decreases compared to 2022: Eastern GB cod by 15.6 percent, eastern GB haddock by 77 percent, and GB yellowtail flounder by 13 percent. For a more detailed discussion of the TMGC's 2023 catch advice, including a description of each country's quota share, see the TMGC's guidance document that will be posted at: *https://www.greateratlantic. fisheries.noaa.gov/*.

The regulations implementing the U.S./Canada Resource Sharing Understanding require deducting any overages of the U.S. quota for eastern GB cod, eastern GB haddock, or GB yellowtail flounder from the U.S. quota in the following fishing year. If catch information for the 2022 fishing year indicates that the U.S. fishery exceeded its quota for any of the shared stocks, we will reduce the respective U.S. quotas for the 2023 fishing year in a future management action, as close to May 1, 2023, as possible. If any fishery that is allocated a portion of the U.S. quota

exceeds its allocation and causes an overage of the overall U.S. quota, the overage reduction would be applied only to that fishery's allocation in the following fishing year. This ensures that catch by one component of the overall fishery does not negatively affect another component of the overall fishery.

**Catch Limits for Fishing Years 2023–2025**

*Summary of the Proposed Catch Limits*

Tables 2 through 11 show the proposed catch limits for the 2023–2025 fishing years. A brief summary of how these catch limits were developed is provided below. More details on the proposed catch limits for each groundfish stock can be found in Appendix II (Calculation of Northeast Multispecies Annual Catch Limits, FY 2023–FY 2025) to the Framework 65 Environmental Assessment (see **ADDRESSES** for information on how to get this document).

Through Framework 65, the Council proposes to adopt catch limits for 13 stocks for the 2023–2025 fishing years and for white hake for the 2023 fishing year, based on stock assessments completed in 2022, and catch limits for GB cod and GB yellowtail flounder for fishing years 2023–2024. Framework 61 (86 FR 40353, July 28, 2021) previously set 2023 quotas for redfish, northern windowpane flounder, and southern windowpane flounder based on assessments conducted in 2020, and those would remain in place. Framework 63 (87 FR 42375, July 15, 2022) previously set the 2023–2024 quota for GOM cod, based on an assessment conducted in 2021, and that would also remain in place. Table 2 provides an overview of which catch limits, if any, would change, as proposed in Framework 65, as well as when the stock was most recently assessed. Table 3 provides the percent change in the 2023 catch limit compared to the 2022 fishing year.

### TABLE 2—CHANGES TO CATCH LIMITS, AS PROPOSED IN FRAMEWORK 65

| Stock | Most recent assessment | Proposed change in framework 65 |
|---|---|---|
| GB Cod ............................................ | 2021 | New 2023–2024 ABC. |
| GOM Cod ......................................... | 2021 | Adjust sub-components, 2023–2024 catch limit set by Framework 63. |
| GB Haddock .................................... | 2022 | New 2023–2025 ABC. |
| GOM Haddock ................................. | 2022 | New 2023–2025 ABC. |
| GB Yellowtail Flounder ................... | 2022 | New 2023–2024 ABC. |
| SNE/MA Yellowtail Flounder .......... | 2022 | New 2023–2025 ABC. |
| CC/GOM Yellowtail Flounder ......... | 2022 | New 2023–2025 ABC. |
| American Plaice .............................. | 2022 | New 2023–2025 ABC. |
| Witch Flounder ................................ | 2022 | New 2023–2025 ABC. |
| GB Winter Flounder ........................ | 2022 | New 2023–2025 ABC. |
| GOM Winter Flounder ..................... | 2022 | New 2023–2025 ABC. |
| SNE/MA Winter Flounder ............... | 2022 | New 2023–2025 ABC. |
| Redfish ............................................ | 2020 | No change: 2023 catch limit set by Framework 61. |
| White Hake ...................................... | 2022 | New 2023 ABC. |
| Pollock ............................................ | 2022 | New 2023–2025 ABC. |
| N. Windowpane Flounder ............... | 2020 | Adjust sub-components, 2023 catch limit set by Framework 61. |
| S. Windowpane Flounder ............... | 2020 | Adjust sub-components, 2023 catch limit set by Framework 61. |
| Ocean Pout ..................................... | 2022 | New 2023–2025 ABC. |
| Atlantic Halibut ............................... | 2022 | New 2023–2025 ABC. |
| Atlantic Wolffish ............................. | 2022 | New 2023–2025 ABC. |

N = Northern; S = Southern

### TABLE 3—PROPOSED FISHING YEARS 2023–2025 OVERFISHING LIMITS AND ACCEPTABLE BIOLOGICAL CATCHES

[mt, live weight]

| Stock | 2023 | | Percent change from 2022 | 2024 | | 2025 | |
|---|---|---|---|---|---|---|---|
| | OFL | U.S. ABC | | OFL | U.S. ABC | OFL | U.S. ABC |
| GB Cod ............................................ | UNK | 519 | 51 | UNK | 519 | ................. | ................. |
| GOM Cod ......................................... | 853 | 551 | 0 | 980 | 551 | ................. | ................. |
| GB Haddock .................................... | 18,482 | 11,901 | −85 | 17,768 | 11,638 | 15,096 | 9,962 |
| GOM Haddock ................................. | 2,515 | 1,936 | −83 | 2,655 | 2,038 | 2,627 | 2,017 |
| GB Yellowtail Flounder ................... | UNK | 106 | −13 | UNK | 106 | ................. | ................. |
| SNE/MA Yellowtail Flounder .......... | 55 | 40 | 82 | 89 | 40 | 345 | 40 |
| CC/GOM Yellowtail Flounder ......... | 1,436 | 1,115 | 35 | 1,279 | 992 | 1,184 | 915 |
| American Plaice .............................. | 7,316 | 5,699 | 102 | 7,091 | 5,520 | 6,763 | 5,270 |
| Witch Flounder ................................ | UNK | 1,256 | −15 | UNK | 1,256 | UNK | 1,256 |
| GB Winter Flounder ........................ | 2,361 | 1,702 | 180 | 2,153 | 1,549 | 2,100 | 1,490 |

TABLE 3—PROPOSED FISHING YEARS 2023–2025 OVERFISHING LIMITS AND ACCEPTABLE BIOLOGICAL CATCHES—
Continued

[mt, live weight]

| Stock | 2023 | | Percent change from 2022 | 2024 | | 2025 | |
|---|---|---|---|---|---|---|---|
| | OFL | U.S. ABC | | OFL | U.S. ABC | OFL | U.S. ABC |
| GOM Winter Flounder | 1,072 | 804 | 62 | 1,072 | 804 | 1,072 | 804 |
| SNE/MA Winter Flounder | 1,186 | 627 | 38 | 1,425 | 627 | 1,536 | 627 |
| Redfish | 13,229 | 9,967 | −1 | | | | |
| White Hake | 2,650 | 1,845 | −13 | | | | |
| Pollock | 19,617 | 15,016 | −11 | 18,208 | 13,940 | 17,384 | 13,294 |
| N. Windowpane Flounder | UNK | 160 | 0 | | | | |
| S. Windowpane Flounder | 513 | 384 | 0 | | | | |
| Ocean Pout | 125 | 87 | 0 | 125 | 87 | 125 | 87 |
| Atlantic Halibut | UNK | 86 | −15 | UNK | 86 | UNK | 86 |
| Atlantic Wolffish | 124 | 93 | 1 | 124 | 93 | 124 | 93 |

UNK = Unknown
**Note:** An empty cell indicates no OFL/ABC is adopted for that year. These catch limits would be set in a future action.

*Overfishing Limits and Acceptable Biological Catches*

The overfishing limit (OFL) is calculated to set the maximum amount of fish that can be caught in a year, without constituting overfishing. The ABC is typically set lower than the OFL to account for scientific uncertainty. For GB cod, GB haddock, and GB yellowtail flounder, the total ABC is reduced by the amount of the Canadian quota (see Table 1 for the Canadian and U.S. shares of these stocks). Although the TMGC recommendations were only for fishing year 2023, the portion of the shared quota that would be allocated to Canada (or assumed for Canada, in the case of GB haddock) in fishing year 2023 was used to project the U.S. portions of the ABCs for these three stocks for 2024. This avoids artificially inflating the U.S. ABC up to the total ABC for the 2024 fishing year. The TMGC will make new recommendations for 2024, which would replace any quotas for these stocks set in this action. Additionally, although GB winter flounder, white hake, and Atlantic halibut are not jointly managed with Canada, there is some Canadian catch of these stocks. Because the total ABC must account for all sources of fishing mortality, expected Canadian catch of GB winter flounder (38 mt), white hake (52 mt), and Atlantic halibut (74 mt) is deducted from the total ABC. The U.S. ABC is the amount available to the U.S. fishery after accounting for Canadian catch (see Table 3). For stocks without Canadian catch, the U.S. ABC is equal to the total ABC.

The OFLs are currently unknown for GB cod, GB yellowtail flounder, witch flounder, northern windowpane flounder, and Atlantic halibut. For 2023, the SSC recommended maintaining the unknown OFL for GB cod, GB yellowtail

flounder, witch flounder, and Atlantic halibut. Empirical stock assessments are used for these five stocks, and these assessments can no longer provide quantitative estimates of the status determination criteria, nor were appropriate proxies for stock status determination able to be developed. In the temporary absence of an OFL, in this and previous actions, we have considered recent catch data and estimated trends in stock biomass as an indication that the catch limits derived from ABCs are sufficiently managing fishing mortality at a rate that is preventing overfishing. The SSC recommended setting the GB cod ABC based on an average between the output of the iSmooth (previously referred to as "PlanBsmooth") approach and the total calendar year catch from 2020, which results in an increase (approximately 20 percent) from the previously set ABC value. Despite this increase, the SSC states that its recommendation is intended to support stock rebuilding by maintaining low catches relative to historic levels. The SSC noted that the fishing mortality in the GB yellowtail flounder fishery does not appear to be limiting stock recovery. However, the continued low stock biomass and poor recruitment for this stock warrant maintaining low catch levels. For witch flounder, the SSC supported the continued use of the swept-area biomass average and fixed harvest fraction for setting the ABC, noting that the target harvest fraction is low relative to the historic harvest fraction for this stock and that the recommended ABC for witch flounder is not likely to result in overfishing. While the catch multiplier for Atlantic halibut remains below 1 for the last four years, despite reductions in ABC advice, the SSC highlighted the uncertainty of Canadian catch estimates

and stated that the recommended ABC is not likely to result in overfishing. For each of these stocks, the Council has relied on the SSC to provide advice on the likelihood of preventing overfishing and promoting rebuilding under the proposed ABCs. Based on these considerations, we have preliminarily determined that these ABCs are a sufficient limit for preventing overfishing and are consistent with the National Standards. This action does not propose any changes to the status determination criteria for these stocks.

Subsequent to submitting Framework 65 to NMFS for review and rulemaking, at its April meeting the New England Council made a new request for NMFS to implement an emergency rule under section 305(c) of the Magnuson-Stevens Act to increase the ABC for GOM haddock based on concerns regarding the economic impacts of the low quota proposed in this action. We are considering this separately from Framework 65, and therefore it is not discussed further here.

*ABC for Georges Bank Cod*

The GB cod 2021 management track assessment followed the iSmooth approach, using updated commercial fishery catch data through calendar year 2020 and updated research survey indices of abundance through 2021. In Framework 63, the Council decided to set the GB cod ABC at 754 mt for only one year (fishing year 2022), requiring the Council to make a new recommendation for fishing years 2023 and 2024 in the current framework. The SSC met in August 2022 to discuss alternatives for the GB cod ABC for fishing years 2023 and 2024, and a majority of the SSC recommended an ABC of 904 mt, the average between the output of the iSmooth and the 2020 calendar year catch of GB cod (based on

000000000006077

the 2021 assessment). The Council selected 904 mt as its preferred option for the GB cod ABC.

The Council's EA for Framework 65 states that the 904 mt ABC would reduce, but not eliminate, adverse economic impacts, compared to the fishing year 2022 ABC of 754 mt. The Council included an updated analysis in its Framework 65 submission, applying the iSmooth approach using fall 2021 and spring 2022 surveys and catch data through 2021, consistent with the methodology and data sources used by the SSC when recommending the fishing year 2022 ABC. This updated analysis resulted in an amount that is 74 mt higher than the 904-mt ABC recommended by the Council. The Council did not revise its recommendation with the higher amount. Instead, it has demonstrated that the 904-mt ABC recommendation would contribute to stock rebuilding while having a low probability of overfishing. The sector component of the fishery will have a high (90-percent) target coverage level of monitoring in fishing year 2023, which is anticipated to help ensure the accuracy of commercial catch data.

*Annual Catch Limits*

Development of Annual Catch Limits

The U.S. ABC for each stock is divided among the various fishery components to account for all sources of fishing mortality. An estimate of catch expected from state waters and the other sub-component (*e.g.,* non-groundfish fisheries or some recreational groundfish fisheries) is deducted from the U.S. ABC. The remaining portion of the U.S. ABC is distributed to the fishery components that receive an allocation for the stock. Components of the fishery that receive an allocation have a sub-ACL set by reducing their portion of the ABC to account for management uncertainty and are subject to AMs if they exceed their respective catch limit during the fishing year. For GOM cod and haddock only, the U.S. ABC is first divided between the commercial and recreational fisheries, before being further divided into sub-components and sub-ACLs. This process is described fully in Appendix II of the Framework 65 Environmental Assessment.

Recreational Catch Target for GB Cod

GB cod is not allocated to the recreational fishery. Instead, a catch

target is set and used to calculate the amount deducted to account for state and other sub-component catch. Framework 65 proposes to set the GB cod recreational catch target based on the proportional change to the GB cod U.S. ABC from fishing year 2022 to 2023. Under the Council's preferred alternative of a 904-mt GB cod ABC, the recreational catch target would be 113 mt, which is an increase from the 75-mt catch target set for fishing year 2022.

Framework 63 modified the regulatory process for the Regional Administrator to adjust recreational measures to prevent the recreational catch target from being exceeded for fishing years 2023 and 2024. Any change to the recreational measures for GB cod would be implemented through a separate rulemaking.

Sector and Common Pool Allocations

For stocks allocated to sectors, the commercial groundfish sub-ACL is further divided into the non-sector (common pool) sub-ACL and the sector sub-ACL, based on the total vessel enrollment in sectors and the cumulative potential sector contributions (PSC) associated with those sectors. The sector and common pool sub-ACLs proposed in this action are based on final fishing year 2023 sector rosters. All permits enrolled in a sector, and the vessels associated with those permits, had until April 30, 2023, to withdraw from a sector and fish in the common pool for the 2023 fishing year. In addition to the enrollment delay, all permits that change ownership after the roster deadline were able to join a sector (or change sector) through April 30, 2023.

Management Uncertainty Buffer for Sectors

In Framework 65, the Council proposes to remove the management uncertainty buffer for the sector sub-ACL for GOM haddock and white hake, for only the 2023 fishing year, if the at-sea monitoring (ASM) coverage target is 90 percent or higher. The Council's goal is to mitigate the economic impacts of the ACLs for these two stocks by increasing the sector sub-ACLs if the ASM coverage target is high enough to reduce uncertainty. Amendment 23 (87 FR 75852, December 9, 2022) implemented a measure to set the management uncertainty buffer for the sector sub-ACL for each allocated groundfish stock to zero. In years that the ASM coverage target is set at 100

percent, the management uncertainty buffer will default to zero for the sector sub-ACL for allocated stocks, unless the Council's consideration of the 100-percent coverage target warrants specifying a different management uncertainty buffer in order to prevent exceeding the sub-ACL. The process by which the Council evaluates and sets management uncertainty buffers was unchanged by Amendment 23 and the Council may adjust management uncertainty buffers in future actions.

On March 16, 2023, the Regional Administrator announced that the fishing year 2023 ASM coverage target will be 90 percent. Therefore, if this measure is approved, sectors' sub-ABCs for GOM haddock and white hake would not be reduced to account for the management uncertainty buffer for fishing year 2023 (see Table 4). The fishery would remain accountable for remaining within the sub-ACLs allocated to it for both stocks affected by this measure, and the removal of the management uncertainty buffer for the sectors alone is not likely to cause the ABC or OFL to be exceeded. The revised management uncertainty buffers apply only to sectors and not to the common pool component of the fishery or other sub-ACLs or sub-components for any stocks. In the case of GOM haddock, the recreational fishery and common pool fishery would both retain a management uncertainty buffer; for white hake, only the common pool fishery would have a management uncertainty buffer applied. Therefore, a certain level of uncertainty buffer will continue to exist for each stock's ACL.

Common Pool Total Allowable Catches

The common pool sub-ACL for each allocated stock (except for SNE/MA winter flounder) is further divided into trimester TACs. Table 7 summarizes the common pool trimester TACs proposed in this action.

Incidental catch TACs are also specified for certain stocks of concern (*i.e.,* stocks that are overfished or subject to overfishing) for common pool vessels fishing in the special management programs (*i.e.,* special access programs (SAP) and the Regular B Days-at-Sea (DAS) Program), in order to limit the catch of these stocks under each program. Tables 8 through 11 summarize the proposed Incidental Catch TACs for each stock and the distribution of these TACs to each special management program.

### TABLE 4—PROPOSED CATCH LIMITS FOR THE 2023 FISHING YEAR
[mt, live weight]

| Stock | Total ACL | Groundfish sub-ACL | Sector sub-ACL | Common pool sub-ACL | Recreational sub-ACL | Midwater trawl fishery | Scallop fishery | Small-mesh fisheries | State waters sub-component | Other sub-component |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | A to H | A + B + C | A | B | C | D | E | F | G | H |
| GB Cod | 500 | 375 | 364 | 11 | | | | | 42 | 83 |
| GOM Cod | 522 | 470 | 268 | 11 | 192 | | | | 48 | 3,4 |
| GB Haddock | 11,301 | 11,080 | 10,829 | 251 | | 221 | | | 0 | 0 |
| GOM Haddock* | 1,888 | 1,818 | 1,183 | 25 | 610 | 18 | | | 45 | 6.4 |
| GB Yellowtail Flounder | 103 | 84 | 80 | 4.5 | | | 16.5 | 2.0 | 0.0 | 0.0 |
| SNE/MA Yellowtail Flounder | 38 | 33 | 25 | 8.1 | | | 2.7 | | 0.2 | 2.0 |
| CC/GOM Yellowtail Flounder | 1,063 | 985 | 931 | 54 | | | | | 34 | 45 |
| American Plaice | 5,417 | 5,360 | 5,210 | 150 | | | | | 29 | 29 |
| Witch Flounder | 1,196 | 1,145 | 1,104 | 41 | | | | | 19 | 31 |
| GB Winter Flounder | 1,651 | 1,634 | 1,585 | 50 | | | | | 0 | 17 |
| GOM Winter Flounder | 772 | 607 | 519 | 88 | | | | | 153 | 12,1 |
| SNE/MA Winter Flounder | 604 | 441 | 387 | 53 | | | | | 19 | 144 |
| Redfish | 9,469 | 9,469 | 9,369 | 99 | | | | | 0 | 0 |
| White Hake* | 1,844 | 1,826 | 1,808 | 18 | | | | | 0 | 19 |
| Pollock | 14,325 | 13,124 | 13,001 | 123 | | | | | 676 | 526 |
| N. Windowpane Flounder | 150 | 105 | na | 105 | | | 31 | | 0.8 | 13 |
| S. Windowpane Flounder | 371 | 45 | na | 45 | | | 129 | | 13 | 184 |
| Ocean Pout | 83 | 49 | na | 49 | | | | | 0 | 34 |
| Atlantic Halibut | 83 | 64 | na | 64 | | | | | 17 | 1.3 |
| Atlantic Wolffish | 87 | 87 | na | 87 | | | | | 0 | 0 |

na: not allocated to sectors
*GOM haddock and white hake catch limits are based on the removal of the management uncertainty buffer.

### TABLE 5—PROPOSED CATCH LIMITS FOR THE 2024 FISHING YEAR*
[mt, live weight]

| Stock | Total ACL | Groundfish sub-ACL | Sector sub-ACL | Common pool sub-ACL | Recreational sub-ACL | Midwater trawl fishery | Scallop fishery | Small-mesh fisheries | State waters sub-component | Other sub-component |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | A to H | A + B + C | A | B | C | D | E | F | G | H |
| GB Cod | 500 | 375 | 364 | 11 | | | | | 42 | 83 |
| GOM Cod | 522 | 470 | 268 | 11 | 192 | | | | 48 | 3 |
| GB Haddock | 11,052 | 10,835 | 10,590 | 245 | | 217 | | | 0 | 0 |
| GOM Haddock | 1,925 | 1,852 | 1,183 | 26 | 643 | 19 | | | 47 | 7 |
| GB Yellowtail Flounder | 103 | 84 | 80 | 4.5 | | | 17 | 2.0 | 0 | 0 |
| SNE/MA Yellowtail Flounder | 38 | 33 | 25 | 8.1 | | | 2.7 | | 0.2 | 2.0 |
| CC/GOM Yellowtail Flounder | 946 | 877 | 828 | 48 | | | | | 30 | 40 |
| American Plaice | 5,247 | 5,192 | 5,046 | 145 | | | | | 28 | 28 |
| Witch Flounder | 1,196 | 1,145 | 1,104 | 41 | | | | | 19 | 31 |
| GB Winter Flounder | 1,503 | 1,488 | 1,442 | 45 | | | | | 0 | 16 |
| GOM Winter Flounder | 772 | 607 | 519 | 88 | | | | | 153 | 12,1 |
| SNE/MA Winter Flounder | 604 | 441 | 387 | 53 | | | | | 19 | 144 |
| Pollock | 13,299 | 12,184 | 12,070 | 114 | | | | | 627 | 488 |
| Ocean Pout | 83 | 49 | na | 49 | | | | | 0 | 34 |
| Atlantic Halibut | 83 | 64 | na | 64 | | | | | 17 | 1.3 |
| Atlantic Wolffish | 87 | 87 | na | 87 | | | | | 0 | 0 |

na: not allocated to sectors
* Northeast multispecies stocks not included in Table 5 do not have catch limits approved or proposed for fishing year 2024.

TABLE 6—PROPOSED CATCH LIMITS FOR THE 2025 FISHING YEAR*

[mt, live weight]

| Stock | Total ACL | Groundfish sub-ACL | Sector sub-ACL | Common pool sub-ACL | Recreational sub-ACL | Midwater trawl fishery | Scallop fishery | Small-mesh fisheries | State waters sub-component | Other sub-component |
|---|---|---|---|---|---|---|---|---|---|---|
| | A to H | A + B + C | A | B | C | D | E | F | G | H |
| GB Haddock ............ | 9,460 | 9,275 | 9,065 | 210 | ............... | 185 | ............... | ............... | 0 | 0 |
| GOM Haddock .......... | 1,905 | 1,833 | 1,171 | 26 | 636 | 19 | ............... | ............... | 47 | 7 |
| SNE/MA Yellowtail Flounder ............... | 38 | 33 | 25 | 8 | ............... | ............... | 3 | ............... | 0 | 2 |
| CC/GOM Yellowtail Flounder ............... | 873 | 808 | 764 | 45 | ............... | ............... | ............... | ............... | 28 | 37 |
| American Plaice ...... | 5,009 | 4,957 | 4,818 | 139 | ............... | ............... | ............... | ............... | 26 | 26 |
| Witch Flounder ........ | 1,196 | 1,145 | 1,104 | 41 | ............... | ............... | ............... | ............... | 19 | 31 |
| GB Winter Flounder | 1,446 | 1,431 | 1,387 | 44 | ............... | ............... | ............... | ............... | 0 | 15 |
| GOM Winter Flounder | 772 | 607 | 519 | 88 | ............... | ............... | ............... | ............... | 153 | 12.1 |
| SNE/MA Winter Flounder ............... | 604 | 441 | 387 | 53 | ............... | ............... | ............... | ............... | 19 | 144 |
| Pollock ................... | 12,683 | 11,619 | 11,510 | 109 | ............... | ............... | ............... | ............... | 598 | 465 |
| Ocean Pout ............ | 83 | 49 | na | 49 | ............... | ............... | ............... | ............... | 0 | 34 |
| Atlantic Halibut ....... | 83 | 64 | na | 64 | ............... | ............... | ............... | ............... | 17 | 1.3 |
| Atlantic Wolffish ...... | 87 | 87 | na | 87 | ............... | ............... | ............... | ............... | 0 | 0 |

na: not allocated to sectors

* Northeast multispecies stocks not included in Table 6 do not have catch limits approved or proposed for fishing year 2025.

TABLE 7—PROPOSED FISHING YEARS 2023–2025 COMMON POOL TRIMESTER TACs

[mt, live weight]

| Stock | 2023 | | | 2024 | | | 2025 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Trimester 1 | Trimester 2 | Trimester 3 | Trimester 1 | Trimester 2 | Trimester 3 | Trimester 1 | Trimester 2 | Trimester 3 |
| GB Cod ................................... | 3.0 | 3.6 | 4.1 | 3.0 | 3.6 | 4.1 | ............... | ............... | ............... |
| GOM Cod ............................... | 5.2 | 3.5 | 1.9 | 5.2 | 3.5 | 1.9 | | | |
| GB Haddock ........................... | 67.6 | 82.7 | 100.2 | 66.1 | 80.8 | 98.0 | 56.6 | 69.2 | 83.9 |
| GOM Haddock ......................... | 6.6 | 6.4 | 11.6 | 7.0 | 6.7 | 12.2 | 6.9 | 6.7 | 12.1 |
| GB Yellowtail Flounder ............ | 0.9 | 1.4 | 2.3 | 0.9 | 1.4 | 2.3 | | | |
| SNE/MA Yellowtail Flounder ..... | 1.7 | 2.3 | 4.1 | 1.7 | 2.3 | 4.1 | 1.7 | 2.3 | 4.1 |
| CC/GOM Yellowtail Flounder .... | 31.0 | 14.1 | 9.2 | 27.6 | 12.6 | 8.2 | 25.5 | 11.6 | 7.6 |
| American Plaice ...................... | 111.0 | 12.0 | 27.0 | 107.5 | 11.6 | 26.2 | 102.6 | 11.1 | 25.0 |
| Witch Flounder ....................... | 22.6 | 8.2 | 10.3 | 22.6 | 8.2 | 10.3 | 22.6 | 8.2 | 10.3 |
| GB Winter Flounder ................ | 4.0 | 12.0 | 33.9 | 3.6 | 10.9 | 30.8 | 3.5 | 10.5 | 29.6 |
| GOM Winter Flounder .............. | 32.7 | 33.6 | 22.1 | 32.7 | 33.6 | 22.1 | 32.7 | 33.6 | 22.1 |
| Redfish .................................. | 24.8 | 30.8 | 43.7 | | | | | | |
| White Hake ............................ | 6.7 | 5.5 | 5.5 | | | | | | |
| Pollock .................................. | 34.4 | 42.9 | 45.4 | 31.9 | 39.9 | 42.1 | 30.4 | 38.0 | 40.2 |

TABLE 8—PROPOSED COMMON POOL INCIDENTAL CATCH TACs FOR THE 2023–2025 FISHING YEARS

[mt, live weight]

| Stock | Percentage of common pool sub-ACL | 2023 | 2024 | 2025 |
|---|---|---|---|---|
| GB Cod .................................................. | 1.68 | 0.18 | 0.18 | ............... |
| GOM Cod ............................................... | 1 | 0.11 | 0.11 | ............... |
| GB Yellowtail Flounder .............................. | 2 | 0.09 | 0.09 | ............... |
| CC/GOM Yellowtail Flounder ...................... | 1 | 0.54 | 0.48 | 0.45 |
| American Plaice ....................................... | 5 | 7.50 | 7.27 | 6.94 |
| Witch Flounder ........................................ | 5 | 2.06 | 2.06 | 2.06 |
| SNE/MA Winter Flounder ........................... | 1 | 0.53 | 0.53 | 0.53 |

TABLE 9—PERCENTAGE OF INCIDENTAL CATCH TACs DISTRIBUTED TO EACH SPECIAL MANAGEMENT PROGRAM

| Stock | Regular B DAS Program (%) | Eastern U.S./CA Haddock SAP (%) |
|---|---|---|
| GB Cod ............................................................. | 60 | 40 |
| GOM Cod ........................................................... | 100 | n/a |
| GB Yellowtail Flounder .......................................... | 50 | 50 |
| CC/GOM Yellowtail Flounder ................................... | 100 | n/a |
| American Plaice .................................................. | 100 | n/a |

000000000006080

*Federal Register* / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Proposed Rules **34817**

TABLE 9—PERCENTAGE OF INCIDENTAL CATCH TACS DISTRIBUTED TO EACH SPECIAL MANAGEMENT PROGRAM—Continued

| Stock | Regular B DAS Program (%) | Eastern U.S./CA Haddock SAP (%) |
|---|---|---|
| Witch Flounder ........................................................ | 100 | n/a |
| SNE/MA Winter Flounder ......................................... | 100 | n/a |

TABLE 10—PROPOSED FISHING YEARS 2023–2025 INCIDENTAL CATCH TACS FOR EACH SPECIAL MANAGEMENT PROGRAM

[mt, live weight]

| Stock | Regular B DAS Program | | | Eastern U.S./Canada Haddock SAP | | |
|---|---|---|---|---|---|---|
| | 2023 | 2024 | 2025 | 2023 | 2024 | 2025 |
| GB Cod ................................................ | 0.11 | 0.11 | ...................... | 0.07 | 0.07 | ...................... |
| GOM Cod ............................................. | 0.11 | 0.11 | ...................... | n/a | n/a | n/a |
| GB Yellowtail Flounder ........................ | 0.05 | 0.05 | ...................... | 0.05 | 0.05 | n/a |
| CC/GOM Yellowtail Flounder ................ | 0.54 | 0.48 | 0.45 | n/a | n/a | n/a |
| American Plaice ................................... | 7.50 | 7.27 | 6.94 | n/a | n/a | n/a |
| Witch Flounder ..................................... | 2.06 | 2.06 | 2.06 | n/a | n/a | n/a |
| SNE/MA Winter Flounder ..................... | 0.53 | 0.53 | 0.53 | n/a | n/a | n/a |

TABLE 11—PROPOSED FISHING YEARS 2023–2025 REGULAR B DAS PROGRAM QUARTERLY INCIDENTAL CATCH TACS

[mt, live weight]

| Stock | 2023 | | | | 2024 | | | | 2025 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1st Quarter (13%) | 2nd Quarter (29%) | 3rd Quarter (29%) | 4th Quarter (29%) | 1st Quarter (13%) | 2nd Quarter (29%) | 3rd Quarter (29%) | 4th Quarter (29%) | 1st Quarter (13%) | 2nd Quarter (29%) | 3rd Quarter (29%) | 4th Quarter (29%) |
| GB Cod ............ | 0.01 | 0.03 | 0.03 | 0.03 | 0.01 | 0.03 | 0.03 | 0.03 | .......... | .......... | .......... | .......... |
| GOM Cod .......... | 0.01 | 0.03 | 0.03 | 0.03 | 0.01 | 0.03 | 0.03 | 0.03 | .......... | .......... | .......... | .......... |
| GB Yellowtail Flounder .......... | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | .......... | .......... | .......... | .......... |
| CC/GOM Yellowtail Flounder ......... | 0.07 | 0.16 | 0.16 | 0.16 | 0.06 | 0.14 | 0.14 | 0.14 | 0.06 | 0.13 | 0.13 | 0.13 |
| American Plaice | 0.98 | 2.18 | 2.18 | 2.18 | 0.94 | 2.11 | 2.11 | 2.11 | 0.90 | 2.01 | 2.01 | 2.01 |
| Witch Flounder .. | 0.27 | 0.60 | 0.60 | 0.60 | 0.27 | 0.60 | 0.60 | 0.60 | 0.27 | 0.60 | 0.60 | 0.60 |
| SNE/MA Winter Flounder .......... | 0.07 | 0.15 | 0.15 | 0.15 | 0.07 | 0.15 | 0.15 | 0.15 | 0.07 | 0.15 | 0.15 | 0.15 |

**Temporary Modification to Accountability Measures for GB Cod**

As described above, a portion of the ABC is set aside to account for an estimate of catch in state waters (including both commercial and recreational vessels) and catch in federal waters by the other non-specified fisheries (including non-groundfish commercial and recreational groundfish vessels). For allocated groundfish stocks, there are no accountability measures for the state and other sub-components; an overage to the ACL results in accountability measures for the allocated components of the groundfish fishery. If the overall ACL for a stock is exceeded, the amount of the overage due to catch from vessels fishing in state waters or other, non-specified fisheries is distributed between the allocated components of the groundfish fishery. Each

component's attributed share of the overage is added to that component's catch to determine whether the AM for that component is triggered and the resulting overage amount. For the commercial fishery (sectors and common pool), the AM due to an overage is payback in a subsequent fishing year.

Framework 65 would temporarily modify the AMs for GB cod when an ACL overage that occurs in fishing years 2022–2024 is (in part or entirely) due to vessels fishing in state waters or other, non-specified fisheries. In the year following the overage (Year 2), the ACL is not achieved or exceeded by any amount, the ACL underage would be proportionately applied to each component's share of the overage from Year 1. While the preliminary AM (*i.e.,* payback) would be implemented at the beginning of Year 3, any reduction to

the overage (due to the underage in Year 2) would be made through an in-season adjustment as soon as possible in Year 3.

For example, if an ACL overage occurred in fishing year 2022, due to (in part or entirely) excess catch from the state and other sub-components, NMFS would determine the amount of this overage after the end of fishing year 2022, *i.e.,* in fishing year 2023. NMFS would then proportionately apply the excessive catch attributed to the state and other-subcomponents to catch from the allocated groundfish fisheries; in the case of GB cod, this would be sectors and the common pool. If the resulting sum of sector catch plus the sectors' share of the state or other sub-component's overage resulted in an overage of the sector sub-ACL, sectors would be required to pay back this overage, pound for pound. The same

JA.107

would be done for the common pool's catch and share of the state and other sub-components' overage. Under the modification proposed in this action, however, if there were an underage of the ACL in fishing year 2023, this underage would be distributed between sectors and the common pool. The overage payback would be implemented at the start of fishing year 2024, but NMFS would implement the reduction of the payback due to the 2023 ACL underage through an in-season adjustment in 2024.

**Regulatory Corrections Under Secretarial Authority**

This rule corrects an error in the northeast regulations for monitoring service providers. We are making this correction consistent with section 305(d) of the Magnuson-Stevens Act, which provides that the Secretary of Commerce may promulgate regulations necessary to ensure that amendments to an FMP are carried out in accordance with the FMP and the Magnuson-Stevens Act. This change is necessary to correct the regulations detailing insurance requirements for monitoring companies to reference the national requirements.

On September 8, 2022, NMFS published a final rule (87 FR 54902) that implemented national insurance requirements for observer providers at 50 CFR 600.748 and revised the northeast regional monitoring program regulations at § 648.11(h)(3)(vii) to reference the newly established national insurance requirements. The final rule implementing Amendment 23 to the Northeast Multispecies FMP (87 FR 75852, December 9, 2022) inadvertently overwrote the northeast regional monitoring program regulations that referred to the national insurance requirements. This rule corrects the regulations at § 648.11(h)(3)(vii)(A) to reference the national insurance requirements. This correction is necessary to eliminate confusion and ensure the northeast monitoring program is consistent with the national insurance requirements.

Framework 65 would also make minor changes in the regulations. It would remove regulatory text that is specific to previous fishing years. Specifically, this action would remove a sentence in 50 CFR 648.90(a)(4)(iii)(H)(*2*) that is specific to the allocation of certain stocks for fishing years 2010 and 2011, and remove the paragraphs at § 648.90(a)(5)(iv)(B) through (D) that are specific to temporary (up through fishing year 2020) modifications to the triggers for the Atlantic sea scallop

fishery's AMs for certain flatfish stocks. It would correct sections of the regulations (§§ 648.87(b)(1)(i)(A) and 648.90(a)(4)(iii)(F)) that refer to the northern and southern windowpane flounder as GOM/GB and SNE/MA windowpane flounder, respectively, which is inconsistent with other sections of the regulations. It would remove a section of text that describes the Fippennies Ledge Area that was moved to a different section of the regulations, but not deleted from § 648.87(c)(2)(i)(A). It would correct several citations in §§ 648.87(c)(2)(i) and 648.86(c) to paragraphs within § 648.90(a)(5)(i) that were redesignated in a previous action, but the citations were not updated.

**Classification**

Pursuant to section 304(b)(1)(A) of the Magnuson-Stevens Act, the NMFS Assistant Administrator has made a preliminary determination that this proposed rule is consistent with Framework 65, other provisions of the Magnuson-Stevens Act, and other applicable law, subject to further consideration after public comment. In making the final determination, the Regional Administrator will consider the data, views, and comments received during the public comment period.

NMFS finds that a 15-day comment period for this action provides a reasonable opportunity for public participation in this action, while also ensuring that the final specifications are in place as close to start of the groundfish fishing year on May 1, 2023, as possible. This action was developed by the New England Fishery Management Council as part of the annual Framework Adjustment process, during which final action was taken in December 2022. However, due to the need for additional analysis regarding the measures proposed in Framework 65, the Council was not able to submit the final Framework until April 18, 2023. This action could not be proposed sooner as a result of the delays in submission. Stakeholder and industry groups have been involved with the development of this action and have participated in public meetings throughout the past year. A prolonged comment period and subsequent potential delay in implementation would be contrary to the public interest, as it would leave in place default quotas for some stocks that do not already have specifications for fishing year 2023, rather than replacing them with the quotas proposed in this rule, which are based on the best available science. For multiple stocks, the fishery is operating under lower quotas than those proposed

in Framework 65, and an extended delay could limit economic opportunities for the fishery, as well as lead to confusion and uncertainty. Providing timely access to these stocks is also a potential safely issue. A significant portion of fishing activity occurs in early summer, due to better weather, and for some smaller vessels, summer may be the only season in which they are able to participate in the fishery.

This proposed rule has been determined to be not significant for purposes of Executive Order (E.O.) 12866.

An Initial Regulatory Flexibility Analysis (IRFA) was prepared for this proposed rule, as required by section 603 of the Regulatory Flexibility Act, 5 U.S.C. 603. The IRFA describes the economic impact that this proposed rule would have on small entities, including small businesses, and also determines ways to minimize these impacts. The IRFA includes this section of the preamble to this rule and analyses contained in Framework 63 and its accompanying EA/RIR/IRFA. A copy of the full analysis is available from the Council (see **ADDRESSES**). A summary of the IRFA follows.

*Description of the Reasons Why Action by the Agency Is Being Considered and Statement of the Objectives of, and Legal Basis for, This Proposed Rule*

This action proposes management measures, including annual catch limits, for the multispecies fishery in order to prevent overfishing, rebuild overfished groundfish stocks, and achieve optimum yield in the fishery. A complete description of the action, why it is being considered, and the legal basis for this action are contained in Framework 65, and elsewhere in the preamble to this proposed rule, and are not repeated here.

*Description and Estimate of the Number of Small Entities to Which This Proposed Rule Would Apply*

The proposed rule would impact the commercial and recreational groundfish, Atlantic sea scallop, small-mesh multispecies, Atlantic herring, and large-mesh non-groundfish fisheries. Individually permitted vessels may hold permits for several fisheries, harvesting species of fish that are regulated by several different FMPs, beyond those impacted by the proposed action. Furthermore, multiple-permitted vessels and/or permits may be owned by entities affiliated by stock ownership, common management, identity of interest, contractual relationships, or economic dependency. For the purposes

of the Regulatory Flexibility Act analysis, the ownership entities, not the individual vessels, are considered to be the regulated entities.

As of June 1, 2022, NMFS had issued 681 commercial limited-access groundfish permits associated with vessels (including those in confirmation of permit history (CPH)), 610 party/charter groundfish permits, 699 limited access and general category Atlantic sea scallop permits, 717 small-mesh multispecies permits, 73 Atlantic herring permits, and 758 large-mesh non-groundfish permits (limited access summer flounder and scup permits). Therefore, this action potentially regulates 3,538 permits. When accounting for overlaps between fisheries, this number falls to 2,027 permitted vessels. Each vessel may be individually owned or part of a larger corporate ownership structure and, for RFA purposes, it is the ownership entity that is ultimately regulated by the proposed action. Ownership entities are identified on June 1st of each year based on the list of all permit numbers, for the most recent complete calendar year, that have applied for any type of Greater Atlantic Federal fishing permit. The current ownership data set is based on calendar year 2021 permits and contains gross sales associated with those permits for calendar years 2019 through 2021.

For RFA purposes only, NMFS has established a small business size standard for businesses, including their affiliates, whose primary industry is commercial fishing (see 50 CFR 200.2). A business primarily engaged in commercial fishing (NAICS code 11411) is classified as a small business if it is independently owned and operated, is not dominant in its field of operation (including its affiliates), and has combined annual receipts not in excess of $11 million for all its affiliated operations worldwide. The determination as to whether the entity is large or small is based on the average annual revenue for the three years from 2019 through 2021. The Small Business Administration (SBA) has established size standards for all other major industry sectors in the U.S., including for-hire fishing (NAICS code 487210). These entities are classified as small businesses if combined annual receipts are not in excess of $8.0 million for all its affiliated operations. As with commercial fishing businesses, the annual average of the three most recent years (2019–2021) is utilized in determining annual receipts for businesses primarily engaged in for-hire fishing.

Based on the ownership data, 1,506 distinct business entities hold at least one permit that the proposed action potentially regulates. All 1,506 business entities identified could be directly regulated by this proposed action. Of these 1,506 entities, 865 are commercial fishing entities, 274 are for-hire entities, and 367 did not have revenues (were inactive in 2021). Of the 865 commercial fishing entities, 854 are categorized as small entities and 11 are categorized as large entities, per the NMFS guidelines. Furthermore, 515 of these commercial fishing entities held limited access groundfish permits, with 512 of these entities being classified as small businesses and 3 of these entities being classified as large businesses. All 274 for-hire entities are categorized as small businesses.

*Description of the Projected Reporting, Record-Keeping, and Other Compliance Requirements of This Proposed Rule*

The proposed action does not contain any new collection-of-information requirements under the Paperwork Reduction Act (PRA).

*Federal Rules Which May Duplicate, Overlap, or Conflict With This Proposed Rule*

The proposed action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of Significant Alternatives to the Proposed Action Which Accomplish the Stated Objectives of Applicable Statutes and Which Minimize Any Significant Economic Impact on Small Entities*

The economic impacts of each proposed measure are discussed in more detail in sections 6.5 and 7.12 of the Framework 65 Environmental Assessment (see **ADDRESSES**) and are not repeated here. The Council considered several options within the proposed GOM cod rebuilding plan, including a $F_{rebuild}$ that are lower (50 percent of $F_{MSY}$) and higher (70 and 75 percent of $F_{MSY}$). The quotas that were set by Framework 63 remain in place for fishing years 2023–2024, and the proposed rebuilding strategy for GOM cod is expected to positively impact the groundfish fishery in the long-term through stock rebuilding. For the updated groundfish specifications, the Council also considered two lower ABC for GB cod, which would have greater negative economic impacts than the preferred alternative. There are no significant alternatives that would minimize the economic impacts. The proposed action is predicted to generate $74.2 million in gross revenues on the

sector portion of the commercial groundfish trips, which is $41.7 million more than No Action, but $4.0 million less than fishing year 2021. Small entities engaged in common pool groundfish fishing may be negatively impacted by the proposed action as well. Likewise, small entities engaged in the recreational groundfish fishery are also likely to be negatively impacted. These negative impacts for both commercial and recreational groundfish entities are driven primarily by a substantial decline in the ACL for GOM haddock for fishing year 2023. While this decline is expected to result in short-term negative impacts, decreased GOM haddock catch in fishing year 2023 is expected to yield long-term positive impacts through stock rebuilding.

## List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping, and reporting requirements.

Dated: May 24, 2023.

**Samuel D. Rauch, III**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons stated in the preamble, NMFS proposes to amend 50 CFR part 648 as follows:

## PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.11, revise paragraph (h)(3)(vii)(A) to read as follows:

### § 648.11   Monitoring coverage.

\*      \*      \*      \*      \*

(h) \* \* \*
(3) \* \* \*
(vii) \* \* \*
(A) A monitoring service provider must hold insurance specified at § 600.748(b) and (c) of this chapter.

■ 3. In § 648.86, revise paragraph (c) to read as follows:

### § 648.86   NE Multispecies possession restrictions.

\*      \*      \*      \*      \*

(c) *Atlantic halibut.* A vessel issued a NE multispecies permit under § 648.4(a)(1) may land or possess on board no more than one Atlantic halibut per trip, provided the vessel complies with other applicable provisions of this part, unless otherwise specified in § 648.90(a)(5)(i)(F).

\*      \*      \*      \*      \*

■ 4. Amend § 648.87 by:

000000000006083

■ a. Revising paragraph (b)(1)(i)(A) and the first sentence of paragraph (c)(2)(i); and

■ b. Removing paragraphs (c)(2)(i)(A) and (B).

The revisions read as follows:

§ 648.87   Sector allocation.

\*      \*      \*      \*      \*

(b) \* \* \*
(1) \* \* \*
(i) \* \* \*

(A) *Allocated stocks.* Each sector shall be allocated a TAC in the form of an ACE for each NE multispecies stock, with the exception of Atlantic halibut, ocean pout, windowpane flounder (both the northern and southern stocks), and Atlantic wolffish based upon the cumulative PSCs of vessels/permits participating in each sector during a particular fishing year, as described in paragraph (b)(1)(i)(E) of this section.

\*      \*      \*      \*      \*

(c) \* \* \*
(2) \* \* \*

(i) *Regulations that may not be exempted for sector participants.* The Regional Administrator may not exempt participants in a sector from the following Federal fishing regulations: Specific times and areas within the NE multispecies year-round closure areas; permitting restrictions (*e.g.,* vessel upgrades, etc.); gear restrictions designed to minimize habitat impacts (*e.g.,* roller gear restrictions, etc.); reporting requirements; and AMs specified in § 648.90(a)(5)(i)(D) through (H). \* \* \*

\*      \*      \*      \*      \*

■ 5. Amend § 648.90 by:
■ a. Removing and reserving paragraph (a)(2)(iv);
■ b. Revising paragraphs (a)(4)(iii)(A) and (B), (a)(4)(iii)(F), the introductory text of paragraph (a)(4)(iii)(H), paragraphs (a)(4)(iii)(H)(*1*)(*i*) and (a)(4)(iii)(H)(*2*), the second sentence of paragraph (a)(5)(i)(D), and paragraph (a)(5)(ii);
■ c. Removing and reserving paragraph (a)(5)(iv)(B); and
■ d. Removing paragraphs (a)(5)(iv)(C) and (D).

The revisions read as follows:

§ 648.90   NE multispecies assessment, framework procedures and specifications, and flexible area action system.

\*      \*      \*      \*      \*

(a) \* \* \*
(4) \* \* \*
(iii) \* \* \*

(A) *Regulated species or ocean pout catch by vessels operating only in state waters.* The catch of regulated species or ocean pout that is expected to be harvested by vessels operating only in

state waters that have not been issued a Federal NE multispecies permit and are not subject to the regulations specified in this part, as well as the recreational catch of regulated species or ocean pout that occurs in state waters, unless otherwise specified in paragraph (a)(4)(iii)(H)(*1*)(*i*) of this section, shall be deducted from the ABC/ACL of each regulated species or ocean pout stock pursuant to the process for specifying ABCs and ACLs, as described in this paragraph (a)(4).

(B) *Regulated species or ocean pout catch by other, non-specified fisheries.* Regulated species or ocean pout catch by other, non-specified fisheries, including, but not limited to, exempted fisheries that occur in Federal waters, fisheries harvesting exempted species specified in § 648.80(b)(3), and recreational fisheries that occur in Federal waters, unless otherwise specified in paragraph (a)(4)(iii)(H)(*1*)(*i*) of this section, shall be deducted from the ABC/ACL of each regulated species or ocean pout stock, pursuant to the process to specify ABCs and ACLs described in this paragraph (a)(4), unless otherwise specified in paragraphs (a)(4)(iii)(C) through (G) of this section. The catch of these non-specified sub-components of the ACL shall be monitored using data collected pursuant to this part. If catch from such fisheries exceeds the amount specified in this paragraph (a)(4)(iii)(B), AMs shall be developed to prevent the overall ACL for each stock from being exceeded, pursuant to the framework adjustment process specified in this section.

\*      \*      \*      \*      \*

(F) *Southern windowpane flounder catch by exempted fisheries.* Southern windowpane flounder catch by other, non-specified fisheries, including, but not limited to, exempted fisheries that occur in Federal waters and fisheries harvesting exempted species specified in § 648.80(b)(3), shall be deducted from the ABC/ACL for southern windowpane flounder pursuant to the process to specify ABCs and ACLs, as described in this paragraph (a)(4). The specific value of the sub-components of the ABC/ACL for southern windowpane flounder distributed to these other fisheries shall be specified pursuant to the biennial adjustment process specified in paragraph (a)(2) of this section.

\*      \*      \*      \*      \*

(H) *Regulated species or ocean pout catch by the NE multispecies commercial and recreational fisheries.* Unless otherwise specified in the ACL recommendations developed pursuant to paragraph (a)(4)(i) of this section,

after all of the deductions and considerations specified in paragraphs (a)(4)(iii)(A) through (G) and (a)(4)(iii)(H)(*1*) of this section, the remaining ABC/ACL for each regulated species or ocean pout stock shall be allocated to the NE multispecies commercial fishery, pursuant to paragraph (a)(4)(iii)(H)(2) of this section.

\*      \*      \*      \*      \*

(*1*) \* \* \*

(*i*) *Stocks allocated.* Unless otherwise specified in this paragraph (a)(4)(iii)(H)(*1*), the ABCs/ACLs for GOM cod and GOM haddock set pursuant to paragraph (a)(4) of this section shall be divided between commercial and recreational components, based upon the average proportional catch of each component for each stock during fishing years 2001 through 2006.

\*      \*      \*      \*      \*

(*2*) *Commercial allocation.* Unless otherwise specified in this paragraph (a)(4)(iii)(H)(*2*), the ABC/ACL for regulated species or ocean pout stocks available to the commercial NE multispecies fishery, after consideration of the recreational allocation pursuant to paragraph (a)(4)(iii)(H)(*1*) of this section, shall be divided between vessels operating under approved sector operations plans, as described at § 648.87(c), and vessels operating under the provisions of the common pool, as defined in this part, based upon the cumulative PSCs of vessels participating in sectors calculated pursuant to § 648.87(b)(1)(i)(E). The ABC/ACL of each regulated species or ocean pout stocks not allocated to sectors pursuant to § 648.87(b)(1)(i)(E) (*i.e.,* Atlantic halibut, ocean pout, windowpane flounder, and Atlantic wolffish) that is available to the commercial NE multispecies fishery shall be allocated entirely to the common pool, and catch from sector and common pool vessels shall be attributed to this allocation. Unless otherwise specified in paragraph (a)(5) of this section, regulated species or ocean pout catch by common pool and sector vessels shall be deducted from the sub-ACL/ACE allocated pursuant to this paragraph (a)(4)(iii)(H)(*2*) for the purposes of determining whether adjustments to common pool measures are necessary, pursuant to the common pool AMs specified in § 648.82(n), or whether sector ACE overages must be deducted, pursuant to § 648.87(b)(1)(iii).

\*      \*      \*      \*      \*

(5) \* \* \*
(i) \* \* \*

(D) *AMs for both stocks of windowpane flounder, ocean pout,*

000000000006084

*Atlantic halibut, and Atlantic wolffish.* * * * If the overall ACL for any of these stocks is exceeded, NMFS shall implement the appropriate AM, as specified in paragraphs (a)(5)(i)(D) through (H) of this section, in a subsequent fishing year, consistent with the APA. * * *

* * * * *

(ii) *AMs due to excessive catch of regulated species or ocean pout by state and other, non-specified fisheries.* At the end of the NE multispecies fishing year, NMFS will evaluate whether the catch of any stock of regulated species or ocean pout by vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, exceeds the sub-component of the ACL for that stock.

(A) *AMs if the overall ACL for a regulated species or ocean pout stock is exceeded.* If the catch of any stock of regulated species or ocean pout by vessels operating only in state waters or in other, non-specified fisheries exceeds the sub-component of the ACL for that stock, and the overall ACL for that stock is exceeded, then the amount of the overage of the overall ACL for that stock attributed to catch from vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, shall be distributed among components of the NE multispecies

fishery based upon each component's share of that stock's ACL available to the NE multispecies fishery pursuant to paragraph (a)(4)(iii)(H) of this section. Each component's share of the ACL overage for a particular stock would be then added to the catch of that stock by each component of the NE multispecies fishery. If the resulting sum of catch of that stock for each component of the fishery exceeds that individual component's share of that stock's ACL specified pursuant to paragraph (a)(4)(iii)(H) of this section, then the AMs specified in paragraphs (a)(5)(i)(A) through (C) of this section shall take effect, as applicable, unless otherwise specified in paragraph (a)(5)(ii)(C) of this section.

(B) *AMs if the overall ACL for a regulated species or ocean pout stock is not exceeded.* If the catch of any stock of regulated species or ocean pout by vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, exceeds the sub-component of the ACL for that stock, but the overall ACL for that stock is not exceeded, even after consideration of the catch of that stock by other sub-components of the fishery, then the AMs specified in this paragraph (a)(5)(ii) shall not take effect.

(C) *AMs for GB cod due to excessive catch by non-allocated fisheries.* For any overages of the GB cod ACL in the

2022–2024 fishing years, the amount of overage of the overall ACL for GB cod attributed to catch from vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, would be reduced by any underage of the GB cod ACL in the fishing year following the overage, in order to determine the total amount that must be added to the catch by components of the NE multispecies fishery, as specified in paragraph (a)(5)(i)(A) of this section. If the full ACL of GB cod is caught or exceeded in the fishing year following an overage, no reduction to this amount would be made. For example, if in 2023 NMFS determines that 100 mt of GB cod catch by vessels operating only in state waters or in other, non-specified fisheries in fishing year 2022 has contributed to an ACL overage, NMFS would implement the AMs specified in paragraph (a)(5)(ii)(A) of this section at the beginning of fishing year 2024. If 2023 fishing year-end data showed that total catch of GB cod in fishing year 2023 was 25 mt below the 2023 ACL, NMFS would reduce the 100-mt overage amount by that 25-mt amount (down to 75 mt) in an in-season adjustment to the 2024 sub-ACLs, as specified in paragraph (a)(5)(i)(A) of this section.

* * * * *

[FR Doc. 2023–11494 Filed 5–30–23; 8:45 am]

**BILLING CODE 3510–22–P**

000000000006085

My name is Jerry Leeman, and I am a lifelong commercial groundfisherman from Maine. I am also the founder and CEO of the New England Fishermen Stewardship Association (NEFSA). NEFSA is an alliance of commercial fishermen dedicated to educating the public about seafood resource management and protecting the future of fishing in New England. NEFSA seeks to promote regional economic strength, ecosystem sustainability, and American food security. Our membership includes multiple local groundfishermen.

The irrational groundfishing restrictions developed by the New England Fishery Management Council would inflict serious harm on my business, those of NEFSA's members, the coastal communities we support, and industries that rely on groundfish for bait. I sincerely hope that the National Marine Fisheries Service (NMFS) will reject the Council's misguided and arbitrary Framework Adjustment 65.

First of all, Framework Adjustment 65 will decimate our ability to harvest haddock for years to come, slashing the commercial catch limit by 85% for Georges Bank and 83% in the Gulf of Maine. The Framework Adjustment also lowers catch limits for white hake and installs a restrictive 10-year cod rebuilding plan that will dramatically curtail access to the cod fishery. None of this is necessary to prevent overfishing. I have seen no evidence of significant population declines among these species, and NEFSA's membership agrees with that assessment. Framework Adjustment 65 marks a serious departure from previous regulations, a sure sign that the Council is overreacting and imposing needless hardship on fishermen and their coastal communities.

The serious policy defects in Framework Adjustment 65 are symptomatic of a deeper constitutional defect that requires rejecting the proposed rule. NMFS must reject Framework Adjustment 65 because it was developed by the unconstitutional, unaccountable New England Fishery Management Council. The Council has long ignored the views, needs, and perspectives

000000000006086

of local commercial fishermen and their communities. Framework Adjustment 65 is just the latest example of the agency capture that this constitutional defect has abetted.

The Council is so susceptible to capture because its membership is unaccountable to anyone. To start, Council members hold federal power without having been properly appointed to their positions. The United States Constitution requires that the President appoint all "officers of the United States" with the advice and consent of the Senate. U.S. Const., Art. II, § 2, cl. 2. Lower-ranking "inferior officers" can be appointed either by the President or by cabinet officials (which the Constitution calls "Heads of Departments") like the Secretary of Commerce.

Members of the Council are principal officers, or (at a minimum) inferior officers because they make fishing management policy for federal fisheries in their regions. But the Magnuson-Stevens Act flagrantly violates the Constitution when it comes to appointing Council members. Some members fill Council seats simply because they hold positions in state fishery and wildlife bureaucracies. 16 U.S.C. § 1852(b)(1)(A). Others are not truly appointed by the Secretary of Commerce because she is statutorily limited to choosing from restricted lists she receives from state governors. § 1852(a)(1)(A), (b)(2)(C).

These methods of appointment are unconstitutional. The Constitution forbids State officials from choosing federal officers; only the President, his cabinet secretaries, and federal courts of law may discharge that basic federal function. The Council's members are thus holding office unlawfully and accordingly lack the federal authority to issue Framework Adjustment 65. The Framework Adjustment is therefore void and NMFS must reject it. § 1854(a)(1)(A).

Not only are Council members unlawfully installed, they are also unconstitutionally immune from removal. The Supreme Court has held that laws protecting certain federal officials from being fired by the President are unconstitutional. *Seila Law LLC v. Consumer Fin. Prot.*

JA.113

*Bureau*, 140 S. Ct. 2183, 2191 (2020).  The Constitution vests executive authority in the President, and the President has the constitutional power and obligation to ensure that federal officials follow the law and carry out his policies.  U.S. Const. Art. I, §§ 1 & 3.

It is virtually impossible for the President or his Secretary of Commerce to supervise the Fishery Management Councils because Council members are protected from removal.  The members the Secretary selects from State-curated lists have fixed three-year terms while the state-appointed members effectively possess life tenure (or at least serve as long as they hold their state positions).  Most Council members can be removed only "for cause" and if two-thirds of their Council colleagues consent to the removal, or if they violate certain conflict-of-interest laws.  16 U.S.C. § 1852(b)(6).  Other members of the Council are completely immune from federal dismissal because they have a statutory right to sit on the Council "so long as [they] continue to hold" jobs in the state bureaucracies.  § 1852(b)(1)(A).  Thus, when the Council seeks to overregulate commercial fishing, crushing family fishermen and their communities—as Framework Adjustment 65 threatens to do—the President and his Administration are powerless to dictate a different approach.  And if the President wants to help commercial fishermen by setting new priorities, the Council can stop that effort in its tracks without any risk of removal or other methods of presidential control.

The Constitution cannot countenance local fishermen being forced out of business by an illegally constituted Council beholden to special interests.  But so long as the Council is unconstitutionally insulated from democratic control on both ends—appointment and removal—we are at its bureaucratic mercy.  NMFS must reject the Council's destructive, illegal Framework Adjustment 65, which is the product of an unconstitutional body and therefore violates "applicable law."  § 1854(a)(1)(A).  If NMFS approves this illegal Council policy and its accompanying

JA.114

regulations, the Council's unconstitutional composition will injure my business, the livelihoods of

NEFSA members, and many other local fishermen.

Jerry Leeman
CEO, New England Fishermen Stewardship Association

000000000006089



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930

June 30, 2023

MEMORANDUM FOR:    Janet Coit
                   Assistant Administrator for Fisheries

FROM:              Michael Pentony
                   Regional Administrator

SUBJECT:           Final Rule to Implement Framework Adjustment 65 to the
                   Northeast Multispecies Fishery Management Plan and Gulf of
                   Maine Haddock Emergency Management Measures, RIN 0648-
                   BL95--ISSUES ADVISORY

I request your acknowledgement of receipt and review for this issues advisory. We intend to
implement this action pursuant to the rulemaking authorities under sections 303(c), 304(b),
305(c), and 305(d) of the Magnuson-Stevens Fishery Conservation and Management Act.
Pursuant to section 305(c), we intend to take emergency action to implement a revised
acceptable biological catch (ABC) for Gulf of Maine (GOM) haddock that is higher than the
amount included in Framework 65. Pursuant to section 305(d), other changes we intend to make
as a part of this action are necessary to carry out the Northeast Multispecies Fishery Management
Plan (FMP), and to correct and improve the clarity of the regulations for multiple FMPs in the
Greater Atlantic Region.

BACKGROUND

Framework Adjustment 65 to the Northeast Multispecies FMP would revise the rebuilding plan
for GOM cod, set catch limits for 16 of the 20 multispecies (groundfish) stocks, and make a
temporary modification to the accountability measures (AM) for Georges Bank (GB) cod. This
action is necessary to respond to updated scientific information and to achieve the goals and
objectives of the FMP. We intend to approve all Framework 65 measures as recommended by
the New England Fishery Management Council and to implement Framework 65 as soon as
possible to minimize disruption and negative impacts to the 2023 fishing year. The 2023 fishing
year began on May 1, 2023. If the rule is not effective by November 1, 2023, the default quotas
that are in place for multiple groundfish stocks, including unit stocks such as white hake, will
become zero, and most groundfish vessels will be prohibited from fishing in the northeast.

On May 31, 2023, we published a rule (88 FR 34810) proposing Framework 65 as recommended
by the New England Fishery Management Council (see attached Decision Memo for the
proposed rule). For efficiency, we also included in the rule several regulatory text changes that
would be made under our administrative authority at section 305(d) of the Magnuson-Stevens
Act.



EMERGENCY MEASURES

As described in the Decision Memorandum for the proposed rule, Framework 65 sets a 1,936 mt ABC for GOM haddock in fishing year 2023, based on a 75-percent $F_{MSY}$.  This ABC represents a substantial reduction (83 percent) from the 2022 ABC of 11,526 mt.  The 2022 management track assessment for GOM haddock estimated the biomass is 270 percent of the target biomass, which represents a roughly 50-percent reduction in biomass compared to the previous assessment.  It concluded that the stock is not overfished, but the lower biomass resulted in an increase in fishing mortality above the overfishing threshold.  As a result, the Council's Scientific and Statistical Committee recommended the 83-percent reduction of the ABC to prevent overfishing.  Subsequent to the Council taking final action on Framework 65, members of the fishing industry began reporting increased interactions with GOM haddock, raising concerns that the fishery may meet or exceed its allocation of GOM haddock in the summer of 2023 due to the low quota.  This would have negative impacts for industry, both because GOM haddock is responsible for a substantial portion of groundfish revenues--$10.8 million out of $51.3 million in fishing year 2021--and because industry will be prevented from targeting other co-occurring groundfish stocks if the Gulf of Maine is closed to the fishery.  It could, in effect, close the Gulf of Maine to fishing for the commercial groundfish fishery.

At its April meeting, after receiving public statements of growing GOM haddock interactions and concerns about potentially reaching catch limits early in the next fishing year, the Council voted to request that NOAA's National Marine Fisheries Service (NMFS) implement an Emergency Action to set the GOM haddock ABC for fishing year 2023 at 90 percent of $F_{MSY}$, or 2,281 mt.  I voted no on the Council's motion to avoid a unanimous vote which would have required NMFS to complete the emergency action.  On May 2, 2023, the Council sent a letter to me requesting the emergency action.  The Council stated in its request that the extent of the potential impact of the extremely low quota for GOM haddock was not well-defined when the Council took final action on Framework 65 in December 2022, and therefore meets the requirement that the situation result from recent unforeseen events or recently discovered circumstances.  The Council further explained that it seeks to balance the risk of overfishing against the risk of a major fishery closure that could result in serious market and community losses.

A large 2020 year-class was documented in the 2022 management track assessment, but the high level of fishery interactions with this year-class was not apparent until after the Council completed its work on Framework 65 in December 2022.  The ratio of discards to total catch in the spring of 2023 reveals an increasing trend, out of proportion with what has been seen in recent fishing years.  This new situation presents unforeseen and serious management problems in the fishery that could not have been addressed by the Council in a timely manner.  In the situation where the commercial fishery reaches its quota early in the fishing year, the Gulf of Maine would be closed to groundfishing through the end of the fishing year (April 30, 2024), resulting in serious economic impacts.  While catch in the 2023 fishing year to date has been low, likely due to seasonal fishing patterns along with concerns about the substantially lower catch limits, we anticipate catch to increase beginning in July based on data from past fishing years.  Historic seasonal trends in the fishery demonstrate a substantial likelihood of early

closure under the severely reduced quota. Alternatively, if the fishery takes measures to constrain its overall catch to remain under the GOM haddock quotas for the entire fishing year, it will result in foregone economic opportunities, both for catching haddock but also other fish stocks. Completion of a fishery management plan framework or amendment and notice and comment rulemaking would take substantially more time than an emergency action, delaying timely implementation of the revised ABC. Concern for impacts to the GOM haddock stock is extremely low given that the total stock biomass is more than 270 percent of the target biomass at MSY. Therefore, we have determined that this situation meets the criteria specified by NMFS for emergency rulemaking (62 FR 44421; August 21, 1997).

Based on our analysis, we have determined that we can set the ABC as high as 100 percent of $F_{MSY}$ (2,515 mt) based on the condition of the GOM haddock stock. While this represents a 30-percent increase from the ABC included in Framework 65, it still would represent a substantial reduction (78-percent) from the fishing year 2022 ABC. Setting the ABC at 100 percent of $F_{MSY}$ (2,515 mt) meets the requirement to have at least a 50-percent probability of preventing overfishing. Therefore, while this final rule would technically approve the ABC that was proposed in Framework 65, it would replace the 1,936-mt GOM haddock ABC in Framework 65 with an ABC of 2,515 mt for 180 days through the emergency authority provided at section 305(c) of the Magnuson-Stevens Act. Pursuant to further consideration after reviewing any comments received on the emergency action, due to the nature of the groundfish sector system and fishery, I expect to extend the emergency GOM haddock ABC so that it replaces the Framework 65 GOM haddock ABC with the emergency ABC for the remainder of the 2023 fishing year.

SUMMARY OF COMMENTS RECEIVED ON THE PROPOSED RULE

We received three comments on the Framework 65 proposed rule from Conservation Law Foundation (CLF), New England Fishermen Stewardship Association (NEFSA), and Northeast Seafood Coalition (NSC). CLF wrote in support of the GOM cod rebuilding plan and the Southern New England/Mid-Atlantic (SNE/MA) winter flounder catch limits, and in opposition to the proposed increase to the Georges Bank (GB) cod ABC. NEFSA urged us to reject Framework 65, and, similar to criticisms that have been lodged for other FMPs in the Northeast and in other regions, questioned the constitutionality of the Fishery Management Council. NSC raised general concerns regarding fluctuations in the results of stock assessments and the timing of the Council action, as well as more specific concerns regarding the decrease in the GOM haddock quota. None of the comments compel me to disapprove any Council-recommended measure. The final rule will provide an opportunity for the public and stakeholders to comment on the emergency measures for GOM haddock.

CHANGES FROM THE PROPOSED RULE

The final rule includes fishing year 2023 potential sector contributions and allocations of annual catch entitlements for each sector that were not available at the time of the proposed rule. We are also adjusting the common pool trip limits for several stocks. We are increasing the trip limits for SNE/MA yellowtail flounder, Cape Cod/GOM yellowtail flounder, American plaice, GB winter flounder, and GOM winter flounder, because increasing these trip limits will provide

the common pool with the opportunity to harvest the increased common pool sub-ACLs for these stocks as implemented by Framework 65. We are decreasing the trip limits for GOM cod, GOM haddock, and white hake in response to fishing effort in fishing year 2022 and the withdrawal of active vessels from the sector program to fish in the common pool for the 2023 fishing year. These trip limit reductions will avoid early closures for the common pool fishery and help prevent overages.

As described more fully above, while the final rule approves the proposed fishing year 2023 ABC for GOM haddock, this rule would also take emergency action to implement the 2023 fishing year GOM haddock ABC of 2,515 mt.

CONTROVERSIALITY

Environmental organizations will likely be concerned about the decision to increase the GOM haddock ABC up to 100 percent of $F_{MSY}$, which is a departure from the Council's ABC control rule and will increase the probability of overfishing, compared to the proposed ABC based on 75 percent of $F_{MSY}$. Industry groups will likely support the emergency rule, although many members will likely still raise concerns that our surveys and stock assessments, including those for GOM haddock, do not match what they see on the water, and that the emergency action does not go far enough to reduce the economic impacts of quota reduction.

No other new policy, budgetary, scientific, or controversial issues or knowledge of litigation risks have arisen since the publication of the proposed rule.

Attachment

**Table 1**:  Comparison of Fishing Years 2022 and 2023 Overfishing limits (OFLs) and
Acceptable Biological Catches (ABCs), in metric tons, for Northeast Multispecies Stocks

| Stock | 2022 | | ABC Change 2022 to 2023 | 2023 | |
|---|---|---|---|---|---|
| | OFL | U.S. ABC | | OFL | U.S. ABC |
| **GB Cod** | UNK | 343 | 51% | UNK | 519 |
| GOM Cod | 724 | 551 | 0% | 853 | 551 |
| **GB Haddock** | 114,925 | 81,383 | -85% | 18,482 | 11,901 |
| **GOM Haddock Emergency Action** | 14,834 | 11,526 | -78% | 2,515 | 2,515 |
| **GOM Haddock Proposed in Framework 65** | 14,834 | 11,526 | -83% | 2,515 | 1,936 |
| **GB Yellowtail Flounder** | UNK | 122 | -13% | UNK | 106 |
| **SNE/MA Yellowtail Flounder** | 184 | 22 | 82% | 55 | 40 |
| **CC/GOM Yellowtail Flounder** | 1116 | 823 | 35% | 1,436 | 1,115 |
| **American Plaice** | 3,687 | 2,825 | 102% | 7,316 | 5,699 |
| **Witch Flounder** | UNK | 1483 | -15% | UNK | 1,256 |
| **GB Winter Flounder** | 974 | 608 | 180% | 2,361 | 1,702 |
| **GOM Winter Flounder** | 662 | 497 | 62% | 1,072 | 804 |
| **SNE/MA Winter Flounder** | 1,438 | 456 | 38% | 1,186 | 627 |
| Redfish* | 13,354 | 10,062 | -1% | 13,229 | 9,967 |
| **White Hake** | 3,022 | 2,116 | -13% | 2,650 | 1,845 |
| **Pollock** | 21,744 | 16,812 | -11% | 19,617 | 15,016 |
| Northern Windowpane | UNK | 160 | 0% | UNK | 160 |
| Southern Windowpane | 513 | 384 | 0% | 513 | 384 |
| **Ocean Pout** | 125 | 87 | 0% | 125 | 87 |
| **Atlantic Halibut** | UNK | 101 | -15% | UNK | 86 |
| **Atlantic Wolffish** | 122 | 92 | 1% | 124 | 93 |

UNK:  Unknown.
**Bold:**  New ABC set by Framework 65.
* Indicates stock with a changing ABC in fishing year 2023, as set by Framework 61.



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930

July 17, 2023

MEMORANDUM FOR:    Janet Coit
                            Assistant Administrator for Fisheries

FROM:                    Michael Pentony
                            Regional Administrator

SUBJECT:              Final Rule to Implement Framework Adjustment 65 to the
                            Northeast Multispecies Fishery Management Plan and Gulf of
                            Maine Haddock Emergency Management Measures, RIN 0648-
                            BL95--DECISION MEMORANDUM

I request that you approve and make determinations about the final rule to implement Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan (FMP). This action revises the rebuilding plan for GOM cod, sets catch limits for 16 of the 20 multispecies (groundfish) stocks, and makes a temporary modification to the accountability measures (AM) for Georges Bank (GB) cod. Additionally, this rule is taking emergency action to implement a revised acceptable biological catch (ABC) for Gulf of Maine (GOM) haddock that is higher than the amount in Framework 65.

We are approving all Framework 65 measures as recommended by the New England Fishery Management Council. We must implement Framework 65 as soon as possible to minimize disruption and negative impacts in the 2023 fishing year, which began on May 1, 2023. If the rule is not effective by November 1, 2023, the default quotas that are in place for multiple groundfish stocks, including unit stocks such as white hake, will become zero, and most groundfish vessels will be prohibited from fishing in the northeast.

BACKGROUND

Framework 65 revises the rebuilding plan for GOM cod, and sets the rebuilding fishing mortality rate ($F_{rebuild}$) at 60 percent of F at maximum sustainable yield ($F_{MSY}$) and the time to rebuild ($T_{Target}$) at 10 years, rebuilding by 2033 with a 70-percent probability of achieving the target biomass ($B_{MSY}$). Based on the 2021 stock assessment, the stock is currently at 5 percent of $B_{MSY}$. The ABCs previously set for fishing years 2023 and 2024 (by Framework 63) would remain in place.

Framework 65 sets the catch limits for the U.S./Canada stocks for 2023 and 2024. It also sets overfishing limits (OFLs) and ABCs for:
- GB haddock, GOM haddock, Southern New England/Mid-Atlantic (SNE/MA) yellowtail flounder, Cape Cod (CC)/GOM yellowtail flounder, American plaice, witch



JA.121

000000000006201

flounder, GB winter flounder, GOM winter flounder, SNE/MA winter flounder, pollock, ocean pout, Atlantic halibut, and Atlantic wolffish for fishing years 2023-2025, based on the 2022 stock assessments;

- GB cod and GB yellowtail flounder for fishing years 2023-2024; and
- White hake for fishing year 2023, based on the 2022 stock assessment.

Compared to 2022, Framework 65 increases the ABC for eight stocks and decreases the ABC for eight stocks (see Table 1, attached).  Framework 65 also removes the management uncertainty buffers for sectors for GOM haddock and white hake, if the at-sea monitoring (ASM) target coverage level is set at 90 percent or greater, for the 2023 fishing year only.  The ASM target for fishing year 2023 is 90 percent, based on available funds for the program and the most recent draft plan for spending the $10.7 million appropriation for human and electronic ASM in fishing year 2023.

Framework 65 temporarily modifies the accountability measures (AMs) for GB cod when an ACL overage in fishing years 2022-2024 is (in part or entirely) due to vessels fishing in state waters or other, non-specified fisheries.  If, in the year following the overage (Year 2), the ACL is not achieved or exceeded by any amount, the ACL underage would be proportionately applied to each component's share of the overage from Year 1.  While the preliminary AM (i.e., payback) would be implemented at the beginning of Year 3, any reduction to the overage (due to the underage in Year 2) would be made through an in-season adjustment as soon as possible in Year 3.

For efficiency, we also include in the rule several regulatory text changes using our administrative authority at section 305(d) of the Magnuson-Stevens Act.

EMERGENCY MEASURES

As described in the Decision Memorandum for the proposed rule, Framework 65 sets a 1,936-mt ABC for GOM haddock in fishing year 2023, based on a 75-percent $F_{MSY}$.  This ABC represents a substantial reduction (83 percent) from the 2022 ABC of 11,526 mt.  The 2022 management track assessment for GOM haddock estimated the biomass is 270 percent of the target biomass, which represents a roughly 50-percent reduction in biomass compared to the previous assessment.  It concluded that the stock is not overfished, but the lower biomass resulted in an increase in fishing mortality above the overfishing threshold.  As a result, the Council's Scientific and Statistical Committee recommended the 83-percent reduction of the ABC to prevent overfishing.  Subsequent to the Council taking final action on Framework 65, members of the fishing industry began reporting increased interactions with GOM haddock, raising concerns that the fishery may meet or exceed its allocation of GOM haddock as early as the summer of 2023 due to the low quota.  Exceeding its GOM haddock allocation mid-fishing year would have severely negative impacts for industry, both because GOM haddock is responsible for a substantial portion of groundfish revenues--$10.8 million out of $51.3 million in fishing year 2021--and because industry would be prevented from targeting other co-occurring groundfish stocks if the Gulf of Maine is closed to the fishery.  It would, in effect, close the Gulf of Maine to fishing for the commercial groundfish fishery.  Uncertainty about the fishery's

000000000006202

ability to continue for the entire fishing year could result in unnecessarily constrained fishing and the failure to harvest the available GOM haddock catch limit and other stocks too.

At its April meeting, after receiving public statements of growing GOM haddock interactions and concerns about potentially reaching catch limits early in the next fishing year, the Council voted to request that NOAA's National Marine Fisheries Service (NMFS) implement an Emergency Action to set the GOM haddock ABC for fishing year 2023 at 90 percent of $F_{MSY}$, or 2,281 mt. I voted no on the Council's motion to avoid a unanimous vote, which would have required NMFS to complete the emergency action. On May 2, 2023, the Council sent a letter to me requesting the emergency action. The Council stated in its request that the extent of the potential impact of the extremely low quota for GOM haddock was not well-defined when the Council took final action on Framework 65 in December 2022, and therefore meets the requirement that the situation result from recent unforeseen events or recently discovered circumstances. The Council's request included a projection based on past years' catch performances showing a potential to harvest up to the catch limit as early as August of this fishing year. The Council further explained that it seeks to balance the risk of overfishing against the risk of a major fishery closure that could result in serious market and community losses.

A large 2020 year class was documented in the 2022 management track assessment, but the unanticipated high level of fishery interactions with this year class that did not become apparent until after the Council completed its work on Framework 65 in December 2022. The ratio of discards to total catch in the spring of 2023 reveals an increasing trend, out of proportion with what has been seen in recent fishing years. This new situation presents unforeseen and serious management problems in the fishery that could not have been addressed by the Council in a timely manner. In the situation where the commercial fishery reaches its quota early in the fishing year, the Gulf of Maine would be closed to groundfish fishing through the end of the fishing year (April 30, 2024), resulting in serious economic impacts. While catch in the 2023 fishing year to date has been low, likely due to seasonal fishing patterns along with concerns about the substantially lower catch limits, we anticipate catch to increase beginning in July based on data from past fishing years. Past seasonal trends in the fishery demonstrate a substantial possibility of early closure under the severely reduced quota. Alternatively, if the fishery takes measures to constrain its overall catch and remains substantially under the GOM haddock quotas for the entire fishing year, it will result in forgone economic opportunities, both for catching haddock but also other fish stocks. Completion of a fishery management plan framework or amendment and notice and comment rulemaking would take substantially more time than an emergency action, delaying timely implementation of the revised ABC. Concern for long-term impacts to the GOM haddock stock is low given that the total stock biomass is estimated to be 270 percent of the target biomass at MSY. Therefore, we have determined that this situation meets the criteria specified by NMFS for emergency rulemaking (62 FR 44421; August 21, 1997).

Based on our analysis, we have determined that we can set the ABC as high as 100 percent of $F_{MSY}$ (2,515 mt) given the condition of the GOM haddock stock while still preventing overfishing. While this represents a 30-percent increase from the ABC included in Framework 65, it still would represent a substantial reduction (78-percent) from the fishing year 2022 ABC.

000000000006203

Setting the ABC at 100 percent of $F_{MSY}$ (2,515 mt) meets the requirement to have at least a 50-percent probability of preventing overfishing. The removal of the management uncertainty buffer is counter-balanced by the remaining buffer on the recreational and common pool fisheries as well as the constraint on overall catch expected from the white hake catch limit. This rule would technically approve the ABC that was proposed in Framework 65, and it would then replace the 1,936-mt GOM haddock ABC in Framework 65 with an ABC of 2,515 mt for 180 days through the emergency authority provided at section 305(c) of the Magnuson-Stevens Act. Pursuant to further consideration after reviewing any comments received on the emergency action, due to the nature of the groundfish sector system and fishery, I expect to need to extend the emergency GOM haddock ABC so that it replaces the Framework 65 GOM haddock ABC with the emergency ABC for the remainder of the 2023 fishing year.

SUMMARY OF COMMENTS RECEIVED ON THE PROPOSED RULE

We received three comments on the Framework 65 proposed rule from Conservation Law Foundation (CLF), New England Fishermen Stewardship Association (NEFSA), and Northeast Seafood Coalition (NSC). CLF wrote in support of the GOM cod rebuilding plan and the Southern New England/Mid-Atlantic (SNE/MA) winter flounder catch limits, and in opposition to the proposed increase to the Georges Bank (GB) cod ABC. NEFSA urged us to reject Framework 65, and, similar to criticisms that have been lodged for other FMPs in the Northeast and in other regions, questioned the constitutionality of the Fishery Management Council. NSC raised general concerns regarding fluctuations in the results of stock assessments and the timing of the Council action, as well as more specific concerns regarding the decrease in the GOM haddock quota. None of the comments compel me to disapprove any Council-recommended measure. The final rule will provide an opportunity for the public and stakeholders to comment on the emergency measures for GOM haddock.

CHANGES FROM THE PROPOSED RULE

The final rule includes fishing year 2023 potential sector contributions and allocations of annual catch entitlements for each sector that were not available at the time of the proposed rule. We are also adjusting the common pool trip limits for several stocks. We are increasing the trip limits for SNE/MA yellowtail flounder, Cape Cod/GOM yellowtail flounder, American plaice, GB winter flounder, and GOM winter flounder, because increasing these trip limits will provide the common pool with the opportunity to harvest the increased common pool sub-ACLs for these stocks as implemented by Framework 65. We are decreasing the trip limits for GOM cod and white hake in response to fishing effort in fishing year 2022 and the withdrawal of active vessels from the sector program to fish in the common pool for the 2023 fishing year. These trip limit reductions will avoid early closures for the common pool fishery and help prevent overages.

As described more fully above, while the final rule approves the proposed fishing year 2023 ABC for GOM haddock, this rule would also take emergency action to implement the 2023 fishing year GOM haddock ABC of 2,515 mt.

000000000006204

CONTROVERSIALITY

Environmental organizations will likely be concerned about the decision to increase the GOM haddock ABC up to 100 percent of $F_{MSY}$, which is a departure from the Council's ABC control rule and will increase the probability of overfishing, compared to the proposed ABC based on 75 percent of $F_{MSY}$. Industry groups will likely support the emergency rule, although many members will likely still raise concerns that our surveys and stock assessments, including those for GOM haddock, do not match what they see on the water, and that the emergency action does not go far enough to reduce the economic impacts of quota reduction.

No other new policy, budgetary, scientific, or controversial issues or knowledge of litigation risks have arisen since the publication of the proposed rule.

CERTIFICATION

I have determined that the final rule is consistent with the national standards and other provisions of the Magnuson-Stevens Fishery Conservation and Management Act, and other applicable laws. Determinations supporting this finding are attached.

RECOMMENDATIONS

I recommend that you approve the final rule and sign the attached clearance memorandum to the Chief Counsel for Regulation, Department of Commerce and the NOAA General Counsel.

1. I concur ____RAUCH.SAMUEL.DEAN.1365850948____ Digitally signed by RAUCH.SAMUEL.DEAN.1365850948
Date: 2023.07.26 15:57:32 -04'00' _____.

                                                                                        Date

2. I do not concur _____.

                                                                                        Date

Attachments

Attachment

**Table 1**:  Comparison of Fishing Years 2022 and 2023 Overfishing limits (OFLs) and
Acceptable Biological Catches (ABCs), in metric tons, for Northeast Multispecies Stocks

| Stock | 2022 | | ABC Change 2022 to 2023 | 2023 | |
|---|---|---|---|---|---|
| | OFL | U.S. ABC | | OFL | U.S. ABC |
| **GB Cod** | UNK | 343 | 51% | UNK | 519 |
| GOM Cod | 724 | 551 | 0% | 853 | 551 |
| **GB Haddock** | 114,925 | 81,383 | -85% | 18,482 | 11,901 |
| **GOM Haddock Emergency Action** | 14,834 | 11,526 | -78% | 2,515 | 2,515 |
| **GOM Haddock Proposed in Framework 65** | 14,834 | 11,526 | -83% | 2,515 | 1,936 |
| **GB Yellowtail Flounder** | UNK | 122 | -13% | UNK | 106 |
| **SNE/MA Yellowtail Flounder** | 184 | 22 | 82% | 55 | 40 |
| **CC/GOM Yellowtail Flounder** | 1116 | 823 | 35% | 1,436 | 1,115 |
| **American Plaice** | 3,687 | 2,825 | 102% | 7,316 | 5,699 |
| **Witch Flounder** | UNK | 1483 | -15% | UNK | 1,256 |
| **GB Winter Flounder** | 974 | 608 | 180% | 2,361 | 1,702 |
| **GOM Winter Flounder** | 662 | 497 | 62% | 1,072 | 804 |
| **SNE/MA Winter Flounder** | 1,438 | 456 | 38% | 1,186 | 627 |
| Redfish* | 13,354 | 10,062 | -1% | 13,229 | 9,967 |
| **White Hake** | 3,022 | 2,116 | -13% | 2,650 | 1,845 |
| **Pollock** | 21,744 | 16,812 | -11% | 19,617 | 15,016 |
| Northern Windowpane | UNK | 160 | 0% | UNK | 160 |
| Southern Windowpane | 513 | 384 | 0% | 513 | 384 |
| **Ocean Pout** | 125 | 87 | 0% | 125 | 87 |
| **Atlantic Halibut** | UNK | 101 | -15% | UNK | 86 |
| **Atlantic Wolffish** | 122 | 92 | 1% | 124 | 93 |

UNK:  Unknown.
**Bold:**  New ABC set by Framework 65.
* Indicates stock with a changing ABC in fishing year 2023, as set by Framework 61.

DETERMINATIONS

NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment (EA) and supplemental EA were prepared for this action. The measures implemented by this action are expected to have negligible to slight positive impacts on managed species and non-target species. This action is also expected to have slight negative to slight positive impacts on protected species and habitat, and negative to positive impacts on human communities. I have found that there will be no overall significant impact on the human environment as a result of this action, based on the analysis contained in the EA and supplemental EA and the information provided in the accompanying finding of no significant impact.

COASTAL ZONE MANAGEMENT ACT (CZMA)

NOAA's National Marine Fisheries Service (NMFS) made a general consistency determination that the Northeast Multispecies FMP is consistent to the maximum extent practicable with the enforceable policies of the approved coastal management programs of Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina. This general consistency determination applies to the current FMP, and all subsequent routine Federal actions carried out in accordance with the FMP such as framework adjustments and specifications, including Framework 65 and this emergency action. This determination was submitted on October 21, 2009, for review by the responsible state agencies under section 307 of the CZMA. North Carolina, Rhode Island, Virginia, Connecticut, New Hampshire, New Jersey, Delaware, and Pennsylvania have concurred with the general consistency determination. Consistency was inferred for those states that did not respond.

REGULATORY FLEXIBILITY ACT (RFA)

A final regulatory flexibility analysis (FRFA) was prepared as part of the regulatory impact review. The FRFA is contained in the final rule that accompanies this action. Each item in section 604(a)(1)-(5) of the RFA has been addressed in the classification section of the attached final rule.

PAPERWORK REDUCTION ACT (PRA)

This action does not contain collection-of-information requirements subject to review and approval by the Office of Management and Budget under the PRA.

ENDANGERED SPECIES ACT (ESA)

Pursuant to section 7 of the Endangered Species Act (ESA), NOAA's National Marine Fisheries Service (NMFS) issued a Biological Opinion on May 27, 2021, that considered the effects of the NMFS' authorization of 10 fishery management plans (FMP), NMFS' North Atlantic Right Whale Conservation Framework, and the New England Fishery Management Council's Omnibus

Essential Fish Habitat Amendment 2, on ESA-listed species and designated critical habitat. The 10 FMPs considered in the Opinion include the: (1) American Lobster; (2) Atlantic Bluefish; (3) Atlantic Deep-Sea Red Crab; (4) Mackerel, Squid, and Butterfish; (5) Monkfish; (6) Northeast Multispecies; (7) Northeast Skate Complex; (8) Spiny Dogfish; (9) Summer Flounder, Scup, and Black Sea Bass; and (10) Jonah Crab FMPs. The American Lobster and Jonah Crab FMPs are permitted and operated through implementing regulations compatible with the interstate fishery management plans issued under the authority of the Atlantic Coastal Fisheries Cooperative Management Act, the other eight FMPs are issued under the authority of the Magnuson-Stevens Fishery Conservation and Management Act.

The 2021 Opinion determined that the proposed action may adversely affect, but is not likely to jeopardize, the continued existence of North Atlantic right, fin, sei, or sperm whales; the Northwest Atlantic Ocean distinct population segment (DPS) of loggerhead, leatherback, Kemp's ridley, or North Atlantic DPS of green sea turtles; any of the five DPSs of Atlantic sturgeon; Gulf of Maine DPS Atlantic salmon; or giant manta rays. The Opinion also concluded that the proposed action is not likely to adversely affect designated critical habitat for North Atlantic right whales, the Northwest Atlantic Ocean DPS of loggerhead sea turtles, U.S. DPS of smalltooth sawfish, Johnson's seagrass, or elkhorn and staghorn corals. An Incidental Take Statement (ITS) was issued in the Opinion. The ITS includes reasonable and prudent measures and their implementing terms and conditions, which NMFS determined are necessary or appropriate to minimize impacts of the incidental take in the fisheries assessed in this Opinion.

NMFS has recently received information that the estimated incidental bycatch rate of Atlantic sturgeon in gillnet gear through 2021 may be higher than what was expected and authorized in the Opinion. NMFS is reviewing this information in order to fully understand the implications on Atlantic sturgeon and is considering if reinitiation of consultation is required. However, based on the information described above, NMFS does not anticipate that this action would be likely to jeopardize the continued existence of any ESA-listed species or adversely modify their designated critical habitat. Further, the proposed action does not entail making any changes to any fishery that would cause an increase in interactions with or effects to ESA-listed species or their critical habitat. The ACLs for constraining stocks remain low or are proposed to be reduced further, and therefore an increase in effort is not expected. Therefore, the proposed action is not expected to result in: (1) More gear (i.e., gillnet or bottom trawl) in the water; (2) an increase in the duration of time that gear is in the water; or (3) changes in the overlap between protected species and the fishery, relative to current operating conditions.

Additionally, the proposed action does not make any irreversible or irretrievable commitment of resources with respect to the agency action that would have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives if this consultation were reinitiated. NMFS is not expending, and does not have to expend, any financial resources, enter into any binding agreements, or commit other resources in order to implement this action. The NE multispecies fishery will continue to operate under its respective FMP unless NMFS takes action under the Magnuson-Stevens Fishery Conservation and Management Act to stop or modify its operation in some manner. Further, commitments of industry resources are not irreversible or irretrievable because NMFS retains the legal authority to restrict activities of fishery participants or modify the FMP as necessary. FMPs and fishery operations are

000000000006208

continually monitored and adjusted, and FMP implementing regulations are always subject to future changes.

MARINE MAMMAL PROTECTION ACT (MMPA)

I have determined that fishing activities conducted under this rule will have no adverse impact on marine mammals.  The Framework 65 EA and supplemental EA indicate that the measures in Framework 65 and the emergency action are likely to affect marine mammal species inhabiting the multispecies management unit, but the measures would not alter the effectiveness of existing MMPA measures, such as take reduction plans, to protect those species based on overall reductions in fishing effort that have been implemented through the FMP.

NATIONAL MARINE SANCTUARIES ACT (NMSA)

I have determined that this action will not destroy, cause the loss of, or injure any sanctuary resource subject to consultation with the Secretary under the NMSA.  This action sets specifications and makes minor changes to management measures.  The measures do not allow new or unauthorized access to any National Marine Sanctuary, nor any new behaviors that are not authorized under the NMSA.  Overall, the combination of past, present, and future actions is expected to reduce fishing effort and hence reduce potential negative impacts to sanctuary resources.

ADMINISTRATIVE PROCEDURE ACT

The Assistant Administrator for Fisheries finds that there is good cause under 5 U.S.C. 553(b)(B) and 553(d)(1) and (3) to waive the 30-day delayed effectiveness of this action along with the notice and comment period for the emergency action.  This action relies on the best available science to set 2023 catch limits for groundfish stocks and adopts several other measures to improve the management of the groundfish fishery.  This final rule must be implemented as soon as possible to capture fully the conservation and economic benefits of Framework 65 and avoid adverse economic impacts.

The development of Framework 65 began in April 2022, and the Council took final action on the Framework 65 measures in December 2022.  However, due to the need for additional analysis regarding the measures proposed in Framework 65, the Council was not able to submit the final Framework until April 18, 2023.  Given the timing of the Council process, the earliest we were able to publish a proposed rule for Framework 65 was on May 31, 2023.

A delay in implementation of this rule increases negative economic effects for regulated entities.  Multiple stocks did not have 2023 quotas set by a previous framework.  A separate action implemented default quotas (75 percent of the 2022 quota) for these stock that will be in effect through October 31, 2023, unless we implement Framework 65 before that date.  After October 31, the default quotas expire, at which point vessels would be prohibited from fishing in the waters of the Northeast until Framework 65 is effective.  For multiple stocks, the fishery is operating under lower quotas than those implemented by this rule, and an extended delay could limit economic opportunities for the fishery, as well as lead to confusion and uncertainty.

Providing timely access to these stocks is also a potential safely issue. A significant portion of fishing activity occurs in early summer, due to better weather, and for some smaller vessels, summer may be the only season in which they are able to participate in the fishery.

The 30-day delay in implementation for this rule is unnecessary because this rule contains no new measures (*e.g.,* requiring new nets or equipment) for which regulated entities need time to prepare or revise their current practices. Fishermen who are subject to this action expect and need timely implementation to avoid adverse economic impacts. This action is similar to the process used to set quotas every 1-2 years, approves all items as proposed, and contains only quotas and minor adjustments to the management plan that were discussed at multiple noticed meetings where the public was provided opportunity to learn about the action, ask questions, and provide input into the development of the measures. Affected parties and other interested parties participated in this public process to develop this action and expect implementation as close to the beginning of the fishing year on May 1 as possible. Overall, a delay in implementation of this action would greatly diminish the benefits of these specifications and other approved measures. For these reasons, a 30-day delay in the effectiveness of this rule is impracticable and contrary to the public interest.

EXECUTIVE ORDER 12866

Pursuant to the procedures established to implement section 6 of Executive Order 12866, OMB has determined that this action is not significant.

EXECUTIVE ORDER 13132

This action does not contain policies with federalism implications under Executive Order 13132.

ESSENTIAL FISH HABITAT (EFH)

The area affected by the final action in the Northeast multispecies fishery has been identified as EFH for species managed under the following FMPs: Northeast Multispecies; Atlantic Sea Scallop; Monkfish; Atlantic Herring; Summer Flounder, Scup, and Black Sea Bass; Atlantic Mackerel, Squid, and Butterfish; Spiny Dogfish; Tilefish; Atlantic Deep-Sea Red Crab; Atlantic Surfclam and Ocean Quahog; Atlantic Bluefish; Northeast Skates; Atlantic Billfish; and Atlantic Tunas, Swordfish, and Sharks. Analyses described in the Framework 65 EA and supplemental EA demonstrate that the overall habitat impacts of all of the measures combined in this proposed action are unlikely to have more than minimal adverse impacts on EFH and are expected to have neutral impacts relative to the baseline habitat protections established under Omnibus Essential Fish Habitat Amendment 2 (OHA2). As such, additional measures to mitigate or minimize adverse effects of the multispecies fishery on EFH beyond those established under OHA2 are not necessary. Because there is no potential new adverse impact on EFH from fishing provided for in this action, NMFS conducted an abbreviated EFH consultation pursuant to 50 CFR 600.920(h) and prepared an EFH Assessment that incorporates all of the information required in 50 CFR 600.920(e)(3).

000000000006210

INFORMATION QUALITY ACT

Pursuant to section 515 of Public Law 106-554, this information product has undergone a pre-dissemination review by the Sustainable Fisheries Division, Greater Atlantic Regional Fisheries Office, completed on July 12, 2023.  The signed Pre-dissemination Review and Documentation Form is on file in that Office, and a copy of the form is included with this package.

000000000006211

| | |
|---|---|
| **From:** | Janet Coit - NOAA Federal |
| **Subject:** | Re: FOR REVIEW: Final Rule; Framework Adjustment 65 to the Northeast Multispecies FMP (BL95) |
| **To:** | Maureen Trnka - NOAA Federal |
| **Cc:** | Sean McNally - NOAA Federal; Brianne Szczepanek - NOAA Federal; Samuel Rauch - NOAA Federal |
| **Sent:** | August 3, 2023 6:36 PM (UTC-04:00) |

I reviewed and clear this. Approved. Thank you.

On Wed, Aug 2, 2023 at 7:01 AM Maureen Trnka - NOAA Federal <maureen.trnka@noaa.gov> wrote:
Janet,
  As Acting AA, Sam signed these documents indicating his concurrence with the rule and it has since proceeded to review in DOC GC/NOAA GC. However, his decision was stipulated with the need to be ratified by you, upon your return. I am now sending you the package for your review/clearance.

For review
Final Rule to Implement Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan and Gulf of Maine Haddock Emergency Management Measures.

Timing
Please review by Friday, August 4

Background
We are approving all Framework 65 measures as recommended by the New England Fishery Management Council. We must implement Framework 65 as soon as possible to minimize disruption and negative impacts in the 2023 fishing year, which began on May 1, 2023. If the rule is not effective by November 1, 2023, the default quotas that are in place for multiple groundfish stocks, including unit stocks such as white hake, will become zero, and most groundfish vessels will be prohibited from fishing in the northeast.

Controversiality
Environmental organizations will likely be concerned about the decision to increase the GOM haddock ABC up to 100 percent of FMSY, which is a departure from the Council's ABC control rule and will increase the probability of overfishing, compared to the proposed ABC based on 75 percent of FMSY. Industry groups will likely support the emergency rule, although many members will likely still raise concerns that our surveys and stock assessments, including those for GOM haddock, do not match what they see on the water, and that the emergency action does not go far enough to reduce the economic impacts of quota reduction. No other new policy, budgetary, scientific, or controversial issues or knowledge of litigation risks have arisen since the publication of the proposed rule.

**Maureen Trnka, PhD**
Advisor for Regulatory Programs
Office of the Assistant Administrator
NOAA Fisheries
U.S. Department of Commerce
Work Cell: 301-641-4387
**www.fisheries.noaa.gov/**

--
Janet Coit
Assistant Administrator, NOAA Fisheries
U.S. Department of Commerce
Office: (301) 427-8000

000000000006212

www.fisheries.noaa.gov

00000000006213

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 622

**[Docket No. 230726–0175]**

**RIN 0648–BM13**

### Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Commercial Trip Limit for Gray Triggerfish

*Correction*

In Rule Document 2023–16229, appearing on pages 50063–50065, in the issue of Tuesday, August 1, 2023, make the following correction:

On page 50063, in the third column, in the heading, on the thirty-first line, under the heading **DATES**, the text reading "September 11, 2023" should read "September 1, 2023".

[FR Doc. C1–2023–16229 Filed 8–15–23; 4:15 pm]

**BILLING CODE 0099–10–D**

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 648

**[Docket No. 230810–0190]**

**RIN 0648–BL95**

### Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Northeast Multispecies Fishery; Framework Adjustment 65

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule; emergency action; request for comments.

**SUMMARY:** This action approves and implements Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan. This rule revises the rebuilding plan for Gulf of Maine cod, sets catch limits for 16 of the 20 multispecies (groundfish) stocks, and makes a temporary modification to the accountability measures for Georges Bank cod. This action also corrects erroneous regulations and removes outdated regulations. This action also implements an emergency action to set fishing year 2023 catch limits for Gulf of Maine haddock. This action is

necessary to respond to updated scientific information and to achieve the goals and objectives of the fishery management plan. The measures are intended to help prevent overfishing, rebuild overfished stocks, achieve optimum yield, and ensure that management measures are based on the best scientific information available. The emergency action is necessary to avoid a potential shut-down of the groundfish fishery in the Gulf of Maine in fishing year 2023, while still preventing overfishing for Gulf of Maine haddock.

**DATES:** Effective August 18, 2023, except for the temporary specification of the Gulf of Maine haddock catch limits under Catch Limits for Fishing Years 2023–2025 in **SUPPLEMENTARY INFORMATION**, which are effective August 18, 2023 through February 14, 2024. Comments on the emergency action for Gulf of Maine haddock must be submitted by 5 p.m. EST on September 18, 2023.

**ADDRESSES:** For this action, NMFS developed a supplement for the Environmental Assessment (EA) for Framework 65. Copies of the supplemental EA for this rulemaking are available on the internet at *https://www.fisheries.noaa.gov/region/new-england-mid-atlantic* and *www.regulations.gov.*

You may submit comments on the emergency action for Gulf of Maine haddock, identified by NOAA–NMFS–2023–0021, by the following method:

• *Electronic Submission:* Submit all electronic public comments via the Federal e-Rulemaking Portal. Go to *www.regulations.gov* and enter NOAA–NMFS–2023–0021 in the Search box. Click on the "Comment" icon, complete the required fields, and enter or attach your comments.

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. You may submit anonymous comments by entering "N/A" in the required fields if you wish to remain anonymous.

Copies of Framework Adjustment 65, including the EA, the Regulatory Impact Review, and the Regulatory Flexibility Act Analysis prepared by the New

England Fishery Management Council in support of this action, are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org/management-plans/northeast-multispecies* or *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Liz Sullivan, Fishery Policy Analyst, phone: 978–282–8493; email: *Liz.Sullivan@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Summary of Approved Measures

The New England Fishery Management Council (Council) adopted Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan (FMP) on December 7, 2022. The Council submitted Framework 65, including an EA, for NMFS approval on April 18, 2023. NMFS published a proposed rule for Framework 65 on May 31, 2023 (88 FR 34810), with a 15-day comment period that closed on June 15, 2023.

Under the Magnuson-Stevens Act, the Secretary approves, disapproves, or partially approves measures that the Council proposes, based on consistency with the Act and other applicable law. On behalf of the Secretary, NMFS reviews proposed regulations for consistency with the fishery management plan, plan amendment, the Magnuson-Stevens Fisheries Conservation and Management Act (Magnuson-Stevens Act) and other applicable law, and publishes the proposed regulations, solicits public comment, and promulgates the final regulations. Based on information provided in the EA, supplemental EA, and considered during the preparation of this action, and after consideration of comments, NMFS (we) have approved all of the measures in Framework 65 recommended by the Council, as described below. The measures implemented in this final rule:

• Revise the rebuilding plan for Gulf of Maine (GOM) cod;
• Set shared U.S./Canada quotas for Georges Bank (GB) yellowtail flounder and eastern GB cod and haddock for fishing years 2023 and 2024;
• Set specifications, including catch limits for 16 groundfish stocks: GB haddock, GOM haddock, Southern New England/Mid-Atlantic (SNE/MA) yellowtail flounder, Cape Cod (CC)/GOM yellowtail flounder, American plaice, witch flounder, GB winter flounder, GOM winter flounder, SNE/

00000000006214

MA winter flounder, pollock, ocean pout, Atlantic halibut, and Atlantic wolffish for fishing years 2023–2025; GB cod and GB yellowtail flounder for fishing years 2023–2024; and white hake for fishing year 2023;

• Remove the management uncertainty buffer for sectors for GOM haddock and white hake, if the at-sea monitoring (ASM) target coverage level is set at 90 percent or greater, for the 2023 fishing year only; and

• Make a temporary modification to the accountability measures (AM) for GB cod.

This action also makes regulatory corrections that are not part of Framework 65, but that are implemented under section 305(d) authority in the Magnuson-Stevens Act to make changes necessary to carry out the FMP. We are making these corrections in conjunction with the Framework 65 measures for expediency purposes. These corrections are described in Regulatory Corrections under Secretarial Authority. This action also takes emergency action under section 305(c) authority to implement a revised acceptable biological catch (ABC) for GOM haddock. The emergency action is described in Catch Limits for Fishing Years 2023–2025 and is supported by information provided and considered in the Supplemental EA.

## Rebuilding Plan for Gulf of Maine Cod

Framework 65 revises the rebuilding plan for GOM cod, which we more fully described in the proposed rule, and is also described in the Framework 65 EA (see **ADDRESSES** for information on how to obtain this document). The approved rebuilding plan for GOM cod sets the fishing mortality rate (F) that is required to rebuild the stock ($F_{rebuild}$) at 60 percent of the fishing mortality rate associated with maximum sustainable yield ($F_{MSY}$) with a 70-percent probability of achieving the biomass associated with maximum sustainable yield ($B_{MSY}$) under the M=0.2 model. As explained in more detail in the EA, the approved rebuilding plan accounts for GOM cod's stock status, the needs of fishing communities, and the multispecies nature of the commercial and recreational fishery.

As part of the revised rebuilding plan for GOM cod, we are removing regulations at 50 CFR 648.90(a)(2)(iv), which include a review process for the rebuilding plans for GOM cod and American plaice. The revised rebuilding plan for GOM cod does not contain this Council review process but is still subject to Secretarial review for determining adequate rebuilding progress. As of 2019, American plaice is rebuilt and no longer in a rebuilding

plan, making this regulation unnecessary.

## Fishing Years 2023 and 2024 Shared U.S./Canada Quotas

*Management of Transboundary Georges Bank Stocks*

As described in the proposed rule, eastern GB cod, eastern GB haddock, and GB yellowtail flounder are jointly managed with Canada under the United States/Canada Resource Sharing Understanding. This action implements shared U.S./Canada quotas for eastern GB cod and GB yellowtail flounder for fishing year 2023, based on updated assessments and the recommendations of the Transboundary Management Guidance Committee (TMGC) and consistent with the Council's Scientific and Statistical Committee (SSC) recommendations. Additionally, it implements the U.S. quota for eastern GB haddock as selected by the Council, following the lack of consensus by the TMGC.

Framework 65 sets the same shared quotas for a second year (*i.e.*, for fishing year 2024) as placeholders, with the expectation that those quotas will be reviewed annually and new recommendations will be received from the TMGC. The 2023 and 2024 shared U.S./Canada quotas, and each country's allocation, are listed in Table 1.

TABLE 1—2023 AND 2024 FISHING YEARS U.S./CANADA QUOTAS (mt, LIVE WEIGHT) AND PERCENT OF QUOTA ALLOCATED TO EACH COUNTRY

| Quota | Eastern GB cod | Eastern GB haddock | GB yellowtail flounder |
|---|---|---|---|
| Total Shared Quota | 520 | *No agreement* | 200. |
| U.S. Quota | 135 (26 percent) | 1,520 | (106 53 percent). |
| Canadian Quota | 385 (74 percent) | *2,320 (estimate)* | 94 (47 percent). |

The regulations implementing the U.S./Canada Resource Sharing Understanding require deducting any overages of the U.S. quota for eastern GB cod, eastern GB haddock, or GB yellowtail flounder from the U.S. quota in the following fishing year. Based on preliminary data through June 5, 2023, the U.S. fishery did not exceed its 2022 fishing year quota for any of the shared stocks. However, if catch information for the 2022 fishing year indicates that the U.S. fishery exceeded its quota for any of the shared stocks, we will reduce the respective U.S. quotas for the 2023 fishing year in a future management action, as soon as possible in the 2023 fishing year. If any fishery that is allocated a portion of the U.S. quota exceeds its allocation and causes an overage of the overall U.S. quota, the overage reduction would be applied

only to that fishery's allocation in the following fishing year. This ensures that catch by one component of the overall fishery does not negatively affect another component of the overall fishery.

## Catch Limits for Fishing Years 2023–2025

*Summary of the Catch Limits*

This rule adopts catch limits for 13 stocks for the 2023–2025 fishing years and for white hake for the 2023 fishing year, based on stock assessments completed in 2022, and catch limits for GB cod and GB yellowtail flounder for fishing years 2023–2024. Framework 61 (86 FR 40353, July 28, 2021) previously set 2023 quotas for redfish, northern windowpane flounder, and southern windowpane flounder based on assessments conducted in 2020, and

those remain in place. Framework 63 (87 FR 42375, July 15, 2022) previously set the 2023–2024 quota for GOM cod, based on an assessment conducted in 2021, and that also remains in place. The catch limits implemented in this action, including overfishing limits (OFL), ABC, and annual catch limits (ACL), are listed in Tables 2 through 10. As part of the catch limits set by Framework 65, this action sets the GB cod recreational catch target to 113 mt. It also removes the management uncertainty buffer for the sector sub-ACL for GOM haddock and white hake for the 2023 fishing year only.

*Emergency Rule To Set Fishing Year 2023 GOM Haddock Catch Limits*

The Council's SSC based its recommendation for the GOM haddock ABC on the results of the 2022

00000000006215

management track assessment for the stock and a 75 percent $F_{MSY}$, which is consistent with the Council's ABC control rule for stocks that are not in a rebuilding plan, and the Council supported the adoption of this ABC in Framework 65. However, in the time since the Council took final action in December 2022, there have been increasing concerns about the significant decrease to the ABC compared to fishing year 2022 and the potential economic impacts of reaching the extremely reduced catch limit earlier than the end of the fishing year.

At its April Council meeting, after receiving public statements of growing GOM haddock interactions and concerns about potentially reaching catch limits early in the next fishing year, the Council voted to request that NMFS implement an emergency action to set the GOM haddock ABC for the fishing year 2023 at 90 percent of $F_{MSY}$, or 2,281 mt, rather than the ABC that was recommended in Framework 65 (1,936 mt, based on 75 percent $F_{MSY}$). On May 2, 2023, the Council sent NMFS a letter requesting the emergency action. The Council stated in its request that the extent of the potential impact of the extremely low quota for GOM haddock resulting in a potentially early closure of the fishery in the Gulf of Maine was not well-defined when the Council took final action on Framework 65 in December 2022. The Council further explained that it seeks to balance the risk of increasing the probability of overfishing, while still preventing overfishing, against the risk of a major fishery closure that could result in serious market and community losses.

A large 2020 year-class was documented in the 2022 management track assessment, but the unanticipated high level of fishery interactions with this year-class was not apparent until after the Council completed its work on Framework 65 in December 2022. The ratio of discards to total catch in the spring of 2023 reveals an increasing trend, out of proportion with what has been seen in recent fishing years. This new situation presents unforeseen and serious management problems in the fishery that could not have been addressed by the Council in a timely manner. In the situation where the commercial fishery reaches its quota early in the fishing year, the Gulf of Maine would be closed to groundfish fishing through the end of the fishing year (April 30, 2024), resulting in serious economic impacts. Catch in the 2023 fishing year has been unusually low at the beginning of this fishing year. We expect this may be due to seasonal fishing patterns along with concerns about the substantially lower catch limits. Uncertainty from the catch projections and attempting to avoid an early shutdown of the fishery and its serious consequences may be overly suppressing fishing effort. We anticipate catch rates will increase as the season progresses, potentially doubling or more by the fall, based on data from past fishing years. Past seasonal trends in the fishery demonstrate a significant potential for early closure under the severely reduced quota. Alternatively, if the fishery takes measures to overly constrain its overall catch to remain under the GOM haddock quotas for the entire fishing year, it may result in undue forgone economic opportunities, both for catching haddock and other fish stocks. Completion of a fishery management plan framework or amendment and notice and comment rulemaking would take substantially more time than an emergency action, delaying timely implementation of the revised ABC. Concern for impacts to the GOM haddock stock is low given that the total stock biomass is more than 270 percent of the target biomass at MSY. Therefore, we have determined that this situation meets the criteria specified by NMFS for emergency rulemaking (62 FR 44421; August 21, 1997).

Based on our analysis, we have determined that we can set the ABC as high as 100 percent of $F_{MSY}$ (2,515 mt) based on the condition of the GOM haddock stock, which is estimated to be at 270 percent of its target biomass, while still preventing overfishing. While this represents a 30-percent increase from the ABC included in Framework 65, it still would represent a substantial reduction (78-percent) from the fishing year 2022 ABC. Setting the ABC at 100 percent of $F_{MSY}$ (2,515 mt) meets the requirement to have at least a 50-percent probability of preventing overfishing in the 2023 fishing year. By implementing a higher catch limit, we intend to increase the flexibility for the fishery to be able to adjust to the large decrease in the quota compared to the previous fishing year by taking advantage of seasonal variations, avoidance of Gulf of Maine haddock and greater ability to pursue other stocks, and better long-term planning than if this rule was delayed. The greater flexibility and ability to adjust is expected to help avoid or mitigate the potentially harsh economic impacts that would occur from an early fishery closure in the Gulf of Maine that are more likely under the proposed ABC. We anticipate that the fishery will still need to adjust its fishing behavior to remain within the catch limits implemented in this emergency action, but expect the additional catch will provide greater operational flexibility.

This final rule technically approves the ABC that was proposed in Framework 65, and it replaces the 1,936-mt GOM haddock ABC in Framework 65 with an ABC of 2,515 mt for 180 days through the emergency authority provided at section 305(c) of the Magnuson-Stevens Act. The ABC is further divided among the various components of the fishery based on the ACL distribution adopted by the Council in Framework 65. The total ACL and the sub-ACLs for each component of the fishery that are implemented through this emergency rule are presented in Table 3. The common pool fishery's sub-ACL for GOM haddock is further divided into trimester total allowable catches (TACs), which are presented in Table 6. The sector sub-ACL for GOM haddock is further divided into annual catch entitlements (ACE), which are presented in Tables 12 and 13.

Actions taken under Secretarial emergency authority are in effect for 180 days. The Secretary has the authority to extend emergency action for up to an additional 186 days, which would be considered in a separate rulemaking. If the emergency action is not extended, the ABC would revert to the amount originally recommended by the Council in Framework 65 and approved in this final rule.

TABLE 2—FISHING YEARS 2023–2025 OVERFISHING LIMITS AND ACCEPTABLE BIOLOGICAL CATCHES

[Mt, live weight]

| Stock | 2023 | | Percent change from 2022 | 2024 | | 2025 | |
|---|---|---|---|---|---|---|---|
| | OFL | U.S. ABC | | OFL | U.S. ABC | OFL | U.S. ABC |
| GB Cod | UNK | 519 | 51 | UNK | 519 | | |
| GOM Cod | 853 | 551 | 0 | 980 | 551 | | |
| GB Haddock | 18,482 | 11,901 | −85 | 17,768 | 11,638 | 15,096 | 9,962 |
| GOM Haddock Emergency Action | 2,515 | 2,515 | −78 | | | | |

000000000006216

TABLE 2—FISHING YEARS 2023–2025 OVERFISHING LIMITS AND ACCEPTABLE BIOLOGICAL CATCHES—Continued

[Mt, live weight]

| Stock | 2023 | | Percent change from 2022 | 2024 | | 2025 | |
|---|---|---|---|---|---|---|---|
| | OFL | U.S. ABC | | OFL | U.S. ABC | OFL | U.S. ABC |
| GOM Haddock Proposed in Framework 65 | 2,515 | 1,936 | −83 | 2,655 | 2,038 | 2,627 | 2,017 |
| GB Yellowtail Flounder | UNK | 106 | −13 | UNK | 106 | ................. | ................. |
| SNE/MA Yellowtail Flounder | 55 | 40 | 82 | 89 | 40 | 345 | 40 |
| CC/GOM Yellowtail Flounder | 1,436 | 1,115 | 35 | 1,279 | 992 | 1,184 | 915 |
| American Plaice | 7,316 | 5,699 | 102 | 7,091 | 5,520 | 6,763 | 5,270 |
| Witch Flounder | UNK | 1,256 | −15 | UNK | 1,256 | UNK | 1,256 |
| GB Winter Flounder | 2,361 | 1,702 | 180 | 2,153 | 1,549 | 2,100 | 1,490 |
| GOM Winter Flounder | 1,072 | 804 | 62 | 1,072 | 804 | 1,072 | 804 |
| SNE/MA Winter Flounder | 1,186 | 627 | 38 | 1,425 | 627 | 1,536 | 627 |
| Redfish | 13,229 | 9,967 | −1 | ................. | ................. | ................. | ................. |
| White Hake | 2,650 | 1,845 | −13 | ................. | ................. | ................. | ................. |
| Pollock | 19,617 | 15,016 | −11 | 18,208 | 13,940 | 17,384 | 13,294 |
| N Windowpane Flounder | UNK | 160 | 0 | ................. | ................. | ................. | ................. |
| S Windowpane Flounder | 513 | 384 | 0 | ................. | ................. | ................. | ................. |
| Ocean Pout | 125 | 87 | 0 | 125 | 87 | 125 | 87 |
| Atlantic Halibut | UNK | 86 | −15 | UNK | 86 | UNK | 86 |
| Atlantic Wolffish | 124 | 93 | 1 | 124 | 93 | 124 | 93 |

UNK = Unknown.

**Note:** An empty cell indicates no OFL/ABC is adopted for that year. These catch limits would be set in a future action.

## Table 3—Catch Limits for the 2023 Fishing Year
[Mt, live weight]

| Stock | Total ACL (A to H) | Groundfish sub-ACL (A+B+C) | Sector sub-ACL (A) | Common pool sub-ACL (B) | Recreational sub-ACL (C) | Midwater trawl fishery (D) | Scallop fishery (E) | Small-mesh fisheries (F) | State waters sub-component (G) | Other sub-component (H) |
|---|---|---|---|---|---|---|---|---|---|---|
| GB Cod | 500 | 375 | 364 | 11 | | | | | 42 | 83 |
| GOM Cod | 522 | 470 | 268 | 11 | 192 | | | | 48 | 3.4 |
| GB Haddock | 11,301 | 11,080 | 10,829 | 251 | | 221 | | | 0 | 0 |
| GOM Haddock Emergency Action | 2,452 | 2,362 | 1,537 | 32 | 793 | 23 | | | 58 | 8.3 |
| GOM Haddock Proposed in Framework 65 | 1,888 | 1,818 | 1,183 | 25 | 610 | 18 | | | 45 | 6.4 |
| GB Yellowtail Flounder | 103 | 84 | 80 | 4.5 | | | 16.5 | 2.0 | 0.0 | 0.0 |
| SNE/MA Yellowtail Flounder | 38 | 33 | 25 | 8.1 | | | 2.7 | | 0.2 | 2.0 |
| CC/GOM Yellowtail Flounder | 1,063 | 985 | 931 | 54 | | | | | 34 | 45 |
| American Plaice | 5,417 | 5,360 | 5,210 | 150 | | | | | 29 | 29 |
| Witch Flounder | 1,196 | 1,145 | 1,104 | 41 | | | | | 19 | 31 |
| GB Winter Flounder | 1,651 | 1,634 | 1,585 | 50 | | | | | 0 | 17 |
| GOM Winter Flounder | 772 | 607 | 519 | 88 | | | | | 153 | 12.1 |
| SNE/MA Winter Flounder | 604 | 441 | 387 | 53 | | | | | 19 | 144 |
| Redfish | 9,469 | 9,469 | 9,369 | 99 | | | | | 0 | 0 |
| White Hake | 1,844 | 1,826 | 1,808 | 18 | | | | | 0 | 19 |
| Pollock | 14,325 | 13,124 | 13,001 | 123 | | | | | 676 | 526 |
| N Windowpane Flounder | 150 | 105 | na | 105 | | | 31 | | 0.8 | 13 |
| S Windowpane Flounder | 371 | 45 | na | 45 | | | 129 | | 13 | 184 |
| Ocean Pout | 83 | 49 | na | 49 | | | | | 0 | 34 |
| Atlantic Halibut | 83 | 64 | na | 64 | | | | | 17 | 1.3 |
| Atlantic Wolffish | 87 | 87 | na | 87 | | | | | 0 | 0 |

na: not allocated to sectors.

## Table 4—Catch Limits for the 2024 Fishing Year *
[Mt, live weight]

| Stock | Total ACL (A to H) | Groundfish sub-ACL (A+B+C) | Sector sub-ACL (A) | Common pool sub-ACL (B) | Recreational sub-ACL (C) | Midwater trawl fishery (D) | Scallop fishery (E) | Small-mesh fisheries (F) | State waters sub-component (G) | Other sub-component (H) |
|---|---|---|---|---|---|---|---|---|---|---|
| GB Cod | 500 | 375 | 364 | 11 | | | | | 42 | 83 |
| GOM Cod | 522 | 470 | 268 | 11 | 192 | | | | 48 | 3 |
| GB Haddock | 11,052 | 10,835 | 10,590 | 245 | | 217 | | | 0 | 0 |
| GOM Haddock | 1,925 | 1,852 | 1,183 | 26 | 643 | 19 | | | 47 | 7 |
| GB Yellowtail Flounder | 103 | 84 | 80 | 4.5 | | | 17 | 2.0 | 0 | 0 |
| SNE/MA Yellowtail Flounder | 38 | 33 | 25 | 8.1 | | | 2.7 | | 0.2 | 2.0 |
| CC/GOM Yellowtail Flounder | 946 | 877 | 828 | 48 | | | | | 30 | 40 |
| American Plaice | 5,247 | 5,192 | 5,046 | 145 | | | | | 28 | 28 |
| Witch Flounder | 1,196 | 1,145 | 1,104 | 41 | | | | | 19 | 31 |
| GB Winter Flounder | 1,503 | 1,488 | 1,442 | 45 | | | | | 0 | 16 |
| GOM Winter Flounder | 772 | 607 | 519 | 88 | | | | | 153 | 12.1 |
| SNE/MA Winter Flounder | 604 | 441 | 387 | 53 | | | | | 19 | 144 |
| Pollock | 13,299 | 12,184 | 12,070 | 114 | | | | | 627 | 488 |
| Ocean Pout | 83 | 49 | na | 49 | | | | | 0 | 34 |
| Atlantic Halibut | 83 | 64 | na | 64 | | | | | 17 | 1.3 |
| Atlantic Wolffish | 87 | 87 | na | 87 | | | | | 0 | 0 |

na: not allocated to sectors.
* Northeast multispecies stocks not included in Table 5 do not have catch limits approved for fishing year 2025.

000000000006218

TABLE 5—CATCH LIMITS FOR THE 2024 FISHING YEAR*
[Mt, live weight]

| Stock | Total ACL | Groundfish sub-ACL | Sector sub-ACL | Common pool sub-ACL | Recreational sub-ACL | Midwater trawl fishery | Scallop fishery | Small-mesh fisheries | State waters sub-component | Other sub-component |
|---|---|---|---|---|---|---|---|---|---|---|
| | A to H | A + B + C | A | B | C | D | E | F | G | H |
| GB Haddock ................ | 9,460 | 9,275 | 9,065 | 210 | ............ | 185 | ............ | ............ | 0 | 0 |
| GOM Haddock ............. | 1,905 | 1,833 | 1,171 | 26 | 636 | 19 | ............ | ............ | 47 | 7 |
| SNE/MA Yellowtail Flounder ................ | 38 | 33 | 25 | 8 | ............ | ............ | ............ | ............ | 0 | 2 |
| CC/GOM Yellowtail Flounder ................ | 873 | 808 | 764 | 45 | ............ | ............ | 3 | ............ | 28 | 37 |
| American Plaice ......... | 5,009 | 4,957 | 4,818 | 139 | ............ | ............ | ............ | ............ | 26 | 26 |
| Witch Flounder ........... | 1,196 | 1,145 | 1,104 | 41 | ............ | ............ | ............ | ............ | 19 | 31 |
| GB Winter Flounder ... | 1,446 | 1,431 | 1,387 | 44 | ............ | ............ | ............ | ............ | 0 | 15 |
| GOM Winter Flounder | 772 | 607 | 519 | 88 | ............ | ............ | ............ | ............ | 153 | 12.1 |
| SNE/MA Winter Flounder | 604 | 441 | 387 | 53 | ............ | ............ | ............ | ............ | 19 | 144 |
| Pollock ........................ | 12,683 | 11,619 | 11,510 | 109 | ............ | ............ | ............ | ............ | 598 | 465 |
| Ocean Pout ................ | 83 | 49 | na | 49 | ............ | ............ | ............ | ............ | 0 | 34 |
| Atlantic Halibut .......... | 83 | 64 | na | 64 | ............ | ............ | ............ | ............ | 17 | 1.3 |
| Atlantic Wolffish ........ | 87 | 87 | na | 87 | ............ | ............ | ............ | ............ | 0 | 0 |

na: not allocated to sectors.
* Northeast multispecies stocks not included in Table 6 do not have catch limits approved for fishing year 2025.

JA.139

000000000006219

Federal Register / Vol. 88, No. 159 / Friday, August 18, 2023 / Rules and Regulations    **56533**

### TABLE 6—FISHING YEARS 2023–2025 COMMON POOL TRIMESTER TACs
[Mt, live weight]

| Stock | 2023 | | | 2024 | | | 2025 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Trimester 1 | Trimester 2 | Trimester 3 | Trimester 1 | Trimester 2 | Trimester 3 | Trimester 1 | Trimester 2 | Trimester 3 |
| GB Cod | 3.0 | 3.6 | 4.1 | 3.0 | 3.6 | 4.1 | .............. | .............. | .............. |
| GOM Cod | 5.2 | 3.5 | 1.9 | 5.2 | 3.5 | 1.9 | .............. | .............. | .............. |
| GB Haddock | 67.6 | 82.7 | 100.2 | 66.1 | 80.8 | 98.0 | 56.6 | 69.2 | 83.9 |
| GOM Haddock Emergency Action | 8.6 | 8.3 | 15.0 | .............. | .............. | .............. | .............. | .............. | .............. |
| GOM Haddock Proposed in Framework 65 | 6.6 | 6.4 | 11.6 | 7.0 | 6.7 | 12.2 | 6.9 | 6.7 | 12.1 |
| GB Yellowtail Flounder | 0.9 | 1.4 | 2.3 | 0.9 | 1.4 | 2.3 | .............. | .............. | .............. |
| SNE/MA Yellowtail Flounder | 1.7 | 2.3 | 4.1 | 1.7 | 2.3 | 4.1 | 1.7 | 2.3 | 4.1 |
| CC/GOM Yellowtail Flounder | 31.0 | 14.1 | 9.2 | 27.6 | 12.6 | 8.2 | 25.5 | 11.6 | 7.6 |
| American Plaice | 111.0 | 12.0 | 27.0 | 107.5 | 11.6 | 26.2 | 102.6 | 11.1 | 25.0 |
| Witch Flounder | 22.6 | 8.2 | 10.3 | 22.6 | 8.2 | 10.3 | 22.6 | 8.2 | 10.3 |
| GB Winter Flounder | 4.0 | 12.0 | 33.9 | 3.6 | 10.9 | 30.8 | 3.5 | 10.5 | 29.6 |
| GOM Winter Flounder | 32.7 | 33.6 | 22.1 | 32.7 | 33.6 | 22.1 | 32.7 | 33.6 | 22.1 |
| Redfish | 24.8 | 30.8 | 43.7 | .............. | .............. | .............. | .............. | .............. | .............. |
| White Hake | 6.7 | 5.5 | 5.5 | .............. | .............. | .............. | .............. | .............. | .............. |
| Pollock | 34.4 | 42.9 | 45.4 | 31.9 | 39.9 | 42.1 | 30.4 | 38.0 | 40.2 |

### TABLE 7—COMMON POOL INCIDENTAL CATCH TACs FOR THE 2023–2025 FISHING YEARS
[Mt, live weight]

| Stock | Percentage of common pool sub-ACL | 2023 | 2024 | 2025 |
|---|---|---|---|---|
| GB Cod | 1.68 | 0.18 | 0.18 | .............. |
| GOM Cod | 1 | 0.11 | 0.11 | .............. |
| GB Yellowtail Flounder | 2 | 0.09 | 0.09 | .............. |
| CC/GOM Yellowtail Flounder | 1 | 0.54 | 0.48 | 0.45 |
| American Plaice | 5 | 7.50 | 7.27 | 6.94 |
| Witch Flounder | 5 | 2.06 | 2.06 | 2.06 |
| SNE/MA Winter Flounder | 1 | 0.53 | 0.53 | 0.53 |

### TABLE 8—PERCENTAGE OF INCIDENTAL CATCH TACs DISTRIBUTED TO EACH SPECIAL MANAGEMENT PROGRAM

| Stock | Regular B DAS program (percent) | Eastern U.S./CA haddock SAP (percent) |
|---|---|---|
| GB cod | 60 | 40 |
| GOM Cod | 100 | n/a |
| GB Yellowtail Flounder | 50 | 50 |
| CC/GOM Yellowtail Flounder | 100 | n/a |
| American Plaice | 100 | n/a |
| Witch Flounder | 100 | n/a |
| SNE/MA Winter Flounder | 100 | n/a |

### TABLE 9—FISHING YEARS 2023–2025 INCIDENTAL CATCH TACs FOR EACH SPECIAL MANAGEMENT PROGRAM
[Mt, live weight]

| Stock | Regular B DAS program | | | Eastern U.S./Canada haddock SAP | | |
|---|---|---|---|---|---|---|
| | 2023 | 2024 | 2025 | 2023 | 2024 | 2025 |
| GB Cod | 0.11 | 0.11 | .............. | 0.07 | 0.07 | .............. |
| GOM Cod | 0.11 | 0.11 | .............. | n/a | n/a | n/a |
| GB Yellowtail Flounder | 0.05 | 0.05 | .............. | 0.05 | 0.05 | n/a |
| CC/GOM Yellowtail Flounder | 0.54 | 0.48 | 0.45 | n/a | n/a | n/a |
| American Plaice | 7.50 | 7.27 | 6.94 | n/a | n/a | n/a |
| Witch Flounder | 2.06 | 2.06 | 2.06 | n/a | n/a | n/a |
| SNE/MA Winter Flounder | 0.53 | 0.53 | 0.53 | n/a | n/a | n/a |

00000000006220

TABLE 10—FISHING YEARS 2023–2025 REGULAR B DAS PROGRAM QUARTERLY INCIDENTAL CATCH TACS
[Mt, live weight]

| Stock | 2023 | | | | 2024 | | | | 2025 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1st quarter (13 percent) | 2nd quarter (29 percent) | 3rd quarter (29 percent) | 4th quarter (29 percent) | 1st quarter (13 percent) | 2nd quarter (29 percent) | 3rd quarter (29 percent) | 4th quarter (29 percent) | 1st quarter (13 percent) | 2nd quarter (29 percent) | 3rd quarter (29 percent) | 4th quarter (29 percent) |
| GB Cod | 0.01 | 0.03 | 0.03 | 0.03 | 0.01 | 0.03 | 0.03 | 0.03 | ............ | ............ | ............ | ............ |
| GOM Cod | 0.01 | 0.03 | 0.03 | 0.03 | 0.01 | 0.03 | 0.03 | 0.03 | ............ | ............ | ............ | ............ |
| GB Yellowtail Flounder | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | ............ | ............ | ............ | ............ |
| CC/GOM Yellowtail Flounder | 0.07 | 0.16 | 0.16 | 0.16 | 0.06 | 0.14 | 0.14 | 0.14 | 0.06 | 0.13 | 0.13 | 0.13 |
| American Plaice | 0.98 | 2.18 | 2.18 | 2.18 | 0.94 | 2.11 | 2.11 | 2.11 | 0.90 | 2.01 | 2.01 | 2.01 |
| Witch Flounder | 0.27 | 0.60 | 0.60 | 0.60 | 0.27 | 0.60 | 0.60 | 0.60 | 0.27 | 0.60 | 0.60 | 0.60 |
| SNE/MA Winter Flounder | 0.07 | 0.15 | 0.15 | 0.15 | 0.07 | 0.15 | 0.15 | 0.15 | 0.07 | 0.15 | 0.15 | 0.15 |

*Sector ACE*

At the start of the 2023 fishing year, we allocated stocks to each sector, based on the catch limits set by prior frameworks. This rule updates the ACE allocated to sectors based on the catch limits approved in Framework 65, fishing year 2023 potential sector contributions (PSC), and final fishing year 2023 sector rosters. We calculate a sector's allocation for each stock by summing its members' PSC for the stock and then multiplying that total percentage by the commercial sub-ACL for that stock. The process for allocating ACE to sectors is further described in the final rule allocating ACE to sectors for fishing year 2023 (88 FR 26502; May 1, 2023) and is not repeated here. Table 11 shows the cumulative PSC by stock for each sector for fishing year 2023. Tables 12 and 13 show the ACEs allocated to each sector for fishing year 2023, in pounds and metric tons, respectively. We have included the common pool sub-ACLs in tables 11 through 13 for comparison.

BILLING CODE 3510–22–P

00000000006221

Table 11 -- Cumulative PSC (percentage) each sector is receiving by stock for fishing year 2023

| Sector Name | MRI Count | GB Cod | GOM Cod | GB Haddock | GOM Haddock | GB Yellowtail Flounder | SNE/MA Yellowtail Flounder | CC/GOM Yellowtail Flounder | Plaice | Witch Flounder | GB Winter Flounder | GOM Winter Flounder | SNE/MA Winter Flounder | Redfish | White Hake | Pollock |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Gear Sector | 61 | 11.3788b499 | 0.63266404 | 1.55769587 | 0.17782891 | 0.00460226 | 0.19072868 | 1.56857544 | 0.43174061 | 1.60070938 | 0.02017520 | 1.76433338 | 0.97813195 | 0.53443731 | 1.02810850 | 3.10014146 |
| Maine Coast Community Sector | 106 | 2.58372338 | 15.76658235 | 3.98860872 | 12.23134132 | 1.94946469 | 2.52105226 | 6.24752345 | 15.57458405 | 12.30858609 | 0.80738770 | 7.86786547 | 2.22916051 | 9.20683775 | 13.81603634 | 12.66240982 |
| Maine Permit Bank | 11 | 0.1043240 | 1.16152981 | 0.04493264 | 1.12518663 | 0.01385769 | 0.02207060 | 0.31964827 | 1.16764286 | 0.72903817 | 0.00021875 | 0.42733160 | 0.0314203574 | 0.82280483 | 1.65051798 | 1.69021727 |
| Mooseabec Sector | 50 | 12.11207637 | 6.56850801 | 3.92552145 | 3.79199235 | 1.32244264 | 0.98275027 | 3.03294381 | 0.91306647 | 1.83459329 | 0.95258019 | 2.85243127 | 2.52636501 | 4.91308407 | 11.18619853 | 11.05573652 |
| NEFS 2 | 113 | 6.28160078 | 23.90449314 | 10.61155045 | 20.56940265 | 1.63047658 | 1.23621426 | 22.90096607 | 9.56811689 | 12.84492215 | 3.21979349 | 2.19688607 | 1.12452591 | 14.91398904 | 8.17047704 | 13.77124534 |
| NEFS 4 | 57 | 7.41182724 | 11.17474122 | 5.84823897 | 8.86143242 | 2.17753304 | 2.28300499 | 6.41078600 | 9.43778040 | 8.82208019 | 0.07561780 | 7.42336800 | 1.09862116 | 6.64654117 | 8.24718069 | 6.85834879 |
| NEFS 5 | 18 | 0.7205874 | 0.3287417 | 0.6939715 | 0.11135814 | 0.06951125 | 15.83280258 | 0.9230423 | 3.0959222 | 0.5652032 | 0.3205717 | 0.8435750 | 10.01630962 | 0.01278743 | 0.6043464 | 0.7549613 |
| NEFS 6 | 19 | 2.9763737 | 2.71820028 | 3.4128246 | 3.9837756 | 2.6907187 | 4.82398814 | 3.8681103 | 4.3752005 | 5.81914224 | 1.14550038 | 4.42247153 | 1.87553025 | 8.81156813 | 4.52602154 | 3.66261878 |
| NEFS 8 | 67 | 15.65781499 | 2.72270254 | 14.23112169 | 7.12601424 | 27.65164455 | 11.46256002 | 8.88851006 | 10.09984910 | 8.60323561 | 38.08255616 | 14.20645961 | 16.29546959 | 7.64776369 | 0.57566090 | 6.07788450 |
| NEFS 10 | 29 | 0.9305911 | 2.48774096 | 0.17754905 | 1.32502399 | 0.00115885 | 0.57051305 | 4.44646870 | 1.20285910 | 2.13677255 | 0.01091121 | 0.11147900 | 0.61624860 | 3.37718022 | 0.65803852 | 7.77238161 |
| NEFS 11 | 41 | 3.9868823 | 11.35784017 | 0.63175960 | 2.73654707 | 0.00088665 | 0.01093753 | 2.26848834 | 1.51337993 | 1.54442014 | 0.00303163 | 2.00303163 | 0.02217232 | 1.86025737 | 4.01329501 | 8.76601247 |
| NEFS 12 | 19 | 0.69691547 | 3.01385264 | 0.09083689 | 1.07377373 | 0.00042837 | 0.01451653 | 8.38930883 | 0.70397202 | 0.62503886 | 0.00042221 | 10.10597019 | 0.26294077 | 0.22799795 | 0.28947543 | 0.70073099 |
| NEFS 13 | 67 | 12.12581344 | 6.04815143 | 20.45989584 | 0.00719996 | 35.05925739 | 22.94096230 | 22.48261064 | 8.38789891 | 8.81654744 | 19.20342385 | 1.81825708 | 17.44410423 | 4.39072387 | 2.20494996 | 2.07070424 |
| New Hampshire Permit Bank | 4 | 0.00082660 | 1.15152380 | 0.00003421 | 0.01236660 | 0.00002041 | 0.00001803 | 0.02142852 | 0.02856510 | 0.00017879 | 0.00000326 | 0.00080509 | 0.00000004 | 0.01042360 | 0.01447690 | 0.11142826 |
| Sustainable Harvest Sector 1 | 50 | 6.3031931 | 5.94257322 | 9.64423085 | 12.67012829 | 4.48827133 | 2.60184435 | 3.60014281 | 16.80461955 | 13.81589835 | 10.29166590 | 2.93121238 | 4.50942687 | 17.77418264 | 18.16711342 | 10.38203747 |
| Sustainable Harvest Sector 2 | 24 | 2.55865401 | 1.91547867 | 2.88372257 | 4.40959622 | 2.84272472 | 2.72846562 | 5.31596012 | 3.54962283 | 3.36537664 | 2.71017433 | 4.65343304 | 5.10781014 | 4.57851646 | 3.44222724 | 3.07648866 |
| Sustainable Harvest Sector 3 | 44 | 15.92324149 | 4.80760938 | 20.80489387 | 6.31924340 | 14.03804255 | 7.69574599 | 10.06603015 | 12.80075445 | 15.48850779 | 19.42649791 | 2.92798175 | 20.84919617 | 18.28435712 | 14.84613393 | 13.66902668 |
| Common Pool | 891 | 2.84412386 | 3.80734494 | 2.26067871 | 2.14581862 | 5.10375711 | 24.16974380 | 5.52508832 | 2.79887548 | 3.58526541 | 3.04707161 | 14.5383640 | 12.12154841 | 1.0485800 | 1.01694462 | 0.93470440 |
| Sector Total | 780 | 97.16 | 98.19 | 97.74 | 97.85 | 94.70 | 75.83 | 94.47 | 97.20 | 96.41 | 96.95 | 85.46 | 87.88 | 98.95 | 98.98 | 99.07 |

000000000006222

Table 12 -- ACE (in 1,000 lb), by stock, for each sector for fishing year 2023 #^

| Sector Name | GB Cod East | GB Cod West | GOM Cod | GB Haddock East | GB Haddock West | GOM Haddock Emergency Action | GOM Haddock Proposed in Framework 65 | GB Yellowtail Flounder | SNE/MA Yellowtail Flounder | CC/GOM Yellowtail Flounder | Plaice | Witch Flounder | GB Winter Flounder | GOM Winter Flounder | SNE/MA Winter Flounder | Redfish | White Hake | Pollock |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Gear Sector | 34 | 61 | 4 | 52 | 328 | 6 | 5 | 0 | 0 | 34 | 51 | 27 | 1 | 24 | 10 | 112 | 41 | 897 |
| Maine Coast Community Sector | 7 | 12 | 97 | 114 | 716 | 424 | 326 | 4 | 2 | 136 | 1,440 | 311 | 29 | 105 | 22 | 1,922 | 556 | 3,664 |
| Maine Permit Bank | 0 | 1 | 7 | 1 | 9 | 39 | 30 | 0 | 0 | 7 | 118 | 18 | 0 | 6 | 0 | 172 | 67 | 491 |
| Mooncusser Sector | 36 | 65 | 39 | 131 | 827 | 131 | 101 | 2 | 1 | 66 | 108 | 46 | 34 | 38 | 25 | 1,026 | 450 | 3,199 |
| NEFS 2 | 19 | 34 | 147 | 356 | 2,236 | 712 | 548 | 3 | 2 | 407 | 1,531 | 324 | 116 | 294 | 40 | 3,113 | 329 | 3,085 |
| NEFS 4 | 22 | 39 | 69 | 196 | 1,232 | 307 | 236 | 4 | 2 | 139 | 1,115 | 223 | 25 | 39 | 10 | 1,387 | 332 | 1,084 |
| NEFS 5 | 1 | 2 | 2 | 23 | 146 | 4 | 3 | 2 | 12 | 20 | 17 | 13 | 12 | 11 | 97 | 3 | 3 | 22 |
| NEFS 6 | 9 | 16 | 17 | 115 | 723 | 152 | 117 | 4 | 4 | 84 | 517 | 147 | 41 | 59 | 18 | 1,422 | 182 | 1,060 |
| NEFS 8 | 46 | 82 | 17 | 477 | 2,999 | 247 | 190 | 51 | 8 | 193 | 1,931 | 226 | 1,372 | 56 | 158 | 1,596 | 265 | 1,759 |
| NEFS 10 | 2 | 3 | 15 | 6 | 37 | 46 | 35 | 0 | 0 | 90 | 142 | 54 | 0 | 122 | 6 | 70 | 27 | 223 |
| NEFS 11 | 1 | 2 | 70 | 1 | 7 | 95 | 73 | 0 | 0 | 50 | 179 | 39 | 0 | 27 | 0 | 390 | 162 | 2,536 |
| NEFS 12 | 1 | 3 | 18 | 3 | 30 | 37 | 29 | 0 | 0 | 182 | 44 | 16 | 0 | 136 | 3 | 48 | 12 | 205 |
| NEFS 13 | 37 | 66 | 4 | 682 | 4,291 | 31 | 24 | 66 | 17 | 141 | 1,015 | 223 | 694 | 24 | 170 | 908 | 89 | 774 |
| New Hampshire Permit Bank | 0 | 0 | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 4 | 3 | 32 |
| Sustainable Harvest Sector 1 | 20 | 36 | 36 | 323 | 2,033 | 439 | 338 | 8 | 2 | 78 | 1,886 | 349 | 371 | 19 | 44 | 3,710 | 732 | 3,004 |
| Sustainable Harvest Sector 2 | 8 | 14 | 12 | 97 | 699 | 153 | 118 | 5 | 2 | 115 | 419 | 85 | 98 | 62 | 50 | 956 | 139 | 890 |
| Sustainable Harvest Sector 3 | 45 | 79 | 29 | 697 | 4,385 | 565 | 435 | 26 | 6 | 218 | 1,517 | 341 | 700 | 19 | 203 | 3,817 | 598 | 3,038 |
| Common Pool | 8 | 15 | 23 | 76 | 476 | 71 | 54 | 10 | 18 | 120 | 331 | 91 | 110 | 195 | 118 | 219 | 39 | 270 |
| Sector Total | 289 | 514 | 590 | 3,275 | 20,600 | 3,389 | 2,608 | 176 | 56 | 2,052 | 17,486 | 2,435 | 3,493 | 1,144 | 854 | 20,656 | 3,986 | 28,663 |

# Numbers are rounded to the nearest thousand pounds. In some cases, this table shows an allocation of 0, but that sector may be allocated a small amount of that stock in tens or hundreds pounds.

^ The data in the table represent the total allocations to each sector.

JA.143

000000000006223

## Table 13 -- ACE (in metric tons), by stock, for each sector for fishing year 2023 #^

| Sector Name | GB Cod East | GB Cod West | GOM Cod | GB Haddock East | GB Haddock West | GOM Haddock Emergency Action | GOM Haddock Proposed in Framework 65 | GB Yellowtail Flounder | SNE/MA Yellowtail Flounder | GOM/CC Yellowtail Flounder | Plaice | Witch Flounder | GB Winter Flounder | GOM Winter Flounder | SNE/MA Winter Flounder | Redfish | White Hake | Pollock |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Gear Sector | 16 | 28 | 2 | 24 | 149 | 3 | 2 | 0 | 0 | 15 | 23 | 12 | 0 | 11 | 4 | 51 | 19 | 407 |
| Maine Coast Community Sector | 3 | 5 | 44 | 52 | 325 | 192 | 148 | 2 | 1 | 62 | 835 | 141 | 13 | 48 | 10 | 872 | 252 | 1,662 |
| Maine Permit Bank | 0 | 0 | 3 | 1 | 4 | 18 | 14 | 0 | 0 | 3 | 63 | 8 | 0 | 3 | 0 | 78 | 30 | 223 |
| Mooseasseuc Sector | 16 | 29 | 18 | 60 | 375 | 60 | 46 | 1 | 0 | 30 | 49 | 21 | 16 | 17 | 11 | 465 | 204 | 1,451 |
| NEFS 2 | 9 | 15 | 67 | 161 | 1,014 | 323 | 249 | 0 | 0 | 226 | 513 | 147 | 53 | 133 | 18 | 1,412 | 149 | 1,808 |
| NEFS 4 | 10 | 18 | 31 | 89 | 559 | 139 | 107 | 2 | 1 | 63 | 506 | 101 | 11 | 45 | 4 | 629 | 151 | 900 |
| NEFS 5 | 1 | 1 | 1 | 11 | 86 | 2 | 1 | 1 | 5 | 0 | 17 | 6 | 5 | 5 | 44 | 1 | 1 | 10 |
| NEFS 6 | 4 | 7 | 8 | 52 | 328 | 60 | 53 | 2 | 2 | 38 | 235 | 67 | 19 | 27 | 8 | 645 | 83 | 481 |
| NEFS 8 | 21 | 37 | 8 | 216 | 1,360 | 112 | 86 | 23 | 4 | 88 | 541 | 100 | 622 | 26 | 72 | 724 | 120 | 798 |
| NEFS 10 | 1 | 1 | 7 | 3 | 17 | 21 | 16 | 0 | 0 | 41 | 64 | 24 | 0 | 55 | 3 | 32 | 12 | 101 |
| NEFS 11 | 1 | 1 | 32 | 1 | 3 | 43 | 33 | 0 | 0 | 23 | 81 | 18 | 0 | 12 | 0 | 177 | 73 | 1,150 |
| NEFS 12 | 1 | 1 | 8 | 1 | 9 | 17 | 13 | 0 | 0 | 83 | 43 | 7 | 0 | 62 | 1 | 22 | 5 | 93 |
| NEFS 13 | 17 | 36 | 2 | 309 | 1,946 | 14 | 11 | 36 | 8 | 64 | 460 | 101 | 315 | 11 | 77 | 412 | 40 | 351 |
| New Hampshire Permit Bank | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 15 |
| Sustainable Harvest Sector 1 | 9 | 16 | 17 | 147 | 922 | 199 | 153 | 4 | 1 | 36 | 901 | 158 | 168 | 18 | 20 | 1,683 | 332 | 1,363 |
| Sustainable Harvest Sector 2 | 3 | 6 | 5 | 44 | 276 | 69 | 53 | 2 | 2 | 52 | 190 | 39 | 44 | 28 | 23 | 434 | 63 | 404 |
| Sustainable Harvest Sector 3 | 20 | 36 | 13 | 316 | 1,989 | 256 | 107 | 12 | 3 | 99 | 688 | 155 | 318 | 18 | 92 | 1,731 | 271 | 1,786 |
| Common Pool | 4 | 7 | 11 | 34 | 216 | 32 | 25 | 4 | 4 | 34 | 150 | 41 | 50 | 88 | 53 | 90 | 18 | 123 |
| Sector Total | 131 | 233 | 268 | 1,486 | 9,344 | 1,517 | 1,183 | 80 | 25 | 931 | 5,210 | 1,104 | 1,585 | 510 | 387 | 9,360 | 1,808 | 13,001 |

# Numbers are rounded to the nearest metric ton, but allocations are made in pounds. In some cases, this table shows a sector allocation of 0 metric tons, but that sector may be allocated a small amount of that stock in pounds.

^ The data in the table represent the total allocations to each sector.

BILLING CODE 3510–22–C

00000000000006224

*Common Pool Measures*

The FMP provides authority for the Regional Administrator to modify common pool fishery trip limits on an annual basis, or as needed, in order to prevent exceeding the common pool sub-ACLs and facilitate harvest so total catch approaches the common pool sub-ACLs. These measures are not part of Framework 65. They were not specifically proposed by the Council, but are implemented in conjunction with Framework 65 for expediency purposes and because they are closely related to the specifications adopted in Framework 65. Common pool participants are accustomed to such changes in connection with changes in overall catch limits. The Regional Administrator can modify these measures during the fishing year if current information indicates further changes are necessary. Any in-season adjustments to these measures will be implemented through an in-season action consistent with the Administrative Procedure Act.

In connection with catch limit changes implemented with Framework 65, we are adjusting the common pool trip limits for SNE/MA yellowtail flounder, CC/GOM yellowtail flounder, American plaice, GB winter flounder, and GOM winter flounder. Increasing these trip limits will provide the common pool with the opportunity to harvest the increased common pool sub-ACLs for these stocks as implemented by Framework 65. We are decreasing the trip limits for GOM cod and white hake in response to fishing history in fishing year 2022 and the addition of new active vessels from the sector program to the common pool fishery. These trip limit reductions will avoid early closures for the common pool fishery and help prevent overages. Table 14 provides the fishing year 2023 trip limits; stocks in bold are changing from previously implemented trip limits.

TABLE 14—COMMON POOL TRIP LIMITS FOR FISHING YEAR 2023

| Stock | 2023 Trip limit |
|---|---|
| GB Cod (outside Eastern U.S./Canada Area) | 100 lb (45.4 kg) per DAS, up to 200 lb (90.7 kg) per trip. |
| GB Cod (inside Eastern U.S./Canada Area) | |
| GB Cod [Closed Area II Yellowtail Flounder/Haddock SAP (for targeting haddock)]. | 500 lb (226.8 kg) per trip. |
| GOM Cod | 150 lb (68.0 kg) per DAS, up to 300 lb (136.1 kg) per trip. |
| GB Haddock | 50,000 lb (22,679.62 kg) per trip. |
| GOM Haddock | 1,000 lb (453.6 kg) per DAS, up to 2,000 lb (907.2 kg) per trip. |
| GB Yellowtail Flounder | 100 lb (45.4 kg) per trip. |
| SNE/MA Yellowtail Flounder | 200 lb (90.7 kg) per DAS, up to 400 lb (181.4 kg) per trip. |
| CC/GOM Yellowtail Flounder | 1,500 lb (680.4 kg) per DAS, up to 3,000 lb (1,360.8 kg) per trip. |
| American plaice | 3,000 lb (1,360.8 kg) per DAS, up to 6,000 lb (2,721.6 kg) per trip. |
| Witch Flounder | 1,500 lb (680.4 kg) per trip. |
| GB Winter Flounder | 500 lb (226.8 kg) per trip. |
| GOM Winter Flounder | 2,000 lb (907.2 kg) per trip. |
| SNE/MA Winter Flounder | 2,000 lb (907.2 kg) per DAS, up to 4,000 lb (1,814.4 kg) per trip. |
| Redfish | Unlimited. |
| White hake | 750 lb (340.2 kg) per trip. |
| Pollock | Unlimited. |
| Atlantic Halibut | 1 fish per trip. |
| Windowpane Flounder | Possession Prohibited. |
| Ocean Pout | |
| Atlantic Wolffish | |

DAS = day-at-sea; stocks in bold are changing from previously set possession limits.
**Note:** Minimum fish sizes apply for many groundfish species, but are not included in this rule. Please see 50 CFR 648.83 for applicable minimum fish sizes.

**Temporary Modification to Accountability Measures for GB Cod**

As more fully described in the proposed rule, Framework 65 temporarily modifies the AMs for GB cod when an ACL overage that occurs in fishing years 2022–2024 is (in part or entirely) due to vessels fishing in state waters or other, non-specified fisheries. If, in the year following the overage (Year 2), the ACL is not achieved or exceeded by any amount, the ACL underage would be proportionately applied to each component's share of the overage from Year 1. While the preliminary AM (*i.e.,* payback) would be implemented at the beginning of Year 3, any reduction to the overage (due to the underage in Year 2) would be made through an in-season adjustment as soon as possible in Year 3.

**Regulatory Corrections Under Secretarial Authority**

This rule corrects an error in the northeast regulations for monitoring service providers. We are making this correction consistent with section 305(d) of the Magnuson-Stevens Act, which provides that the Secretary of Commerce may promulgate regulations necessary to ensure that amendments to an FMP are carried out in accordance with the FMP and the Magnuson-Stevens Act. This change is necessary to correct the regulations detailing insurance requirements for monitoring companies to reference the national requirements.

On September 8, 2022, NMFS published a final rule (87 FR 54902) that implemented national insurance requirements for observer providers at 50 CFR 600.748 and revised the northeast regional monitoring program regulations at § 648.11(h)(3)(vii) to reference the newly established national insurance requirements. The final rule implementing Amendment 23 to the Northeast Multispecies FMP (87 FR 75852, December 9, 2022) inadvertently overwrote the northeast regional monitoring program regulations that referred to the national insurance requirements. This rule corrects the regulations at § 648.11(h)(3)(vii)(A) to reference the national insurance requirements. This correction is necessary to eliminate confusion and ensure the northeast monitoring program is consistent with the national insurance requirements.

Framework 65 also makes minor changes in the regulations. It removes regulatory text that is specific to previous fishing years. Specifically, this

000000000006225

action removes a sentence in 50 CFR 648.90(a)(4)(iii)(H)(2) that is specific to the allocation of certain stocks for fishing years 2010 and 2011, and removes the paragraphs at § 648.90(a)(5)(iv)(B) through (D) that are specific to temporary (up through fishing year 2020) modifications to the triggers for the Atlantic sea scallop fishery's AMs for certain flatfish stocks. It corrects sections of the regulations (§§ 648.87(b)(1)(i)(A) and 648.90(a)(4)(iii)(F)) that refer to the northern and southern windowpane flounder as GOM/GB and SNE/MA windowpane flounder, respectively, which is inconsistent with other sections of the regulations. It removes a section of text that describes the Fippennies Ledge Area that was moved to a different section of the regulations, but not deleted from § 648.87(c)(2)(i)(A). It corrects several citations in §§ 648.87(c)(2)(i) and 648.86(c) to paragraphs within § 648.90(a)(5)(i) that were redesignated in a previous action, but the citations were not updated.

**Comments and Responses on Measures Proposed in the Framework 65 Proposed Rule**

We received comments on the Framework 65 proposed rule from Conservation Law Foundation (CLF), New England Fishermen Stewardship Association (NEFSA), and Northeast Seafood Coalition (NSC).

*Gulf of Maine Cod Rebuilding Plan*

*Comment 1:* CLF wrote in support of the proposed GOM cod rebuilding plan, stating that while it supported an even more conservative alternative during the development of FW65, the current rebuilding plan has a higher probability of success than prior plans, and will allow the stock a better chance at recovery. CLF added that it is unfortunate that the research track assessment was not completed in time to inform the rebuilding plan.

*Response 1:* For the reasons discussed in the proposed rule, we are approving the GOM cod rebuilding plan as proposed. When NMFS informed the Council of the need to revise the GOM cod rebuilding plan, we understood that it would likely need to be completed before the finalization of the research track assessment; however, the requirement to notify the Council of our determination and the resulting timeline for the Council to revise the plan were dictated by the Magnuson-Stevens Act.

*Comment 2:* The NEFSA urged NMFS to reject Framework 65. It states that the revised rebuilding plan for GOM cod will "dramatically curtail access to the cod fishery." NEFSA states that this is

not necessary to prevent overfishing, and that they have seen no evidence of significant population declines in this species.

*Response 2:* We disagree. The revised rebuilding plan for GOM cod follows 20 years of rebuilding plans that have failed to rebuild this stock based on the best scientific information available. Despite efforts from the Council and NMFS to set quotas that prevent overfishing, the 2021 management track assessment indicates that GOM cod has been experiencing overfishing for decades. The quotas currently in place for GOM cod, set by Framework 63, are expected to prevent overfishing, but it is also necessary to rebuild the stock, as required by the Magnuson-Stevens Act. The revised rebuilding plan implemented by Framework 65 has a 70-percent probability of achieving the biomass target in 10 years, which is the maximum amount of time allowed under the Magnuson-Stevens Act.

NEFSA did not provide additional scientific information to counter the analysis provided in the EA, and for the reasons stated here and in the proposed rule, we are approving the GOM cod rebuilding plan as proposed in Framework 65.

*Comment 3:* NSC commented that the revised rebuilding plan for GOM cod is conservative. It states that, in light of the ongoing Atlantic cod research track and subsequent management track assessment that may modify stock boundaries, NSC is hopeful that modifications to the rebuilding plan will be possible.

*Response 3:* Given the past two decades of failure to rebuild GOM cod, we support the Council's approach that a more conservative rebuilding plan is prudent, and are therefore approving the proposed rebuilding plan that uses an $F_{rebuild}$ of 60 percent of $F_{MSY}$. We agree with NSC that, if the stock structure for Atlantic cod changes, it will likely be prudent to re-examine the rebuilding plans to ensure they are appropriate for any new or revised cod stocks.

*Catch Limits*

*Comment 4:* CLF wrote in support of the proposed SNE/MA winter flounder catch limits, but expressed concern that there will be more situations where an adjustment of biological reference points leads to the increase in exploitation rates on stocks in poor condition.

*Response 4:* We agree that the proposed SNE/MA winter flounder catch limits are appropriate. We are approving the SNE/MA winter flounder catch limits as proposed. We intend to continue to work with the Council and

Northeast Fisheries Science Center on how to manage fisheries for stocks in similar situations as SNE/MA winter flounder.

*Comment 5:* CLF expressed concern regarding the proposed 2023–2024 GB cod ABC of 904 mt. While acknowledging the potential economic impacts of maintaining the lower, 754-mt, ABC that was in place in fishing year 2022, CLF raised the concern that this higher amount will not promote rebuilding. CLF also argued that the Council's updated analysis, which re-ran the iSmooth method to include fall 2021 and spring 2022 survey data, bypassed the Northeast Region Coordinating Council (NRCC) process for stock assessments, including the peer review and SSC consideration.

*Response 5:* We disagree that the Council's updated analysis bypasses the NRCC process for stock assessments. The output of the Council's updated analysis was not used to set a new ABC that had not been reviewed or recommended by the SSC. Instead, it was used as an additional piece of evidence that the amount recommended by the SSC would contribute to stock rebuilding, with a low probability of overfishing. We are concerned about rebuilding the GB cod stock. We consider it important to reduce the potential economic impacts of maintaining a lower ABC, in the situation where updated analysis indicates that the catch limit can be increased without jeopardizing rebuilding. We share CLF's hope that the ongoing research track assessment will provide a more accurate stock structure and an accepted analytical model on which we can base biological reference points. We are approving the 2023–2024 GB cod ABC as proposed.

*Comment 6:* NSC commented in support of the proposed 2023–2024 GB cod ABC of 904 mt. It also indicated support for the 2023 ABC for white hake, but expressed concern that the quota would be constraining for the fishery.

*Response 6:* We agree and are approving the proposed 2023–2024 ABC for GB cod. We are approving the white hake ABC as proposed, for 2023 only. The Council will need to set white hake ABCs for additional years in a different action. While NSC is correct that white hake is no longer overfished, it remains in a rebuilding plan until it is determined to be rebuilt.

*Comment 7:* NSC stated that it cannot support the 2023–2025 GOM haddock ABCs, citing the drastic reduction to the quota for a stock that is not overfished and is estimated to be at 270 percent of its biomass target. NSC also noted the

000000000006226

lease price for GOM haddock in fishing year 2023 has gone up considerably, and exceeds the estimates predicted in the quota change model.

*Response 7:* As described in the preamble, while we are approving the ABCs for fishing years 2023–2025, we are simultaneously implementing an emergency action to increase the ABC for fishing year 2023 up to 100 percent of $F_{MSY}$ that still has a 50-percent probability of preventing overfishing as required by the Magnuson-Stevens Act.

*Comment 8:* NEFSA urged NMFS to reject Framework 65. NEFSA states that the reductions to GB and GOM haddock and white hake are not necessary to prevent overfishing, and that it has seen no evidence of significant population declines in these species.

*Response 8:* We disagree that we should disapprove Framework 65. In the case of all 3 stocks referenced by NEFSA, if we were to disapprove the framework, these stocks would remain at default specifications (75 percent of fishing year 2022 quotas) until October 31, 2023. After October 31, the default quotas expire, at which point vessels would be prohibited from fishing in the waters of the Northeast. The haddock and the white hake ABCs set in Framework 65 are based on the 2022 stock assessments, which are the best scientific information available. White hake is rebuilding, but is not rebuilt, and therefore continues to be subject to its rebuilding plan established in Framework 61 (citation). Both haddock stocks have decreased significantly compared to the previous assessments and the specifications in Framework 65 reflect these declines. Additionally, GOM haddock was experiencing overfishing in the terminal year of the stock assessment and the Magnuson-Stevens Act requires ending overfishing immediately. NEFSA did not provide additional information to counter the analysis provided in the EA, and for the reasons stated in the proposed rule, we are approving Framework 65.

*Comment 9:* NSC commented in support of the removal of the management uncertainty buffer for sectors for GOM haddock and white hake under the 2023 at-sea monitoring target of 90 percent. CLF commented that the buffer should not be removed for GOM haddock if the request for emergency action is granted, stating that this would represent two departures from usual protocol, both of which carry risk.

*Response 9:* Based on the rationale provided in the preamble regarding the emergency action, we have determined that it is appropriate to approve removal of the management uncertainty buffer

along with implementing the emergency action for GOM haddock. These actions mitigate the potential adverse economic consequences of these significant quota reductions compared to the previous fishing year for a stock that remains at a very healthy level of biomass. The measure recommended by the Council, and that we are implementing, removes the management uncertainty buffer for sectors only; the management uncertainty buffers for the common pool and the recreational fishery will remain in place for the 2023 fishing year. Further, we expect the white hake catch limit to also place a constraint on GOM haddock catch.

*Accountability Measures for GB Cod*

*Comment 10:* NSC commented in support of the temporary modification to the GB cod accountability measures.

*Response 10:* We agree and are approving this measure.

*General Comments*

*Comment 11:* NEFSA argues that the Magnuson-Stevens Act violates the Constitution by providing for appointment of Council members outside the procedures set forth in the Appointments Clause, U.S. Const., Art. II, § 2, cl. 2, and that Council Members are therefore not properly appointed to their positions as officers of the United States. Because Council members make policy decisions for Federal fisheries management in their region, NEFSA suggests they are 'principal' or at minimum 'inferior' Federal officers, but that because they are improperly appointed, unsupervised, and immune from removal, they hold office unlawfully and lack the Federal authority to issue Framework 65. NEFSA asserts that NMFS must reject Framework 65 because it is "void" and "violates 'applicable law.' "

*Response 11:* NEFSA misunderstands the function and authority of the Council, which is neither an "unaccountable" or "illegally constituted" body. The Magnuson-Stevens Act establishes the Council structure so that state officials, fishermen, scientists, and other stakeholders may provide important expert input on fishery management. But the Council acts as an advisory body only: authority to issue Federal regulations to implement fishery management measures that impact fishermen is vested solely in the Secretary of Commerce. This final rule implements Framework 65, which NMFS, through delegation of authority from the Secretary, has approved as consistent with the Magnuson-Stevens Act and other applicable law. Under

Section 304 of the Magnuson-Stevens Act, NMFS, acting through delegated authority from the Secretary, retains significant discretion to reject Council recommendations, including the proposed regulations that the Council submitted to NMFS to implement Framework 65.

In addition, Federal courts have held that fishery management councils are not considered Federal agencies for purposes of the Administrative Procedure Act. Council members are not Federal "officers" under the Constitution as suggested by the commenter. They neither occupy continuing positions nor exercise significant authority. As simply stated by one court, fishery management councils have "no authority to do anything" because final decision-making power about the content of fishery management plans and whether to implement them through regulations rests with the Secretary. Thus, the Council members are not Federal officers and need not be appointed in a specific way to be consistent with the U.S. Constitution. The commenter's view that Council members were acting as Federal officers is inaccurate. Although Council members assist with important work that helps manage regional fisheries, only the Secretary has the authority under the Magnuson-Stevens Act to promulgate the regulations that affect the commenter.

*Comment 12:* In NSC's comment, it raised general concerns regarding the impact of fluctuations in stock assessments and the disconnect between the results of the assessments and what industry sees on the water. It highlighted that the most recent assessments have increased uncertainty due to missing survey data and complete survey tows due to mechanical and covid-related issues, and the decrease in port sampling in recent years. NSC also highlighted their concerns regarding the timing of framework actions and the impact of these delays on fishery operations.

*Response 12:* We will continue to work with the Council to make the most appropriate decisions based on the best available scientific information and maintain a realistic scope of actions so that timelines can be met.

**Changes From the Proposed Rule**

We have made three changes to the proposed rule. The proposed rule included sector and common pool sub-ACLs based on fishing year 2023 PSCs and final fishing year 2023 sector rosters, but did not include the PSCs and ACEs allocated to each sector. This final rule includes the PSCs and ACEs

000000000006227

at the sector level. Second, this final rule adjusts the common pool trip limits for several stocks.

Third, although NMFS is approving the fishing year 2023 ABC for GOM haddock that was proposed (1,936 mt), given the situation described more fully in Emergency Rule to Set Fishing Year 2023 GOM Haddock Catch Limits in the preamble, we have determined that it is appropriate to set the 2023 ABC for GOM haddock based on 100 percent of $F_{MSY}$. The proposed rule referenced the request made by the Council following its submission of Framework 65 to NMFS for review and rulemaking, and it has been included in the final rule for Framework 65 for expediency. Thus, through emergency authority, this final rule implements an increased fishing year 2023 ABC for GOM haddock (2,515 mt) in place of the ABC proposed in this action (1,936 mt).

**Classification**

NMFS is issuing this rule pursuant to sections 304(b)(1)(A), 305(c)(2)(B), and 305(d) of the Magnuson-Stevens Act, which provides specific authority for implementing this action. Pursuant to section 305(d), this action is necessary to carry out the Northeast Multispecies FMP, and to correct and improve the clarity of the regulations for multiple FMPs in the Greater Atlantic Region. The NMFS Assistant Administrator has determined that this final rule is consistent with Framework Adjustment 65, the Northeast Multispecies FMP, other provisions of the Magnuson-Stevens Act, and other applicable law.

This final rule has been determined to be not significant for purposes of Executive Order (E.O.) 12866, as amended by E.O. 14094. This final rule does not contain policies with federalism or takings implications as those terms are defined in E.O. 13132 and E.O. 12630, respectively.

The Assistant Administrator for Fisheries finds that there is good cause under 5 U.S.C. 553(d)(1) and (3) to waive the 30-day delayed effectiveness of this action. Further, under 5 U.S.C. 553(b)(B), the Assistant Administrator for Fisheries finds good cause to waive the general notice of proposed rulemaking for the emergency action to implement a higher fishing year 2023 ABC for GOM haddock. As described more fully earlier in the preamble, and below, the reasons justifying promulgation of this rule on an emergency basis make solicitation of public comment, or a delay in effectiveness, contrary to the public interest.

This action relies on the best available science to set 2023 catch limits for groundfish stocks and adopts several other measures to improve the management of the groundfish fishery. This final rule must be implemented as soon as possible to capture fully the conservation and economic benefits of Framework 65 and avoid adverse economic impacts.

This action was developed by the New England Fishery Management Council as part of the annual Framework Adjustment process, during which final action was taken in December 2022. However, due to the need for additional analysis regarding the measures proposed in Framework 65, the Council was not able to submit the final Framework until April 18, 2023. Given the timing of the Council process and submission, the earliest we were able to publish a proposed rule for Framework 65 was on May 31, 2023.

A delay in implementation of this rule increases negative economic effects for regulated entities. Multiple stocks did not have 2023 quotas set by a previous framework. A separate action implemented default quotas (75 percent of the 2022 quota). For multiple stocks, the fishery is operating under lower quotas than those implemented by this rule, and a delay could limit economic opportunities for the fishery. Providing timely access to these stocks is also a potential safety issue. A significant portion of fishing activity occurs in early summer, due to better weather, and for some smaller vessels, summer may be the only season in which they are able to participate in the fishery.

Additionally, this rule contains no new measures (e.g., requiring new nets or equipment) for which regulated entities need time to prepare or revise their current practices. Fishermen who are subject to this action expect and need timely implementation to avoid adverse economic impacts. This action is similar to the process used to set quotas every 1–2 years, approves all items as proposed, and contains only quotas and minor adjustments to the management plan that were discussed at multiple noticed meetings where the public was provided opportunity to learn about the action, ask questions, and provide input into the development of the measures. Affected parties and other interested parties participated in this public process to develop this action and desire implementation as close to the beginning of the fishing year on May 1 as possible. Further, the emergency action relieves a restriction by implementing a higher ABC for GOM haddock.

A delay in implementation of this action would greatly diminish the benefits of these specifications and other approved measures. For these reasons, a 30-day delay in the effectiveness of this rule is impracticable and contrary to the public interest.

*Final Regulatory Flexibility Analysis*

Section 604 of the Regulatory Flexibility Act (RFA), 5 U.S.C. 604, requires Federal agencies to prepare a Final Regulatory Flexibility Analysis (FRFA) for each final rule. The FRFA describes the economic impact of this action on small entities. The FRFA includes a summary of significant issues raised by public comments, the analyses contained in Framework 63 and its accompanying Environmental Assessment/Regulatory Impact Review/ Initial Regulatory Flexibility Analysis (IRFA), the IRFA summary in the proposed rule, as well as the summary provided below. A statement of the necessity for and the objectives of this action are contained in Framework 65 and in the preamble to this final rule and is not repeated here.

*A Summary of the Significant Issues Raised by the Public in Response to the IRFA, a Summary of the Agency's Assessment of Such Issues, and a Statement of Any Changes Made in the Final Rule as a Result of Such Comments*

We received several comments expressing concern about the economic impacts of this action, and we have summarized these comments in the comments and responses section of this rule. None of these comments were directly related to the IRFA, or provided information that changed the conclusions of the IRFA. The Chief Counsel for the Office of Advocacy of the Small Business Administration (SBA) did not file any comments. We made no changes to the proposed rule measures other than the minor changes described above, although we are simultaneously implementing the emergency action for GOM haddock.

*Description and Estimate of the Number of Small Entities to Which the Rule Would Apply*

The final rule would impact the commercial and recreational groundfish, Atlantic sea scallop, small-mesh multispecies, Atlantic herring, and large-mesh non-groundfish fisheries. Individually permitted vessels may hold permits for several fisheries, harvesting species of fish that are regulated by several different FMPs, beyond those impacted by the proposed action. Furthermore, multiple-permitted vessels and/or permits may be owned by entities affiliated by stock ownership,

000000000006228

common management, identity of interest, contractual relationships, or economic dependency. For the purposes of the RFA analysis, the ownership entities, not the individual vessels, are considered to be the regulated entities.

As of June 1, 2022, NMFS had issued 681 commercial limited-access groundfish permits associated with vessels (including those in confirmation of permit history (CPH)), 610 party/ charter groundfish permits, 699 limited access and general category Atlantic sea scallop permits, 717 small-mesh multispecies permits, 73 Atlantic herring permits, and 758 large-mesh non-groundfish permits (limited access summer flounder and scup permits). Therefore, this action potentially regulates 3,538 permits. When accounting for overlaps between fisheries, this number falls to 2,027 permitted vessels. Each vessel may be individually owned or part of a larger corporate ownership structure and, for RFA purposes, it is the ownership entity that is ultimately regulated by the proposed action. Ownership entities are identified on June 1st of each year based on the list of all permit numbers, for the most recent complete calendar year, that have applied for any type of Greater Atlantic Federal fishing permit. The current ownership data set is based on calendar year 2021 permits and contains gross sales associated with those permits for calendar years 2019 through 2021.

For RFA purposes only, NMFS has established a small business size standard for businesses, including their affiliates, whose primary industry is commercial fishing (see 50 CFR 200.2). A business primarily engaged in commercial fishing (NAICS code 11411) is classified as a small business if it is independently owned and operated, is not dominant in its field of operation (including its affiliates) and has combined annual receipts not in excess of $11 million for all its affiliated operations worldwide. The determination as to whether the entity is large or small is based on the average annual revenue for the three recent years from 2019 through 2021. The Small Business Administration (SBA) has established size standards for all other major industry sectors in the U.S., including for-hire fishing (NAICS code 487210). These entities are classified as small businesses if combined annual receipts are not in excess of $8.0 million for all its affiliated operations. As with commercial fishing businesses, the annual average of the three most recent years (2019–2021) is utilized in determining annual receipts for

businesses primarily engaged in for-hire fishing.

Based on the ownership data, 1,506 distinct business entities hold at least one permit that the proposed action potentially regulates. Of all 1,506 business entities identified could be directly regulated by this proposed action. Of these 1,506 entities, 865 are commercial fishing entities, 274 are for-hire entities, and 367 did not have revenues (were inactive in 2021). Of the 865 commercial fishing entities, 854 are categorized as small entities and 11 are categorized as large entities, per the NMFS guidelines. Furthermore, 515 of these commercial fishing entities held limited access groundfish permits, with 512 of these entities being classified as small businesses and 3 of these entities being classified as large businesses. All 274 for-hire entities are categorized as small businesses.

*Description of the Projected Reporting, Record-Keeping, and Other Compliance Requirements of This Proposed Rule*

The action does not contain any new collection-of-information requirements under the Paperwork Reduction Act (PRA).

*Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes*

The economic impacts of each measure are discussed in more detail in sections 6.5 and 7.12 of the Framework 65 Environmental Assessment (see **ADDRESSES**) and are not repeated here. The Council considered several options for the GOM cod rebuilding plan, including a $F_{rebuild}$ that is lower (50 percent of $F_{MSY}$) and higher (70 and 75 percent of $F_{MSY}$). The GOM cod quotas that were set by Framework 63 remain in place for fishing years 2023–2024, and the rebuilding strategy for GOM cod is expected to positively impact the groundfish fishery in the long-term through stock rebuilding. For the updated groundfish specifications, the Council also considered two lower ABCs for GB cod, which would have greater negative economic impacts than the preferred alternative. Of the alternatives considered by the Council, there are no significant alternatives that would minimize the economic impacts. The action is predicted to generate $74.2 million in gross revenues on the sector portion of the commercial groundfish trips, which is $41.7 million more than No Action, but $4.0 million less than fishing year 2021. Small entities engaged in common pool groundfish fishing may be negatively impacted by

the action as well. Likewise, small entities engaged in the recreational groundfish fishery are also likely to be negatively impacted.

Because advance notice and opportunity for prior comment is not required for the emergency action setting ACL for GOM haddock for fishing year 2023, an regulatory flexibility analysis is not required and has not been prepared

**Small Entity Compliance Guide**

Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 states that, for each rule or group of related rules for which an agency is required to prepare a FRFA, the agency will publish one or more guides to assist small entities in complying with the rule and will designate such publications as ''small entity compliance guides'' that will explain the actions a small entity is required to take to comply with a rule or group of rules. As part of this rulemaking process, a bulletin to permit holders that also serves as a small entity compliance guide was prepared. This final rule and the guide (*i.e.*, bulletin) will be sent via email to the Greater Atlantic Regional Fisheries Office Northeast multispecies fishery email list, as well as the email lists for the scallop and herring fisheries, which receive an allocation of some groundfish stocks. The final rule and the guide are available from NMFS at the following website: *https:// www.fisheries.noaa.gov/management-plan/northeast-multispecies-management-plan*. Hard copies of the guide and this final rule will be available upon request (see **ADDRESSES**).

**List of Subjects in 50 CFR Part 648**

Fisheries, Fishing, Recordkeeping, and reporting requirements.

Dated: August 10, 2023.

**Samuel D. Rauch, III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons stated in the preamble, NMFS amends 50 CFR part 648 as follows:

**PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES**

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.11, revise paragraph (h)(3)(vii)(A) to read as follows:

**§ 648.11   Monitoring coverage.**

\*    \*    \*    \*    \*

(h) \*  \*  \*

(3) * * *

(vii) * * *

(A) A monitoring service provider must hold insurance specified at § 600.748(b) and (c) of this chapter.

\* \* \* \* \*

■ 3. In § 648.86, revise paragraph I to read as follows:

### § 648.86  NE Multispecies possession restrictions.

\* \* \* \* \*

(c) *Atlantic halibut.* A vessel issued a NE multispecies permit under § 648.4(a)(1) may land or possess on board no more than one Atlantic halibut per trip, provided the vessel complies with other applicable provisions of this part, unless otherwise specified in § 648.90(a)(5)(i)(F).

\* \* \* \* \*

■ 4. In § 648.87:

■ a. Revise paragraph (b)(1)(i)(A) and the first sentence of paragraph (c)(2)(i) introductory text; and

■ b. Remove paragraphs I(2)(i)(A) and (B).

The revisions read as follows:

### § 648.87  Sector allocation.

\* \* \* \* \*

(b) * * *

(1) * * *

(i) * * *

(A) *Allocated stocks.* Each sector shall be allocated a TAC in the form of an ACE for each NE multispecies stock, with the exception of Atlantic halibut, ocean pout, windowpane flounder (both the northern and southern stocks), and Atlantic wolffish based upon the cumulative PSCs of vessels/permits participating in each sector during a particular fishing year, as described in paragraph (b)(1)I(E) of this section.

\* \* \* \* \*

(c) * * *

(2) * * *

(i) * * * The Regional Administrator may not exempt participants in a sector from the following Federal fishing regulations: Specific times and areas within the NE multispecies year-round closure areas; permitting restrictions (*e.g.,* vessel upgrades, etc.); gear restrictions designed to minimize habitat impacts (*e.g.,* roller gear restrictions, etc.); reporting requirements; and AMs specified in § 648.90(a)(5)(i)(D) through (H). * * *

\* \* \* \* \*

■ 5. In § 648.90:

■ a. Remove and reserve paragraph (a)(2)(iv);

■ b. Revise paragraphs (a)(4)(iii)(A) and (B), (a)(4)(iii)(F), (a)(4)(iii)(H) introductory text, (a)(4)(iii)(H)(*1*)(*i*),

(a)(4)(iii)(H)(*2*), the second sentence of paragraph (a)(5)(i)(D), and paragraph (a)(5)(ii);

■ c. Remove and reserve paragraph (a)(5)(iv)(B); and

■ d. Remove paragraphs (a)(5)(iv)(C) and (D).

The revisions read as follows:

### § 648.90  NE multispecies assessment, framework procedures and specifications, and flexible area action system.

\* \* \* \* \*

(a) * * *

(4) * * *

(iii) * * *

(A) *Regulated species or ocean pout catch by vessels operating only in state waters.* The catch of regulated species or ocean pout that is expected to be harvested by vessels operating only in state waters that have not been issued a Federal NE multispecies permit and are not subject to the regulations specified in this part, as well as the recreational catch of regulated species or ocean pout that occurs in state waters, unless otherwise specified in paragraph (a)(4)(iii)(H)(*1*)(*i*) of this section, shall be deducted from the ABC/ACL of each regulated species or ocean pout stock pursuant to the process for specifying ABCs and ACLs, as described in this paragraph (a)(4).

(B) *Regulated species or ocean pout catch by other, non-specified fisheries.* Regulated species or ocean pout catch by other, non-specified fisheries, including, but not limited to, exempted fisheries that occur in Federal waters, fisheries harvesting exempted species specified in § 648.80(b)(3), and recreational fisheries that occur in Federal waters, unless otherwise specified in paragraph (a)(4)(iii)(H)(*1*)(*i*) of this section, shall be deducted from the ABC/ACL of each regulated species or ocean pout stock, pursuant to the process to specify ABCs and ACLs described in this paragraph (a)(4), unless otherwise specified in paragraphs (a)(4)(iii)(C) through (G) of this section. The catch of these non-specified sub-components of the ACL shall be monitored using data collected pursuant to this part. If catch from such fisheries exceeds the amount specified in this paragraph (a)(4)(iii)(B), AMs shall be developed to prevent the overall ACL for each stock from being exceeded, pursuant to the framework adjustment process specified in this section.

\* \* \* \* \*

(F) *Southern windowpane flounder catch by exempted fisheries.* Southern windowpane flounder catch by other, non-specified fisheries, including, but not limited to, exempted fisheries that

occur in Federal waters and fisheries harvesting exempted species specified in § 648.80(b)(3), shall be deducted from the ABC/ACL for southern windowpane flounder pursuant to the process to specify ABCs and ACLs, as described in this paragraph (a)(4). The specific value of the sub-components of the ABC/ACL for southern windowpane flounder distributed to these other fisheries shall be specified pursuant to the biennial adjustment process specified in paragraph (a)(2) of this section.

\* \* \* \* \*

(H) *Regulated species or ocean pout catch by the NE multispecies commercial and recreational fisheries.* Unless otherwise specified in the ACL recommendations developed pursuant to paragraph (a)(4)(i) of this section, after all of the deductions and considerations specified in paragraphs (a)(4)(iii)(A) through (G) and (a)(4)(iii)(H)(*1*) of this section, the remaining ABC/ACL for each regulated species or ocean pout stock shall be allocated to the NE multispecies commercial fishery, pursuant to paragraph (a)(4)(iii)(H)(*2*) of this section.

(*1*) * * *

(*i*) *Stocks allocated.* Unless otherwise specified in this paragraph (a)(4)(iii)(H)(*1*), the ABCs/ACLs for GOM cod and GOM haddock set pursuant to paragraph (a)(4) of this section shall be divided between commercial and recreational components, based upon the average proportional catch of each component for each stock during fishing years 2001 through 2006.

\* \* \* \* \*

(*2*) *Commercial allocation.* Unless otherwise specified in this paragraph (a)(4)(iii)(H)(*2*), the ABC/ACL for regulated species or ocean pout stocks available to the commercial NE multispecies fishery, after consideration of the recreational allocation pursuant to paragraph (a)(4)(iii)(H)(*1*) of this section, shall be divided between vessels operating under approved sector operations plans, as described in § 648.87(c), and vessels operating under the provisions of the common pool, as defined in this part, based upon the cumulative PSCs of vessels participating in sectors calculated pursuant to § 648.87(b)(1)(i)(E). The ABC/ACL of each regulated species or ocean pout stocks not allocated to sectors pursuant to § 648.87(b)(1)(i)(E) (*i.e.,* Atlantic halibut, ocean pout, windowpane flounder, and Atlantic wolffish) that is available to the commercial NE multispecies fishery shall be allocated entirely to the common pool, and catch from sector and common pool vessels

000000000006230

shall be attributed to this allocation. Unless otherwise specified in paragraph (a)(5) of this section, regulated species or ocean pout catch by common pool and sector vessels shall be deducted from the sub-ACL/ACE allocated pursuant to this paragraph (a)(4)(iii)(H)(*2*) for the purposes of determining whether adjustments to common pool measures are necessary, pursuant to the common pool AMs specified in § 648.82(n), or whether sector ACE overages must be deducted, pursuant to § 648.87(b)(1)(iii).

\* \* \* \* \*

(5) \* \* \*

(i) \* \* \*

(D) \* \* \* If the overall ACL for any of these stocks is exceeded, NMFS shall implement the appropriate AM, as specified in paragraphs (a)(5)(i)(D) through (H) of this section, in a subsequent fishing year, consistent with the APA. \* \* \*

\* \* \* \* \*

(ii) *AMs due to excessive catch of regulated species or ocean pout by state and other, non-specified fisheries.* At the end of the NE multispecies fishing year, NMFS will evaluate whether the catch of any stock of regulated species or ocean pout by vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, exceeds the sub-component of the ACL for that stock.

(A) *AMs if the overall ACL for a regulated species or ocean pout stock is exceeded.* If the catch of any stock of regulated species or ocean pout by vessels operating only in state waters or in other, non-specified fisheries exceeds the sub-component of the ACL for that stock, and the overall ACL for that stock is exceeded, then the amount of the overage of the overall ACL for that stock attributed to catch from vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, shall be distributed among components of the NE multispecies fishery based upon each component's share of that stock's ACL available to the NE multispecies fishery pursuant to paragraph (a)(4)(iii)(H) of this section. Each component's share of the ACL overage for a particular stock would be then added to the catch of that stock by each component of the NE multispecies fishery. If the resulting sum of catch of that stock for each component of the fishery exceeds that individual component's share of that stock's ACL specified pursuant to paragraph (a)(4)(iii)(H) of this section, then the AMs specified in paragraphs (a)(5)(i)(A)

through (C) of this section shall take effect, as applicable, unless otherwise specified in paragraph (a)(5)(ii)(C) of this section.

(B) *AMs if the overall ACL for a regulated species or ocean pout stock is not exceeded.* If the catch of any stock of regulated species or ocean pout by vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, exceeds the sub-component of the ACL for that stock, but the overall ACL for that stock is not exceeded, even after consideration of the catch of that stock by other sub-components of the fishery, then the AMs specified in this paragraph (a)(5)(ii) shall not take effect.

(C) *AMs for GB cod due to excessive catch by non-allocated fisheries.* For any overages of the GB cod ACL in the 2022–2024 fishing years, the amount of overage of the overall ACL for GB cod attributed to catch from vessels operating only in state waters or in other, non-specified fisheries, as defined in paragraphs (a)(4)(iii)(A) and (B) of this section, would be reduced by any underage of the GB cod ACL in the fishing year following the overage, in order to determine the total amount that must be added to the catch by components of the NE multispecies fishery, as specified in paragraph (a)(5)(i)(A) of this section. If the full ACL of GB cod is caught or exceeded in the fishing year following an overage, no reduction to this amount would be made. For example, if in 2023 NMFS determines that 100 mt of GB cod catch by vessels operating only in state waters or in other, non-specified fisheries in fishing year 2022 has contributed to an ACL overage, NMFS would implement the AMs specified in paragraph (a)(5)(ii)(A) of this section at the beginning of fishing year 2024. If 2023 fishing year-end data showed that total catch of GB cod in fishing year 2023 was 25 mt below the 2023 ACL, NMFS would reduce the 100-mt overage amount by that 25-mt amount (down to 75 mt) in an in-season adjustment to the 2024 sub-ACLs, as specified in paragraph (a)(5)(i)(A) of this section.

\* \* \* \* \*

[FR Doc. 2023–17592 Filed 8–17–23; 8:45 am]

**BILLING CODE 3510–22–P**

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

[Docket No. 221223–0282; RTID 0648–XD195]

**Fisheries of the Northeastern United States; Summer Flounder Fishery; Quota Transfer From North Carolina to Virginia**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notification of quota transfer.

**SUMMARY:** NMFS announces that the State of North Carolina is transferring a portion of its 2023 commercial summer flounder quota to the Commonwealth of Virginia. This adjustment to the 2023 fishing year quota is necessary to comply with the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan quota transfer provisions. This announcement informs the public of the revised 2023 commercial quotas for North Carolina and Virginia.

**DATES:** Effective August 17, 2023, through December 31, 2023.

**FOR FURTHER INFORMATION CONTACT:** Laura Deighan, Fishery Management Specialist, (978) 281–9184.

**SUPPLEMENTARY INFORMATION:** Regulations governing the summer flounder fishery are found in 50 CFR 648.100 through 648.110. These regulations require annual specification of a commercial quota that is apportioned among the coastal states from Maine through North Carolina. The process to set the annual commercial quota and the percent allocated to each state is described in § 648.102 and final 2023 allocations were published on January 3, 2023 (88 FR 11).

The final rule implementing Amendment 5 to the Summer Flounder Fishery Management Plan (FMP), as published in the **Federal Register** on December 17, 1993 (58 FR 65936), provided a mechanism for transferring summer flounder commercial quota from one state to another. Two or more states, under mutual agreement and with the concurrence of the NMFS Greater Atlantic Regional Administrator, can transfer or combine summer flounder commercial quota under § 648.102(c)(2). The Regional Administrator is required to consider three criteria in the evaluation of requests for quota transfers or

**U.S. DEPARTMENT OF COMMERCE**
**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION**

## NOAA ORGANIZATIONAL HANDBOOK

## TRANSMITTAL NO. 61

**DATE:**          February 24, 2015

**SUBJECT:**       DELEGATIONS OF AUTHORITY-
                   Assistant Administrator for Fisheries

**THIS TRANSMITS** -  NOAA Organization Handbook Transmittal No. 61 (TM #61) comprised of delegation materials related to the National Marine Fisheries Service previously issued as TM #34, dated 5/31/1993; as amended by TM #40, dated 7/28/1995; and as TM #37, dated 1/30/1995; and as TM #61 dated 2/28/2006; and incorporating, revising, and superseding the delegations made through TM #47 dated 9/7/1999; TM #48 dated 2/16/2011; TM #49 dated 2/16/2001; and TM #63 dated 11/06/2006; all as amended in accordance with Section 1.0, Introduction, of National Marine Fisheries Service's Policy Directive 02-110-12, issued as TM #60, dated February 28, 2006.

**EFFECT ON OTHER ISSUANCES:**  This delegation revises Transmittal #61 dated February 28, 2006, and incorporates, revises, and supersedes TM #48, #49, and #63.

**FILING INSTRUCTIONS:**  Please insert the attached pages in the appropriate place of the NOAA Organization Handbook or of Book I of the NOAA Directives System Handbook under Delegations of Authority, Organization Code FA0000, National Marine Fisheries Service.

File this transmittal sheet in the back of the Handbook.

000000000006244

Delegations of Authority to the Assistant Administrator for Fisheries

I.      Reorganization Plan No. 4 of 1970 (5 U.S.C. App.), section 2(e)(4), established in NOAA the position of Assistant Administrator for Fisheries.  The Assistant Administrator is responsible for all matters related to living marine resources that may arise in connection with the conduct of the functions of NOAA.

II.     Department Organization Order 10-15 (January 15, 1988) delegates certain authority to the Under Secretary/Administrator.  Section 3.05 of DOO 10-15 provides for redelegations of that authority to any employee of NOAA, subject to such conditions in the exercise of that authority as the Under Secretary/Administrator may prescribe.  The Under Secretary/Administrator redelegates to the Assistant Administrator for Fisheries, with noted conditions and reservations, the authority to perform functions relating to:

A.   Administrative/Management
    1.      Signature of material for publication in the Federal Register and the Code of Federal Regulations.
    2.      Determinations under Executive Order 12866, for regulations promulgated by NMFS.
    3.      Initial decision to deny program information requested from fisheries records under the Freedom of Information Act, 5 U.S.C. 552.
    4.      Signature of certificates as Certifying Officer.
    5.      Exercise of NOAA's full Civilian Personnel Appointing Authority

B.   Financial Assistance/Industry Services
    1.      Agricultural Marketing Act of 1946, 7 U.S.C. 1621-1627.
    2.      Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C. 1704.
    3.      Cooperative fisheries associations, 15 U.S.C. 521-522.
    4.      Saltonstall-Kennedy Act, 15 U.S.C 713c-3.
    5.      The Fisheries Loan Fund, 16 U.S.C. 742c.
    6.      The Columbia Basin Fishery Development Act (Mitchell Act), 16 U.S.C. 755-757.
    7.      The Anadromous Fish Conservation Act, 16 U.S.C. 757a-757g.
    8.      The Interjurisdictional Fisheries Act, 16 U.S.C. 4101-4107, except the Secretary reserves authority to submit the biennial report to Congress (4106).
    9.      The Fishing Vessel and Gear Compensation Fund, 22 U.S.C. 1980.
    10.     The Fisherman's Contingency Fund, 43 U.S.C.1841-1846, except the Secretary reserves authority to submit the annual report to Congress {1846).
    11.     Capital construction funds under the Merchant Marine Act of 1936, 46 U.S.C. App. 1177.
    12.      Fisheries loan obligation guarantees under the Merchant Marine Act of 1936, 46 U.S.C. App. 1271 et seq.

C.   Management of Living Marine Resources
    1.      The Fish and Wildlife Coordination Act, 16 U.S.C. 661-666c.

JA.153

000000000006245

2.      The Fish and Wildlife Act of 1956 and associated provisions, 16 U.S.C. 742a-742d, 742e-742j, 742k, 744-748, 750-753, 753a-753b, 754, 758-758d, 760a-760g.

3.      The Fish and Wildlife Improvement Act of 1978, 16 U.S.C. 7421, 753a.

4.      The Central, Western, and South Pacific Fisheries Development Act, 16 U.S.C. 758e-758e-5.

5.      The Northern Pacific Halibut Act of 1982, 16 U.S.C. 773-773k.

6.       The New England Fishery Resources Restoration Act of 1990, 16 U.S.C. 777e-1.

7.       Fish Research and Experimentation Program, 16 U.S.C. 778-778c.

8.      The Sponge Act, 16 U.S.C. 781-785.

9.      The Federal Power Act, 16 U.S.C. 803, 811, 823a.

10.      Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. 839 et seq.

11.      The Whaling Convention Act of 1949, 16 U.S.C. 916.

12.      The Whale Conservation and Protection Study Act, 16 U.S.C 917.

13.      The Tuna Conventions Act of 1950, 16 U.S.C. 951-961.

14.      The Atlantic Tunas Convention Act of 1975, 16 U.S.C. 971-971i.

15.      The Eastern Pacific Tuna Licensing Act of 1984, 16 U.S.C. 972-972h.

16.      The South Pacific Tuna Act of 1988, 16 U.S.C. 6973-6973r.

17.      The North Pacific Fisheries Act of 1954, 16 U.S.C. 1021-1035.

18.      The Fur Seal Act Amendments of 1983, 16 U.S.C. 1151-1175, with the following exceptions:

   a.   Authority to appoint trustees (1166(c)).
   b.   Authority to transfer property (1165(a)).
   c.   Administration of Trust requirements (1166).
   d.   Administrative functions delegated to the Director, Western Administrative Support Center.

19.      Control or Elimination of Jellyfish or Sea Nettles, 16 U.S.C. 1201-1205.

20.      Conservation of "Crown of Thorns" Starfish, 16 U.S.C. 1211-1213.

21.      The National Fishing Enhancement Act of 1984 (Artificial Reefs), 16 U.S.C. 1220; 33 U.S.C. 2101 et seq.

22.      The Estuarine Areas Act, 16 U.S.C. 1221-1226.

23.      The Marine Mammal Protection Act of 1972, 16 U.S.C. 1361-1407.

24.      The Dolphin Protection Consumer Information Act, 16 U.S.C. 1385.

25.      The Endangered Species Act of 1973, 16 U.S.C. 1531-1543.

26.      The Magnuson Fishery Conservation and Management Act, 16 U.S.C. 1801-1882, with the following functions:

   a.   The Under Secretary must be advised before final action is taken with respect to the following functions:

      i.    Establishing guidelines to assist in the development of fishery management plans (1851(b));
      ii.   Appointing or removing members of the Regional Fishery Management Councils (1852(b)(2) or (5));
      iii.  Issuing preliminary fishery management plans and implementing regulations, if the Assistant Administrator considers the action to be controversial (1821(h));

JA.154

        iv.     Approving, disapproving, partially disapproving, or issuing a fishery management plan or amendment, or issuing implementing or emergency regulations, if the Assistant Administrator considers the action to be controversial (1853 and 1854).

   b.    The Under Secretary/Administrator reserves the authority to issue a fishery management plan for highly migratory species or amendment to such plan or any implementing regulations (1854(f)(3)), whenever such action is requested by the Deputy Assistant Secretary for International Interests.

27.    The Driftnet Impact Monitoring, Assessment and Control Act, 16 U.S.C. 1822 note.

28.    Certificates of legal origin for anadromous fish products, 16 U.S.C. 1822 note.

29.    The Atlantic Striped Bass Conservation Act, 16 U.S.C. 1851 note.

30.    The Antarctic Conservation Act of 1978, 16 U.S.C. 2401-2412.

31.    The Antarctic Marine Living Resources Convention Act of 1984, 16 U.S.C. 2431-2444.

32.    Small Hydroelectric Power Projects Act, 16 U.S.C. 2701-2708.

33.    The National Aquaculture Act, 16 U.S.C. 2801-2810.

34.    The Lacey Act Amendments of 1981, 16 U.S.C. 3371-3378.

35.    The Atlantic Salmon Convention Act of 1982, 16 U.S.C. 3601-3608.

36.    The Pacific Salmon Treaty Act of 1985, 16 U.S.C. 3631-3644, except that the Under Secretary/Administrator reserves authority to appoint panel members (3632), and to make the determination whether a State or Treaty Indian law, regulation, or order jeopardizes U.S. fulfillment of its international obligations (3635).

37.    The Fish and Seafood Promotion Act, 16 U.S.C. 4003-4017, except that the Secretary retains authority to appoint or remove council members (4006(a)(5), 4009(f)).

38.    The Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, 16 U.S.C. 4701-4741.

39.    The Fisherman's Protective Act (Pelly Amendment), 22 U.S.C. 1978.

40.    Designation of Alternate U.S. Commissioners, 22 U.S.C. 1344.

41.    Federal Water Pollution Control Act, 33 U.S.C. 1344.

42.    The Water Resources Planning Act, 42 U.S.C. 1962-1962d-14.

43.    Commerce, State, Justice Appropriations Act (shrimp embargo), Pub. L 101-162.

44.    Northwest Atlantic Fisheries Convention Act of 1995, 16 U.S.C. 5601-5612.

45.    High Seas Driftnet Moratorium Protection Act, 16 U.S.C. 1826d-k.

46.    Pacific Whiting Act of 2006, 16 U.S.C. 7001-7010.

47.    Western and Central Pacific Fisheries Convention Implementation Act, 16 U.S.C. 6901-6910.

48.    Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. 4261-4266

49.    High Seas Fishing Compliance Act of 1995, 16 U.S.C. 5501-5509.

50.    Marine Turtle Conservation Act of 2004, 16 U.S.C. 6601-6607.

000000000006247

51.    North Pacific Anadromous Stocks Act of 1992, 16 U.S.C. 5001-5012.

52.    Shark Finning Prohibition Act, 16 U.S.C. 1822 note.

III.    The following are redelegations of authority from the Assistant Administrator for Fisheries. Any further redelegations from the Assistant Administrator or from his delegates must be approved by the Assistant Administrator after clearance by the Office of General Counsel for Fisheries, and published as a NOAA Circular.

Delegations of Authority to the Deputy Assistant Administrator for Regulatory Programs, the Deputy Assistant Administrator for Operations, and the Director of Scientific Programs

Signature of material for publication in the Federal Register and the Code of Federal Regulations.

END

Delegations of Authority to the Director, Office of Sustainable Fisheries

Signature for publication in the Federal Register and the Code of Federal Regulations, for regulations that are exempt from Office of Management and Budget review procedures under Executive Order 12866.

END

Delegations of Authority to the Director, Office of Enforcement

Disposal of any item abandoned or forfeited to the United States in under any laws administered by the Secretary of Commerce relating to fish, wildlife, or plants (16 U.S.C. 7421 (c)).

END

Delegation of Authority to the Director, Office of Protected Resources

1.    Except as delegated to the Regional Administrator for the West Coast Region, the development of recovery plans under section 4 of the Endangered Species Act, 16 U.S.C. 1531-1543.

2.    Except as delegated to the Regional Administrator for the West Coast, and Southeast Regions, the issuance of permits and letters of authorization (LOAs) under the Marine Mammal Protection Act, 16 U.S.C. 1361-1407, and the Endangered Species Act, 16 U.S.C. 1531-1543, including the issuance of pre-listing conservation agreements.

3.    Signature for publication in the Federal Register and the Code of Federal Regulations, of notices of receipt of applications for permits and requests for LOAs, notices of issuance of permits and LOAs, and notices of meetings and hearings.

END

JA.156

Delegation of Authority to the Director, Office of Habitat Conservation

1. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to conduct consultations and other activities related to essential fish habitat, in accordance with section 305{b) of the Act, in those instances where the Director, in consultation with the appropriate NMFS Region(s), determines that the activities have national significance.

2. Signature for publication in the Federal Register of notices of meetings, requests for nomination to panels, notices of appointments to panels, and notices of the availability of documents for public comments that are within the mission and assigned responsibilities of the Office. These delegations are l.imited to non-regulatory notice within the mission and assigned responsibilities of the Office of Habitat Conservation.

END

Delegation of Authority to the Director, Office of Management and Budget

1. Authority (except for issuing regulations) concerning capital construction funds under the Merchant Marine Act of 1936, 46 U.S.C. App. 1177.

2. Authority (except for issuing regulations) concerning fisheries loan obligation guarantees under the Merchant Marine Act of 1936, 46 U.S.C. App. 1271 et seq.

3. Authority (except for issuing regulations) concerning Fishing Vessel and Gear Compensation Fund, 22 U.S.C. 1980.

4. Authority (except for issuing regulations) concerning the Fishermen's Contingency Fund, 43 U.S.C. 1841-1846.

5. Authority (except for issuing regulations) concerning the Fisheries Loan Fund, 16 U.S.C. 742c.

END

Delegation of Authority to the Director, Office of International Affairs and Seafood Inspection

Authority to sign Commission for the Conservation of Antarctic Living Marine Resources Dealer permits.

END

Delegation of Authority to the Regional Administrator, Greater Atlantic Regional Fisheries Office

1. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., with the concurrence of the Assistant Administrator for Fisheries to approve, disapprove, or partially disapprove fishery management plans {FMPs) and amendments, except for FM Ps covering highly migratory species. This authority may be redelegated only to the Deputy Regional Administrator.

JA.157

000000000006249

2. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to make determinations, approve or disapprove recommendations, and take other actions authorized in regulations implementing FMPs, except for FMPs covering highly migratory species.

3. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to conduct consultations with, and make recommendations to, federal and state agencies regarding activities affecting essential fish habitat, in accordance with section 305(b) of the Act, except in those instances where the Director, Office of Habitat Conservation, in consultation with the Greater Atlantic Region, determines that the activities have national significance. This authority may be redelegated to the Deputy Regional Administrator or Assistant Regional Administrator for Habitat Conservation, who may redelegate authority to conduct individual EFH consultations to area or field office supervisors, but cannot redelegate authority for programmatic consultations or general concurrences.

4. Authority under the Fish and Wildlife Coordination Act, 16 U.S.C. 661 et seq., to consult with federal permitting, licensing, and construction agencies on proposed projects that may affect living marine resources under the Act.

5. Authority under the Federal Power Act, 16 U.S.C. 791a et seq., to provide recommendations for fishery protection, mitigation and enhancement, and prescriptions for fishways, as well as to carry out NMFS' FPA responsibilities, under the Act.

6. Signature of certifications as Certifying Officer.

END

Delegation of Authority to the Regional Administrator, Southeast Region

1. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., with the concurrence of the Assistant Administrator for Fisheries, to approve, disapprove, or partially disapprove fishery management plans (FMPs) and amendments, except for FMPs covering highly migratory species. This authority may be redelegated only to the Deputy Regional Administrator.

2. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to make determinations, approve or disapprove recommendations, and take other actions authorized in regulations implementing FMPs, except for FMPs covering highly migratory species.

3. Authority to issue permits, terms and conditions therein, and deny applications thereof, authorizing public or private exper,imentation aimed at improving shrimp retention efficiency of existing approved TEDs and at developing additional TEDs, or conducting fishery research as described in 50 CFR §227.72(e)(5)(ii) and which occur only in the Southeast Region.

4. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to conduct consultations with, and make recommendations to, federal and state

JA.158

agencies regarding activities affecting essential fish habitat, in accordance with section 305(b) of the Act, except in those instances where the Director, Office of Habitat Conservation, in consultation with the Southeast Region, determines that the activities have national significance. This authority may be redelegated to the Deputy Regional Administrator or Assistant Regional Administrator for Habitat Conservation, who may redelegate authority to conduct individual EFH consultations to area or field office supervisors, but cannot redelegate authority for programmatic consultations or general concurrences.

5.  Authority under the Fish and Wildlife Coordination Act, 16 U.S.C. 661 et seq., to consult with federal permitting, licensing, and construction agencies on proposed projects that may affect living marine resources under the Act.

6.  Authority under the Federal Power Act, 16 U.S.C. 791a et seq., to provide recommendations for fishery protection, mitigation and enhancement, and prescriptions for fishways, as well as to carry out NMFS' FPA responsibilities, under the Act.

7.  Signature of certifications as Certifying Officer.

END

Delegation of Authority to the Regional Administrator, West Coast Region

1.  Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., with the concurrence of the Assistant Administrator for Fisheries, to approve, disapprove, or partially disapprove fishery management plans (FMPs) and amendments. This authority may be redelegated only to the Deputy Regional Administrator.

2.  Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to make determinations, approve or disapprove recommendations, and take other actions authorized in regulations implementing FMPs.

3.  Approval of pre-listing agreements and issuance of permits under section IO(a)(I)(B) of the Endangered Species Act, 16 U.S.C. 1539, for activities (excluding fish harvest) involving anadromous species for which the West Coast Region has primary ESA responsibility, with the following reservation: for activities the RA considers controversial, the RA must consult with F/PR and advise the AA before final action is taken.

4.  Development and implementation of recovery plans under section 4 of the Endangered Species Act, 16 U.S.C. 1533, for listed anadromous species for which the West Coast Region has primary ESA responsibility, with the following reservation: for activities the RA considers controversial, the RA must consult with F/PR and advise the AA before final action is taken.

5.  Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to conduct consultations with, and make recommendations to, federal and state agencies regarding activities affecting essential fish habitat, in accordance with section 305(b) of the Act, except in those instances where the Director, Office of Habitat Conservation, in consultation with the West Coast Region, determines that the activities have national significance. This authority may be redelegated to the Deputy Regional Administrator, Associate

000000000006251

Deputy Regional Administrator, the Assistant Regional Administrator for Protected Resources, the Assistant Regional Administrator for the Oregon & Washington Coastal Area Office, the Assistant Regional Administrator for the Interior Columbia River Basin Area Office, the Assistant Regional Administrator for the California Central Valley Area Office, or the Assistant Regional Administrator for the California Coastal Area Office, who may redelegate authority to conduct individual EFH consultations to area or field office supervisors, but cannot redelegate authority for programmatic consultations or general concurrences.

6. Authority under the Fish and Wildlife Coordination Act, 16 U.S.C. 661 et seq., to consult with federal permitting, licensing, and construction agencies on proposed projects that may affect living marine resources under the Act.

7. Authority under the Federal Power Act, 16 U.S.C. 791a et seq., to provide recommendations for fishery protection, mitigation and enhancement, and prescriptions for fishways, as well as to carry out NMFS' FPA responsibilities, under the Act.

8. Signature of certifications as Certifying Officer.

9. Issuance of orders under 50 CFR 371.21 that establish fishing times and areas consistent with the Pacific Salmon Commission regime and in-season orders of the Fraser River Panel. This Authority may be redelegated only to the Deputy Administrator, West Coast Region.

END

Delegation of Authority to the Regional Administrator, Alaska Region

1. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., with the concurrence of the Assistant Administrator for Fisheries, to approve, disapprove, or partially disapprove fishery management plans (FMPs) and amendments. This authority may be redelegated only to the Deputy Regional Administrator.

2. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to make determinations, approve or disapprove recommendations, and take other actions authorized in regulations implementing FMPs.

3. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to conduct consultations with, and make recommendations to, federal and state agencies regarding activities affecting essential fish habitat, in accordance with section 305(b) of the Act, except in those instances where the Director, Office of Habitat Conservation, in consultation with the Alaska Region, determines that the activities have national significance. This authority may be redelegated to the Deputy Regional Administrator or Assistant Regional Administrator for Habitat Conservation, who may redelegate authority to conduct individual EFH consultations to area or field office supervisors, but cannot redelegate authority for programmatic consultations or general concurrences.

4. Authority under the Fish and Wildlife Coordination Act, 16 U.S.C. 661 et seq., to consult with federal permitting, licensing, and construction agencies on proposed projects that may affect living marine resources under the Act.

JA.160

000000000006252

5. Authority under the Federal Power Act, 16 U.S.C. 791a et seq., to provide recommendations for fishery protection, mitigation and enhancement, and prescriptions for fishways, as well as to carry out NMFS' FPA responsibilities, under the Act.

6. Signature of certifications as Certifying Officer.

END

### Delegations of Authority to the Regional Administrator, Pacific Islands Region

1. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., with the concurrence of the Assistant Administrator for Fisheries, to approve, disapprove, or partially disapprove fishery management plans {FMPs) and amendments. This authority may be redelegated only to the Deputy Regional Administrator.

2. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to make determinations, approve or disapprove recommendations, and take other actions authorized in regulations implementing FMPs.

3. Authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq., to conduct consultations with, and make recommendations to, federal and state agencies regarding activities affecting essential fish habitat, in accordance with section 305{b) of the Act, except in those instances where the Director, Office of Habitat Conservation, in consultation with the Pacific Islands Region, determines that the activities have national significance. This authority may be redelegated to the Deputy Regional Administrator or Assistant Regional Administrator for Habitat Conservation, who may redelegate authority to conduct individual EFH consultations to area or field office supervisors, but cannot redelegate authority for programmatic consultations or general concurrences.

4. Authority under the Fish and Wildlife Coordination Act, 16 U.S.C. 661 et seq., to consult with federal permitting, licensing, and construction agencies on proposed projects that may affect living marine resources under the Act.

5. Authority under the Federal Power Act, 16 U.S.C. 791a et seq., to provide recommendations for fishery protection, mitigation and enhancement, and prescriptions for fishways, as well as to carry out NMFS' FPA responsibilities, underthe Act.

6. Signature of certifications as Certifying Officer.

END

### Delegations of Authority to the Director, Northeast Inspection Service

Signature of certifications as Certifying Officer.

END

### Delegations of Authority to the Director, Southeast Inspection Service

JA.161

Signature of certifications as Certifying Officer.

                                    END

             Delegations of Authority to the Director, Western Inspection Service

Signature of certifications as Certifying Officer.

                                    END

    Delegations of Authority to the Chief Documentation Approval and Supply Services Division, National
                              Seafood Inspection Laboratory

Signature of certifications as Certifying Officer.

                                    END

    Delegations of Authority to Chief, Permits and Documentation Division; Chief, Marine Mammal Division;
                           Chief, Endangered Species Division
                           Office of Protected Resources, NMFS

Type of Delegation:         Administrative

Source of Authority:        Marine Mammal Protection Act of 1972 {MMPA}, 16 U.S.C. 1361. Et seq.
                            Endangered Species Act of 1973 (ESA), 16 U.S.C. 1531 et seq.

Authority to do What:       Signature for publication in the Federal Register and the Code of Federal
                            Regulations of notices of receipt of applications for permits and requests for
                            letters of authorization {LOAs); notices of issuance of permits and LOAs, and
                            notices of meetings and hearings, as may be necessary for the issuance of
                            permits and LOAs.

Reserved Authority:         Issuance of permits and LOAs under the MMPA, 16 U.S.C. 1361-1407, and the
                            ESA, 16 U.S.C. 1531-1543.

000000000006254

| | | U.S. DEPARTMENT OF COMMERCE Chief Financial Officer and Assistant Secretary for Administration Office of Human Resources Management | DATE **11/14/17** |
|---|---|---|---|

| **CONCURRENCE RECORD** | ROUTING PURPOSE SYMBOLS (RPS) C- Concurrence S- Signature FYI-For Your Information |
|---|---|

**Subject:** Michael Pentony SES selection NOAA, NMFS | CONTROL NUMBER **OHRM 18-025**

| NAME AND OFFICE OF ORIGINATOR **Nancy Osborn, OER** | TELEPHONE NUMBER **X5815** | DEADLINE DATE |
|---|---|---|

INITIALS      DATE

| SUBMITTED TO | RPS | INITIALS | DATE | SUBMITTED TO | RPS | INITIALS | DATE |
|---|---|---|---|---|---|---|---|
| NAME: Denise Yaag OFFICE: Director, Office of Executive Resources | C | *Day* | 11/16/17 | NAME: Rich Houston OFFICE: OHRM | FYA | | |
| NAME: Marcia Frederick OFFICE: OHRM front office | FYA | mF | 11/16/17 | NAME: Tyra Smith OFFICE: Deputy Director for HRM and Deputy CHCO | C | *tb* | 11/17 |
| NAME: OFFICE: | | | | NAME: Kevin E. Mahoney OFFICE: Director for HRM and CHCO | S | *JM* | 11/17/17 |
| NAME: OFFICE: | | | | NAME: Richard Townsend OFFICE: OSY | S | *FOV* | 11-21-17 |
| NAME: OFFICE | | | | NAME: Lisa Casias OFFICE: DAS for Administration | S | | |
| NAME: OFFICE: | | | | NAME: Ellen Herbst OFFICE: CFO/ASA | S | | |

ADDITIONAL INFORMATION OR SPECIAL INSTRUCTIONS:
*See e-mail.*

| PREPARER: | (Circle One) | | |
|---|---|---|---|
| Did you meet suspense date? | Yes | No | N/A |
| Did you use approved format? | Yes | No | N/A |
| Did you use spell check? | Yes | No | N/A |
| Did you use grammar check? | Yes | No | N/A |
| Did you coordinate action? | Yes | No | N/A |

ADMINISTRATIVE SUPPORT:
| Did you proofread document? | Yes | No | N/A |
|---|---|---|---|
| Did you log document in/out of office? | Yes | No | N/A |

FORM OHRM (08/04)                    TO BE FILED WITH A OFFICIAL FILE# COPY

JA.163

FORM CD-590
(3/05)

US DEPARTMENT OF COMMERCE

## EXECUTIVE PERSONNEL TRANSACTION

Submit original to OER

### I. TYPE OF TRANSACTION

**A. Actions Involving Position** *(Enter from codes 01 to 1 0 in the first two spaces at right - 2 entries are possible.  Then enter "R" for Request for Approval or "N" for Information in the third space.)*

01 - Establish new position

02 - Reestablish old position

03 - Change grade of established position

04 - Redescribe established position

05 - Cancel position *(permanent)*

06 - Cancel position *(temporary)*

07 - Authorization for SES limited appointing authority

08 - Change SES career reserved position to general

09 - Change SES general position to career reserved

10 - Other (Specify):

R or N

▶ [  ][  ][  ]
Effective Date
Year | Mo. | Day

R or N

▶ [  ][  ][  ]
Effective Date
Year | Mo. | Day

**B. Actions Involving Individual** *(Enter from codes 01 to 1 1 in the first two spaces at right - 2 entries are possible.  Then enter "R" for Request for Approval or "N" for Information in the third space.)*

01 - Individual appointed to position
*(no qualifications approval needed)*

02 - Individual proposed for position
*(request approval of qualifications
or noncompetitive action)*

03 - Individual leaving covered position

04 - Conversion under Section 413, CSRA

05 - Change in ST salary or SES pay rate

06 - Nomination to SES Meritorious
Executive Rank

07 - Nomination to SES Distinguished
Executive Rank

08 - Detail or long-term training ...........

09 - SES Sabbatical ...................

10 - Temporary Assignment outside Executive

11 - Other (Specify):

R or N

▶ [0][2]  [R]
Effective Date
Year | Mo. | Day

R or N

Begin [  ]  End [  ]
Begin [  ]  End [  ]
Begin [  ]  End [  ]

▶ [  ][  ][  ]
Effective Date
Year | Mo. | Day

### II. POSITION INFORMATION

**A. Former Position** *(Leave blank if no change in position, or if the individual comes from outside the Federal government.)*

| Position Title | Position Number | Pay Plan | Grade | Occupational Series | Appt. Auth. |
|---|---|---|---|---|---|
| Fish Management Officer | FS0238 | ZP | PII | 480 | |
| | Enter:  M - Manager  S - Supervisor  A - All others ▶ | | | | |
| Agency, Bureau, Division | Enter for SES:  1 - General  2 - Career Reserved ▶ | | | | |
| National Oceanic and Atmospheric Administration National Marine Fisheries Service | Geographic Location (City, State) | | | | |
| | Gloucester, MA | | | | |

**B. Current or Proposed Position** *(Complete in all Transactions unless submitted only to cancel a position.)*

| Position Title | Position Number | Pay Plan | Grade | Occupational Series | Appt. Auth. |
|---|---|---|---|---|---|
| Regional Administrator, Greater Atlantic Region | DCES-0308 | ES | PII | 301 | C |
| | Enter:  M - Manager  S - Supervisor  A - All others ▶ | | | | |
| Agency, Bureau, Division | Enter for SES:  1 - General  2 - Career Reserved ▶ | | | | 1 |
| National Oceanic and Atmospheric Administration National Marine Fisheries Service | Geographic Location (City, State) | | | | |
| | Gloucester, MA | | | | |

### III. INFORMATION ABOUT THE INDIVIDUAL

If the position is vacant, enter "V" ▶

| A. Name *(Last, First, Middle Initial)* | | Sex | |
|---|---|---|---|
| Pentony, Michael | | M - Male  F - Female ▶ | M |

B. Current or Proposed Pay Rate, Grade, or Salary *(Enter pay plan at right)*  ▶ [E] [S]

1 - Grade if graded pay system *(Enter EX or GS or other grade)*
- OR -
2 - Salary if ungraded pay system *(Enter ST or other salary)*    ▶ $ PII

▶ [  ]

C. Previous Pay Rate, Grade, or Salary if Different *(Enter pay plan at right)*  ▶ [Z] [P]

1 - Grade if graded pay system *(Enter EX or GS or other grade)*
- OR -
2 - Salary if ungraded pay system *(Enter ST or other salary)*    ▶ $ PII

▶ [V]

JA.164

## IV. STAFFING INFORMATION

**A. If going into a new position, where was individual recruited from** *(Enter from codes 1 to 6 at right)* ▶ `1`

| | | |
|---|---|---|
| 1 - Same bureau, same agency | 3 - Different Executive Branch agency | 5 - Outside Fed. Gov't. *(reinstatement)* |
| 2 - Different bureau, same agency | 4 - Legislative or Judicial Branch | 6 - Outside Fed. Gov't. *(not reinstatement)* |

**B. If individual left Federal service, was it through:** *(Enter from codes 1 to 9 at right)* ▶ ☐

| | | |
|---|---|---|
| 1 - Resignation | | |
| 2 - Retirement: Discontinued Service *(SES Performance)* | 4 - Retirement: Optional | 8 - Death |
| 3 - Retirement: Discontinued Service *(RIF, reorganization, transfer of function)* | 5 - Retirement: Disability | 9 - Other *(Specify)*: |
| | 6 - Termination during Probation | |
| | 7 - Reduction in Force | |

**C. If individual left Federal service, did individual plan to work for:** *(Enter from codes 1 to 9 at right)* ▶ ☐

| | | |
|---|---|---|
| 1 - State or local government | 4 - Business or industry | 7 - No employment planned |
| 2 - University | 5 - Professional *(e.g. law firm, medical)* | 8 - Unknown |
| 3 - Nonprofit organization *(e.g. foundation, union)* | 6 - Self-employment | 9 - Other *(Specify)*: |

## V. INFORMATION ABOUT SES MEMBERS ONLY

**A. Type of appointment** *(Enter from codes 1 to 4 at right)* ▶ `1`

| | | | |
|---|---|---|---|
| 1 - Career | 2 - Noncareer | 3 - Limited term | 4 - Limited emergency |

**B. Does individual have 5 years current continuous service in the civil service immediately preceding initial SES appointment?** *(Enter 1 for Yes or 2 for No at right)* ▶ `1`

**C. If employee leaves SES for another Federal position, was it a result of:** *(Enter from codes 1 to 6 at right)* ▶ ☐

| | |
|---|---|
| 1 - Voluntary change | 4 - Two less than fully satisfactory ratings in three years |
| 2 - One unsatisfactory rating | 5 - Unsatisfactory performance during probation |
| 3 - Two unsatisfactory ratings in five years | 6 - Other *(Specify)*: |

**D. If converted to a Presidential appointment with the advice and consent of the Senate, does employee elect to continue SES benefits?** *(Enter 1 for Yes or 2 for No at right)* ▶ ☐

## VI. DOCUMENTS SUBMITTED *(See instructions and place an "X" in the appropriate box(es), if attached)*

| Document | ✓ | Document | ✓ | Document | ✓ |
|---|---|---|---|---|---|
| Memorandum Justifying Request . . . . . . . . . . . . . . . | ✓ | Recruitment Plan . . . . . . . . . . . | | Position Description *(or Statement of Unclassified Duties, as appropriate)* | ✓ |
| Signed PD Cover Sheet (CD516) . . . . . . . . . . . . . . | ✓ | Evaluation Statement . . . . . . . . | | Written Notice of Reassignment . . . . . . . . . . . . . . . . . | |
| Organization and Staffing Charts *(Crosswalk if reorganizing)* | | Certification Statement. . . . . . . | ✓ | Bio/Resume/CV/Application *(with Executive Core Qualifications where appropriate)* | ✓ |
| Qualification Statement . . . . . . . . . . . . . . . . . . . . . | ✓ | Vacancy Announcement . . . . . | ✓ | Other *(Specify)*: . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Copy of Official Security Paperwork . . . . . . . . . . . . . . | | Pay Rate Analysis. . . . . . . . . . | ✓ | | |

## VII. AGENCY REMARKS AND APPROVAL

Approval is requested for the selection of Mr. Michael Pentony for the Senior Executive Service (SES) career reserved position of Regional Administrator, Greater Atlantic Region, National Marine Fisheries Service, NOAA.

| ☐ Approved | ☐ Disapproved | ☐ Let's Discuss | |
|---|---|---|---|
| Chief Financial Officer and Assistant Secretary for Administration **Ellen Herbst** | Signature | | Date |

## VIII. OER REMARKS

**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
WORKFORCE MANAGEMENT OFFICE

January 4, 2018

Michael W. Pentony
PII
PII

Dear Mr. Pentony:

Congratulations on your appointment to the "General" Senior Executive Service position of Regional Administrator, Greater Atlantic Region, ES-0301-00, within the National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), U.S. Department of Commerce (DOC), located in Gloucester, MA.  Your salary PII PII.  This appointment has been approved by the Departmental Executive Resources Board and your executive qualifications have been certified by the Office of Personnel Management Qualifications Review Board.  **Your appointment to this position will be effective on January 21, 2018 with a reporting date of January 22, 2018.  We will conduct a virtual session at 9:00 am eastern time**.

The following information pertains to changes in your salary, various benefits and the SES in general.

**BENEFITS**



**ANNUAL AND SICK LEAVE BENEFITS:**

**PROBATIONARY PERIOD:**

**FY 2018 PERFORMANCE APPRAISAL:**

PII

PII                                                              PII

**OGE 278 FILER:**

PII

**POST EMPLOYMENT RESTRICTIONS:**

PII

If you have additional questions concerning your appointment, please feel to contact me on (301) 713-6330.

Congratulations and best wishes in your new assignment!

Sincerely,

Shelita R. Aldrich
Human Resources Specialist
Executive Resources Division

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| PENTONY, MICHAEL W | PII | PII | 01/21/18 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5–A. Code **542** | 5–B. Nature of Action **CONV TO SES CAREER APPT** | 6–A. Code | 6–B. Nature of Action |
| 5–C. Code **V2M** | 5–D. Legal Authority **5 USC 3393** | 6–C. Code | 6–D. Legal Authority |
| | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| FISH MGMT OFFCR<br>15331190  FS0238 | REGIONAL ADMINISTRATOR, GREATER ATLANT<br>15326421  ES0308 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ZP | 0480 | PII | PII | PII | PII | ES | 0301 | PII | PII | PII | PII |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| PII | .00 | PII | .00 | PII | .00 | PII | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| NATIONAL OCEANIC AND ATMOSPHERIC ADMIN<br>NAT MARINE FISHERIES SERVICE<br>GREATER ATLANTIC REG<br>GREATER ATL REG FISH OFC | NATIONAL OCEANIC AND ATMOSPHERIC ADMIN<br>NAT MARINE FISHERIES SERVICE<br>GREATER ATLANTIC REG<br><br>CM 543020000000000000   PP 02 2018 |

### EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 2 | 1 – None  3 – 10–Point/Disability  5 – 10–Point/Other<br>2 – 5–Point  4 – 10–Point/Compensable  6 – 10–Point/Compensable/30% | 0  0 – None  2 – Conditional<br>1 – Permanent  3 – Indefinite | | X  YES ☐ NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| PII | 9  NOT APPLICABLE | 0  NOT APPLICABLE |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per |
|---|---|---|---|
| PII | PII | F  FULL TIME | Biweekly<br>Pay Period |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 3  1 – Competitive Service  3 – SES General<br>2 – Excepted Service  4 – SES Career Reserved | PII  E – Exempt<br>N – Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 25-0430-009 | GLOUCESTER  ESSEX  MA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

PII

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF COMMERCE | ELECTRONICALLY SIGNED BY: KIMBERLYN BAUHS<br><br>DIRECTOR, WORKFORCE MGMT OFFICE |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| CM 54 | 1424 | 01/21/18 | |

| 5–Part 50–316 | 2 - OPF Copy - Long-Term Record - DO NOT DESTROY | Editions Prior to 7/91 Are Not Usable After 6/30/93<br>NSN 7540–01–333–6238 |
|---|---|---|

# APPOINTMENT AFFIDAVITS

___Regional Administrator, Greater Atlantic Region___            ___01/24/2018___
*(Position to which Appointed)*                                  *(Date Appointed)*

___Department of Commerce___   ___NOAA___            ___Gloucester, MA___
*(Department or Agency)*       *(Bureau or Division)*    *(Place of Employment)*

I, _____ Michael W. Pentony _____, do solemnly swear (or affirm) that—

## A. OATH OF OFFICE

I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. ~~So help me God.~~

## B. AFFIDAVIT AS TO STRIKING AGAINST THE FEDERAL GOVERNMENT

I am not participating in any strike against the Government of the United States or any agency thereof, and I will not so participate while an employee of the Government of the United States or any agency thereof.

## C. AFFIDAVIT AS TO THE PURCHASE AND SALE OF OFFICE

I have not, nor has anyone acting in my behalf, given, transferred, promised or paid any consideration for or in expectation or hope of receiving assistance in securing this appointment.

_____
*(Signature of Appointee)*

Subscribed and sworn (or affirmed) before me this _24_ day of _____January_____, 2018

at _____Silver Spring_____      _____Maryland_____
        *(City)*                    *(State)*

_____
*(Signature of Officer)*

(SEAL)

Commission expires_____            Deputy Director, Workforce Mgmt.
*(If by a Notary Public, the date of his/her Commission should be shown)*            *(Title)*

Note - If the appointee objects to the form of the oath on religious grounds, certain modifications may be permitted pursuant to the Religious Freedom Restoration Act. Please contact your agency's legal counsel for advice.

U.S. Office of Personnel Management
The Guide to Processing Personnel Actions

NSN 7540-00-634-4015

Standard Form 61
Revised August 2002
Previous editions not usable

JA.169

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MAINE

 3     _____

 4  NEW ENGLAND FISHERMEN'S
    STEWARDSHIP ASSOCIATION,              CIVIL ACTION
 5

 6          Plaintiff          Docket No:  2:23-00339-JAW

 7       -versus-

 8  HOWARD LUTNIK, U.S. Secretary
    of Commerce, et al.,
 9
            Defendants
10     _____

11              Transcript of Proceedings

12

13  Pursuant to notice, the above-entitled matter came on for Oral
    Argument held before THE HONORABLE JOHN A. WOODCOCK, JR.,
14  United States District Court Judge, in the United States
    District Court, Edward T. Gignoux Courthouse, 156 Federal
15  Street, Portland, Maine, on the 29th day of October 2024 at
    10:01 a.m. as follows:

16

17  Appearances:

18  For the Plaintiff:    John Henry Thompson, Esquire
                          James Burnham, Esquire
19
    For the Defendants:   Frederick H. Turner, Esquire
20                        John G. Osborn, Esquire

21

22              Lori D. Dunbar, RMR, CRR
                Official Court Reporter
23
              (Prepared from manual stenography and
24                computer aided transcription)

25
```

```
 1                          (Open court)

 2            THE COURT:  All right.  We're here in the matter of

 3   New England Fishermen's Stewardship Association versus Gina

 4   Raimondo, which is 2:28-CV-339 [sic].  Would counsel for New

 5   England Fishermen please enter their appearances.

 6            MR. BURNHAM:  Good morning, Your Honor.  My name is

 7   James Burnham and I'm here for the New England Fishermen's

 8   Stewardship Association.  With me is my colleague John Henry

 9   Thompson.  Mr. Thompson will handle our presentation this

10   morning.

11        I also want to introduce Your Honor to two

12   representatives from our client, Jerry Leeman and Dustin

13   Colson, who are in the gallery.  Thank you, Your Honor.

14            THE COURT:  Good morning, gentlemen.  And for the

15   Secretary of Commerce?

16            MR. TURNER:  Good morning, Your Honor.  Frederick

17   Turner for the defendants, and with me today at counsel's

18   table is John Osborn from the U.S. Attorney's Office.

19            THE COURT:  Good morning.

20        So first I'd like to apologize for the delay in getting

21   to this.  This is a complicated and interesting case.  I've

22   been on the bench for 20 years, I've never had an Appointments

23   Clause case, so this was new territory for me.  And I

24   appreciate all the effort that counsel have put into these

25   memoranda.
```

1    My thought is to really cut to the chase on this.  And

2    what I mean by that is until September 25 I found this more of

3    a struggle.  But on September 25 we had the opinion out of the

4    Third Circuit by Judge Bibas called Lofstad v. Raimondo, very,

5    very similar from what I can gather to this case.  And I will

6    say that I read the opinion and I found it remarkably

7    impressive.  He is a brilliant man.  He writes extremely well,

8    very clearly, and I think in a very convincing manner.

9    So what I mean by cutting to the chase, I -- since

10    reading Lofstad I've begun to think why shouldn't I just issue

11    a concurrence and allow counsel to get up to the First Circuit

12    and see if you can get a circuit split and take it to the

13    Supreme Court.  There is -- there is a -- there are a couple

14    of aspects of Judge Bibas's opinion that trouble me, but I --

15    before I get there I want to ask counsel about -- some

16    questions about Lofstad.

17    First, the best we could determine -- we did note that

18    on September 25 -- yes, sir.

19    MR. THOMPSON:  Should I approach the --

20    THE COURT:  Well, no, I'm going to ask generally,

21    and we can go back and forth and then I'll allow you to make a

22    presentation.

23    MR. THOMPSON:  Thank you, Your Honor.

24    THE COURT:  There was an opinion issued on

25    September 25, 2024.  It was vacated the next day and then

1    replaced by only a couple of sentences in Section II, so I

2    didn't see anything in the revised opinion that was

3    particularly significant.  I am curious, and the Government

4    can answer this, about the status of <u>Lofstad</u>.  Has there been

5    a motion for rehearing filed?  Does -- has the Government

6    begun to prepare or has it filed or is it thinking of filing a

7    petition for writ of certiorari?  Has there been a motion for

8    an en banc hearing?  Where do we stand on the Third Circuit

9    case; do you know?

10           MR. TURNER:  Your Honor, as far as I know no motion

11   has been filed.  I will note that it's being handled by a

12   different attorney in our appellate section, but to my

13   knowledge no motion for rehearing has yet been filed.  The

14   decision is still under consideration by the Government.

15           THE COURT:  Okay.  Fair enough.

16       There are some factual differences between this case and

17   <u>Lofstad</u>, but they seem at least to me immaterial.  The

18   Mid-Atlantic Council has 21 members; we have 18 here in New

19   England.  The fish are different.  We've got haddock and scup.

20   I don't think the fishermen here have caught very many scup

21   here in Maine waters, but I don't think that's a difference

22   that is significant.

23       There is a difference in the plaintiffs.  In <u>Lofstad</u>

24   they were individual fishermen; here there's an association so

25   you have an issue of associational standing.  At least I

 1    didn't see, with the exception of associational standing, any

 2    material factual differences between Lofstad and this case.

 3    Does the plaintiff agree?

 4         MR. THOMPSON:  Yes, Your Honor.  We don't think

 5    there are any material factual distinctions between the two.

 6    It's just I think a pure question of law whether the Third

 7    Circuit got it right.

 8         THE COURT:  All right.  And from the Government?

 9         MR. TURNER:  Your Honor, I would -- I do not see

10    material differences, but I would point out that the process

11    by which the framework adjustments are proposed and then

12    approved by the secretary is slightly different.  We are

13    not -- unlike Lofstad, which involved fishery management plan

14    amendment.

15         THE COURT:  Right.

16         MR. TURNER:  We're in a slightly different world,

17    but as I said, I don't think that would materially alter the

18    ultimate decision-making with regards to the Appointments

19    Clause.

20         THE COURT:  To the Appointments Clause, correct,

21    thank you.

22         I mention the difference with associational standing.

23    That is a difference.  I don't know that it really is going to

24    make a difference in terms of the decision here.

25    Associational standing under U.S. v. AVX Corp., which is 962

1    F.2d 108, a 1992 First Circuit case, has three factors.  And

2    that's at page pin cite 116.

3        First, at least one member could sue in court.  Two, the

4    interests are pertinent to the group mission, which it seems

5    to me they are.  And three, neither claim nor relief requires

6    the personal participation of individuals.

7        And I -- I think it's pretty clear that two and three

8    have been met, so we go back to whether or not there's -- the

9    individuals could sue here in court.  And for that you've got

10   the three factors that are familiar to all of you, <u>TransUnion</u>

11   <u>v. Ramirez</u>, it's 594 U.S. 413, 2021, reiterating the need for

12   an injury in fact likely caused by the defendant and likely

13   addressed by judicial relief.

14       Do -- I thought the analysis of that in <u>Lofstad</u> was on

15   point here.  It seems to me that the fishermen will have

16   demonstrated that they were injured by the reduction in the

17   amount of fish they could take, that this reduction was likely

18   caused by the defendant, and that there is judicial relief

19   that they've requested.

20       I wondered, Mr. Turner, do you want to be heard on --

21   first do you think that there's a difference between -- that

22   I -- that should make a difference or a distinction that

23   should make a difference with <u>Lofstad</u> because it's an

24   associational standing matter as opposed to what was in

25   <u>Lofstad</u>?

1          MR. TURNER:  No, Your Honor, not with respect to the

2     difference between the plaintiffs, no.

3          THE COURT:  All right, thank you.

4          So let's then turn to the heart of <u>Lofstad</u>.  And I have

5     to say I was deeply impressed by Judge Bibas's pulling out of

6     the sky this pocket veto concept which I had not thought of.

7     I thought it's really brilliant, and I think it's not only

8     innovative but an accurate way to think about what the council

9     can do here.  And he -- he -- he focused on three issues that

10    he said were subject to the pocket veto.  And the first was

11    who can fish and the second was delegation to the state and

12    the third was repeal.

13         The question -- and this is the one point that troubled

14    me in terms of just writing a quick concurrence -- the who can

15    fish is clearly raised by the plaintiffs.  No question about

16    that.  You've raised it in your memoranda.  You raised it in

17    your complaint.  You noted, for example, that who can fish and

18    the way it's been devised by the council has had an impact on

19    the ability of younger members of the population to engage in

20    fishing.  You allege at least that the way the regulations

21    have been promulgated by the council in effect causes small

22    businesses and fishermen to be at an economic disadvantage to

23    larger corporations, and there's been a sea change in who is

24    doing the fishing from individual fishermen to large

25    corporations.  So I think the who can fish has been properly

```
 1      raised by the plaintiffs.

 2           I'm less convinced that either of the other two pocket

 3      veto issues have been raised by the plaintiff.  And what I

 4      mean by that is this:  That I can as a federal judge make

 5      rulings that matter, but I can't make rulings that don't

 6      matter.  I can't issue advisory rulings.

 7           And with due respect to the Third Circuit, I'm -- I'm

 8      not sure that I should reach both the delegation to the state

 9      issue, which is -- I don't think there's any allegation that

10      the council has actually delegated something to the state

11      that's a factual issue before me.  So that causes me concern

12      that on that issue I may be issuing an advisory ruling, which

13      I don't think the Constitution allows.

14           The second is this:  And that's the other issue they

15      address was the repeal.  But I don't think the issue of repeal

16      has been factually placed before me either.  I may be wrong on

17      that but I didn't see it.

18           So if neither of these issues is factually before me, my

19      concern is whether -- whether I'm not issuing effectively an

20      advisory ruling on those issues and I should defer -- I mean,

21      if -- if I adopt the meat here, which is that the council

22      are -- members are principal officers and, therefore, subject

23      to the Appointments Clause, then it's a small step to

24      forbidding delegation, if in fact there is a delegation.  But

25      if there's never a delegation the issue never will be reached.
```

 1    And the other -- the same thing would be applicable to

 2    appeal -- to repeal, excuse me.

 3         The one question I had about that was a comment that I

 4    saw in Lofstad which struck me as unusual because it may be a

 5    variant of the standing rule, and if it's a variant of the

 6    standing rule it's also a variant of the advisory -- it may

 7    well be a variant of the advisory opinion rule.  And that is

 8    he says a litigant need not show direct harm to challenge the

 9    Appointment Clause, and he cites a Third Circuit case to that

10    effect.

11         Well, that seems to me to be a little different.  If you

12    don't need direct harm in order to challenge a constitutional

13    clause and that's unique to the Appointments Clause, which

14    is -- it may be, then that may allow me to reach further and

15    issue opinions that I otherwise would not have issued since it

16    is a facial attack on the Appointments Clause itself.

17         So, anyway, those were the concerns I had.  I don't want

18    to step on counsel's presentations.  But I -- I really -- I

19    looked carefully at Lofstad.  I'm very impressed with it.  I'm

20    really -- it's a great opinion in my view.  And I'm inclined

21    to adopt it with the concerns that I've raised here.

22         So with that sort of introduction, Mr. Burnham, do you

23    want to be heard?

24              MR. BURNHAM:  Mr. Thompson, yes.

25              THE COURT:  Oh, Mr. Thompson's going to be heard,

```
 1       thank you.

 2                MR. THOMPSON:  Yes, Your Honor.

 3            Thank you, Your Honor, may it please the Court, I'm

 4       happy to talk about Lofstad right off the bat if that's better

 5       for Your Honor and try to address your concerns about it.

 6            First of all, we -- I'm seconded on my admiration for

 7       Judge Bibas, and I do think there are aspects of the opinion

 8       that are spot on.  I think the standing analysis is spot on,

 9       and I think his analysis of the -- what he calls the pocket

10       veto provisions, what we called in our briefs the unreviewable

11       powers of the council, is also spot on.  I think those things

12       are both correct.  But I will have to quibble with two other

13       aspects of his analysis.

14            First, his conclusion that the council's role in

15       promulgating regulations is insignificant.  We very much

16       disagree with that conclusion and with his severability

17       analysis, and we'll get to those in a minute.  But I first

18       wanted to address your concern about advisory opinions and

19       what's before the Court and what isn't.

20            First of all, on the citation to the Third Circuit case

21       Cirko about not having to show harm --

22                THE COURT:  Right.

23                MR. THOMPSON:  -- I think what that Third Circuit

24       opinion is about is that a plaintiff doesn't have to show that

25       a properly appointed official would have done something better
```

 1          for the plaintiff, right?

 2                   THE COURT:  I see.

 3                   MR. THOMPSON:  So our clients don't have to show

 4          that if this council was staffed by people who were properly

 5          appointed that they would have let us fish for more haddock.

 6          That's not required.  We don't view it as saying that there is

 7          no harm requirement at all, right?  You do have to be harmed

 8          by some kind of government action to sue, but the Government

 9          doesn't dispute that our members are harmed by the thing we

10          have challenged, which is the final rule.

11               So what also is going on here -- and there is something

12          unique to the Appointments Clause in this respect.  And I

13          would point you to Freytag, and I would point you to 501 U.S.

14          at 882.  And in Freytag you had these special tax judges.

15          Sometimes they had final decision-making authority; other

16          times they did not.  The case at issue they did not.  And the

17          Court said they're still officers, but the Court also said in

18          some cases they do have final decision-making authority.  And

19          so even if they weren't officers with respect to your case

20          they're still officers.

21               And it explained -- and the Government said whoa, whoa,

22          you don't have standing, the plaintiffs don't have standing to

23          get you to write an opinion about whether they're officers in

24          this other context.  And the Court expressly rejected that

25          kind of power-by-power approach to whether someone is an

1    officer of the United States.  And what the Court said is the

2    standing argument is beside the point.  Special trial judges

3    are not inferior officers for purposes of some of their duties

4    but employees with respect to other responsibilities.

5            THE COURT:  Makes sense.

6            MR. THOMPSON:  The fact that an inferior officer on

7    occasion performs duties that may be performed by an employee

8    does -- not subject to the clause does not transform his

9    status under the Constitution.

10       So there is something unique going on here, which is

11   Freytag tells us very clearly, when you're trying to figure

12   out whether someone is an inferior officer or an employee or

13   just an officer or employee, you have to look at the full

14   scope of their authority, right?

15       So, yes, there is a harm component.  Did the thing the

16   officer did here harm my client?  Yes.  But the legal

17   question, the merits question is, is the person who took that

18   act validly appointed as an officer of the United States.  And

19   for purposes of that question we have to widen the lens a

20   little bit.  We think you actually don't have to do that here

21   because, as we said, we disagree with Judge Bibas's first

22   conclusion, which is that the council's role in developing

23   regulations is insignificant.

24           THE COURT:  Well, he says basically, as I recall

25   what he said, the -- the power to propose -- there are three

13

1    issues -- there were four issues actually here that he

2    discussed, and the first was the power to propose plans and

3    amendments.

4             MR. THOMPSON:  Yep.

5             THE COURT:  And then the -- another one was this

6    emergency regulation.  And he said with regard to the power to

7    propose plans and amendments, fishermen in that case basically

8    said, well, the law limits the secretary's rejection to a

9    legal basis, basically, they have to state a legal basis and

10   that's too narrow.  The secretary should have the right to

11   disagree as a matter of policy as opposed to just statute.

12   And the Government came back and said, well, we agree.  They

13   have a broader power.  And so based on -- it was based on that

14   concession that the Court agreed with the Government.  Once

15   the Government says we agree in the Third Circuit, they have

16   to say they agree here.  Right?

17            MR. THOMPSON:  Yes, Your Honor, I would think so.

18   I -- I do -- but I think that Judge Bibas -- I think he simply

19   got this part of his analysis wrong, frankly.  I mean, so

20   there's two issues here.  First is what the act provides and

21   the second is what are the constitutional implications of

22   that.

23            On the question of what the act actually does, you're

24   right, he just accepted what the Government said, but with

25   respect that is not how constitutional avoidance principles

JA.182

1    work.  You have to first interpret the text.  And if you find

2    an ambiguity and if you find that the Government's answer to

3    the ambiguity is plausible, then you may accept the

4    Government's reading to avoid the constitutional problem.  But

5    Judge Bibas didn't run through any of that analysis, and we

6    think if you do run through it you'd come out our way.

7        The act is very clear that, when the council submits a

8    plan or an amendment or a regulation, the secretary has one

9    job.  It is to review it for, quote, consistency with the act

10   and other applicable law.  That is not the same as do whatever

11   you want, reject it on any ground.  Congress knows how to

12   write things like that.  I think they've written it elsewhere

13   in this very act, right?  So when the secretary is exercising

14   her own authority to develop a plan or regulation, the council

15   has a very different job.  They simply submit comments which

16   the secretary considers.  So I think that textual variation

17   explains that this is very different.

18       So we strongly disagree with the notion that it is kind

19   of plenary de novo review by the secretary and she can do

20   whatever she wants.  But even if it was, that would not change

21   the constitutional answer, and we know that from Lucia and

22   Freytag, right?  So in Lucia you had an Administrative Law

23   Judge who was improperly appointed.  The Administrative Law

24   Judge developed the factual record and issued what the reg and

25   the statute called an initial decision on the issue.  The SEC,

1    which no one alleged was unlawfully appointed, reviewed it de

2    novo and affirmed.  And the Supreme Court had no trouble

3    saying, yeah, the ALJ is still an officer and we're still

4    going to vacate the whole kit and caboodle and give you a redo

5    in front of someone who's properly appointed.

6        And they went out of their way -- Justice Sotomayor in

7    dissent said, that's wrong.  You have to have final

8    decision-making authority to be an officer.  And Justice

9    Kagan's opinion specifically says that's wrong.  Final

10   decision-making authority is not the sine qua non of officer

11   status.  That's in Lucia.

12       So with respect to Judge Bibas on this portion of the

13   opinion, I don't think he grappled with what the text of the

14   act actually says, and I also think he doesn't deal with the

15   constitutional implications either way.  Even if the secretary

16   has very broad authority, which again we disagree with, but

17   even if she does, they have not materially distinguished it

18   from the situation in Lucia.  And any distinctions between the

19   two cases I think cut in our favor, because the ALJ in Lucia

20   was developing the factual record and issuing an initial

21   reviewable decision in a case that involved one person, one

22   retrospective adjudication.  The council does effectively the

23   same thing for an entire industry across five states, right?

24       So I just -- I disagree with that portion of his

25   analysis.  And I think if you agree with us on that then you

1  don't have to worry about the other powers, what you can say

2  about them, whether they're severable, all of that.  Because

3  the thing that harmed us here is also a violation of the

4  Appointments Clause, and you can vacate the final rule on that

5  basis.

6           THE COURT:  All right.  So the other -- the other

7  two that he talked about that -- the emergency regulation I

8  take it fits in the same category because he's basically

9  saying that -- the fishermen said the council action can

10 basically force the secretary to make -- or take emergency

11 action, but he said there's no particular action.  And then he

12 pointed to the fact they have a regional administrator who

13 acts as the secretary's representative on the council, and

14 there's a requirement of unanimity on that.  So if the

15 secretary doesn't want it, which he said has been done, then

16 it's not going to get done.  Do you have a response on that?

17          MR. THOMPSON:  Yeah, so that -- we -- we have raised

18 this provision in our briefs as an example of the council's

19 unreviewable authority, and we do think it would be really

20 remarkable to say that you don't have to be appointed as an

21 officer to get together and force a cabinet secretary to

22 implement a new regulation.  Judge Bibas is absolutely correct

23 and you're correct, Your Honor; the council doesn't dictate

24 the content of what that regulation looks like, but they can

25 force the secretary to have to take some action.

```
 1          With respect to the assistant administrator, yes, the
 2     assistant administrator kind of has these two hats.
 3     Sometime -- he's always a member of the council and he's also
 4     always a member of the agency.  And so the secretary I'm sure
 5     has some kind of informal ability to try to instruct him which
 6     way to vote on these things; but as far as I'm aware there's
 7     nothing in the statute or the regulations that binds that
 8     individual to have to vote the way the secretary says.
 9          But stepping back from all that, the fact that we're
10     debating these details I think shows that these cannot be what
11     Lucia called people who are in the broad swath of lesser
12     functionaries in the Government's work force, right?  These
13     are people who are coming together to make policy decisions
14     that trigger --
15               THE COURT:  Well, he does find they're public
16     officers, no question about it.
17               MR. THOMPSON:  Yes, right.
18               THE COURT:  Without any -- and I think that's a
19     pretty convincing part of this statement.  They're basically
20     bossing around the Secretary of Commerce.
21               MR. THOMPSON:  Well, that's our view and I think
22     once you agree with that premise the -- the section from
23     Freytag I just read shows that again there's no halfway
24     officers.  You're not an officer on Monday and an employee on
25     Tuesday.
```

```
1              THE COURT:  Right, just because you're -- but just
2     because you can boss them around on some things doesn't mean
3     that you can boss them around on everything.
4              MR. THOMPSON:  Well, that's right.
5              THE COURT:  And the -- the other thing, you're going
6     to get to severability, I understand, but the idea that I'm
7     going to -- I mean, this -- this statute's been around for
8     what, 50 years.  It's very, very vital to the fisheries.
9     We've all seen what happened to cod; we're all I think
10    concerned about it.  And if I were to declare the whole scheme
11    unconstitutional it would have a profound, immediate impact on
12    the scarcity of the resource and the ability of the federal
13    government to manage it.  So I've got some concern about going
14    further than I have to.
15             MR. THOMPSON:  Yes, Your Honor, and we appreciate
16    that concern and we are not asking this Court to issue an
17    opinion that says the whole Magnuson-Stevens Act is in the
18    trash can.  That is not what we're looking for.  What we are
19    targeting is a very specific way in which the act works, which
20    is the councils cannot play this kind of first-step role in
21    this process, and any regulation that is developed by that
22    method we do think would be subject to an attack on these
23    grounds.  But there are plenty of backup ways to achieve the
24    results that the fisheries need.
25             States always have authority under 1856 and the
```

1    secretary has unilateral authority under the act, right?  For

2    instance, if the council doesn't act in a reasonable amount of

3    time then the secretary can act.  So we don't think that this

4    is pulling the plug on the whole system at all.  And, right,

5    there are problems on the other side, too, as the dissent in

6    Lofstad pointed out.

7        Once you start -- as a court start scratching off things

8    from the list of what entities can do under a statute, that's

9    also fundamentally changing the legislative bargains that go

10    into promulgating statutes.  And we talk about in our briefs

11    with the severability arguments we make, Congress was very

12    attuned to these questions of state/federal balance when it

13    was putting the councils together.  And sometimes severability

14    makes perfect sense.  We've seen this in the Supreme Court's

15    removal restriction cases, right, you'll have a whole

16    statutory scheme and you'll have this one little provision off

17    to the side that says and, by the way, this official can only

18    be terminated for cause.  And the Court has very little

19    trouble saying, you know what, we're just going to ignore that

20    and that solves the problem.

21        What I don't think they've ever done and what I think

22    Judge Bibas's opinion is the first to ever do is to take

23    someone who the Court says, yeah, they're an officer, and then

24    blue pencil out their authority until it whittles them down to

25    an employee.  And, in fact, Free Enterprise Fund expressly

1    says courts do not have the authority to do that.  You cannot

2    blue pencil an agency's authorities into making a

3    recommendatory advisory body.  So I do think that's a misstep

4    in his analysis.

5         I think the thing to do from a perspective of judicial

6    restraint is to take -- I think actually the narrower course

7    here is just to vacate this rule in an opinion that explains

8    the scope of the problem so that the agency can respond.  And

9    I think -- I would be very surprised if my friends on the

10   other side got up and said that if you rule for us the

11   secretary would all of a sudden have no ability to deal with

12   these problems.  I think they would take the opposite

13   position.  I think they would say if the council is no longer

14   functional the secretary's going to be able to do a lot more

15   on her own, right?  And that may be exactly right.

16        So I understand your concern about kind of blowing up

17   the system.  We're not asking to blow up the system; we're not

18   asking to scrap the whole act.  We're targeting a specific way

19   in which regulations are promulgated.

20             THE COURT:  Let's get to the two other things that

21   he talked about in the opinion about the power to delegate to

22   the state, and in that opinion he said that it wasn't properly

23   developed and therefore he didn't issue a ruling on that.  Do

24   you want to comment on that?  Did you raise it and, if so, is

25   it properly before me?

```
 1            MR. THOMPSON:  No, in all candor, Your Honor, we did
 2    not raise that argument.  We think it would be an example of
 3    significant authority, but we -- we did not raise the
 4    1856(a)(3)(B) power in our complaint or our briefs.
 5            THE COURT:  All right.  So then we get to the
 6    consultation requirement where it's required that before
 7    revising any regulations the secretary must consult and the
 8    council could refuse to consult, and I thought that was sort
 9    of a reach, really, because the Government basically said
10    that's not really the way it works.  The secretary must
11    solicit and if the council doesn't respond the secretary just
12    acts as a practical matter.  What do you think of that?
13            MR. THOMPSON:  So I can't speak --
14            THE COURT:  Did you raise that one as well?
15            MR. THOMPSON:  I believe we did, yes, we did.  And
16    we cited a case, Oceana v. Evans, I think in a footnote in our
17    brief where at least one time it didn't work that way where
18    the council, you know, wouldn't really cooperate.  And the
19    agency actually said in its briefs to the district court, we
20    can't do this because we can't force them to consult with us.
21    So I can't speak to how it works every time; there's at least
22    some evidence that it doesn't always work that way.  But I
23    also -- we haven't focused that much on that issue, and the
24    reason is I think we have just a fundamental disagreement with
25    the Government over how the regulations go into effect, right?
```

```
 1            I think the Government's position is you can go through

 2     this whole process, the council submits the amendment, the

 3     secretary says yep, looks good, looks consistent with law; the

 4     council submits the regulations, the secretary said yep, looks

 5     good, consistent with law.  They put it out as a rule, and

 6     they get a comment that says I don't know.  And I think their

 7     view is that the secretary can just say, oh, yeah, it's this

 8     now.  The -- the amendment said that the catch limit was going

 9     to be 80,000 pounds, but we think it should be 50 or we think

10     it should be 150 and so that's what's going into the CFR.

11            Respectfully, we just think that would make a hash of

12     the statutory scheme, right?  How it works is there has to be

13     congruency between the plan or the amendment and the

14     regulations.  That's in 1854(b), right?  So you can't have a

15     set of regulations on the books in the CFR that conflict with

16     the policy that the council has proposed and the secretary has

17     approved.

18            So we -- I think we have a bigger disagreement than the

19     kind of practicalities, but I do want to point out it's not

20     clear that the practicalities are always as clear as that.

21     But, again, I -- I'm not sure you need to opine on that --

22     on -- on that requirement here if you agree with us on our

23     arguments about the rulemaking process in general.

24            THE COURT:  All right, thank you very much.  I

25     appreciate your argument.  Well done.
```

```
 1            So, Mr. Turner, you're up.

 2            MR. TURNER:  Thank you, Your Honor.  With respect,

 3   I'll start with Lofstad since that's where the Court's

 4   primarily focused.

 5            THE COURT:  Sure.

 6            MR. TURNER:  We'll start by saying that we agree

 7   that the opinion in large part got it right, that Judge Bibas

 8   issued a reasoned decision in the case.  We do have some

 9   disagreements with the outcome, in particular with the three

10   provisions that you referenced earlier on.  But I do want to

11   point out that we think that the -- the reading is not just

12   simply the -- the reading put forward by the Government in the

13   opinion where the judge -- where the Third Circuit's talking

14   about the process by which councils are submitting plans or

15   submitting proposed regulations.  The Court talked about that

16   being a reasonable reading.  So it's not simply the

17   Government's reading.

18            THE COURT:  Okay.

19            MR. TURNER:  It was deemed to be a reasonable

20   reading.  And we think that is a warranted finding, because of

21   the way that the structure of the statute is set up, Congress

22   intended to draw a stark contrast in our view between the role

23   of the secretary who wields the authority in the statute and

24   the council on the other hand, which does not wield any

25   significant authority.
```

```
 1          If I could turn to those three provisions.
 2          THE COURT:  Sure, that would be great.  So the first
 3     one is who can fish, which was raised by the --
 4          MR. TURNER:  Right, I think on the -- I'd like to --
 5     all three of those but starting with that one, none of those
 6     provisions are at issue in this particular rulemaking, so I
 7     wanted to make that point because I think it -- it may go to
 8     the remedy that the Court can provide if the Court reaches a
 9     decision in plaintiff's favor.
10          I should note that we don't -- we don't view -- we view
11     provisions that are outside the scope of the challenged action
12     to be reviewable by the court in the sense that courts looking
13     at Appointments Clause challenges can look beyond specific
14     provisions that may have been raised by the rulemaking.  But
15     we do -- I do want to point out that none of these three are
16     at issue in the rule that promulgates framework 65.
17          THE COURT:  Well, so this is the way I think about
18     what you just said, and that is where you have this really
19     drastic reduction, particularly in haddock, it can't -- the
20     impact of that can't be divorced from the impact on who can
21     fish.  Because it seems to me that if you reduce the catch
22     limits by that -- to that extent that you are effectively
23     foreclosing new entrants, for example, into the fisheries.  So
24     I -- I'm not sure that there isn't a direct connection between
25     catch limits and who can fish.  Do you want to be heard on
```

1   that?

2           MR. TURNER:  Yes, a couple responses, Your Honor.

3   The first is I do want to point out that there were reductions

4   for some of the catch limits, but there were also increases

5   for some of the other stock.  So my understanding is that

6   eight stocks decreased in catch limit size while eight stocks

7   were increased.

8           THE COURT:  Yeah, I'm not --

9           MR. TURNER:  That being said --

10          THE COURT:  To me that's -- the question is whether

11  or not they have the power either to increase or decrease to

12  begin with.

13          MR. TURNER:  Right.  So my second point is that the

14  particular provision is 1854(c)(3), and it talks about

15  establishing a limited access system.  And I think there may

16  be some generalization from that specific provision to the

17  Third Circuit's description of who can fish.  And so I think

18  that's an important distinction.  We don't have -- in this

19  final rule that's at issue in this case, we do not have

20  1854(c)(3) and the -- and the establishment of a limited

21  access system being challenged.

22          So I do -- I think that's where I'm going to draw the

23  distinction.  We have a -- we have a -- yes, I agree that if

24  you're looking at it through the more general lens that the

25  Third Circuit applies of who can fish then, yes, we do have I

1      think a question in this case because of the catch limits.

2      But I think if you look at the actual -- the specific

3      subsection of the statute, it is about limited access systems,

4      and that is not at play in our case so I just point that out.

5              THE COURT:  Thank you.

6              MR. TURNER:  The other two, I agree that those --

7      those also have not been -- in part 1856, as you mentioned,

8      has not been raised by plaintiffs, but it's also not at issue

9      in the rule, nor is 1854(h).  There's been no repeal or

10     revocation of the relevant fishery management plan.

11         So I don't -- from the Government's perspective really

12     none of those are at play, and even if the first one is we

13     would submit that if the -- if the Court is -- shares the

14     concerns that the Third Circuit shared that the outcome would

15     be an appropriate outcome here, that is, if the Court were to

16     sever that provision from the statute, that would be an

17     acceptable outcome for the Government, as it was in -- in

18     Lofstad.

19              THE COURT:  All right.

20              MR. TURNER:  I wanted to talk about, as I said,

21     the -- the statute contemplates a stark contrast between the

22     Secretary of Commerce and the council.  And during opposing

23     counsel's comments Your Honor referenced the vital role that

24     the -- the councils play but also that the statutory scheme as

25     a whole plays.  And I did want to drill down a little bit on

1    that idea and underscore that the council plays a very

2    important advisory role.  And I think this was on Congress's

3    mind when it set up the statute.  It wanted to make sure that

4    where local and regional interests could be affected by

5    fisheries and fishery management and fishery regulation, it

6    was important to have a local voice --

7              THE COURT:  Right.

8              MR. TURNER:  -- on the council.  So --

9              THE COURT:  It's an interesting interplay and, you

10   know, I've -- sort of applaud Senator Magnuson for being so

11   inventive here because it's an interesting -- I don't think

12   I've seen another statute quite like this where you have a

13   federal umbrella that is really protecting their -- sitting

14   under the umbrella are state entities were represented.  It's

15   an unusual circumstance but the -- anybody who's aware of what

16   goes on in the Gulf of Maine knows that the fishermen from

17   Massachusetts don't necessarily always agree with the

18   fishermen from Maine.  And this is a way to try and bring

19   everybody together to formulate something that's in best

20   interest for both groups.

21             MR. TURNER:  Yes, I agree, Your Honor, and I think

22   the -- if you look at the nature -- it is unusual.  If you

23   look at the nature of the resource, I think you start to see

24   why Congress thought that this would be an appropriate

25   approach.  You see the -- the resource itself, the fish, of

```
 1    course not -- not recognizing boundaries between state and
 2    federal waters.
 3             THE COURT:  Right.
 4             MR. TURNER:  And differences between regions,
 5    wherever you are, whether on the east coast, the Gulf, or the
 6    west coast, differences in the stocks that are being managed,
 7    different types of fishing, different gear.  And built into
 8    the structure of the statute is an ability to have differences
 9    at this regional level and to have that voice heard.  If you
10    look at the -- even in the record of -- in our case the
11    administrative record, if you look at the statements put
12    forward by the council members who are appointed by the
13    secretary, you see a diversity of views, recreational
14    fishermen, commercial fishermen, fishery biologists, a
15    nonprofit organization representative.
16             THE COURT:  So all that's great but the -- and we
17    can say -- we can applaud the federal government for being
18    inventive in this and figuring out a way to rationalize
19    differing viewpoints and including the states.  The difference
20    here, though, is how it's done.  And the -- what is -- based
21    on your descriptions of the Third Circuit case here, I -- I
22    want to be clear exactly what you're telling me the
23    Government's position is.
24             Are -- to what extent do you -- you said you agree, you
25    thought he got it right in certain ways, and you disagree in
```

1    other ways.  But I want it clear what you're telling me you

2    think they got right in the Third Circuit and what they got

3    wrong.  Because if you tell me they got something right I'm

4    going to treat that as a concession.

5            MR. TURNER:  Understood, Your Honor.  I think if you

6    look at the part of the opinion where the -- where the Court

7    talks about the -- the significant authority of the secretary

8    on the one hand and the lack -- or more importantly the lack

9    of authority on the part of the council, the discussion on the

10   proposal of fishery management plans in particular, and then

11   the process by which the secretary then approves those plans,

12   I think the discussion on a couple of the other provisions

13   that you asked about earlier, there's the emergency regulation

14   provision, we think that that was properly adjudicated in the

15   case.

16        I do want to point out a slight variation and make sure

17   that the Court is aware of a distinction between two

18   subsections of the emergency regulation rule.  One is

19   1855(c)(2)(A) which the Court addressed in that case.  That's

20   a scenario in which the council votes unanimously for an

21   emergency measure to be implemented, and in that scenario

22   there is more mandatory language on -- in terms of what the

23   secretary has to do in response.

24        There's another provision that follows it,

25   1855(c)(2)(B), and that's a scenario in which there's a less

1    than unanimous vote, and that's what we have in our case,

2    actually.  We have not just the catch limits.  We have an

3    emergency regulation that was put into place at the request of

4    the council.  It was not a unanimous vote.  There is a

5    practice on the part of the National Marine Fisheries Service

6    to have the regional administrator, who does sit as part of

7    the council, to vote no.

8            THE COURT:  Is that just a majority vote?

9            MR. TURNER:  The -- in our case was it a --

10           THE COURT:  Well, no, is -- the requirement is

11   unanimous in that first subsection.  What is the requirement?

12   Is it just a majority vote in the second?

13           MR. TURNER:  Oh, the second provision simply states

14   that if it's less than unanimous then the secretary may go

15   forward, as opposed to the secretary shall move forward.

16           THE COURT:  Okay.

17           MR. TURNER:  So it's a less than unanimous vote

18   which -- which the secretary through the regional

19   administrator can ensure by simply voting no, and that's what

20   happened in our case.  So we believe that that -- but despite

21   that difference we believe that the Third Circuit was correct

22   in that analysis.

23       The points of disagreement are with the -- the three

24   provisions that the Court viewed as essentially pocket vetoes.

25   That's where we continue to have a disagreement for a variety

1    of reasons, one of which is that there are very limited

2    applicability.  In fact, the -- DOJ has discussed with agency

3    counsel in particular but also staff at the agency and is not

4    aware of any time that any of those provisions has been -- has

5    led to effectively a veto, as the Third Circuit calls it, in

6    the five decades that the statute's been around.

7              THE COURT:  Right.

8              MR. TURNER:  But nonetheless if the Court --

9              THE COURT:  The problem with that is that if -- if

10   the power is there, even not exercised, it can have an

11   influence.

12             MR. TURNER:  The other point I would make -- I

13   understand that, Your Honor, I -- I take that point.  The

14   other -- an alternative view would be also to look at there's

15   case law on the question of limited concurrence, in other

16   words, if a -- if a body or an actor has the ability to --

17   if -- if the -- an agency's decision-making is conditioned on

18   an outside body's vote, for example, I would point the Court's

19   attention to Currin v. Wallace.  This was a case more about

20   nondelegation, which we cited in that portion of the brief,

21   but I think it speaks to the same principle.  And in that case

22   the Secretary of Agriculture could not take an action without

23   first obtaining two-thirds approval from tobacco growers.  And

24   those -- clearly outside the -- outside the government.  And

25   the Court decided that that was not delegating the sovereign

```
 1    authority of the Government to the tobacco growers.

 2         So I think there is some case law that could be leaned

 3    on in finding that even these scenarios where there's a

 4    limited condition or a concurrence from the council, it still

 5    doesn't mean that significant authority has been conferred.

 6    And I think that's an important distinction.  It's not

 7    simply -- it has to be significant authority.

 8              THE COURT:  Right.

 9              MR. TURNER:  Not just a little bit of authority.

10              THE COURT:  Right.  Well, that's what Judge Rendell

11    concluded.

12         What do you think -- if I agree with the majority, why

13    don't you talk a little bit about severability.

14              MR. TURNER:  Your Honor, we think that the

15    severability approach is consistent with the Supreme Court

16    case law.  I think I would point the Court's attention to

17    Arthrex in particular.  I have the pin cite, 594 U.S. 23, and

18    that's a case where there was a -- found to be an Appointments

19    Clause issue, and the Court was able to address it by

20    essentially severing off the problematic provision.

21         So I would push back on plaintiff's position regarding

22    Freytag as the -- as a sign here that the Court is somehow --

23    it's -- the hands are held or tied by the decision in that

24    case where you would have -- the Court would have to vacate or

25    essentially undo the -- all of the provisions.
```

```
 1              THE COURT:  Can a -- can a principal officer be a

 2     principal officer for some purposes and a functionary for

 3     others?

 4              MR. TURNER:  Well, I think -- I think that would be

 5     consistent with the Arthrex decision, yes, I think you could

 6     have a scenario.  We don't see it that way in this context, of

 7     course, but I think you could have a scenario where the --

 8     some of the powers were deemed to be problematic.  And -- and

 9     if you have a scenario like ours where it can be -- those

10     problematic provisions can be severed, then I -- then I think

11     it's an entirely reasonable and acceptable approach.

12              THE COURT:  All right.  Very good.  Anything

13     further?

14              MR. TURNER:  Let me check.  I would just -- the last

15     thing I want to point out, Your Honor, is that there is

16     significant activity on the part of the secretary throughout

17     the process, and this is just to push back on the idea that

18     the secretary, acting through the National Marine Fisheries

19     Service, is simply a rubber stamp.  There is from the

20     beginning participation on the part of the National Marine

21     Fisheries Service and the council, of course the regional

22     administrators on the council, but there is significant back

23     and forth.

24              This case is a great example of that.  The record shows

25     that when the council had prepared the preliminary framework
```

1    it was submitted to the National Marine Fisheries Service,

2    which in turn sent comments back to the council, the council

3    incorporated the comments, and then the final rule was

4    presented -- I'm sorry, the final framework was presented to

5    the agency.

6          And so at every step we have significant participation

7    on the part of the secretary.  And then when you get to the

8    process contemplated by the statute, 1854(a) in particular,

9    you see the secretary exercising a significant amount of

10   discretion.  And here I would just point out the First

11   Circuit's decision in Lovgren v. Locke, which talked about the

12   wide discretion that's granted to the secretary in making sure

13   that the rules or the plans or the amendments or the framework

14   that they are -- I'm sorry, this only applies to the fishery

15   management plans, that they are consistent with the national

16   standards, and there are ten national standards with a lot of

17   substance.

18              THE COURT:  Right.

19              MR. TURNER:  So I just wanted to make that final

20   point.

21              THE COURT:  Very good.  Thank you very much,

22   Mr. Turner.  I appreciate it.

23          Mr. Thompson, anything further?

24              MR. THOMPSON:  Yes, Your Honor, a few points on

25   rebuttal, if I may.

```
 1                 THE COURT:  Sure.
 2                 MR. THOMPSON:  I'll try to keep this brief.  There
 3       was a lot in there I didn't talk about the first time, so I'll
 4       try to address a few of them.
 5            First, on the inventive nature of the way the council
 6       works, the inventiveness is okay but what the Appointments
 7       Clause and Article II more broadly address --
 8                 THE COURT:  I got it.
 9                 MR. THOMPSON:  -- is that accountability is
10       essential.
11                 THE COURT:  Right.
12                 MR. THOMPSON:  And the problem that our client has
13       is that when they go before the council no one there is
14       politically accountable to them, and that's especially true
15       because state officials pick these guys, right?  So if I'm the
16       fisherman from Maine and a big chunk of the council is
17       effectively selected by the governor of Massachusetts and
18       those guys are making rules that affect my livelihood, that is
19       a fundamental distortion of how the federal government is
20       supposed to operate.  You can't have state officials making
21       decisions that affect outside their border.
22                 THE COURT:  Well, that's precisely what the Third
23       Circuit described in great detail, I think.
24                 MR. THOMPSON:  Right.  Second, Your Honor --
25                 THE COURT:  That's the whole purpose of the
```

1        Appointments Clause basically.

2               MR. THOMPSON:  Right, exactly.  Second, Your Honor,

3        my friend on the other side talked a lot about what he calls

4        the stark contrast between the role of the councils and the

5        role of the secretary.  Respectfully, the Appointments Clause

6        is not a comparative exercise.  You don't look at the power

7        that one individual has and compare it to the power another

8        one has.  And there was a stark contrast in <u>Lucia</u>, too.  The

9        ALJ had no power to issue a final decision.  Justice Kagan's

10       opinion says that the ALJ's decision had no effect unless

11       approved by someone else.  That's exactly the same here, so

12       they cannot rely on that.

13          And they also say, well, the secretary's not a rubber

14       stamp.  Again, that doesn't matter, as long as the council is

15       undertaking the indispensable first step in a multistage

16       decision-making process that is on all fours with <u>Lucia</u>, and I

17       have still not heard any answer to that from the Government.

18          Next, on the pocket veto provisions, the -- they didn't

19       develop any defenses of these provisions on their own.  They

20       just said they're not part of the case, they're not in the

21       case, you don't have to worry about them.  And respectfully I

22       think <u>Freytag</u> tells us that's not correct, which brings us to

23       severability and <u>Arthrex</u> briefly.

24          <u>Arthrex</u> is a completely different case, and I think we

25       have to start with the language in <u>Free Enterprise Fund</u> that I

1    quoted earlier, this is 561 U.S. at 509 through 10, and it

2    says the legislature, not the judiciary, has the editorial

3    freedom to blue pencil a sufficient number of the board's

4    responsibilities so that its members would no longer be

5    officers of the United States.

6        So the Government says, well, _Arthrex_ basically got

7    wiped out but it didn't.  _Arthrex_ is a situation where you

8    have an official who everyone agrees was properly appointed as

9    an inferior officer, right, so they're not void ab initio,

10   they have some government authority, and there's one provision

11   that makes them a principal officer, and that is this

12   restriction on review of their decisions.  And so the Court I

13   think quite reasonably said, if we scratch that out, if we

14   ignore that going forward, it solves the problem.

15       Here it's very different for the reasons I talked about

16   earlier, which are there's not a review provision you can just

17   get rid of.  You would have to go through and change the

18   substantive authority that the council has.  And unlike in

19   _Arthrex_ the council members are not properly appointed to

20   anything.  The Government has offered no defense of their

21   appointment mechanisms as applied to even inferior officers.

22   So unlike in _Arthrex_, where there was this underlying initial

23   decision that everyone agreed was fine and valid because they

24   had a proper appointment to an inferior office, here you don't

25   have that.  So _Arthrex_ can't save the day.

1      Our view is that the council members have zero authority

2 to undertake any official actions on behalf of the federal

3 government because their appointment mechanisms do not comply

4 with Article II.  Thank you, Your Honor.

5      THE COURT:  Thank you very much.

6      Mr. Turner, any surrebuttal?

7      MR. TURNER:  Thank you, Your Honor.  I think I'll

8 just make one point, one final point, and I think that goes to

9 the question of significant authority and this idea in -- in

10 the plaintiff's briefing you see this phrase of it's not a

11 zero sum game in -- in the scenario where two bodies, the

12 secretary and the council, could both have significant

13 authority potentially.  But we submit that in this case under

14 this statute it is a zero sum game, it is more of a binary

15 situation where the secretary is the one exercising that final

16 decision-making authority.

17      And I would submit that the significant authority,

18 although as you look at the case law over the last several

19 decades is usually cabined to that term, is two-word terms,

20 significant authority has a long history.  And it goes back

21 to -- as far back as 1822 there was a decision actually by the

22 Supreme Judicial Court of Maine in which the Court talked

23 about the legal power being one that in its effects will bind

24 the right -- rights of others.  And this was a -- a case that

25 was cited in the Office of Legal Counsel's opinion which we

1    cited in our brief on officers within the Appointments Clause

2    of the Constitution.  And I think it gets to this idea that

3    the question is who has the final decision-making authority.

4    And our answer is it's the secretary.

5         THE COURT:  All right.  Thank you both very much.

6    This is a well-presented and well-argued case.  I hope you --

7    I'll issue a decision, and I hope you enjoy your time in the

8    First Circuit.  Thank you.

9         (Time noted:  10:59 a.m.)

10         **C E R T I F I C A T I O N**

11   I, Lori D. Dunbar, Registered Merit Reporter, Certified

12   Realtime Reporter, and Official Court Reporter for the United

13   States District Court, District of Maine, certify that the

14   foregoing is a correct transcript from the record of

15   proceedings in the above-entitled matter.

16   Dated:  March 13, 2025

17         /s/ Lori D. Dunbar

18         Official Court Reporter

19

20

21

22

23

24

25

**CERTIFICATE OF SERVICE**

I certify that on June 4, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system.    Counsel for Defendants-Appellees / Cross-Appellants are registered CM/ECF users and will be served by the CM/ECF system.


Dated:  June 4, 2025                    */s/ John M. Gore*
                                        John M. Gore
                                        *Counsel for Plaintiff-Appellant New*
                                        *England Fishermen's Stewardship*
                                        *Association*