Nos. 25–1212, 25-1213

_____

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

NEW ENGLAND FISHERMEN'S STEWARDSHIP ASS'N,
*Plaintiff-Appellant*,

v.

HOWARD LUTNICK, in his official capacity as Secretary of
Commerce; EUGENIO PIÑEIRO SOLER, in his official capacity as
Assistant Administrator for Fisheries, National Marine Fisheries
Service; NATIONAL MARINE FISHERIES SERVICE; SAMUEL
D. RAUCH, III, in his official capacity as Deputy Assistant
Administrator for Regulatory Programs, NMFS,
*Defendant-Appellees; Cross-Appellants*.

_____

Appeal from the United States District Court
for the District of Maine
Civil Action No. 23-00339 (Hon. John A. Woodcock, Jr.)

_____

## FEDERAL DEFENDANTS' PRINCIPAL & RESPONSE BRIEF

_____

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

THEKLA HANSEN-YOUNG
DANIEL HALAINEN
JOHN E. BIES
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

Federal Defendants believe that oral argument would be useful to the Court given the significant and complex questions these appeals raise regarding the Magnuson-Stevens Fishery Conservation and Management Act and the Appointments Clause of the U.S. Constitution.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ........................................................ v

RELATED CASES AND PROCEEDINGS ..................................... xv

GLOSSARY ............................................................................ xvi

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 4

STATEMENT OF THE ISSUES ................................................. 5

PERTINENT CONSTITUTIONAL PROVISIONS
    AND STATUTES ................................................................ 7

STATEMENT OF THE CASE ................................................... 8

    A.   Legal background ..................................................... 8

        1.   The Magnuson-Stevens Act .......................... 8

            a.   The role of the Secretary and the
                Regional Fishery Management
                Councils ................................................. 9

            b.   Fishery Management Plans ................. 10

            c.   Binding fishery regulations ................. 12

        2.   Delegation of the Secretary's Magnuson-
            Stevens Act authorities ................................ 14

    B.   Factual background ............................................. 15

1.  The Northeast Multispecies Fishery Management Plan ......................................... 15

2.  Framework Adjustment 65 and the Final Rule ................................................................. 17

C.  Proceedings below ...................................... 19

SUMMARY OF ARGUMENT .......................................... 21

STANDARD OF REVIEW .................................................. 26

ARGUMENT ........................................................................ 27

I.  Regional Councils do not exercise significant federal authority in the Magnuson-Stevens Act's structured recommendation process. ................................................ 28

A.  The Magnuson-Stevens Act gives the Secretary final word on fishery management plans and exclusive authority to promulgate regulations. ................... 28

1.  The Act does not limit the Secretary's review of proposed fishery management plans. ............................................................. 28

2.  The Secretary would still retain ultimate discretion over fishery management plans even if his review were limited to consistency with the National Standards and applicable law. ........................................ 33

3.  The Secretary has exclusive authority over the terms of binding fishery regulations. ................... 36

B.  The Magnuson-Stevens Act assigns Regional Fishery Management Councils only an advisory role. ......................................................................... 39

C.    Council members are not officers of the United States. ........................................................... 44

D.    The Court must construe any ambiguity in the Magnuson-Stevens Act to avoid constitutional doubt. ...................................................................... 59

II.    NEFSA cannot rely on two rarely invoked ancillary provisions that played no role in the challenged agency actions. .................................................................. 63

A.    NEFSA lacks standing to raise constitutional concerns about statutory provisions unrelated to the challenged agency actions. .............................. 63

B.    Severance would resolve any constitutional issue potentially raised by the two rarely invoked ancillary provisions NEFSA cites. .......................... 66

III.    NEFSA is not entitled to relief against the Final Rule. ................ 75

A.    Provisions the Court construes to unambiguously empower Council recommendations to restrict the Secretary's policy discretion should be severed. ................... 75

B.    NEFSA has not shown any injury resulting from any constitutional infirmity in Regional Councils. ............. 78

C.    NEFSA's removal claims are not relevant here. ................. 81

CONCLUSION ........................................................................ 86

CERTIFICATE OF COMPLIANCE ................................................. 87

CERTIFICATE OF SERVICE .......................................................... 88

ADDENDUM ........................................................................... 1a

iv

# TABLE OF AUTHORITIES

## Cases

*Alaska Factory Trawler Ass'n v. Baldridge,*
  831 F.2d 1456 (9th Cir. 1987)...................................................38, 57, 58

*All. Against IFQs v. Brown,*
  84 F.3d 343 (9th Cir. 1996).............................................................35

*Allen v. Wright,*
  468 U.S. 737 (1984) ...................................................................64, 65

*Ayotte v. Planned Parenthood of Northern New England,*
  546 U.S. 320  (2006) ..................................................................67, 75

*Babbitt v. Sweet Home Chapter of Cmty. for a Great Or.,*
  515 U.S. 687 (1995) .......................................................................28

*Barr v. Am. Ass'n of Pol. Consultants,*
  140 S. Ct. 2335 (2020)...............................................................67, 74

*Calcutt v. FDIC,*
  37 F.4th 293 (6th Cir. 2022) ............................................................83

*California v. Texas,*
  593 U.S. 659 (2021) .......................................................................63

*Clark v. Rameker*
  573 U.S. 122 (2014) .......................................................................41

*Collins v. Yellen,*
  594 U.S. 220 (2021) ..................................................................82, 83

*Comm. Fin. Servs. Ass'n v. Cons. Fin. Prot.,*
  *Bd.,* 51 F.4th 616 (5th Cir. 2022).......................................................83

*Conservation L. Found. v. U.S. Dep't of Com.*,
  229 F.Supp.2d 29 (D.Mass. 2002) ....................................... 15

*Conservation Law Found. of New England, Inc. v. Franklin*,
  989 F.2d 54 (1st Cir. 1993) ........................................... 30, 33

*Conservation Law Foundation v. Ross*,
  374 F.Supp.3d 77 (D.D.C. 2019) ........................................ 36

*Edmond v. United States*,
  520 U.S. 651 (1997) ................................................... 42

*Ex Parte Siebold*,
  100 U.S. 371 (1879) ................................................... 71

*Fishing Co. of Alaska v. Gutierrez*,
  510 F.3d 328 (D.C. Cir. 2007) ......................................... 37

*Flaherty v Ross*,
  373 F.Supp.3d 97 (D.D.C. 2019) ..................................... 47, 48

*Food & Drug Admin. v. Alliance for Hippocratic Medicine*,
  602 U. S. 367 (2024) .............................................. 64, 65

*Franklin v. Navient, Inc.*,
  534 F.Supp.3d 341 (D.Del. 2021).................................... 70, 71

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ........................................ 42, 73, 74, 77

*Freytag v. Comm'r of Internal Revenue*,
  501 U.S. 868 (1991) ............................... 44, 53, 56, 65, 66, 80

*Goethel v. Pritzker*,
  2016 WL 4076831 (D.N.H. July 29, 2016) ............................... 47

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  920 F.3d 1 (D.C. Cir.) ................................................ 80

*Gulf of Me. Fisherman's All. v. Daley*,
   292 F.3d 84 (1st Cir. 2002) ................................................... 15

*Integrity Advance, LLC v. CFPB*,
   48 F.4th 1161 (10th Cir. 2022) ............................................ 83

*J.H. Miles & Co. v. Brown*,
   910 F. Supp. 1138 (E.D. Va. 1995) ...................................... 48

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ............................................................ 62

*K&R Contractors, LLC v. Keene*,
   86 F.4th 135 (4th Cir. 2023) ............................................... 83

*Kajmowicz v. Whitaker*,
   42 F.4th 138 (3d Cir. 2022) ................................................ 80

*Kaufmann v. Kijakazi*,
   32 F.4th 843 (9th Cir. 2022) ............................................... 83

*Kennedy v. Braidwood Management, Inc.*,
   145 S. Ct. 2427 (2025) ................................... 49, 50, 51, 52, 61

*Kuhn v. Fairmont Coal Co.*,
   215 U.S. 349 (1910) ............................................................ 70

*Law Offices of Crystal Moroney, P.C.*,
   63 F.4th 174 (2d Cir. 2023) ................................................ 83

*Lofstad v. Raimondo*,
   2024 WL 836392 (D.N.J. Feb. 28, 2024) ......................... 47, 55

*Lofstad v. Raimondo*,
   117 F.4th 493 (3d Cir. 2024) ......................................... 58, 60

*Lovgren v. Locke,*
701 F.3d 5 (1st Cir. 2012) ...................................................................... 35

*Lucia v. Sec. & Exch. Comm'n,*
585 U.S. 237 (2018) .................................................. 44, 52, 53, 56, 59, 80

*Massachusetts v. Pritzker,*
10 F.Supp.3d 208 (D.Mass. 2014) ......................................................... 15

*Moose Jooce v. FDA,*
981 F.3d 26 (D.C. Cir. 2020) ................................................................. 80

*Mulloy v. Acushnet Co.,*
460 F.3d 141 (1st Cir. 2006) .................................................................. 26

*N.C. Fisheries Ass'n v. Gutierrez,*
518 F.Supp.2d 62 (D.D.C. 2007) ........................................................... 36

*N.C. Fisheries Ass'n v. Gutierrez,*
550 F.3d 16 (D.C. Cir. 2008) ........................................................... 12, 57

*National Horsemen's Benevolent & Protective Ass'n v. Black,*
53 F.4th 869 (5th Cir. 2022) .................................................................. 53

*Oklahoma v. United States,*
62 F.4th 221 (6th Cir. 2023) .................................................................. 54

*Opinion of the Justices,*
3 Greenl. (Me.) 481 (1822) .................................................................... 46

*Plumley v. Southern Container, Inc.,*
303 F.3d 364 (1st Cir. 2002) .................................................................. 58

*Rivers v. Roadway Express, Inc.,*
511 U.S. 298 (1994) ......................................................................... 70, 71

*Satanic Temple, Inc. v. Boston,*
111 F.4th 156 (1st Cir. 2024) ................................................................. 26

*Seila Law LLC v. CFPB*,
591 U.S. 197 (S. Ct. 2020)......................................................62, 68, 72

*State of New York v. Raimondo*,
84 F.4th 102 (2d Cir. 2023)............................................................35

*Teamsters Local No. 59 v. Superline Transp. Co.*,
953 F.2d 17 (1st Cir.1992) ............................................................64

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ......................................................................65

*United Cook Inlet Drift Ass'n v. NMFS*,
2022 WL 2222879 (D. Alaska June 21, 2022)....................................49

*United States v. Am. Ry. Express Co.*,
265 U.S. 425 (1924) ......................................................................26

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ......................................24, 42, 67, 68, 69, 76

*United States v. Hansen*,
599 U.S. 762 (2023) ................................................................38, 62

*United States v. Security Industrial Bank*,
459 U.S. 70 (1982) ......................................................................70

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ......................................65

## Statutes

5 U.S.C. § 553(b) ......................................................................43

5 U.S.C. § 553(c)......................................................................43

5 U.S.C. § 7513......................................................................69

16 U.S.C. § 1801.................................................................8

16 U.S.C. § 1801(a)(1)-(3) ................................................8

16 U.S.C. § 1801(a)(6) .......................................................8

16 U.S.C. § 1801(b)(1) .......................................................8

16 U.S.C. § 1801(b)(3) .......................................................8

16 U.S.C. § 1801(b)(4) .......................................................8

16 U.S.C. § 1801(b)(5) ...........................................9, 40, 67

16 U.S.C. § 1802(13) ..........................................................8

16 U.S.C. § 1802(33) ........................................................34

16 U.S.C. § 1802(34) ........................................................16

16 U.S.C. § 1851..........................................................8, 67

16 U.S.C. § 1851(a) ..........................................................10

16 U.S.C. § 1851(a)(1) ......................................................34

16 U.S.C. § 1851(a)(5) ......................................................34

16 U.S.C. § 1851(a)(8) ......................................................34

16 U.S.C. § 1851(b) ..........................................................10

16 U.S.C. § 1852................................................................14

16 U.S.C. § 1852(a) ............................................................9

16 U.S.C. § 1852(b) ............................................................9

16 U.S.C. § 1852(a)(1) ........................................................9

16 U.S.C. § 1852(f)(1)-(3) .................................................55

16 U.S.C. § 1852(h)(1)..................................11, 22, 39, 47

16 U.S.C. § 1852(i)(1) ............................................................ 40

16 U.S.C. § 1853 .................................................................... 11

16 U.S.C. § 1853(a)(l) ............................................................ 10

16 U.S.C. § 1853(a)(l)-(15) .................................................... 10

16 U.S.C. § 1853(a)(1)(C) ...................................................... 10

16 U.S.C. § 1853(a)(15) ......................................................... 16

16 U.S.C. § 1853(b)(l)-(14) .................................................... 10

16 U.S.C. § 1853(c)(1) ............................................................ 13

16 U.S.C. § 1854 ............................................................. 14, 32

16 U.S.C. § 1854(a) ................................................................ 11

16 U.S.C. § 1854(a)(1) ...................................................... 31, 33

16 U.S.C. § 1854(a)(1)(A) ........................................... 11, 29, 76

16 U.S.C. § 1854(a)(1)(B) .............................................. 11, 41

16 U.S.C. § 1854(a)(2)(A) .............................................. 11, 41

16 U.S.C. § 1854(a)(3) ........................... 11, 21, 29, 30, 31, 32, 57

16 U.S.C. § 1854(a)(4) ..................................................... 11, 30

16 U.S.C. § 1854(b) ......................................................... 11, 13

16 U.S.C. § 1854(b)(1)(A) ...................................................... 41

16 U.S.C. § 1854(b)(1) ........................................................... 76

16 U.S.C. § 1854(b)(1)(B) ................................................. 13, 37

16 U.S.C. § 1854(b)(3) ............................................ 13, 22, 29, 37

16 U.S.C. § 1854(c) ................................................. 21, 30, 59, 77

16 U.S.C. § 1854(c)(1) ............................................................ 12, 13

16 U.S.C. § 1854(c)(1)(A) .................................................. 52, 79, 81

16 U.S.C. § 1854(c)(2)(A) ............................................................ 12

16 U.S.C. § 1854(c)(3) ................................................ 21, 23, 63, 64

16 U.S.C. § 1854(c)(4) ............................................................ 12

16 U.S.C. § 1854(c)(5) ............................................................ 12

16 U.S.C. § 1854(c)(6) ...................................................... 13, 79

16 U.S.C. § 1854(c)(7) ............................................................ 13

16 U.S.C. § 1854(e)(5) ................................................ 12, 21, 30

16 U.S.C. § 1854(h) ...................................................... 21, 23, 63, 64

16 U.S.C. § 1855 ............................................................ 14

16 U.S.C. § 1855(c)(1) ............................................................ 14

16 U.S.C. § 1855(c)(2) ............................................................ 58

16 U.S.C. § 1855(d) .................................... 9, 14, 21, 28, 59, 77

16 U.S.C. § 1855(f)(1) ...................................................... 41, 84

16 U.S.C. § 1855(f)(2) ...................................................... 41, 84

16 U.S.C. § 1856(a)(3)(B) ............................................................ 64

35 U.S.C. § 6(c) ...................................................... 69, 76

43 U.S.C. § 1301 ............................................................ 29

43 U.S.C. § 1311(a) ............................................................ 29

43 U.S.C. § 1312 ............................................................ 29

Pub. L. No. 97-453, 96 Stat. 2481 (1983) ................................ 40

Pub. L. No. 106-129, § 2(a), 113 Stat. 1659 (1999) .................................50

Pub. L. 109-479, 120 Stat. 3575 (Jan. 12, 2007) ....................................16

Reorganization Plan No. 4 of 1970, 84 Stat. 2090, 2091 (1970) .............14

## Rules and Regulations

50 C.F.R. §§ 600.305–600.355 .................................................................10

50 C.F.R. § 600.310(b)(2)(ii) ...................................................................34

50 C.F.R. § 600.310(e)(3)(i) .....................................................................34

50 C.F.R. § 648.90 ...................................................................1, 15, 16, 17

88 Fed. Reg. 34810 (May 31, 2023) .........................................................18

88 Fed. Reg. 56527 (Aug. 18, 2023) ...................................................18, 19

## Constitutional Provisions

U.S. Const. Art. 2, § 2, cl. 2 ....................................................................44

## Other Authorities

William Baude,
   *Severability First Principles*, 109 U. Va. L. Rev. 1 (2021) ............70, 71

Floyd R. Mechem,
   *A Treatise on the Law of Public Offices and Officers* § 1 (1890) ........46

John N. Pomeroy,
   *An Introduction to the Constitutional Law of the United States*
   § 642 (7th ed. 1883) ..............................................................................46

Memorandum Opinion for General Counsels of the Executive Branch
   from Steven G. Bradbury,
   *Officers of the United States Within the Meaning of the
   Appointments Clause*,
   31 Op. O.L.C. 73 (2007)....................................................45, 46, 49, 54

NOAA, *Magnuson-Stevens Act Process,* Table X,
    https://perma.cc/H7SV-3QS9. ................................................................ 31

President Bush Signing Statement on the 2006 Magnuson-Stevens
    Reauthorization Act,
    2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12, 2007) ................. 48

President Clinton Signing Statement on the 1996 Sustainable Fisheries
    Act,
    1996 U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996) .......... 48, 49

President Trump Signing Statement on 2018 Amendments to
    Magnuson-Stevens Act,
    2018 WL 6839393 (Dec. 31, 2018) ....................................................... 48

The Federalist No. 72 (J. Cooke ed. 1961) (A. Hamilton) ....................... 42

## RELATED CASES AND PROCEEDINGS

Federal Defendants are aware of no related cases not identified by

NEFSA.

# GLOSSARY

| | |
|---|---|
| Framework 65 | Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan |
| Assistant Administrator | the Assistant Administrator for Fisheries of the National Oceanic & Atmospheric Administration and head of the National Marine Fisheries Service |
| Final Rule | *Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan*, 88 Fed. Reg. 56527 (Aug. 18, 2023), *available at* https://perma.cc/3ZZH-D5W4. |
| the Fishery Management Plan | the Northeast Multispecies Fishery Management Plan |
| HHS | the Department of Health & Human Services |
| New England Council | New England Fishery Management Council, *established by* 16 U.S.C. § 1852(a)(1)(A) |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation & Management Act, 16 U.S.C. §§ 1801 *et seq.* |
| NMFS | National Marine Fisheries Service |
| National Standards | Section 301 of the Magnuson-Stevens Act, National standards for fishery conservation and management, 16 U.S.C. § 1851 |
| NEFSA | New England Fishermen's Stewardship Association |
| Regional Councils | Regional Fishery Management Councils |
| the Secretary | the Secretary of Commerce |

## INTRODUCTION

The Fishery Conservation and Management Act of 1976 (Magnuson-Stevens Act) established a national program to conserve and manage fishery resources within the United States' exclusive economic zone. Congress recognized the importance of fisheries to state and local economies, the need for national policies to account for differences among regional fisheries, and the coordination required because the resources being managed—fish and other aquatic species—move freely between federal and state waters. So Congress established a structured process whereby the Secretary of Commerce ordinarily receives and considers recommendations from advisory bodies representing state and regional stakeholders—the Regional Fishery Management Councils—before he establishes (or amends) fishery management plans and promulgates implementing regulations. The National Marine Fisheries Service (NMFS) has established expedited regulatory processes under fishery management plans to make quick, efficient changes to fishery regulations ("framework adjustment(s)"), such as adjusting annual catch limits. *See*, *e.g.*, 50 C.F.R. § 648.90.

Federal Defendants used this expedited process to revise annual catch limits and other requirements for multiple fish stocks in the Northeast Multispecies Fishery Management Plan. The New England Regional Fishery Management Council (New England Council) weighed input from technical experts and proposed revised measures for the covered stocks. The Council submitted these proposals to the National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries (Assistant Administrator), who oversees NMFS. Following review, exercising the Secretary's delegated authority, the Assistant Administrator proposed and solicited public comment on the Council's recommended revisions. And after considering public comments, the Assistant Administrator decided to approve the Framework Adjustment and promulgate implementing regulations.

Plaintiff New England Fishermen's Stewardship Association (NEFSA) is a trade association for commercial fishermen that objects to the revisions these NMFS regulations implement. NEFSA raises no substantive complaints about the regulatory changes or the scientific basis for them. NEFSA instead contends only that the Council members

who proposed the revisions were not appointed in accordance with the Appointments Clause of the U.S. Constitution.

This challenge fails because the Council's role was purely advisory. The Magnuson-Stevens Act's procedural requirement that the Secretary obtain input from regional stakeholders does not constrain the Secretary's substantive policy judgment to execute the Act. Council members lack the authority necessary to qualify as officers of the United States. Only promulgated regulations legally bind fishery participants, and only the Secretary can promulgate them. And if there were any ambiguity, constitutional avoidance also compels this result.

NEFSA also points to two rarely invoked ancillary provisions of the Act, but those provisions played no role in the challenged agency action and so NEFSA lacks standing to raise them. Regardless, they are severable, as the district court found. Besides, even if Council members were exercising significant authority, NEFSA is not entitled to vacatur because any injury NEFSA suffered resulted from the Assistant Administrator's independent decision to implement the revisions. This Court should affirm, but should not reach the merits regarding the two ancillary provisions the district court severed.

## JURISDICTIONAL STATEMENT

NEFSA lacks standing to raise constitutional concerns regarding ancillary provisions of the Magnuson-Stevens Act that were not involved in the challenged agency action, *see* Part II.A. *infra*. If this Court reverses the judgment in Federal Defendant's favor, there would also be jurisdictional questions about NEFSA's requested relief. *See* pp. 84–85, *infra*. Federal Defendants otherwise concur in NEFSA's jurisdictional statement.

## STATEMENT OF THE ISSUES

1.      Whether the Magnuson-Stevens Act unambiguously confers significant federal authority on Regional Fishery Management Council members in its structured recommendation process when

     a.      the Secretary has authority to approve or disapprove Council-recommended fishery management plans and to establish his own plans where necessary even absent a Council proposal, and, moreover, only the Secretary can promulgate regulations that legally bind fishery participants;

     b.      the Secretary can exercise policy judgment in evaluating whether Council proposals are consistent with Congress's direction in the Act's National Standards and other applicable law;

     c.      Councils play a purely advisory role, and no provision of the Act empowers them to take any action with a direct legal effect on any fishery participant; and

     d.      constitutional avoidance requires construing any ambiguity in the Act against finding Council members have significant authority.

2.    With respect to NEFSA's contention that two rarely invoked ancillary provisions of the Magnuson-Stevens Act confer significant authority on New England Council members,

a.    whether NEFSA has standing to challenge the constitutionality of provisions of the Act that played no role in any asserted injury to NEFSA or its members; and

b.    whether, if the Court reaches the question, those provisions are severable given that they are not central to Act's purposes to conserve and maintain our nation's fishery resources in a manner informed by state and regional input.

3.    Whether NEFSA is entitled to relief setting aside the challenged regulations if the Court concludes that New England Council members unconstitutionally exercise significant authority, when

a.    severance of those provisions of the Magnuson-Stevens Act that authorize Council members to unconstitutionally constrain the Secretary would preserve a fully operative Act that meets Congress's purposes;

b.    any injury to NEFSA was not caused by any constitutional infirmity in the Council but instead by an independent decision to promulgate regulations by a duly authorized officer; and

c.    NEFSA raises a removal claim but does not identify how it was harmed by the operation of the challenged removal restrictions.

## PERTINENT CONSTITUTIONAL PROVISIONS AND STATUTES

This brief's Addendum reproduces pertinent constitutional provisions and statutes.

## STATEMENT OF THE CASE

### A.   Legal background

#### 1.   The Magnuson-Stevens Act

The Magnuson-Stevens Act establishes a comprehensive "national program for the conservation and management of the fishery[1] resources of the United States." 16 U.S.C. § 1801(a)(6). Congress recognized fisheries are "valuable and renewable natural resources"; the risks of overfishing; and the economic significance of fisheries. *Id.* § 1801(a)(1)–(3). So Congress sought "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States," *id.* § 1801(b)(1), and "to promote domestic commercial and recreational fishing under sound conservation and management principles," *id.* § 1801(b)(3). To do so, Congress created a process "for the preparation and implementation … of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery," *id.* § 1801(b)(4), and set forth principles to guide fisheries policy, *id.* § 1851.

---

[1] A "fishery" is "one or more stocks of fish which can be treated as a unit for purposes of conservation and management" and "any fishing for such stocks." 16 U.S.C. § 1802(13).

### a.   The role of the Secretary and the Regional Fishery Management Councils

The Magnuson-Stevens Act vests responsibility for managing the nation's fisheries in the Secretary: "The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him," and "may promulgate such regulations, … as may be necessary to discharge such responsibility or to carry out any other provision of this chapter." 16 U.S.C. § 1855(d).

Congress created Regional Fishery Management Councils to advise the Secretary. *See* 16 U.S.C. § 1852(a)(1). Each Council is responsible for a specific geographic region and consists of federal officials, state officials, and individuals with regional fisheries expertise appointed by the Secretary. *Id.* § 1852(a), (b). Congress established the Councils to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of" fishery management plans so that they "take into account the social and economic needs of the States." *Id.* § 1801(b)(5).

b.    Fishery Management Plans

The Magnuson-Stevens Act's process begins with the preparation of fishery management plans. These plans identify the "conservation and management measures" "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(l). The Act establishes plan requirements, *id.* § 1853(a)(l)–(15), and identifies discretionary elements, *id.* § 1853(b)(l)–(14).

Fishery management plans must be consistent with ten broadly written National Standards. 16 U.S.C. § 1853(a)(1)(C). These standards underscore the Secretary's need to consider the complex tradeoffs between sustainability and economic development central to fishery conservation and management. *See id.* § 1851(a). The Act also requires the Secretary to "establish advisory guidelines …, based on the national standards, to assist in the development of fishery management plans." *Id.* § 1851(b). *See* 50 C.F.R. §§ 600.305–600.355.

Congress created a structured process for establishing, modifying, and implementing fishery management plans that ordinarily begins

with recommendations from Regional Councils. *See* 16 U.S.C. §§ 1852(h)(1), 1853, 1854(a) & (b). Councils "prepare and submit to the Secretary" proposed plans for any fishery in their region that requires conservation and management, and such plan amendments as "are necessary from time to time." *See id.* § 1852(h)(1).

After receiving a Council-recommended fishery management plan or amendment, the Secretary reviews it, including "to determine whether it is consistent with the national standards, the other provisions of [the Magnuson-Stevens Act], and any other applicable law," 16 U.S.C. § 1854(a)(1)(A), and then solicits public comment, *id.* § 1854(a)(1)(B). After "tak[ing] into account the information, views, and comments received from interested persons," *id.* § 1854(a)(2)(A), the Secretary decides whether to "approve, disapprove, or partially approve" the plan or amendment "by written notice to the Council." *Id.* § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review." *Id.* § 1854(a)(4).

Importantly, Regional Council recommendations are not the only source for developing conservation and management measures. The

Secretary, on his own, may prepare fishery management plans or
"necessary amendments" without such recommendations if the Council
fails to develop and submit a plan required for fishery conservation or
management in "a reasonable period of time," or if the Secretary
disapproves of the plan submitted and the Council fails to appropriately
revise it, 16 U.S.C. § 1854(c)(1), and must do so to stop overfishing
immediately and rebuild stocks if a Council does not within two years
once notified of overfished stocks, *id.* § 1854(e)(5). For Secretarial plans,
the Secretary must also "conduct public hearings" to gather input, *id.*
§ 1854(c)(2)(A), and solicit comments from the relevant Council and the
public, *id.* § 1854(c)(4). After considering any comments, the Secretary
may adopt a plan or amendment. *Id.* § 1854(c)(5).

### c.   Binding fishery regulations

Fishery management plans are not self-executing—they are not
enforceable without implementing regulations. *See N.C. Fisheries Ass'n
v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). The plans "do not
themselves have any regulatory effect" and create no legally binding
obligations for fishery participants. *Id.*

Proposed implementing regulations may originate with either Regional Councils or the Secretary. Councils may submit proposed regulations to the Secretary if they believe regulations would be "necessary or appropriate" to implement a plan or amendment. 16 U.S.C. § 1853(c)(1). The Secretary reviews Council-proposed regulations, including for consistency with the relevant fishery management plan, the Magnuson-Stevens Act, and other applicable laws, and, if appropriate, publishes a proposed rule, solicits public comment, and ultimately decides what to promulgate as a final rule. *Id.* § 1854(b). The Secretary may decline to publish a proposed rule, returning it to the Council for a revised proposal, *see id.* § 1854(b)(1)(B), or revise the proposed regulations himself after "consult[ing] with the Council" and publishing "an explanation of any differences between the proposed and final regulations" in the Federal Register, *id.* § 1854(b)(3).

The Secretary may also create regulations. He may "propose regulations in the Federal Register to implement any plan or amendment" he prepared. 16 U.S.C. § 1854(c)(6). He must seek comment on his proposals from the Council and the public. *Id.* After considering comments, he may issue final regulations. *Id.* § 1854(c)(7).

13

The Secretary also has general authority to "promulgate such regulations … as may be necessary" to discharge his responsibilities under the Act. *Id.* § 1855(d). The Secretary can also promulgate "emergency regulations or interim measures" that he finds "necessary to address [an] emergency or overfishing." *Id.* § 1855(c)(1).

Conservation and management measures are binding on fishery participants only if the Secretary promulgates final regulations. Only the Secretary, and not Regional Councils, can promulgate regulations. *See id.* §§ 1852, 1854, 1855.

### 2. Delegation of the Secretary's Magnuson-Stevens Act authorities

The Secretary has delegated his Magnuson-Stevens Act authorities to the Under Secretary of Commerce for Oceans and Atmosphere, who oversees the National Oceanic & Atmospheric Administration. The Under Secretary has in turn delegated those authorities to the Assistant Administrator for Fisheries, who oversees NMFS. (JA-152–55.) The Assistant Administrator is a duly appointed inferior officer. *See* Reorganization Plan No. 4 of 1970, 84 Stat. 2090, 2091 (1970) (The Assistant Administrator "shall be appointed by the Secretary, subject to approval of the President.").

14

B.    Factual background

1.    The Northeast Multispecies Fishery Management Plan

The Northeast Multispecies Fishery Management Plan contains management and conservation measures for twenty groundfish stocks in New England federal waters. NMFS originally approved and implemented it in 1985 to curb the decline of groundfish stock in the Gulf of Maine.

The Plan has undergone numerous revisions as conditions in the fishery evolved. With cod and other groundfish populations on the verge of collapse, NMFS regulations in 1996 established an expedited process known as "framework adjustment" to facilitate this revision process. *See* 50 C.F.R. § 648.90; *Gulf of Me. Fisherman's All. v. Daley*, 292 F.3d 84, 86 (1st Cir. 2002). "A framework adjustment is an administrative procedure permitting 'quick, efficient changes to [plans] as the need arises.'" *Conservation L. Found. v. U.S. Dep't of Com.*, 229 F.Supp.2d 29, 32 (D.Mass. 2002) (citation omitted).  These adjustments allow NMFS and the Regional Council "to respond more quickly and efficiently to fluctuations in the groundfish population." *Massachusetts v. Pritzker,* 10 F.Supp.3d 208, 212–13 (D.Mass. 2014).

Congress reauthorized the Magnuson-Stevens Act in 2006. Pub. L. 109-479, 120 Stat. 3575 (Jan. 12, 2007). The reauthorization further mandated that fishery management plans include a mechanism to specify annual catch limits in the plans themselves, implementing regulations, or annual specifications, "at a level such that overfishing does not occur in the fishery,"[2] and "including measures to ensure accountability." 16 U.S.C. § 1853(a)(15). NMFS's framework adjustment regulations include provisions to do so. 50 C.F.R. § 648.90.

Development of proposed framework adjustments involves multiple steps. First, the New England Council's Plan Development Team—a team of technical experts—meets at least every other year to review the fishery and recommend catch limits for upcoming fishing years. *Id.* § 648.90(a)(2)(i)–(ii). Area-specific annual catch limits, area management boundaries, gear restrictions, sector allocation requirements, specifications, or other measures may also be recommended to achieve Plan objectives. *Id.* § 648.90(a)(2)(iii). The

---

[2] "Overfishing" is the "rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34).

Council reviews these recommendations, considers public input, and prepares its own recommendation for NMFS. *Id.* § 648.90(a)(2)(v)–(vi).

NMFS then reviews the Council's recommendation. If NMFS concurs, it either publishes a proposed rule that solicits public comment or publishes a final rule, consistent with the Administrative Procedure Act (APA). *Id.* § 648.90(a)(2)(vii). The agency can also adopt other options prepared by the Council, unless rejected by the Council, if the option meets the Plan's objectives and is consistent with applicable law. *Id.* § 648.90(a)(2)(v), (viii). NMFS, and thus the duly appointed Assistant Administrator who oversees NMFS, retain ultimate authority over whether to issue a rule, and, if so, what type of rule to issue.

## 2.    Framework Adjustment 65 and the Final Rule

The challenged revisions, Framework Adjustment 65, followed this process. After consulting its experts, the New England Council prepared several recommended revisions to the Northeast Multispecies Fishery Management Plan regarding sixteen covered groundfish stocks to ensure appropriate conservation and management and permit rebuilding of overfished stocks. The Council also proposed regulations to implement those changes.

The Council transmitted those recommendations to NMFS. (JA-087.) Following review, the Assistant Administrator approved the proposal. (JA-098–99.) NMFS then published a notice of proposed rulemaking regarding the Framework Adjustment and sought public comment. 88 Fed. Reg. 34810, 34818 (May 31, 2023). After considering public comments, including comments from NEFSA, (JA-112–20), the Assistant Administrator approved, (JA-132–33), and NMFS promulgated, the final rule. *Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan*, 88 Fed. Reg. 56527, 56527–28 (Aug. 18, 2023), https://perma.cc/3ZZH-D5W4 (Final Rule).

The Final Rule implemented measures (1) revising the rebuilding plan for Gulf of Maine cod; (2) setting the shared United States/Canada quotas for two fish stocks; (3) setting specifications for sixteen groundfish stocks; (4) conditionally removing the Gulf of Maine haddock and white hake management uncertainty buffer; and (5) instituting a temporary change to the accountability measure for Georges Bank cod. *Ibid.* The Final Rule also took two other actions: first, it made other regulatory changes pursuant to NMFS's broad authority under 16 U.S.C. § 1855(d), and second, it established an emergency action

18

under 16 U.S.C. § 1855(c) that further revised the acceptable biological catch and associated annual catch limits for Gulf of Maine haddock. 88 Fed. Reg. at 56527–31.

### C.    Proceedings below

NEFSA sued Federal Defendants in the U.S. District Court for the District of Maine seeking to set aside the Final Rule. (JA-018–75 (Complaint).) After concluding NEFSA had standing for its claims against the Final Rule,[3] (Add.99–110), the district court found that two provisions—16 U.S.C. §§ 1854(c)(3) & (h)—conferred significant federal authority on Council members because they empowered the Council "to unilaterally block executive action." (Add.126–27.) With respect to the remaining provisions of the Magnuson-Stevens Act, including those related to the structured recommendation process, the court concluded that the Council's "policy development role" did not constitute significant federal authority. (Add.127–32.)

Based on this analysis, the court found that "the appointments of the Council Members are unconstitutional." (Add.131.) The court then

---

[3] The district court found that NEFSA lacked standing for its claim regarding Deputy Assistant Administrator Rauch. (Add.111–17.) On appeal, NEFSA has not contested dismissal of that claim.

19

considered whether the Magnuson-Stevens Act was capable of "functioning independently" if the two offending provisions were severed, and whether Congress would have passed the Act without those "invalid components" in light of its text and history, and concluded that "[r]emoving the ability of the Council to pocket veto the Secretary's desired adoption of a limited access system or to repeal [a fishery management plan] does not interfere with the primary responsibility of the Councils as policy developers and advisors, nor does it reallocate the truly binding legal authority of the statute, issuing regulations, from the Secretary." (Add.135–36.) The court therefore severed those two provisions—partially granting and partially denying summary judgment to both parties—and entered final judgment.

## SUMMARY OF ARGUMENT

1.    The structured recommendation process created by the Magnuson-Stevens Act is wholly advisory, so the Final Rule is lawful under the Appointments Clause.

a.    The Assistant Administrator's decision to implement the challenged Framework Adjustment was not constrained by the New England Council's recommendations. The Magnuson-Stevens Act conveys to the Secretary broad authority and responsibility over federal fisheries management. 16 U.S.C. § 1855(d). The Act creates a structured process for Regional Councils to inform the Secretary regarding state and regional needs before he establishes or modifies a fishery management plan or promulgates implementing regulations. The Secretary retains final say over the contents of fishery management plans, *id.* § 1854(a)(3), has authority to establish or amend plans as he finds necessary if the Regional Councils fail to act, *id.* § 1854(c), and must act if the Council fails to timely recommend measures to prevent overfishing, *id.* § 1854(e)(5). Besides, fishery management plans alone do not have any binding legal effect on fishery participants. Only the Secretary can promulgate regulations that bind fishery participants.

The Secretary determines the terms of any binding rules and may revise Council-proposed rules after consulting with the Council and explaining any changes, *id.* § 1854(b)(3).

b.      Regional Councils play a purely advisory role. Councils "prepare and submit" proposed plans, amendments, and implementing regulations to the Secretary. 16 U.S.C. § 1852(h)(1). Those proposals are simply advice; the Secretary retains the final word on the contents of any approved fishery management plan and exclusive authority to promulgate rules. The text and structure of the Act demonstrate the Councils' advisory function.

c.      Regional Council members are not officers of the United States. They do not exercise significant federal authority. No action taken by Regional Councils can bind fishery participants or otherwise exercise significant authority to execute or administer the law. Instead, Councils provide advice to the Secretary, who must take affirmative action to promulgate binding regulations and has discretion over their terms. Caselaw does not support NEFSA's view that the ability to make non-binding recommendations alone constitutes significant authority.

d.    This is the best reading of the Magnuson-Stevens Act, but if there were ambiguity, constitutional avoidance would lead to the same result. At a minimum, it is "fairly possible" to read the Act to assign Regional Councils an advisory role, and so constitutional avoidance requires adopting such a reading, rather than construing the Act in a manner that manufactures unnecessary constitutional conflict.

2.    NEFSA cannot escape this conclusion by relying on two rarely invoked ancillary provisions of the Magnuson-Steves Act, 16 U.S.C. §§ 1854(c)(3) & (h), that were not involved in the challenged regulatory changes.

a.    These two provisions played no role in the challenged agency action, and NEFSA identifies no injury traceable to these provisions. To establish standing for a constitutional challenge to a statutory provision, however, plaintiffs must show that they have suffered a concrete, particularized injury fairly traceable to the defendants' conduct in enforcing the specific statutory provision they attack as unconstitutional. NEFSA therefore lacks standing to challenge the constitutionality of these two ancillary provisions.

b.     In any event, these minor provisions can appropriately be severed, as both the district court and the Third Circuit held. The Supreme Court has directed courts confronting a constitutional flaw in a statute to "try to limit the solution to the problem" by disregarding "problematic portions while leaving the remainder intact." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021) (citation omitted). Severing these two ancillary provisions is particularly appropriate here where it will leave the Magnuson-Stevens Act's structured recommendation process intact and preserve Congress's core purpose to conserve and maintain the nation's fishery resources in a manner informed by state and regional input. NEFSA's contrary blunderbuss proposal would damage central aspects of the Act and undermine the process used for nearly fifty years to conserve and manage our nation's fisheries.

3.     If the Court nevertheless concludes that the Magnuson-Stevens Act unambiguously authorizes Regional Councils to constrain the Secretary's discretion in a manner that constitutes significant federal authority, vacating the Final Rule still would be improper.

a.     The appropriate response would be to sever any provision of the Act that empowers Regional Council recommendations to constrain

the Secretary. This approach would likewise disregard "problematic portions while leaving the remainder intact," and this "tailored approach" would be the narrowest possible modification that would preserve the core of the Magnuson-Stevens Act—the structured advisory process using Regional Councils—while curing any constitutional defect.

b.      Even if there were constitutional infirmity in Regional Council members' appointment, NEFSA has not established that such infirmity caused it injury. Any injuries NEFSA has identified flow not from the Council's structure but from the Assistant Administrator's independent decision to promulgate the Final Rule after her own independent review.

c.      Finally, the Court need not reach NEFSA's removal claim because Council members are not officers of the United States exercising significant federal authority. Regardless, to state a cognizable removal claim, plaintiffs must demonstrate that the unconstitutional removal provision caused them harm in connection with the specific challenged agency action. NEFSA has failed to make this required showing.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo. Mulloy v. Acushnet Co.*, 460 F.3d 141, 145 (1st Cir. 2006). Appellees may defend a judgment on any ground supported by the record, including one rejected by the district court. *See United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924); *Satanic Temple, Inc. v. Boston*, 111 F.4th 156, 167 (1st Cir. 2024).

## ARGUMENT

NEFSA advances two general lines of argument. Both are flawed. First, NEFSA argues that Regional Council members have significant authority to "develop" policy by making proposals in the Magnuson-Stevens Act's structured recommendation process. (Br. at 45–60.) But Council recommendations do not constrain the Secretary's final decision, and even if the Act were ambiguous on that point, constitutional avoidance would require reading the Act that way. Simply making non-binding policy recommendations does not qualify as exercising significant authority to execute or administer federal law.

Second, NEFSA asserts that Council members qualify as officers anyway because two rarely invoked ancillary provisions of the Act permit them to block Secretarial actions and cannot be severed. (Br. at 28–45.) But NEFSA can trace no injury to the operation of those provisions because they played no role in the rule challenged here; NEFSA therefore lacks standing to challenge their constitutionality. Regardless, for reasons the district court and Third Circuit explain, these minor provisions can be severed, leaving the Act fully operational and preserving the Act's primary purposes.

I.   **Regional Councils do not exercise significant federal authority in the Magnuson-Stevens Act's structured recommendation process.**

   A.   **The Magnuson-Stevens Act gives the Secretary final word on fishery management plans and exclusive authority to promulgate regulations.**

      1.   **The Act does not limit the Secretary's review of proposed fishery management plans.**

The Magnuson-Stevens Act gives the Secretary broad responsibility and authority to implement the Act's requirements. Congress assigned the Secretary "general responsibility to carry out any fishery management plan or amendment approved or prepared by him" and authorized him to "promulgate such regulations" "as may be necessary to discharge such responsibility or to carry out any other provision of this [Act]." 16 U.S.C. § 1855(d). This broad authority shows that the Secretary is ultimately responsible—and politically accountable—for executing the Act's requirements. *Cf. Babbitt v. Sweet Home Chapter of Cmty. for a Great Or.*, 515 U.S. 687, 708 (1995) (finding comparable language in the Endangered Species Act conferred "broad administrative and interpretive power").

Congress also recognized the importance of regional fishery resources to state and local economies; the differences among regional

28

fisheries in terms of participants, ecosystems, and environmental challenges; and the need for coordination between federal and state agencies managing a resource that can swim between federal and state waters.[4] Congress therefore established a structured process to inform the Secretary of state and regional social, economic, and ecological needs when he sets policy in the ordinary course.

To accomplish this, the Magnuson-Stevens Act creates procedural requirements the Secretary typically follows before establishing and implementing federal fisheries policies. But these *procedures* do not constrain the Secretary's judgment on *substance*—that is, on how best to conserve and manage federal fisheries consistent with Congress's direction. The Secretary may consider a Council's proposal before taking action—absent an emergency, unreasonable delay, or other necessity— but he never has to accept the Council's recommendations. The specific authorities that the Act assigns the Secretary when evaluating and implementing Council proposals show his independent discretion on policy. *See* 16 U.S.C. § 1854(a)(1)(A), (a)(3), (b)(3).

---

[4] States typically have authority to regulate fishing activities within three miles of shore. 43 U.S.C. §§ 1301, 1311(a), 1312.

The Magnuson-Stevens Act plainly gives the Secretary full discretion to "approve, disapprove, or partially approve" a Regional Council-recommended fishery management plan or amendment. 16 U.S.C. § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review." *Id.* § 1854(a)(4).

Importantly, although Congress established this structured recommendation process for making fishery management decisions in the ordinary course, the Magnuson-Stevens Act also empowers the Secretary to prepare fishery management plans or amendments himself without a Council proposal if the Council fails to timely submit a plan and the Secretary believes the fishery requires conservation or management measures, or if the Secretary disapproves the plan proposed by the Council. *Id.* § 1854(c), (e)(5). This Court has construed this provision broadly, finding that a narrow reading of the Secretary's authority "would create an incomprehensible gap in the statute" and "hold the Secretary hostage to the Councils." *Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 60 (1st Cir. 1993).

30

There is no textual limitation on the factors the Secretary may consider in deciding whether to approve, disapprove, or partially approve Council-proposed plans. To be sure, the Act requires the Secretary to review Council-recommended fishery management plans and amendments for consistency "with the national standards, the other provisions of [the Act], and any other applicable law."[5] *See* 16 U.S.C. § 1854(a)(1); *id.* § 1854(a)(3) (upon disapproval or partial disapproval of a plan or amendment, requiring the Secretary to specify any "applicable law" with which the proposal is inconsistent and "recommend[]" how the Council might conform it to that law). But it does not follow, as NEFSA contends, that the Act requires the Secretary to simply rubberstamp Council recommendations unless they violate an express legal requirement. (Br. at 52, 59.)

To support their contention that the Secretary's review is limited, NEFSA points to a law review article, (Br. at 9–10), an informal oral interview with a NMFS employee, (Br. at 11), and legislative history,

---

[5] Other applicable law includes the Endangered Species Act, Marine Mammal Protection Act, National Environmental Policy Act, Administrative Procedure Act, and tribal treaty rights. *See* NOAA, *Magnuson-Stevens Act Process,* at pdf p. 31 (Table X), https://perma.cc/H7SV-3QS9.

(Br. at 52). But NEFSA does not cite any actual statutory language expressly imposing limits on the Secretary's considerations. NEFSA instead quotes only the word "shall" from the Act and inserts its own extra-textual reading of the statute—rather than Congress's actual words—around it. (*See, e.g.*, Br. at 9 (claiming that "[t]he Secretary 'shall' promulgate [*sic*] all legally compliant plans or amendments after notice and comment").)  The Act's actual text says only that "[t]he Secretary *shall approve, disapprove, or partially approve* a plan or amendment within 30 days." *See* 16 U.S.C. § 1854(a)(3) (emphasis added). This emphasizes rather than cabins the Secretary's authority.

True, section 1854(a)(3) also requires that a notice of disapproval or partial approval "specify . . . the applicable law with which the plan or amendment is inconsistent." But it does not say that the Secretary must approve absent such an inconsistency. It makes no sense to think Congress meant a provision that reads as a reporting requirement to operate as a direct limitation on what factors the Secretary may consider without saying so. Congress knows how to prescribe a particular manner of review when it wants to. Given the absence of any express limitation, the Act does not limit the Secretary's substantive

review of fishery management plans or amendments, as the district court recognized. (Add.128–29.) As this Court has explained, the Act "unequivocally vests the Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable." *Conservation Law Found.*, 989 F.2d at 60.

> **2.    The Secretary would still retain ultimate discretion over fishery management plans even if his review were limited to consistency with the National Standards and applicable law.**

Even if the Magnuson-Stevens Act were read to limit review of Council-proposed fishery management plans or amendments to consistency "with the national standards, the [Magnuson-Stevens Act], and any other applicable law," 16 U.S.C. § 1854(a)(1), the Secretary— not the Councils—would retain ultimate policy discretion when approving plans or amendments. Evaluating whether a plan or amendment is consistent with the National Standards is an inherently policy-laden judgment that necessarily involves significant discretion applying legal standards to particular facts. The Secretary must judge how to weigh competing interests, such as

- What conservation and management measures will best "prevent overfishing" while also "achieving, on a continuing

basis, the optimum yield" for the domestic fishing industry? 16 U.S.C. § 1851(a)(1).

- What allocation of fishing privileges is "fair and equitable" to domestic fishing interests; is "reasonably calculated to promote conservation"; and ensures that no one "acquires an excessive share of such privileges"? *Id.* § 1851(a)(4).

- When is it "practicable" to consider efficiency in the use of fishery resources when establishing conservation and management measures? *Id.* § 1851(a)(5).

- How can measures "take into account the importance of fishery resources to fishing communities" while also remaining consistent "with the conservation requirements of [the Act] (including the prevention of overfishing and rebuilding of overfished stocks)"? *Id.* § 1851(a)(8).

These considerations for the Secretary have an inherent policy dimension. For example, National Standard 1 requires preventing overfishing and achieving, on a continuing basis, optimum yield, which requires "balancing the various interests that comprise the greatest overall benefits to the Nation," "particularly with respect to food production and recreational opportunities," and taking into account the protection of marine ecosystems. *See* 16 U.S.C. §§ 1851(a)(1), 1802(33); 50 C.F.R. § 600.310(b)(2)(ii), (e)(3)(i). Assessing whether Council-recommended proposals are consistent with the Standards therefore depends on weighing competing interests, including conservation and

exploitation of fishery resources. It is the Secretary who Congress charges to faithfully execute these requirements.

Courts, including this Court, have repeatedly recognized the Secretary's "discretion and judgment" in reconciling the disparate concerns in the National Standards. *See Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012) (explaining that "[t]he purposes of the national standards are many, and can be in tension with one another. … Compliance with the national standards requires balancing *by the agency* and the exercise of discretion and judgment.") (emphasis added); *State of New York v. Raimondo*, 84 F.4th 102, 107 (2d Cir. 2023) ("The national standards' expansive text and structure reflect that Congress intended for *NMFS* to use discretion and judgment to reconcile this tension when managing the fishery.") (emphasis added) (cleaned up); *All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996) ("Congress required *the Secretary* to exercise discretion and judgment in balancing among the conflicting national standards.") (emphasis added).

The Magnuson-Stevens Act gives "NMFS rulemaking flexibility to react to dynamic natural conditions and account for multiple stakeholders." *State of New York*, 84 F.4th at 107. The language

Congress uses—"optimum," "where practicable," "minimize," "take into account"—presumes the Secretary's exercise of discretion and judgment. *See Conservation Law Foundation v. Ross*, 374 F.Supp.3d 77, 91–92 (D.D.C. 2019); *see also N.C. Fisheries Ass'n v. Gutierrez*, 518 F.Supp.2d 62, 102 (D.D.C. 2007) (describing the "substantial discretion that Congress conferred upon [the Secretary] to strike the appropriate balance among the competing goals of the ten National Standards").

NEFSA is wrong that the Secretary must defer to the Councils' judgment on weighing the competing objectives within the National Standards. (Br. at 53.) The statutory text contains no such requirement. Instead, Congress established ten broad objectives for fishery conservation and management and charged the Secretary with faithfully executing Congress's mandate.

> ### 3.   The Secretary has exclusive authority over the terms of binding fishery regulations.

In any event, NEFSA's argument conflates fishery management plans with binding regulations. Fishery management plans do not legally bind fishery participants. Only the Secretary can promulgate regulations that bind fishery participants. And the Magnuson-Stevens Act's terms do not limit—expressly or otherwise—the Secretary's

discretion to revise Council-proposed regulations before promulgating final rules.[6] If the Secretary disagrees with a Council proposal, he may decline to publish the proposed rule and return it to the Council for revision. *See* 16 U.S.C. § 1854(b)(1)(B). And once he has received public comment on Council-proposed regulations, the Secretary may also revise the regulations himself before promulgating a final rule. The Act requires only that he "consult with the Council" and publish "an explanation of any differences between the proposed and final regulations" in the Federal Register. *Id.* § 1854(b)(3).

The Secretary thus has exclusive discretion over the content of implementing regulations. The Act places no limit on his authority to revise Council proposals, and instead only sets procedural requirements. Power to alter a proposed rule before it binds fishery participants "rests only with the Secretary." *Fishing Co. of Alaska v. Gutierrez*, 510 F.3d 328, 333 (D.C. Cir. 2007) (citing 16 U.S.C. § 1854(b)(3)). A final rule—and thus the Secretary's decision to revise

---

[6] NEFSA's argument and much of the case law focuses on regulations, so the government focuses on that element of the Magnuson-Stevens Act. But the same principles apply to framework recommendations that the Council puts forward for the Northeast Multispecies Fishery Management Plan, which likewise can only be implemented by NMFS.

(or not revise) a proposed rule—is invalid only if "the Secretary acts in an arbitrary and capricious manner in promulgating [the] regulations." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987).

NEFSA suggests that the requirement to "consult" before making changes to a Council-proposed implementing regulation might be a "significant power." (Br. at 47.) But it imposes no substantive constraint whatsoever on the Secretary's discretion to promulgate implementing regulations as he sees fit. NEFSA's argument—that with a consultation requirement, Congress intended, *sub silentio*, to compel the Secretary to approve Council-proposed implementing regulations notwithstanding his disagreement—overreads the Act's plain text. And NEFSA's approach—once again reading extra-textual limitations into a statute then arguing those limits render the statute unconstitutional—runs directly counter to the Court's duty. Courts construe statutes to avoid constitutional problems, not to seek them out. *See United States v. Hansen*, 599 U.S. 762, 781 (2023) ("When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict."). *See* Part I.D., *infra*.

**B.    The Magnuson-Stevens Act assigns Regional Fishery Management Councils only an advisory role.**

In contrast to the Secretary's role, the Magnuson-Stevens Act establishes Regional Councils as purely advisory bodies. The Act gives Councils no authority to take actions that have legal effects or impose legal obligations on any fishery participant. Legal obligations instead flow from the Secretary's discretionary decision to implement Council proposals by regulation. NEFSA complains that the Act empowers Councils to "set and adjust fishery policies," (Br. at 1), but no Council action can do so. Only a rule promulgated by the Secretary creates legally binding fishery policy.

The primary function Congress assigned Regional Councils is to "prepare and submit" proposals to the Secretary. *See* 16 U.S.C. § 1852(h)(1). Councils prepare and submit recommended fishery management plans, amendments, framework adjustments, and proposed regulations in a structured process intended to inform the Secretary of regional needs before he establishes federal fishery policies. But these proposals are just that—proposals. The Council's role in this statutorily structured process is to provide recommendations for fishery conservation and management to the Secretary in an advisory capacity.

39

The Secretary remains free to approve or disapprove of Council-recommended plans or amendments and to adopt or alter Council-proposed regulations. *See* Part I.A., *supra.*

Both textual and structural features of the Magnuson-Stevens Act confirm the Regional Councils' advisory role. To begin with, Congress twice indicates in the Act's text that it intended Councils to perform an advisory function. NEFSA does not address these textual features.

First, the Act explains that Congress established Councils to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and *advise on*, the establishment and administration of" fishery management plans in a manner that "take[s] into account the social and economic needs of the States." 16 U.S.C. § 1801(b)(5) (emphasis added).

Second, Congress expressly excluded Councils from Federal Advisory Committee Act requirements, *id.* § 1852(i)(1), indicating Congress believed the Councils would otherwise be subject to them. *See* Pub. L. No. 97-453, 96 Stat. 2481 (1983) (providing that "[t]he Federal Advisory Committee Act … shall not apply to the Councils …"). This exclusion would be surplusage if Congress thought it was assigning

Councils significant authority, rather than advisory functions. "[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (cleaned up).

The Magnuson-Stevens Act's structure also shows that the Secretary has ultimate authority over the substance of federal fishery policy. The Act requires that Council-proposed plans, amendments, and regulations undergo notice and comment before the Secretary finalizes them, *see* 16 U.S.C. § 1854(a)(1)(B) & (b)(1)(A), and requires the Secretary to "take into account the information, views, and comments received from interested persons," *id.* § 1854(a)(2)(A). That would be pointless if the Secretary lacked discretion to make decisions informed by the comments received. The limits that Congress placed on judicial review—confining it to "[r]egulations promulgated *by the Secretary*" and "actions that are taken *by the Secretary* under regulations which implement a fishery management plan," *see id.* § 1855(f)(1), (2) (emphasis added)—likewise reflect Congress's understanding that only the Secretary, and not Regional Councils, can affect fishery participants in a manner that might require judicial redress.

41

The Magnuson-Stevens Act also makes the Secretary (and not the advisory Councils) politically accountable for any binding fishery regulations, as only regulations promulgated by NMFS have binding legal effect. This serves one of the Appointments Clause's central aims: "Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure … ought really to fall.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting The Federalist No. 72, at 476 (J. Cooke ed. 1961) (A. Hamilton)). Only the Secretary can decide to impose legal obligations on fishery participants, and there is "a clear and effective chain of command" to the Secretary "from the President, on whom all the people vote." *Arthrex*, 594 U.S. at 11 (cleaned up). There is no diffusion of accountability; all the Act's legal authority is vested in a principal officer, the Secretary.[7]

---

[7] That the Secretary has delegated these authorities to the Assistant Administrator, a duly appointed inferior officer, is no problem. Inferior officers can exercise significant federal authority, including by promulgating binding regulations, so long as their activities are "directed and supervised *at some level* by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Arthrex*, 594 U.S. at 13 (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)) (emphasis added).

NEFSA also tries to make hay of the fact that Congress required the Secretary to take certain steps upon receipt of a Council recommendation. (Br. at 47.) But there is nothing problematic with Congress setting procedural requirements for administrative rulemaking. Like the Magnuson-Stevens Act, for instance, the Administrative Procedure Act imposes many procedural requirements that typically apply before an agency can issue a binding regulation. *See*, *e.g.*, 5 U.S.C. § 553(b) (notice of proposed rulemaking "shall" be published in the Federal Register); *id.* § 553(c) ("the agency shall give interested persons an opportunity to participate in the rule making…"). But while these provisions may require certain procedural steps before agency decisionmakers act, they do not improperly constrain the agency decisionmaker's authority over the substance of any agency action— that is, they do not allow those simply providing input to exercise significant federal authority in executing or administering the law. There is no legal problem with Congress empowering Councils to develop policy proposals informed by state and regional needs for the Secretary to consider.

## C.    Council members are not officers of the United States.

The Appointments Clause provides that the President "shall
nominate, and by and with the Advice and Consent of the Senate, shall
appoint … all [] Officers of the United States" not otherwise addressed
in the Constitution, but that "Congress may by Law vest the
Appointment of such inferior Officers, as they think proper, in the
President alone, in the Courts of Law, or in the Heads of Departments."
U.S. Const. Art. 2, § 2, cl. 2. To qualify as an officer, an individual must
"occupy a 'continuing' position established by law" and exercise
"significant authority pursuant to the laws of the United States." *Lucia
v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (cleaned up). To
exercise significant authority, an official must exercise "significant
discretion" in "carrying out [] important functions" executing federal
law. *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 882 (1991).

Regional Council members do not meet these requirements and
are not officers of the United States. Assuming Regional Council
members occupy a "continuing" position despite their temporary and
episodic duties,[8] none of the functions the Magnuson-Stevens Act

---

[8] The New England Council typically meets a handful of times each
year, each meeting lasting just a few days.

assigns Councils involves the exercise of significant federal authority. As discussed above, *see* Part I.B., *supra*, the Councils' role is advisory only. "[A]n individual who occupies a purely advisory position … does not hold a federal office." *See* Memorandum Opinion for General Counsels of the Executive Branch from Steven G. Bradbury, *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 77 (2007) (Bradbury Memo). "[M]ere authority to advise"—even "substantial practical authority to develop and coordinate policy"—is not significant authority absent legal power. *Id.* at 98.

Regional Councils cannot limit, circumscribe, or control the Secretary's ability to regulate fisheries. *See* Part I.A., *supra.* Rather, the Secretary retains final say over the contents of any approved fishery management plan and promulgated regulations. That only the Secretary—and not the Councils—can undertake sovereign acts executing or administering federal fishery management measures is dispositive. "Significant authority" is modern shorthand for meaningful discretion to exercise significant sovereign powers of the United States. That a position becomes an "office" only when it is vested with

significant discretion to exercise such powers goes back to the Founding and English common law. *See id.* at 78–87.

An early opinion from the Supreme Judicial Court of Maine, for instance, explained that "the term 'office' implies a delegation of a portion of the sovereign power to, and possession of it by the person filling the office." *Opinion of the Justices*, 3 Greenl. (Me.) 481, 482 (1822). The "legal power" possessed is one that "in its effects [] will bind the rights of others." *Ibid.* Therefore "every 'office,' in the constitutional meaning of the term, implies an authority to exercise some portion of the sovereign power, either in making, executing or administering the laws." *Id.* at 483. Officers are "the means and instruments by which the laws shall be executed." John N. Pomeroy, *An Introduction to the Constitutional Law of the United States* § 642, at 425 (7th ed. 1883).

But there is no sense in which Regional Councils are "invested with some portion of the sovereign functions of government." *Cf.* Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 1, at 1–2 (1890). They have no authority to execute or administer the laws of the United States whatsoever, much less to exercise significant discretion in doing so. While Councils may "prepare and submit"

46

proposals to the Secretary, 16 U.S.C. § 1852(h)(1), only the Secretary can put sovereign weight behind them.

Many courts have therefore recognized that Regional Councils play an advisory role that falls far short of exercising significant authority. "The Council is charged with distilling the members' expertise into recommendations for the Secretary, which the Secretary then independently evaluates to determine whether they comply with her and the President's policy objectives." *Lofstad v. Raimondo*, 2024 WL 836392, at *21 (D.N.J. Feb. 28, 2024), *rev'd on other grounds*, 117 F.4th 493 (3d Cir. 2024); *see also Goethel v. Pritzker*, No. 15-CV-497-JL, 2016 WL 4076831 (D.N.H. July 29, 2016) (reiterating that plan amendments cannot establish rights, obligations, or legal consequences without implementing regulations, which only the Secretary can promulgate), *aff'd on other grounds*, *Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106 (1st Cir. 2017). While Councils may be "heavily involved" in developing plans and proposing regulations, they lack authority to take legally binding action and so the structure of the Magnuson-

Stevens Act "reinforces the advisory nature of the Council's role."

*Flaherty v Ross*, 373 F.Supp.3d 97, 104–10 (D.D.C. 2019).[9]

The Executive Branch has likewise long understood the Regional Councils' role to be wholly advisory and has implemented the Magnuson-Stevens Act accordingly. *See* President Trump Signing Statement on 2018 Amendments to Magnuson-Stevens Act, 2018 WL 6839393 (Dec. 31, 2018) ("Keeping with past practice of the executive branch, my Administration will treat the plans promulgated by the Council *as advisory only*; the adoption of the plans will be subject to the discretion of the Secretary of Commerce as part of the regulatory process described in … the [Magnuson-Stevens Act].") (emphasis added); President Bush Signing Statement on the 2006 Magnuson-Stevens Reauthorization Act, 2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12, 2007); President Clinton Signing Statement on the

---

[9] *See also United Cook Inlet Drift Association v. NMFS*, No. 3:21-cv-00247-JMK, 2022 WL 2222879, at *19 (D. Alaska June 21, 2022) (explaining that Regional Councils "are simply advisory bodies and have no legal authority"); *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1157–59 (E.D. Va. 1995) (finding that Councils have "no 'authority' to do anything[,]" and decision-making power rests with NMFS).

1996 Sustainable Fisheries Act, 1996 U.S.C.C.A.N. 4120, 1996 WL
787969 (Oct. 11, 1996).

NEFSA tries to frame what it calls the Regional Council's "rule-
developing power," (Br. at 4, 5, 8, 10, 20, 26, 27, 35, 39, 45, 46, 48, 50,
51), as exercising significant federal authority. But "substantial
practical authority to develop and coordinate policy" is not significant
authority absent legal power. Bradbury Memo, 31 Op. O.L.C. at 98.
"[M]ere authority to advise," *id.*, does not give members significant
authority to execute or administer the law. There is a material
difference between the "power to *develop* binding federal regulations,"
(Br. at 8 (emphasis added)), and the power to promulgate them and
thereby actually create legal obligations.

The Supreme Court recently made this line clear in *Kennedy v.
Braidwood Management, Inc.*, 145 S. Ct. 2427 (2025). In that case,
which principally concerns whether U.S. Preventive Services Task
Force members are principal or inferior officers, the Court explained
that Task Force members were not officers at all until the Affordable
Care Act gave members authority to make *legally binding* decisions on
preventive care coverage requirements. In 1984, the Department of

Health & Human Services (HHS) established the Task Force as a periodic advisory committee. In 1999, Congress gave it statutory authority to make recommendations to HHS. Pub. L. No. 106-129, § 2(a), 113 Stat. 1659 (1999). Until 2010, however, Task Force recommendations "were still advisory" and its "members were mere employees." *Id.* at 2455. After the Affordable Care Act, Task Force members became "officers, not just employees," because "health insurers had to begin covering [Task Force recommended] services at no cost to the insured." *Ibid.* It was this authority to make "legally binding" determinations on coverage requirements that converted Task Force members into officers, even though the HHS Secretary could block Task Force recommendations from taking effect. *Id.* at 2445, 2457.

The mere ability to develop policy proposals, without the authority to decide and implement policy for the federal government, cannot be significant federal authority. Otherwise all kinds of federal employees who assist agency officials—not to mention federal advisory committee members, outside lobbyists, advocates, or participants in the notice and comment process—would also need to be officers of the United States.

NEFSA tries to avoid this conclusion by reframing the question as one of finality, arguing that the fact that the Secretary reviews the Council's proposals just means that Council members are *inferior* officers. (Br. at 49–51.) But this misses the point because it posits an initial *decision* by the government, lacking here, that is subject to review. To be sure, the fact that a decision is subject to *de novo* review (like, for instance, the district court's decision here) does not mean that the initial decision is not properly viewed as an exercise of significant sovereign power. But for this framework to apply, there still needs to be an initial *decision* that potentially has the force and effect of law.

Thus in *Braidwood*, Task Force members were not officers before 2010, despite statutory authority to make recommendations to the agency, because their role was merely advisory. *Id.* at 2455. They only became officers when the Affordable Care Act required health insurers *by law* to cover certain preventive services at no cost to the insured based on the Task Force's decision to recommend them. *Ibid.* Although the HHS Secretary could block the recommendations from taking effect, and thus could "review" the decision, it is the Task Force's ability to

make a "legally binding" initial decision that makes its members inferior officers. *Id.* at 2445, 2457.[10]

The same is true for the officers identified in other cases NEFSA cites. Regional Councils' inability to impose legally enforceable obligations on fishery participants distinguishes them from those officials that courts have found to violate the Appointments Clause. While NEFSA says these officials are "indistinguishable," (Br. at 26), each of these officers (unlike Council members) could make legally binding decisions.

The administrative law judges in *Lucia*, for example, "exercise[d] significant discretion" in "tak[ing] testimony, conduct[ing] trials, rul[ing] on the admissibility of evidence, and . . . enforc[ing] compliance with discovery orders." 585 U.S. at 247 (cleaned up). The Court found them to be officers because they exercised "nearly all the tools of federal

---

[10] Another difference also distinguishes Task Force members in *Braidwood* from Council members here. While the HHS Secretary could block Task Force recommendations from taking effect, 145 S.Ct. at 2444–45, he has no authority to issue binding preventive care recommendations of his own. By contrast, as explained above, the Commerce Secretary has ample authority to establish or amend fishery management plans and promulgate implementing regulations on his own, for instance, if he believes a fishery requires conservation and management measures and the Council has not acted in a "reasonable time." 16 U.S.C. § 1854(c)(1)(A).

trial judges" in proceedings against private parties and issued decisions that could be "deemed the action of the Commission" resolving legal matters without further review. *Id.* at 248–49; *see also Freytag*, 501 U.S. at 881–82, 891 (holding that Tax Court special trial judges— who "take testimony, conduct trials, … and … enforce compliance with discovery orders" and could "punish contempts by fine or imprisonment"—were inferior officers.). The authority to make these legal determinations—determinations that bound the parties appearing before them—made them officers.

NEFSA also cites *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022). (Br. at 53–54.) But that case is distinguishable because the Federal Trade Commission conceded that it could not review the Horseracing Integrity and Safety Authority's policy choices, *id.* at 872, and the relevant statute *expressly* provided that the Commission "shall approve" any rule proposed by the Authority that is consistent with the statute, *id.* at 884.

By contrast, here the Secretary has full discretion to approve or disapprove Council proposals, determines the content of any binding implementing regulations, can review Council proposals on policy

grounds, and has plenary authority to implement any measures he believes necessary if federal fisheries require conservation and management and the Council has failed to act. *See* Part I.A., *supra*. Indeed, the Magnuson-Stevens Act is more akin to the *amended* Horseracing Integrity and Safety Act, which gave the Commission "final say over any implementation of the Act relative to the Horseracing Authority." *Oklahoma v. United States*, 62 F.4th 221, 230 (6th Cir. 2023); *see* Add.139–43 (rejecting private nondelegation challenge based on comparison with the HISA).

NEFSA's complaint about Framework Adjustment 65 is essentially that the Assistant Administrator considered, approved, and promulgated it as proposed by the Council. But NEFSA misses the point: simply recommending proposals to duly authorized decisionmakers does not require *any* sovereign powers of the United States and so is not exercising significant discretion executing federal authority. "[M]erely render[ing] assistance to another in the performance of [the] functions [of government]" does not entail significant authority. *See* Bradbury Memo, 31 Op. O.L.C. at 98.

NEFSA's objection, (Br. at 46), that Regional Councils assemble the record supporting their own recommendations is similarly flawed. First, NMFS plays a central role in developing the record before the Councils. NMFS both is represented on each Council and provides technical support services necessary for the Councils' effective functioning, *see* 16 U.S.C. § 1852(f)(1)–(3). NMFS ensures that Councils consider a robust record that can inform and support both the Councils' recommendations and NMFS's consideration of them.

Second, the Council's record forms only part of the administrative record for any NMFS action. NMFS's administrative record necessarily extends beyond the Council's record, as evidenced by the notice-and-comment process every proposed plan, amendment, and implementing regulation undergoes. "Councilmembers here are only one part of the Secretary's information-gathering apparatus in deciding whether to approve and promulgate [a plan] or regulation." *Lofstad*, 2024 WL 836392, at *21. Nothing bars the Secretary from adding anything he wants to the administrative record.

NEFSA also ignores important differences between agency adjudication and rulemaking, relying on inapposite case law involving

creating a factual record for decisions in adjudicative proceedings. *See, e.g., Freytag*, 501 U.S. 868 (tax judges); *Lucia*, 585 U.S. 237 (Securities & Exchange Commission administrative law judges). Courts considering Appointments Clause challenges in the adjudication context have emphasized an adjudicator's ability to shape the factual record for any subsequent legal decision by managing discovery, deciding whether and when to compel the production of evidence, taking testimony, and similar decisions that drive adjudicative fact-finding.

But even if such actions could improperly constrain final decisionmakers in agency adjudications, those concerns do not translate to the rule-making context. Here, the Council's decisions about what to place in the record for *the Council's* recommendation do not limit what NMFS may consider in *NMFS's* rule-making decision. Rather, NMFS is fully empowered to add to the administrative record, and weigh, *any* information that arises from within the agency or through the notice-and-comment process even if it was not before the Council.

Finally, NEFSA also argues that Regional Council members have decisionmaking authority on behalf of the government because the Magnuson-Stevens Act provides that Council-proposed fishery

management plans or amendments "shall take effect as if approved" if the Secretary does not "notify a Council within 30 days of the end of the comment period" of his approval, disapproval, or partial approval. 16 U.S.C. § 1854(a)(3). But this argument again relies on improperly conflating fishery management plans and amendments—which create no legal obligations for fishery participants—with regulations that could bind such participants.

Setting aside the Secretary's ability to simply disapprove, section 1854(a)(3)'s "take effect" provision does not convey significant authority to Councils because plans and amendments themselves have no legal effect on fishery participants. As the district court explained, "a key factor distinguishes the Council proposals from the decisions of ALJs: without implementing regulations, [a fishery management plan] has no legal effect affecting private parties." (Add.131.)

Courts have long recognized that fishery management plans "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them." *N.C. Fisheries Ass'n*, 550 F.3d at 17. *See also Alaska Factory Trawler Assoc.*, 831 F2d at 1464 ("[A]pproval … of a fishery management plan or amendment does not

adversely affect anyone nor can it be considered final agency action.").
So even if a plan or amendment is "approved" by operation of
section 1854(a)(3), it remains entirely precatory, and without any direct
effect on fishery participants' legal rights or obligations, absent
implementing regulations. "There is no mechanism for the Council's
proposed regulations to take automatic effect." (Add.131.) Only the
Secretary can promulgate regulations that bind fisheries participants.

NEFSA argued below that the Magnuson-Stevens Act's provision
on emergency and interim measures to prevent overfishing, *see* 16
U.S.C. § 1855(c)(2), also conferred significant authority on Council
members by allowing them to compel Secretarial action by unanimous
vote. NEFSA does not advance that argument in its opening brief—
indeed, the provision is not mentioned or cited in the brief's argument
section—and so it has been forfeited. *Plumley v. Southern Container,
Inc.*, 303 F.3d 364, 372 n.7 (1st Cir. 2002). Regardless, "the Council
cannot force the Secretary to take any particular action" and "the
Secretary can and does block unanimous votes by having her designee
(the Regional Director) vote against all such measures." *Lofstad*, 117
F.4th at 500–01. This is therefore not significant authority.

In sum, Councils are strictly advisory bodies. Council members do not wield "significant discretion" carrying out "important functions," *cf. Lucia*, 585 U.S. at 247–48, and are not officers of the United States.

### D. The Court must construe any ambiguity in the Magnuson-Stevens Act to avoid constitutional doubt.

For these reasons, the Magnuson-Stevens Act does not assign significant authority to Regional Councils. But even if the Court found some ambiguity about whether any particular provision might afford Council members significant authority, constitutional avoidance requires reading such provisions to assign Councils an advisory role.

NEFSA asks this Court to draw inferences from the Magnuson-Stevens Act's text and to find that those inferences empower the Regional Councils with significant authority to create limitations on the Secretary's ability to act. But the extra-textual limitations NEFSA reads into the Act cannot be reconciled with the Act's plain text or broader structure. The best reading of the Act is that Congress expressly assigned the Secretary broad authority to implement the Act, *see, e.g.*, 16 U.S.C. § 1855(d), and to act if Regional Councils fail to make necessary proposals, *see id.* § 1854(c); and Congress included

multiple textual indications that Councils play an advisory role only, *see* Part I.B., *infra*.

But even if NEFSA's reading of the Magnuson-Stevens Act were reasonable, constitutional avoidance would still require the Court to conclude that the Regional Council's role is advisory. NEFSA's claim that the Act's Council structure violates the Appointments Clause rests on extravagant inferences and extrapolation, not unambiguous statutory text. This interpretive approach—arguing the Act's penumbral emanations create constitutional problems—contravenes the Court's duty to construe statutes to avoid constitutional doubt. The Court should not find the Act to authorize unconstitutional Council actions unless its plain terms unambiguously do so.

Instead, the Court should construe the Magnuson-Stevens Act to avoid constitutional doubt. As the Third Circuit found in *Lofstad*, the Act does not "expressly" limit the Secretary's considerations when reviewing Council recommendations, and to avoid the constitutional issue that reading such limitations into the Act might create, the court "adopt[ed] the government's reasonable reading" of the Act. *See* 117 F.4th at 500.

60

This is precisely how the Supreme Court recently approached ambiguous provisions in another Appointments Clause context in *Braidwood*. Plaintiffs there argued that a statutory provision on independence should be read to limit the Secretary's authority to supervise the work of the U.S. Preventive Services Task Force, but the Court found that "constitutional avoidance" counseled "against adopting [Plaintiff's] expansive interpretation." 145 S. Ct. at 2451. The Court further held that "[w]e should not read the statute in a way that makes the current method of appointment … unconstitutional if we can reasonably read it otherwise." *Ibid.*

This plain directive confirms that the Third Circuit's approach in *Lofstad* was proper; there the court adopted the government's reasonable reading of the Magnuson-Stevens Act to avoid the constitutional issues that would result from a more constrictive reading. And the *Braidwood* Court again turned to avoidance to resolve a question about the Secretary's authority to appoint Task Force members. *Id.* at 2460–61. This recent precedent in the Appointments Clause context marks the right path forward even if the Court finds

some merit in NEFSA's contention that the Act could be read to restrict the Secretary's policy discretion.

NEFSA fails to demonstrate, as they must, that the Act *unambiguously* empowers Council recommendations to constrain the Secretary. As the district court and Third Circuit recognized, Federal Defendants have a "proffered interpretation" of the Act "that is rooted in the statutory text and structure" and "would avoid [a] constitutional violation." *Cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 230 (2020). If there is a "fairly possible" reading of the Act that is consistent with the Constitution, "the canon of constitutional avoidance would [] counsel [] to adopt it." *See Hansen*, 599 U.S. at 781 (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)). It is at least "fairly possible" to read the Act to convey only advisory responsibilities to Regional Councils. And any ambiguity must be construed to avoid—rather than create—constitutional doubts. The Court should "seek harmony" and confirm the Councils' advisory role, rather than take up NEFSA's invitation "to manufacture conflict," *Hansen*, 599 U.S. at 781.

II. **NEFSA cannot rely on two rarely invoked ancillary provisions that played no role in the challenged agency actions.**

A. **NEFSA lacks standing to raise constitutional concerns about statutory provisions unrelated to the challenged agency actions.**

NEFSA lacks standing to raise constitutional concerns regarding Magnuson-Stevens Act sections 1854(c)(3) and 1854(h). NEFSA relies on these provisions, which played no role in Framework Adjustment 65 or the Final Rule, even though NEFSA itself concedes they are "*not even at issue.*" (Br. at 4.) Plaintiffs typically do not have standing to challenge statutory provisions without establishing a cognizable injury traceable to their operation.

To establish Article III standing, plaintiffs must show that they have suffered "a concrete, particularized injury fairly traceable to the defendants' conduct *in enforcing the specific statutory provision* they attack as unconstitutional." *California v. Texas*, 593 U.S. 659, 680 (2021) (emphasis added). Here, NEFSA asserts that the Final Rule updated commercial annual catch limits in a manner that injures NEFSA's members. NEFSA's constitutional argument principally relies, however, on provisions of the Magnuson-Stevens Act that played no role

63

whatsoever in the development of those catch limits. (*See*, *e.g.*, Br. at 30 (citing 16 U.S.C. § 1854(h) (concerning the repeal of fishery management plans); *id.* § 1854(c)(3) (regarding the implementation of limited access systems).)[11] NEFSA's alleged injury does not relate to any effort to establish a limited access system or to repeal or revoke a plan. While NEFSA argues that sections 1854(c)(3) and 1854(h) improperly empower Council members to block Secretarial action, those provisions are not implicated here—as NEFSA concedes, these provisions are "*not even at issue*." (Br. at 4.) This case instead involves a routine decision by the Assistant Administrator to approve and implement a framework adjustment proposed by the Council.

Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U. S. 367, 379 (2024) (quoting *Allen v. Wright*, 468 U.S.

---

[11] NEFSA's brief also cites 16 U.S.C. § 1856(a)(3)(B), (Br. at 13), but NEFSA conceded to the district court that it had not relied upon that provision, (Add.126 (Op. at 124 n.9)), and so it is forfeited. *See Teamsters Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir.1992) (explaining that arguments not advanced in the district court cannot be raised for the first time on appeal).

737, 760 (1984)). *See also id.* (explaining that the point of standing doctrine is to ensure that "courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing'" because "legal questions presented to the court" should be resolved "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.") (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)). NEFSA has no "personal stake" in whether the two severed provisions confer significant authority on Regional Council members; with respect to the operation of those provisions, NEFSA is nothing more than a "bystander." *Id.* at 379 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

NEFSA's only response is to point to *Freytag*, 501 U.S. 868. (Br. at 33–35.) In *Freytag*, the Supreme Court held that the Tax Court's special trial judges were officers of the United States because they had the power to take testimony, conduct trials, rule on the admissibility of evidence, and enforce compliance with discovery orders. *See id.* at 881–882. The Court also noted that special trial judges could render

65

final decisions in certain cases. *See id.* at 882. The Court then observed that "[s]pecial trial judges are not inferior officers for purposes of some of their duties * * * but mere employees with respect to other responsibilities." *Ibid.*

Importantly, the Court in *Freytag* ultimately held that special trial judges' combination of different powers sufficed to make them officers of the United States, and that the exercise of at least some of those powers had directly injured the challengers. *See id.* at 881–82. Here, the purported constitutional violation did not arise from the combination of different provisions, some of which injured NEFSA. Rather, the only constitutional violation the district court found arose entirely because of two isolated provisions requiring the Secretary to obtain the Council's concurrence before taking certain actions. Neither provision has injured NEFSA and so it lacks standing to challenge them.

## B.    Severance would resolve any constitutional issue potentially raised by the two rarely invoked ancillary provisions NEFSA cites.

Even if the Court reaches these two ancillary provisions, however, severance would be the appropriate response, as both the district court

and the Third Circuit have held. "When confronting a constitutional flaw in a statute," the Court must "try to limit the solution to the problem" by disregarding the "problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of Northern New England,* 546 U.S. 320, 328–29 (2006); *accord Arthrex*, 594 U.S. at 23. The district court's approach follows the "normal rule" that "partial" rather than wholesale "invalidation is the required course," so as not to "nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329 (cleaned up). If the "remainder of the statute is 'capable of functioning independently' and thus would be 'fully operative' as a law," "[t]he Court's precedents reflect a decisive preference for surgical severance rather than wholesale destruction." *Barr v. Am. Ass'n of Pol. Consultants,* 140 S. Ct. 2335, 2350–52 (2020) (plurality opinion).

Severance of these two rarely invoked ancillary provisions here would be the appropriate "tailored approach." *Arthrex*, 594 U.S. at 25. The Regional Councils' advisory functions and the structured process that ensures the Secretary considers state and regional needs sit at the heart of Congress's approach to fisheries management. *See* 16 U.S.C. §§ 1801(b)(5), 1851–1855. These aspects of the Councils' role fully

comply with Appointments Clause requirements. Neither of the provisions severed by the district court play a central role in the fishery conservation and management structure Congress established. In fact, to agency counsels' recollection, a Secretarial proposal has never been blocked under either provision in nearly fifty years of experience under the Magnuson-Stevens Act, and even the question of repeal or revocation of a plan has only arisen once. But the core structured recommendation process has played a central advisory role in the effective conservation and management of the nation's fishery resources under the Act for nearly half-a-century. Severing the two ancillary provisions would leave the Council's primary advisory functions intact, and the Act would "function[] independently" and remain "fully operative" as law. *Seila Law*, 591 U.S. at 235.

In *Arthrex*, the Supreme Court employed a similar approach to severance to eliminate an Appointments Clause violation. *Arthrex* addressed the officer status of judges serving on the Patent Trial and Appeal Board, an adjudicative body. The Court held that the patent judges exercised powers "incompatible with their appointment by the Secretary to an inferior office." 594 U.S. at 23. That incompatibility

arose from prohibitions on the relevant principal officer reviewing patent judge decisions, *see* 35 U.S.C. § 6(c), and prohibitions on removing those judges at will, *see* 5 U.S.C. § 7513. Together, these provisions "restrain[ed]" the principal officer from reviewing the decisions, which broke the "chain of command" between the Director and his subordinates. *Arthrex*, 594 U.S. at 15, 27.

The Court concluded any Appointments Clause violation could be eliminated by "a tailored approach": if the principal officer "were to have the 'authority to take control' of" adjudicative proceedings, then patent judges "would properly function as inferior officers." *Id.* at 25. So the Court severed 35 U.S.C. § 6(c) "to the extent that its requirements prevent the [principal officer] from reviewing final decisions rendered by" patent judges. *Ibid.* With this severance, the Court transformed patent judges from principal officers to inferior officers, an approach analytically analogous to the district court's approach here.

NEFSA's primary argument against the district court's severance of these two provisions rests on a basic mistake of law. NEFSA contends that the district court's remedy means Council members were "officers at the time they developed the catch limits … and employees on the day

of judgment." (Br. at 4; *see also* Br. at 23, 25, 38 ("After-the-fact judicial severance of the statutory scheme cannot retroactively validate an action tainted by a contemporaneous Appointments Clause violation.").) But as the Supreme Court has repeatedly explained, "[t]he principle that ... judicial decisions operate retrospectively[] is familiar to every law student." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311–12 (1994) (quoting *United States v. Security Industrial Bank*, 459 U.S. 70, 79 (1982)); *see also Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372 (1910) ("Judicial decisions have had retrospective operation for near a thousand years") (Holmes, J., dissenting).

A judicial decision severing these provisions does not effect an "after-the-fact" change in the status of Council members from officers to non-officers. Instead, it simply states what the law is and always has been. If those provisions are constitutionally problematic, they were displaced by the Constitution immediately on the day of enactment, not altered by the courts on "the day of judgment." As Third Circuit Judge Bibas explained sitting by designation for the District of Delaware, "[a] severance ruling, like any other ruling, says only what the law is and has always been." *Franklin v. Navient, Inc.*, 534 F.Supp.3d 341, 345

(D.Del. 2021); *see* William Baude*, Severability First Principles*, 109 U. Va. L. Rev. 1, 5–9 (2021) (explaining that a judicial determination that the Constitution displaces a conflicting statutory provision is just a statement of "what the law is" and not a remedy that changes the law).

"A judicial construction of a statute is an authoritative statement of what the statute meant *before as well as after the decision* of the case giving rise to that construction." *Rivers*, 511 U.S. at 312–13 (emphasis added). That is, "federal courts cannot "'change[ ]" the law'; they can only, in deciding cases, say what a law 'has meant continuously since the date when it became law.'" *Navient*, 534 F.Supp.3d at 345 (quoting *Rivers*, 511 U.S. at 313 n.12) (alteration original). Thus, "[w]hen a court finds a law unconstitutional, it finds that it is 'void, and is as no law' from the day it is passed ... It never took effect as written." *Id.* (quoting *Ex parte Siebold*, 100 U.S. 371, 376 (1879)).

The conceit underlying NEFSA's critique of the severance holding—that it meant the Council members were officers at one time and then became non-officers at another with the district court's judgment—thus rests on a mistaken premise. All the district court did, in severing the provisions, was determine what the law is, and always

71

has been; the status of Council members as non-officers has never changed. This was true "at the time" of the challenged action just as much as at the time of judgment. (*Cf.* Br. at 38.)

NEFSA also argues that the district court's approach does too much to rework the statute, and the court instead should have vacated the Final Rule because the Council members were not nominated by the President and confirmed by the Senate, calling every Council-proposed fishery management measure in the past fifty years into question. Alternatively, NEFSA suggests the Court strike the appointment provisions for Regional Council members, effectively invalidating every Council member appointment over the past fifty years, calling all their actions into question, and effectively rendering the participation of state officials in the Council's advisory process impossible. While NEFSA tries to downplay its request by saying it does not seek "wholesale invalidation of the Act," (Br. at 45), this blunderbuss approach— striking down the core features of the Act and calling a half-century of fishery regulation into question—does not comport with the Supreme Court's directive to "use a scalpel rather than a bulldozer" to cure constitutional defects. *Seila Law*, 591 U.S. at 237.

The district court's narrower approach—severing two minor outlier provisions that are not central to the Act's operations—is more faithful to the Act's text and structure and Congress's purposes. Plaintiff even concedes the likely result of its proposal would simply be the Secretary taking direct action to manage federal fisheries without state or regional input. (Br. at 45 (describing the Secretary's authority to "regulate unilaterally").) Reviewing the Act as a whole, it is clear that Congress would have preferred Regional Councils with advisory input to no Councils at all.[12]

NEFSA also claims the district court's narrow approach somehow contradicts the Supreme Court's approach in *Free Enterprise Fund*. (Br. at 5, 26, 37–38, 40–41.) But this shows a misunderstanding of that case. The Supreme Court found that the Public Company Accounting Oversight Board had wide-ranging enforcement and rulemaking powers constituting significant authority, and that reworking the statute to remove all of these various authorities would effectively rewrite the statute, fundamentally change the operation of the Board as Congress

---

[12] The district court's approach would not, as NEFSA confusingly claims, "permit the judiciary effectively to create whole new offices Congress did not 'establish by Law.'" (Br. at 41–42.)

had intended it, and therefore exceed the Court's authority to negate statutory provisions that are repugnant to the Constitution. 561 U.S. at 508–10. Contrary to NEFSA's claim, this reasoning does not reflect any "rule" against negating provisions that grant significant authority but instead a rule against fundamentally reworking a statute in multiple ways in a manner that's more akin to legislation than merely negating provisions that are repugnant to the Constitution.

Simply negating two rarely invoked ancillary provisions, as the district court did here, does not work that sort of fundamental rewriting of the Magnuson-Stevens Act. Instead, it simply disregards the problematic portions of the Act while remaining faithful to Congress's purpose of conserving and maintaining the nation's fishery resources in a manner informed by state and regional input. "Constitutional litigation is not a game of gotcha against Congress, where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Barr v. Am. Ass'n of Pol. Consultants,* 140 S. Ct. 2335, 2351 (2020) (plurality opinion). This Court should not follow NEFSA's suggestion to do so here.

III.   NEFSA is not entitled to relief against the Final Rule.

    A.   Provisions the Court construes to unambiguously empower Council recommendations to restrict the Secretary's policy discretion should be severed.

The same severance analysis would hold if the Court were to conclude that the Magnuson-Stevens Act somehow improperly empowers Council recommendations to constrain the Secretary's decisions on fishery conservation and management policy. That is not the best reading of the Act's text and structure, *see* Part I.A., *supra*, and even if the text were ambiguous, constitutional avoidance requires reading the Act to avoid rather than seek out constitutional problems, *see* Part I.D., *supra*. But if the Court were to conclude that the Act *unambiguously* empowers Regional Councils to constrain the Secretary's discretion in a manner that constitutes significant authority, then the proper response is likewise to sever any constitutionally problematic constraints.

Construing the Magnuson-Stevens Act to give the Regional Councils only an advisory role would properly "limit the solution to the problem" and disregard the "problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328–29. If the Court concludes

that sections 1854(a)(1)(A) and 1854(b)(1) somehow unconstitutionally constrained the Secretary's review, the Constitution displaces those constraints, and the Court should sever them to the extent the Constitution requires. For instance, the Court might make clear that sections 1854(a)(1)(A) and 1854(b)(1) do not limit the Secretary's discretion to consider other lawful factors, and so the Secretary retains full discretion to decide whether to approve or disapprove any plan or amendment and to revise proposed implementing.

This "tailored approach" would sever the Magnuson-Stevens Act's provisions to the extent they prevent the Secretary from exercising his full discretion when reviewing Regional Council proposals and would make clear that Councils play only an advisory role. Severing any unconstitutional constraints on the Secretary's review of Council proposals would mirror how *Arthrex* severed the constraints in 35 U.S.C. § 6(c), thereby permitting the principal officer to review and reject decisions by patent judges.

Adopting such an approach would also be the narrowest possible modification to the scheme Congress created with the Magnuson-Stevens Act and would cure any constitutional violation. Contrary to

76

NEFSA's claims, doing so would not require "blue-penciling" a large part of the Act because any perceived constraints on the Secretary's review of Council recommendations comes only from reading extra-textual inferences into the Act. No express textual limitations would need to be negated.

Given Congress's purposes in enacting the Act—to prevent overfishing, rebuild overfished stocks, and provide for sound conservation and management of federal fisheries informed by state and regional voices—there is no doubt Congress would prefer an Act where the Secretary regulates federal fisheries based on the advice of Regional Councils to one where the Secretary was disempowered from using the Councils and instead regulates fisheries himself through sections 1854(c) and 1855(d) without state or regional input. *Cf. Free Enterprise Fund*, 561 U.S. at 509 ("[N]othing in the statute's text or historical context made it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will.") (cleaned up). This approach here would correctly leave the Magnuson-Stevens Act an independently functioning, fully operative law.

## B.     NEFSA has not shown any injury resulting from any constitutional infirmity in Regional Councils.

NEFSA also has not shown that any putative constitutional infirmity in New England Council members' appointments caused any injury they suffer. Setting aside the fact that NEFSA has established no injury at all with respect to most aspects of the Final Rule or Framework Adjustment 65, *see* pp. 84–85, *infra*, NEFSA has only alleged injury from the Final Rule's revised catch limits for four fish stocks. But NEFSA cannot show that the asserted constitutional violation caused these alleged injuries. Instead, any injury here flows from the Assistant Administrator's independent decision to promulgate the Final Rule.

NEFSA identifies no substantive infirmity in the Final Rule and does not dispute that the Assistant Administrator is a properly appointed inferior officer duly authorized to exercise the Secretary's Magnuson-Stevens Act authorities. NEFSA has not alleged any violations of the National Standards or other provisions of the Act or challenged the Assistant Administrator's decision as arbitrary, capricious, or an abuse of discretion. NEFSA merely takes issue with the Council's role in providing its recommendation. But that

recommendation was purely advisory, and longstanding Executive Branch practice required treating it so regardless. Consequently, the Assistant Administrator independently reviewed the proposed revisions and reached an independent decision to promulgate regulations implementing them.

The Final Rule therefore reflects the Assistant Administrator's substantive view on what the revised catch limits and specifications for the four fish stocks should be. And even without the Council's recommendation, the Assistant Administrator would have had authority to make the same revisions if she had concluded it was necessary for "conservation and management" of the fishery and the Council failed "to develop and submit" an amendment in "a reasonable period of time," 16 U.S.C. § 1854(c)(1)(A), (c)(6). The Assistant Administrator's independent act imposing the revisions breaks any causal link between the Council's action and injury to NEFSA.

This independent review and independent decision by the Assistant Administrator to approve and implement the revisions in the Final Rule functionally ratifies the Council's recommendations and thereby cures any defect arising from the Council's structure. In the

rulemaking context, such an independent review and decision by a duly appointed politically accountable officer is all NEFSA is entitled to under the Appointments Clause.[13]

Other Courts of Appeals have recognized that an independent review and decision on a regulation by a duly appointed officer suffices to cure an Appointments Clause defect. *See Moose Jooce v. FDA*, 981 F.3d 26, 28 (D.C. Cir. 2020) (holding that ratification of rule by duly appointed officer "cured any Appointments Clause defect"), *cert. denied*, 141 S. Ct. 2854 (2021); *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 11 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019); *Kajmowicz v. Whitaker*, 42 F.4th 138, 147 (3d Cir. 2022). Importantly, this independent review cures any Appointments Clause issue *on the merits* by providing an independent

---

[13] NEFSA relies heavily on Appointments Clause cases from the adjudication context rather than the rulemaking context. But curing an Appointments Clause violation in the adjudication context may require something more than in the rulemaking context, such as a new hearing before a duly appointed officer, given the unique ways in which interstitial decisionmaking during the trial process can shape the adjudications. *See*, *e.g.*, *Lucia*, 585 U.S. at 247; *Freytag*, 501 U.S. at 881–82, 891. That concern does not apply to the rulemaking context, however, because, unlike in adjudications, there is no set record that constrains the final decisionmaker or limits his considerations.

decision by a duly appointed, politically accountable officer. And, as noted above, assuming NEFSA is correct that the Council's proposed Framework Adjustment was invalid (and thus the Secretary would not have received any valid Council proposal addressing the issues "in a reasonable time"), the Assistant Administrator would have had full authority to impose any required conservation or management measures on the fishery on her own. 16 U.S.C. § 1854(c)(1)(A).

### C.    NEFSA's removal claims are not relevant here.

Because Council members are not officers of the United States, *see* Part I, *supra*, the terms for their removal have no bearing on the lawfulness of any recommendations they provide to the Secretary. There is no requirement that the Secretary weigh advice only from persons subject to at-will removal. The Secretary can simply disregard the advice rather than remove the official.

Besides, there is no need to reach NEFSA's removal arguments here. If the Court concludes that (1) the Magnuson-Stevens Act *unambiguously* confers significant federal authority on Regional Council members; (2) the provisions of the Act that confer significant authority on Council members are *not* severable; and (3) the Assistant

Administrator's independent review and decision to promulgate the Final Rule did *not* functionally ratify the Final Rule or otherwise break the chain of causation between any alleged infirmity in the Council structure and NEFSA's alleged injuries from the Final Rule, NEFSA will be already be entitled to remand and some remedy. A different outcome on any of these issues would resolve the case before the Court reaches the removal question. Contrary to NEFSA's suggestion, (Br. at 60), there is no need to reach or provide relief on removal.

Regardless, NEFSA has failed to state a cognizable removal claim. Even assuming that Council members are officers and the removal restrictions present constitutional concerns, NEFSA has failed show that they were injured by the removal restrictions. To obtain relief on a removal claim, NEFSA must show "compensable harm" or prejudice caused by the removal restriction *specifically in connection with* the challenged agency action.

The Supreme Court has made clear that to state a removal claim, plaintiffs must show that the restrictions on removal themselves caused their injury. As the Court has explained, the challenging party must demonstrate not only that the removal restriction violates the

Constitution but also that "the unconstitutional removal provision inflicted harm." *Collins v. Yellen*, 594 U.S. 220, 260 (2021). Several Circuits have since confirmed plaintiffs' obligation to make this causation showing. *See Comm. Fin. Servs. Ass'n v. Cons. Fin. Prot. Bd.*, 51 F.4th 616, 631–33 (5th Cir. 2022) ("Plaintiffs must demonstrate that the unconstitutional removal provision *caused them harm*.") (emphasis added); *id.* at 632 (identifying "three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor.").[14] NEFSA has failed to make this required showing.[15]

*    *    *

---

[14] *See also K&R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 179–181 (2d Cir. 2023); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849–850 (9th Cir. 2022); *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161, 1170–1171 (10th Cir. 2022); *Calcutt v. FDIC*, 37 F.4th 293, 316–317 (6th Cir. 2022).

[15] Plaintiff has abandoned on appeal any argument regarding the removability of the Deputy Assistant Administrator.

If this Court reverses on either the constitutionality of the Magnuson-Stevens Act's core recommendation process or severance of the two ancillary provisions, remand to the district court for further consideration of remedy would be necessary because there are questions about the relief sought by NEFSA that the district court should address in the first instance.

First, NEFSA improperly seeks relief directly targeting Framework Adjustment 65 rather than the Final Rule. (*See* JA-074 (seeking relief "[d]eclaring Framework Adjustment 65 . . . unlawful, unenforceable, and void" and "[v]acating Framework Adjustment 65").) But Congress has not waived sovereign immunity or provided a cause of action authorizing relief directly against fishery management plans or amendments. The Magnuson-Stevens Act's limited waiver of sovereign immunity expressly provides for judicial review only of "[*r*]*egulations* promulgated by the Secretary" and "actions that are taken by the Secretary *under regulations* which implement a fishery management plan." 16 U.S.C. § 1855(f)(1)–(2) (emphasis added). NEFSA's request for relief directly against the Framework Adjustment itself therefore exceeds Congress's carefully drawn limits in section 1855(f).

Second, NEFSA also seeks vacatur of the entire Final Rule and all of Framework Adjustment 65. The Final Rule implements multiple substantive measures in connection with sixteen groundfish stocks. But NEFSA made no meaningful effort to establish injury from each of those revisions, instead only alleging specific injury from four discrete changes: the reduction in the commercial annual catch limits for Georges Bank haddock, the Gulf of Maine haddock, and white hake, as well as the revised rebuilding plan for cod. (JA-043–44 (Compl. ¶¶ 75–76); JA-061–62 (Compl. ¶¶ 127); JA-077–78 (Decl. of David Osier ¶¶ 9–13); JA-083–84 (Decl. of Devyn Campbell ¶¶ 11–13); Br. at 15–16.) Without a showing of injury, NEFSA lacks standing to challenge or seek relief regarding any other aspect of the Framework Adjustment.

# CONCLUSION

This Court should affirm the district court, but should not reach

the merits on the two provisions severed by the district court.

Respectfully submitted,

s/ *John E. Bies*
ADAM R.F. GUSTAFSON
Acting Assistant Attorney
General

THEKLA HANSEN-YOUNG
DANIEL HALAINEN
JOHN E. BIES
Attorneys
Environment and Natural
Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

August 4, 2025
90-8-8-08667

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i), because, excluding the parts of the document exempted by Rule 32(f), this document contains 15,274 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century font.

s/ *John E. Bies*
JOHN E. BIES
Counsel for Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, I electronically filed the

foregoing answering brief using the court's CM/ECF system, which will

notify all registered counsel.


s/ *John E. Bies*
JOHN E. BIES

Counsel for Federal Defendants

# ADDENDUM

The Appointments Clause,
　　U.S. Const. Art. 2, § 2, cl. 2 ........................................................... 2a

The Magnuson-Stevens Act,
　　16 U.S.C. § 1801 ........................................................................... 3a

　　16 U.S.C. § 1851 ........................................................................... 8a

　　16 U.S.C. § 1852 (excerpts) ....................................................... 10a

　　16 U.S.C. § 1853 ......................................................................... 23a

　　16 U.S.C. § 1854 (excerpts) ....................................................... 32a

　　16 U.S.C. § 1855 (excerpts) ....................................................... 38a

Constitution of the United States

Article II. The President

Const. Art. II § 2, cl. 2

**Section 2, Clause 2. Treaty Making Power; Appointing Power**

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter I. Generally

16 U.S.C. § 1801

## § 1801. Findings, purposes and policy

(a) Findings

The Congress finds and declares the following:

(1) The fish off the coasts of the United States, the highly migratory species of the high seas, the species which dwell on or in the Continental Shelf appertaining to the United States, and the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.

(2) Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls, or (C) direct and indirect habitat losses which have resulted in a diminished capacity to support existing fishing levels.

(3) Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage,

interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fishermen.

(4) International fishery agreements have not been effective in preventing or terminating the overfishing of these valuable fishery resources. There is danger that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented.

(5) Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

(6) A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources.

(7) A national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry, including bottom fish off Alaska, is necessary to assure that our citizens benefit from the employment, food supply, and revenue which could be generated thereby.

(8) The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States.

(9) One of the greatest long-term threats to the viability of commercial and recreational fisheries is the continuing loss of marine, estuarine, and other aquatic habitats. Habitat considerations should receive increased attention for the conservation and management of fishery resources of the United States.

**(10)** Pacific Insular Areas contain unique historical, cultural, legal, political, and geographical circumstances which make fisheries resources important in sustaining their economic growth.

**(11)** A number of the Fishery Management Councils have demonstrated significant progress in integrating ecosystem considerations in fisheries management using the existing authorities provided under this chapter.

**(12)** International cooperation is necessary to address illegal, unreported, and unregulated fishing and other fishing practices which may harm the sustainability of living marine resources and disadvantage the United States fishing industry.

**(13)** While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector.

**(b)** Purposes

It is therefore declared to be the purposes of the Congress in this chapter--

**(1)** to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States, by exercising (A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983, and (B) exclusive fishery management authority beyond the exclusive economic zone over such anadromous species and Continental Shelf fishery resources;

**(2)** to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species, and to encourage the negotiation and implementation of additional such agreements as necessary;

(3) to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

(4) to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery;

(5) to establish Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans under circumstances (A) which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such plans, and (B) which take into account the social and economic needs of the States;

(6) to encourage the development by the United States fishing industry of fisheries which are currently underutilized or not utilized by United States fishermen, including bottom fish off Alaska, and to that end, to ensure that optimum yield determinations promote such development in a non-wasteful manner; and

(7) to promote the protection of essential fish habitat in the review of projects conducted under Federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.

(c) Policy

It is further declared to be the policy of the Congress in this chapter--

(1) to maintain without change the existing territorial or other ocean jurisdiction of the United States for all purposes other than the conservation and management of fishery resources, as provided for in this chapter;

(2) to authorize no impediment to, or interference with, recognized legitimate uses of the high seas, except as necessary for the

conservation and management of fishery resources, as provided for in this chapter;

(3) to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

(4) to permit foreign fishing consistent with the provisions of this chapter;

(5) to support and encourage active United States efforts to obtain internationally acceptable agreements which provide for effective conservation and management of fishery resources, and to secure agreements to regulate fishing by vessels or persons beyond the exclusive economic zones of any nation;

(6) to foster and maintain the diversity of fisheries in the United States; and

(7) to ensure that the fishery resources adjacent to a Pacific Insular Area, including resident or migratory stocks within the exclusive economic zone adjacent to such areas, be explored, developed, conserved, and managed for the benefit of the people of such area and of the United States.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1851

### § 1851. National standards for fishery conservation and management

(a) In general

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

 (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

 (2) Conservation and management measures shall be based upon the best scientific information available.

 (3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

 (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

 (5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources;

except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

(b) Guidelines

The Secretary shall establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1852 (excerpts)

§ 1852. Regional Fishery Management Councils

(a) Establishment

(1) There shall be established, within 120 days after April 13, 1976, eight Regional Fishery Management Councils, as follows:

* * * * *

(A) New England Council

The New England Fishery Management Council shall consist of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except as provided in paragraph (3)). The New England Council shall have 18 voting members, including 12 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State).

* * * * *

(2) Each Council shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority.

(3) The Secretary shall have authority over any highly migratory species fishery that is within the geographical area of authority of more than one of the following Councils: New England Council, Mid-Atlantic Council, South Atlantic Council, Gulf Council, and Caribbean Council.

**(b) Voting members**

(1) The voting members of each Council shall be:

(A) The principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official.

(B) The regional director of the National Marine Fisheries Service for the geographic area concerned, or his designee, except that if two such directors are within such geographical area, the Secretary shall designate which of such directors shall be the voting member.

(C) The members required to be appointed by the Secretary in accordance with paragraphs (2) and (5).

(2)(A) The members of each Council required to be appointed by the Secretary must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned. Within nine months after November 28, 1990, the Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph.

**(B)** The Secretary, in making appointments under this section, shall, to the extent practicable, ensure a fair and balanced apportionment, on a rotating or other basis, of the active participants (or their representatives) in the commercial and recreational fisheries under the jurisdiction of the Council. On January 31, 1991, and each year thereafter, the Secretary shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives a report on the actions taken by the Secretary to ensure that such fair and balanced apportionment is achieved. The report shall--

    **(i)** list the fisheries under the jurisdiction of each Council, outlining for each fishery the type and quantity of fish harvested, fishing and processing methods employed, the number of participants, the duration and range of the fishery, and other distinguishing characteristics;

    **(ii)** assess the membership of each Council in terms of the apportionment of the active participants in each such fishery; and

    **(iii)** state the Secretary's plans and schedule for actions to achieve a fair and balanced apportionment on the Council for the active participants in any such fishery.

**(C)** The Secretary shall appoint the members of each Council from a list of individuals submitted by the Governor of each applicable constituent State. A Governor may not submit the names of individuals to the Secretary for appointment unless the Governor has determined that each such individual is qualified under the requirements of subparagraph (A) and unless the Governor has, to the extent practicable, first

consulted with representatives of the commercial and recreational fishing interests of the State regarding those individuals. Each such list shall include the names and pertinent biographical data of not less than three individuals for each applicable vacancy and shall be accompanied by a statement by the Governor explaining how each such individual meets the requirements of subparagraph (A). The Secretary shall review each list submitted by a Governor to ascertain if the individuals on the list are qualified for the vacancy on the basis of such requirements. If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor of that determination. The Governor shall then submit a revised list or resubmit the original list with an additional explanation of the qualifications of the individual in question. An individual is not eligible for appointment by the Secretary until that individual complies with the applicable financial disclosure requirements under subsection (k).

* * * * *

(E) Whenever the Secretary makes an appointment to a Council, the Secretary shall make a public announcement of such appointment not less than 45 days before the first day on which the individual is to take office as a member of the Council.

(3) Each voting member appointed to a Council by the Secretary in accordance with paragraphs (2) and (5) shall serve for a term of 3 years; except that the Secretary may designate a shorter term if necessary to provide for balanced expiration to terms of office. No member appointed after January 1, 1986, may serve more than three consecutive terms. Any term in which an individual was appointed to replace a member who left office during

the term shall not be counted in determining the number of consecutive terms served by that Council member.

**(4)** Successors to the voting members of any Council shall be appointed in the same manner as the original voting members. Any individual appointed to fill a vacancy occurring prior to the expiration of any term of office shall be appointed for the remainder of that term.

* * * * *

### (c) Nonvoting members

**(1)** The nonvoting members of each Council shall be:

**(A)** The regional or area director of the United States Fish and Wildlife Service for the geographical area concerned, or his designee.

**(B)** The Commander of the Coast Guard district for the geographical area concerned, or his designee; except that, if two Coast Guard districts are within such geographical area, the commander designated for such purpose by the commandant of the Coast Guard.

**(C)** The executive director of the Marine Fisheries Commission for the geographical area concerned, if any, or his designee.

**(D)** One representative of the Department of State designated for such purpose by the Secretary of State, or his designee.

* * * * *

### (d) Compensation and expenses

The voting members of each Council who are required to be appointed by the Secretary and who are not employed

by the Federal Government or any State or local government, shall receive compensation at the daily rate for GS-15, step 7 of the General Schedule, when engaged in the actual performance of duties for such Council. The voting members of each Council, any nonvoting member described in subsection (c)(1)(C), and the nonvoting member appointed pursuant to subsection (c)(2) shall be reimbursed for actual expenses incurred in the performance of such duties, and other nonvoting members and Council staff members may be reimbursed for actual expenses.

## (e) Transaction of business

(1) A majority of the voting members of any Council shall constitute a quorum, but one or more such members designated by the Council may hold hearings. All decisions of any Council shall be by majority vote of the voting members present and voting.

(2) The voting members of each Council shall select a Chairman for such Council from among the voting members.

(3) Each Council shall meet at appropriate times and places in any of the constituent States of the Council at the call of the Chairman or upon the request of a majority of its voting members.

(4) If any voting member of a Council disagrees with respect to any matter which is transmitted to the Secretary by such Council, such member may submit a statement to the Secretary setting forth the reasons for such disagreement. The regional director of the National Marine Fisheries Service serving on the Council, or the regional director's designee, shall submit such a statement, which shall be made available to the public upon request, if the regional director disagrees with any such matter.

(5) At the request of any voting member of a Council, the Council shall hold a roll call vote on any matter before the Council. The official minutes and other appropriate records of any Council meeting shall identify all roll call votes held, the name of each voting member present during each roll call vote, and how each member voted on each roll call vote.

## (f) Staff and administration

(1) Each Council may appoint, and assign duties to, an executive director and such other full- and part-time administrative employees as the Secretary determines are necessary to the performance of its functions.

(2) Upon the request of any Council, and after consultation with the Secretary, the head of any Federal agency is authorized to detail to such Council, on a reimbursable basis, any of the personnel of such agency, to assist such Council in the performance of its functions under this chapter.

(3) The Secretary shall provide to each Council such administrative and technical support services as are necessary for the effective functioning of such Council.

(4) The Administrator of General Services shall furnish each Council with such offices, equipment, supplies, and services as he is authorized to furnish to any other agency or instrumentality of the United States.

(5) The Secretary and the Secretary of State shall furnish each Council with relevant information concerning foreign fishing and international fishery agreements.

(6) Each Council shall determine its organization, and prescribe its practices and procedures for carrying out its functions under this chapter, in accordance with such uniform standards as are prescribed by the Secretary. The

procedures of a Council, and of its scientific and statistical committee and advisory panels established under subsection (g), must be consistent with the procedural guidelines set forth in subsection (i)(2). Each Council shall publish and make available to the public a statement of its organization, practices, and procedures.

(7) The Secretary shall pay--

(A) the compensation and expenses provided for in subsection (d);

(B) appropriate compensation to employees appointed under paragraph (1);

(C) the amounts required for reimbursement of other Federal agencies under paragraphs (2) and (4);

(D) the actual expenses of the members of the committees and panels established under subsection (g); and

(E) such other costs as the Secretary determines are necessary to the performance of the functions of the Councils.

## (g) Committees and advisory panels

* * * * *

(4) The Secretary shall establish advisory panels to assist in the collection and evaluation of information relevant to the development of any fishery management plan or plan amendment for a fishery to which subsection (a)(3) applies. Each advisory panel shall participate in all aspects of the development of the plan or amendment; be balanced in its representation of commercial, recreational, and other interests; and consist of not less than 7 individuals who are knowledgeable about the fishery for

which the plan or amendment is developed, selected from among--

    **(A)** members of advisory committees and species working groups appointed under Acts implementing relevant international fishery agreements pertaining to highly migratory species; and

    **(B)** other interested persons.

\* \* \* \* \*

## (h) Functions

Each Council shall, in accordance with the provisions of this chapter--

    **(1)** for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary (A) a fishery management plan, and (B) amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed);

    **(2)** prepare comments on any application for foreign fishing transmitted to it under section 1824(b)(4)(C) of this title or section 1824(d) of this title, and any fishery management plan or amendment transmitted to it under section 1854(c)(4) of this title;

    **(3)** conduct public hearings, at appropriate times and in appropriate locations in the geographical area concerned, so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans, and with respect to the administration and implementation of the provisions of this chapter (and for purposes of this paragraph, the term

"geographical area concerned" may include an area under the authority of another Council if the fish in the fishery concerned migrate into, or occur in, that area or if the matters being heard affect fishermen of that area; but not unless such other Council is first consulted regarding the conduct of such hearings within its area);

(4) submit to the Secretary such periodic reports as the Council deems appropriate, and any other relevant report which may be requested by the Secretary;

(5) review on a continuing basis, and revise as appropriate, the assessments and specifications made pursuant to section 1853(a)(3) and (4) of this title with respect to the optimum yield from, the capacity and extent to which United States fish processors will process United States harvested fish from, and the total allowable level of foreign fishing in, each fishery (except as provided in section4 subsection (a)(3)) within its geographical area of authority;

(6) develop annual catch limits for each of its managed fisheries that may not exceed the fishing level recommendations of its scientific and statistical committee or the peer review process established under subsection (g);

(7) develop, in conjunction with the scientific and statistical committee, multi-year research priorities for fisheries, fisheries interactions, habitats, and other areas of research that are necessary for management purposes, that shall--

(A) establish priorities for 5-year periods;

(B) be updated as necessary; and

(C) be submitted to the Secretary and the regional science centers of the National Marine Fisheries

Service for their consideration in developing research priorities and budgets for the region of the Council;

**(8)** in addition to complying with the standards and requirements under paragraph (6), sections 1851(a), 1853(a)(15), and 1854(e) of this title, and other applicable provisions of this chapter, have the authority to use fishery management measures in a recreational fishery (or the recreational component of a mixed-use fishery) in developing a fishery management plan, plan amendment, or proposed regulations, such as extraction rates, fishing mortality targets, harvest control rules, or traditional or cultural practices of native communities in such fishery or fishery component; and

**(9)** conduct any other activities which are required by, or provided for in, this chapter or which are necessary and appropriate to the foregoing functions.

## (i) Procedural matters

**(1)** Chapter 10 of Title 5 [Federal Advisory Committees] shall not apply to the Councils, the Council coordination committee established under subsection (l), or to the scientific and statistical committees or other committees or advisory panels established under subsection (g).

**(2)** The following guidelines apply with respect to the conduct of business at meetings of a Council, of the Council coordination committee established under subsection (l), and of the scientific and statistical committees or other committees or advisory panels established under subsection (g):

**(A)** Unless closed in accordance with paragraph (3), each regular meeting and each emergency meeting shall be open to the public.

**(B)** Emergency meetings shall be held at the call of the chairman or equivalent presiding officer.

**(C)** Timely public notice of each regular meeting and each emergency meeting, including the time, place, and agenda of the meeting, shall be provided by any means that will result in wide publicity in the major fishing ports of the region (and in other major fishing ports having a direct interest in the affected fishery), except that e-mail notification and website postings alone are not sufficient. Timely notice of each regular meeting shall also be published in the Federal Register. The published agenda of the meeting may not be modified to include additional matters for Council action without public notice or within 14 days prior to the meeting date, unless such modification is to address an emergency action under section 1855(c) of this title, in which case public notice shall be given immediately.

**(D)** Interested persons shall be permitted to present oral or written statements regarding the matters on the agenda at meetings. All written information submitted to a Council by an interested person shall include a statement of the source and date of such information. Any oral or written statement shall include a brief description of the background and interests of the person in the subject of the oral or written statement.

**(E)** Detailed minutes of each meeting of the Council, except for any closed session, shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all statements filed. The Chairman shall certify the accuracy of the minutes of each such meeting and submit a copy thereof to the Secretary. The minutes shall be made available to any court of competent jurisdiction.

**(F)** Subject to the procedures established under paragraph (4), and the guidelines prescribed by the Secretary under section 1881a(b) of this title, relating to confidentiality, the administrative record, including minutes required under subparagraph (E), of each meeting, and records or other documents which were made available to or prepared for or by the Council, committee, or panel incident to the meeting, shall be available for public inspection and copying at a single location in the offices of the Council or the Secretary, as appropriate.

* * * * *

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1853

§ 1853. Contents of fishery management plans

(a) Required provisions

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall--

(1) contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are--

(A) necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;

(B) described in this subsection or subsection (b), or both; and

(C) consistent with the national standards, the other provisions of this chapter, regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law;

(2) contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interests in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any;

(3) assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification;

(4) assess and specify--

　(A) the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield specified under paragraph (3),

　(B) the portion of such optimum yield which, on an annual basis, will not be harvested by fishing vessels of the United States and can be made available for foreign fishing, and

　(C) the capacity and extent to which United States fish processors, on an annual basis, will process that portion of such optimum yield that will be harvested by fishing vessels of the United States;

(5) specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational,1 charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of,

and the actual processing capacity utilized by, United States fish processors;

(6) consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;

(7) describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under section 1855(b)(1)(A) of this title, minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat;

(8) in the case of a fishery management plan that, after January 1, 1991, is submitted to the Secretary for review under section 1854(a) of this title (including any plan for which an amendment is submitted to the Secretary for such review) or is prepared by the Secretary, assess and specify the nature and extent of scientific data which is needed for effective implementation of the plan;

(9) include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for--

(A) participants in the fisheries and fishing communities affected by the plan or amendment;

25a

(B) participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants; and

(C) the safety of human life at sea, including whether and to what extent such measures may affect the safety of participants in the fishery;

(10) specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery;

(11) establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority--

(A) minimize bycatch; and

(B) minimize the mortality of bycatch which cannot be avoided;

(12) assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish;

(13) include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery, including its economic impact, and, to the extent practicable, quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors;

(14) to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery and;3

(15) establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

## (b) Discretionary provisions

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may--

(1) require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to--

(A) any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone or for anadromous species or Continental Shelf fishery resources beyond such zone;

(B) the operator of any such vessel; or

27a

(C) any United States fish processor who first receives fish that are subject to the plan;

(2)(A) designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specified types and quantities of fishing gear;

(B) designate such zones in areas where deep sea corals are identified under section 1884 of this title, to protect deep sea corals from physical damage from fishing gear or to prevent loss or damage to such fishing gear from interactions with deep sea corals, after considering long-term sustainable uses of fishery resources in such areas; and

(C) with respect to any closure of an area under this chapter that prohibits all fishing, ensure that such closure--

(i) is based on the best scientific information available;

(ii) includes criteria to assess the conservation benefit of the closed area;

(iii) establishes a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and

(iv) is based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures (either alone or in combination with such measures), including the benefits and impacts of limiting access to: users of the area, overall fishing activity, fishery science, and fishery and marine conservation;

(3) establish specified limitations which are necessary and appropriate for the conservation and management of the fishery on the--

> (A) catch of fish (based on area, species, size, number, weight, sex, bycatch, total biomass, or other factors);
>
> (B) sale of fish caught during commercial, recreational, or charter fishing, consistent with any applicable Federal and State safety and quality requirements; and
>
> (C) transshipment or transportation of fish or fish products under permits issued pursuant to section 1824 of this title;

(4) prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter;

(5) incorporate (consistent with the national standards, the other provisions of this chapter, and any other applicable law) the relevant fishery conservation and management measures of the coastal States nearest to the fishery and take into account the different circumstances affecting fisheries from different States and ports, including distances to fishing grounds and proximity to time and area closures;

(6) establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account--

> (A) present participation in the fishery;
>
> (B) historical fishing practices in, and dependence on, the fishery;

**(C)** the economics of the fishery;

**(D)** the capability of fishing vessels used in the fishery to engage in other fisheries;

**(E)** the cultural and social framework relevant to the fishery and any affected fishing communities;

**(F)** the fair and equitable distribution of access privileges in the fishery; and

**(G)** any other relevant considerations;

**(7)** require fish processors who first receive fish that are subject to the plan to submit data which are necessary for the conservation and management of the fishery;

**(8)** require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

**(9)** assess and specify the effect which the conservation and management measures of the plan will have on the stocks of naturally spawning anadromous fish in the region;

**(10)** include, consistent with the other provisions of this chapter, conservation and management measures that provide harvest incentives for participants within each gear group to employ fishing practices that result in lower levels of bycatch or in lower levels of the mortality of bycatch;

(11) reserve a portion of the allowable biological catch of the fishery for use in scientific research;

(12) include management measures in the plan to conserve target and non-target species and habitats, considering the variety of ecological factors affecting fishery populations; and

(14) prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery.

## (c) Proposed regulations

Proposed regulations which the Council deems necessary or appropriate for the purposes of--

(1) implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment under section 1854 of this title; and

(2) making modifications to regulations implementing a fishery management plan or plan amendment may be submitted to the Secretary at any time after the plan or amendment is approved under section 1854 of this title.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1854

§ 1854. Action by Secretary

(a) Review of plans

(1) Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall--

(A) immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law; and

(B) immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

(2) In undertaking the review required under paragraph (1), the Secretary shall--

(A) take into account the information, views, and comments received from interested persons;

(B) consult with the Secretary of State with respect to foreign fishing; and

(C) consult with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea and to fishery access adjustments referred to in section 1853(a)(6) of this title.

(3) The Secretary shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period under paragraph (1) by written notice to the Council. A notice of disapproval or partial approval shall specify--

(A) the applicable law with which the plan or amendment is inconsistent;

(B) the nature of such inconsistencies; and

(C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.

If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved.

(4) If the Secretary disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review under this subsection.

(5) For purposes of this subsection and subsection (b), the term "immediately" means on or before the 5th day after the day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final.

**(b) Review of regulations**

(1) Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and--

(A) if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes, for a public comment period of 15 to 60 days; or

(B) if that determination is negative, the Secretary shall notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the fishery management plan, plan amendment, this chapter, and other applicable law.

(2) Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation under paragraph (1).

(3) The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (1)(A). The Secretary shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations.

**(c) Preparation and review of Secretarial plans**

(1) The Secretary may prepare a fishery management plan, with respect to any fishery, or any amendment to any such plan, in accordance with the national standards, the other provisions of this chapter, and any other applicable law, if--

(A) the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a fishery management plan for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management;

(B) the Secretary disapproves or partially disapproves any such plan or amendment, or disapproves a revised plan or amendment, and the Council involved fails to submit a revised or further revised plan or amendment; or

(C) the Secretary is given authority to prepare such plan or amendment under this section.

(2) In preparing any plan or amendment under this subsection, the Secretary shall--

(A) conduct public hearings, at appropriate times and locations in the geographical areas concerned, so as to allow interested persons an opportunity to be heard in the preparation and amendment of the plan and any regulations implementing the plan; and

(B) consult with the Secretary of State with respect to foreign fishing and with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea.

(3) Notwithstanding paragraph (1) for a fishery under the authority of a Council, the Secretary may not include in any fishery management plan, or any amendment to any such plan, prepared by him, a provision establishing a limited access system, including any limited access privilege program, unless such system is first approved by a majority of the voting members, present and voting, of each appropriate Council.

(4) Whenever the Secretary prepares a fishery management plan or plan amendment under this section, the Secretary shall immediately--

    (A) for a plan or amendment for a fishery under the authority of a Council, submit such plan or amendment to the appropriate Council for consideration and comment; and

    (B) publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

(5) Whenever a plan or amendment is submitted under paragraph (4)(A), the appropriate Council must submit its comments and recommendations, if any, regarding the plan or amendment to the Secretary before the close of the 60-day period referred to in paragraph (4)(B). After the close of such 60-day period, the Secretary, after taking into account any such comments and recommendations, as well as any views, information, or comments submitted under paragraph (4)(B), may adopt such plan or amendment.

(6) The Secretary may propose regulations in the Federal Register to implement any plan or amendment prepared by the Secretary. In the case of a plan or amendment to which paragraph (4)(A) applies, such regulations shall be submitted to the Council with such plan or amendment. The comment period on proposed regulations shall be 60 days, except that the Secretary may shorten the comment period on minor revisions to existing regulations.

(7) The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (6). The Secretary must publish in the Federal Register an explanation of any substantive differences between the proposed and final rules. All final regulations must be consistent with the fishery management plan, with the national standards and other provisions of this chapter, and with any other applicable law.

* * * * *

## (h) Repeal or revocation of a fishery management plan

The Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council.

* * * * *

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1855

§ 1855. Other requirements and authority

* * * * *

**(c) Emergency actions and interim measures**

(1) If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing, without regard to whether a fishery management plan exists for such fishery.

(2) If a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a fishery management plan exists for such fishery--

(A) the Secretary shall promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by unanimous vote of the members who are voting members, requests the taking of such action; and

(B) the Secretary may promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by less than a unanimous vote, requests the taking of such action.

(3) Any emergency regulation or interim measure which changes any existing fishery management plan or amendment shall be treated as an amendment to such plan for the period in which such regulation is in effect. Any emergency regulation or interim measure promulgated under this subsection--

(A) shall be published in the Federal Register together with the reasons therefor;

(B) shall, except as provided in subparagraph (C), remain in effect for not more than 180 days after the date of publication, and may be extended by publication in the Federal Register for one additional period of not more than 186 days, provided the public has had an opportunity to comment on the emergency regulation or interim measure, and, in the case of a Council recommendation for emergency regulations or interim measures, the Council is actively preparing a fishery management plan, plan amendment, or proposed regulations to address the emergency or overfishing on a permanent basis;

(C) that responds to a public health emergency or an oil spill may remain in effect until the circumstances that created the emergency no longer exist, Provided, That the public has an opportunity to comment after the regulation is published, and, in the case of a public health emergency, the Secretary of Health and Human Services concurs with the Secretary's action; and

(D) may be terminated by the Secretary at an earlier date by publication in the Federal Register of a notice of termination, except for emergency regulations or interim measures promulgated under paragraph (2) in which case such early termination may be made only upon the agreement of the Secretary and the Council concerned.

## (d) Responsibility of Secretary

The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter. The Secretary may promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.

* * * * *

## (f) Judicial review

(1) Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that--

(A) section 705 of such title is not applicable, and

(B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.

(2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

(3)(A) Notwithstanding any other provision of law, the Secretary shall file a response to any petition filed in accordance with paragraph (1), not later than 45 days after the date the Secretary is served with that petition, except that the appropriate court may extend the period for filing such a response upon a showing by the Secretary of good cause for that extension.

(B) A response of the Secretary under this paragraph shall include a copy of the administrative record for the regulations that are the subject of the petition.

(4) Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

* * * * *